**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------

IN RE SOLAREDGE TECHNOLOGIES,
INC. SECURITIES LITIGATION

------------------------------------------------------

THIS DOCUMENT RELATES TO: ALL
ACTIONS

------------------------------------------------------

No. 1:23-cv-09748-GHW

**<u>CLASS ACTION</u>**

**<u>ORAL ARGUMENT REQUESTED</u>**

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO
<u>DISMISS THE CONSOLIDATED AMENDED COMPLAINT</u>**

GIBSON, DUNN & CRUTCHER LLP

Christopher D. Belelieu
Nathan C. Strauss
200 Park Avenue
New York, New York 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035

*Attorneys for Defendants*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ..................................................................................................... 3

    A.    SOLAREDGE IS AN INTERNATIONAL PROVIDER OF RENEWABLE ENERGY
    SOLUTIONS ................................................................................................................ 3

    B.    THE COMPANY ENGAGES IN TYPICAL FINANCIAL REPORTING DURING THE
    CLASS PERIOD............................................................................................................ 5

    C.    SOLAREDGE STRIVES TO MEET POST-PANDEMIC DEMAND FOR ITS
    PRODUCTS.................................................................................................................. 6

        1.    The COVID-19 Pandemic Affects SolarEdge's Business While Macroeconomic
        Factors Lead to a Surge in Demand for Solar Products............................................ 6

        2.    SolarEdge Explains the Strong Demand in Europe for Its Products .............................. 6

    D.    SOLAREDGE REMAINS OPTIMISTIC ABOUT GROWTH IN 2023 ........................... 7

        1.    SolarEdge's Executives Explain to Investors, with Caveats, Europe's Growing
        Demand ............................................................................................................... 7

        2.    During the Q1 2023 Earnings Call, SolarEdge Explains That While Demand Is High,
        Inventory Is Also Rising ......................................................................................... 8

    E.    THE COMPANY DISCLOSES SLOWER-THAN-EXPECTED BUT STILL STRONG
    GROWTH IN EUROPE ................................................................................................ 8

        1.    During the Q2 2023 Earnings Call, While SolarEdge Reported Record Revenue in
        Europe, It Cautioned That Demand Was More Moderate Than Expected and Inventory
        Build-Up Had Risen............................................................................................... 8

        2.    During the Q3 2023 Earnings Call, SolarEdge Executives Disclose an Unexpected
        Drop in Demand.................................................................................................... 10

STANDARD OF REVIEW ..................................................................................................... 11

ii

ARGUMENT .......................................................................................................................... 12

A.    PLAINTIFFS HAVE FAILED TO SATISFY THE HEIGHTENED PLEADING
REQUIREMENTS FOR SECURITIES FRAUD................................................................... 12

B.    PLAINTIFFS HAVE FAILED TO PLEAD AN ACTIONABLE MISSTATEMENT OR
OMISSION ........................................................................................................................ 19

1.    Plaintiffs Do Not Allege Any of Defendants' Statements Were False When Made .... 19

2.    Defendants Had No Duty to Disclose Any of the Information Plaintiffs Claim Was
Omitted ........................................................................................................................ 20

C.    SEVERAL OF DEFENDANTS' STATEMENTS ARE FORWARD-LOOKING
STATEMENTS PROTECTED BY THE PSLRA'S SAFE-HARBOR PROVISION ............. 26

D.    SEVERAL OF DEFENDANTS' STATEMENTS ARE INACTIONABLE
CORPORATE OPTIMISM AND PUFFERY ............................................................... 28

E.    PLAINTIFFS HAVE NOT ADEQUATELY PLEADED SCIENTER ........................... 30

1.    The CAC Does Not Allege That Defendants Had Motive and Opportunity ................ 30

2.    The CAC Fails to Allege That Any of the Individual Defendants Engaged in Conscious
Misbehavior or Recklessness .............................................................................. 31

3.    Plaintiffs Have Not Pleaded Any Scienter Allegations Against Defendants Lowe or
Danziger ........................................................................................................... 39

F.    PLAINTIFFS FAIL TO STATE A 20(a) CLAIM BECAUSE THEY FAIL TO STATE A
10(b) CLAIM ................................................................................................................... 40

CONCLUSION.................................................................................................................... 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Am. Express Co. Sec. Litig.*,
2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008)..................................................................37

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ...............................................................................................30

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...........................................................................................................11

*In re AT&T/DirecTV Now Sec. Litig.*,
480 F. Supp. 3d 507 (S.D.N.Y. 2020)................................................................................22

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)......................................................................................4, 11, 39

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................................................11

*Campo v. Sears Holding Corp.*,
635 F. Supp. 2d 323 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010).................16, 18

*Chapman v. Mueller Water Prods., Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020)................................................................................18

*In re Citigroup Inc. Sec. Litig.*,
753 F. Supp. 2d 206 (S.D.N.Y. 2010)......................................................................36, 38, 39

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)........................................................................................21, 31

*In re DraftKings Inc. Sec. Litig.*,
650 F. Supp. 3d 120 (S.D.N.Y. 2023)............................................................................13, 17

*In re Federated Dep't Stores Sec. Litig.*,
2005 WL 696894 (S.D.N.Y. Mar. 25, 2005) ....................................................................34

*Francisco v. Abengoa, S.A.*,
481 F. Supp. 3d 179 (S.D.N.Y. 2020)................................................................................16

*In re FuboTV Inc. Sec. Litig.*,
2023 WL 2711826 (S.D.N.Y. Mar. 30, 2023) ..................................................................16

*Gavish v. Revlon, Inc.*,
2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004)...............................................................14, 22

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011)................................................................................35

iv

*Gluck v. Hecla Mining Co.*,
   657 F. Supp. 3d 471 (S.D.N.Y. 2023)................................................................31, 32

*Gregory v. ProNAi Theapeutics Inc.*,
   297 F. Supp. 3d 372 (S.D.N.Y. 2018)........................................................................16

*Gross v. AT&T Inc.*,
   2021 WL 9803956 (S.D.N.Y. Sept. 27, 2021)...........................................................14

*In re Hain Celestial Grp. Inc. Sec. Litig.*,
   2022 WL 18859055 (E.D.N.Y. Nov. 4, 2022), *report and recommendation*
   *adopted*, 2023 WL 6360345 (E.D.N.Y. Sept. 29, 2023)...........................................14

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)..................................................................................................12

*In re Hardinge, Inc. Sec. Litig.*,
   696 F. Supp. 2d 309 (W.D.N.Y. 2010).....................................................................32

*Hart v. Internet Wire, Inc.*,
   145 F. Supp. 2d 360 (S.D.N.Y. 2001).......................................................................37

*In re ITT Educ. Servs., Inc. Secs. & S'holder Derivatives Litig.*,
   859 F. Supp. 2d 572 (S.D.N.Y. 2012).......................................................................22

*Kalnit v. Eichler*,
   264 F. 3d 131 (2d Cir. 2001).....................................................................................30

*Kleinman v. Elan Corp., PLC*,
   706 F.3d 145 (2d Cir. 2013)...................................................................................3, 21

*Kusnier v. Virgin Galactic Holdings Inc.*,
   639 F. Supp. 3d 350 (E.D.N.Y. 2022) .......................................................................29

*In re Lions Gate Ent. Corp. Sec. Litig.*,
   165 F. Supp. 3d 1 (S.D.N.Y. 2016) ...........................................................................21

*Lipow v. Net 1 UEPS Techs., Inc.*,
   131 F. Supp. 3d 144 (S.D.N.Y. 2015)........................................................................20

*Loc. No. 38 Int'l. Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
   724 F. Supp. 2d 447 ..................................................................................................33

*Long Miao v. Fanhua, Inc.*,
   442 F. Supp. 3d 774 (S.D.N.Y. 2020)............................................................13, 15, 17

*In re Lottery.com, Inc. Sec. Litig.*,
   2024 WL 454298 (S.D.N.Y. Feb. 6, 2024).................................................................19

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014)..........................................................................29

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
   601 U.S. 257 (2024)................................................................................................2, 21

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
518 F. Supp. 3d 772 (S.D.N.Y. 2021)...............................................................................37

*Novak v Kasaks*,
216 F.3d 300 (2d Cir. 2000)..................................................................................30, 37

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019).................................................................................31

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
11 F.4th 90 (2d Cir. 2021) ...........................................................................................22

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Can. Imperial Bank of Com.*,
694 F. Supp. 2d 287 (S.D.N.Y. 2010)........................................................33, 35, 36

*In re PXRE Grp., Ltd., Sec. Litig.*,
600 F. Supp. 2d 510 (S.D.N.Y. 2009)...............................................................................31

*Robeco Capital Growth Fund SICAV – Robeco Global Consumer Trends v.
Peloton Interactive Inc.*,
665 F. Supp. 522 (S.D.N.Y. 2023) .......................................................................37

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)................................................................11, 28, 32, 39

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.,
Inc.*,
75 F.3d 801 (2d Cir. 1996)................................................................................37

*Sask. Healthcare Emp.'s Pension Plan v. KE Holdings Inc.*,
2024 WL 775195 (S.D.N.Y. Feb. 26, 2024).....................................3, 4, 11, 28, 37

*Schiro v. Cemex, S.A.B. de C.V.*,
396 F. Supp. 3d 283 (S.D.N.Y. 2019)..........................................................18, 23

*In re Sec. Cap. Assurance Ltd. Sec. Litig.*,
729 F. Supp. 2d 569 (S.D.N.Y. 2010).............................................................................39

*Shield v. Citytrust Bancorp, Inc.*,
25 F.3d 1124 (2d Cir. 1994).............................................................................................28

*Siegel v. Bos. Beer Co., Inc.*,
2022 WL 17417111 (S.D.N.Y. Dec. 5, 2022) .........................................................26

*Slayton v. American Exp. Co.*,
604 F.3d 758 (2d Cir. 2010).............................................................................................27

*Steinberg v. Ericsson LM Telephone Co.*,
2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) .........................................................17

*In re Synchrony Fin. Sec. Litig.*,
988 F.3d 157 (2d Cir. 2021)................................................................................................28

*In re Telefonaktiebolaget LM Ericsson Sec. Litig.*,
    675 F. Supp. 3d 273 (E.D.N.Y. 2023) ...................................................................22, 23, 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..............................................................................................30, 31

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
    625 F. Supp. 3d 164 (S.D.N.Y. 2022)..............................................................3, 27, 28, 29

*In re WEBMD Health Corp. Sec. Litig.*,
    2013 WL 64511 (S.D.N.Y. Jan. 2, 2013) ..........................................................................38

*Woolgar v. Kingstone Cos., Inc.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020)...............................................................................34

**Statutes**

15 U.S.C. § 78u-4 ...................................................................................................11, 30

15 U.S.C. § 78u-5 ................................................................................................3, 26, 27

Defendants SolarEdge Technologies, Inc. ("SolarEdge" or the "Company"), Zvi Lando, Ronen Faier, J.B. Lowe, and Lior Danziger (the "Individual Defendants," and together with SolarEdge, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss Plaintiffs'[1] Consolidated Amended Class Action Complaint ("CAC") for failure to state a claim under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934.

## PRELIMINARY STATEMENT

This case is nothing more than an attempt to dress up a non-existent breach of contract claim as a purported securities class action. There were no misstatements. There were no actionable omissions. As a result, Plaintiffs spend much of the 237-paragraph CAC conclusorily claiming (at least 75 times in the CAC) that SolarEdge "forced" or "pushed" product on its customers and those purported sales tactics should have been disclosed to the market. But repeatedly claiming, without any basis, that SolarEdge deployed aggressive sales tactics (which even if true, would not need to be disclosed) does not amount to a securities fraud claim. Plaintiffs' fabricated narrative is also illogical—no customer or distributor has sued SolarEdge for purportedly "forcing" products on them in contravention of their contractual rights.

What Plaintiffs really want this Court to do is place blame on SolarEdge for changing macroeconomic conditions—low global interest rates, enormous government spending programs in solar energy, the Russia-Ukraine conflict—that resulted in an explosion in demand for solar energy products in 2022 and the first half of 2023 followed by an abrupt and unexpected slowdown in demand for those same products in the second half of 2023, which the Company appropriately disclosed. Unsurprisingly, when this unexpected softening in demand occurred, SolarEdge's stock

---

[1] The court-appointed lead plaintiffs in this matter are Mivtachim the Workers Social Insurance Fund Ltd., Keren Hgimlaot Hmerkazit Histadrut Central Pension Fund Ltd., Kerren Makefet Pension and Provident Center Cooperative Society Ltd., the Hadassah Workers Pension Fund Ltd., and Hachshara Insurance Company Ltd.

price declined—as did the stock price of almost all peer companies in the solar energy industry, all of which encountered the same demand headwinds.  SolarEdge's stock decline is not the basis for any legal claim, let alone a securities fraud claim.

Plaintiffs claim that Defendants made actionable misstatements and omissions in their securities filings and other public statements from February to October 2023.  Plaintiffs do not point to a single statement by any Defendant that was actually false when made; rather, they allege that by disclosing routine financial information regarding revenue and expected future performance, Defendants were under an obligation to disclose *additional* alleged facts regarding the Company's revenue, customer inventory levels, sell-through forecasts, and softening demand for SolarEdge products in Europe.  Plaintiffs' square peg narrative does not fit into the round hole of an alleged securities fraud claim.  At best, all Plaintiffs have alleged is a claim of "fraud by hindsight," which courts in this Circuit routinely dismiss for failure to state a claim.

*First*, Plaintiffs fail to satisfy the heightened pleading standard for fraud under Federal Rule of Civil Procedure 9(b) and the PSLRA because they rely almost exclusively on purported "confidential witnesses," whose statements lack sufficient particularity, are not properly situated in time with respect to the purported misstatements, and come from witnesses who would not be in a position to know the facts attributed to them (*i.e.*, all of the alleged witnesses are based in North America, and the crux of Plaintiffs' allegations relate to SolarEdge's business in Europe).

*Second*, Plaintiffs fail to allege an actionable misstatement or omission because they do not allege that any statement by Defendants was actually false when made.  Moreover, they fail to establish that Defendants were under any duty to disclose the purported additional facts cited by Plaintiffs.  *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.,* 601 U.S. 257, 265 (2024) ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5." (citation omitted));

2

*Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 152 (2d Cir. 2013) (holding that the securities laws do not "create an affirmative duty to disclose any and all material information" (citation omitted)).

*Third*, a number of the purported misstatements are classic forward-looking statements that are protected by the PSLRA's "safe-harbor" provision. *See* 15 U.S.C. § 78u-5(c)(1). Plaintiffs fail to plead that any of these statements regarding projected economic performance or future plans and objectives were made by anyone who had "actual knowledge" of their falsity. *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 209 (S.D.N.Y. 2022). And in any event, each of the relevant statements was accompanied by meaningful cautionary language.

*Fourth*, several of the purported misstatements are inactionable because they are statements of "optimism and puffery" that are regularly disregarded by this Court. *See Sask. Healthcare Emp.'s Pension Plan v. KE Holdings Inc.*, 2024 WL 775195, at *20 (S.D.N.Y. Feb. 26, 2024) (Woods, J.) ("General statements of optimism and puffery are non-actionable under federal securities laws because they are not sufficiently specific that a reasonable investor could rely on [them] . . . ." (alteration in original) (citations and internal quotation marks omitted)).

*Fifth*, because Plaintiffs have failed to state a claim under Section 10(b) or Rule 10b-5, they also fail to state a claim against the Individual Defendants under Section 20(a).

For each—or any—of these reasons and others explained below, Defendants respectfully request that the Court dismiss the CAC with prejudice.

## STATEMENT OF FACTS[2]

**A.    SOLAREDGE IS AN INTERNATIONAL PROVIDER OF RENEWABLE ENERGY SOLUTIONS**

SolarEdge is a leading smart energy technology provider that manufactures and sells solar

---

[2] The alleged misstatements are laid out in chronological order in Appendix A. Appendix A further confirms the sudden drop in demand and Plaintiffs' attempt in the CAC to manipulate facts to create a fraud narrative where none exists.

products.  Compl. ¶ 2.  The Company offers several renewable energy solutions in the residential, commercial, and small-scale utility markets, including power optimizers, inverters, monitoring services, and energy storage and management solutions.  *Id.*  As of last year, SolarEdge had shipped approximately 125.1 million power optimizers and 5.6 million inverters, and its products had been installed in over 140 countries.  Belelieu Decl. Ex. 17 (Feb. 26, 2024 10-K) at 1.[3]  The Company employs over 5,600 people around the globe and has offices, lab facilities, and manufacturing sites in 21 different countries.  *Id.* at 13, 36.

SolarEdge's primary customers are distributors and wholesalers of electrical equipment that "sell-through" products to end users, usually installers or engineering, procurement, or construction firms that outfit buildings with photovoltaic, or "PV," capabilities.  Compl. ¶ 2.  The Company recognizes revenue when its customers receive control of the products, not when products reach the end user.  *Id.*  Its largest markets are Europe and the United States, which in 2023 accounted for 64% and 25.5% respectively of the Company's total revenue.  *Id.* ¶¶ 3, 51.  Because of the worldwide reach of its products and multi-input manufacturing process, SolarEdge's business, like that of other solar companies, is dependent on complex international supply chains.  *See* Belelieu Decl. Ex. 17 (Feb. 26, 2024 10-K) at 8-9, 21.

Since 2020, Zvi Lando has served as SolarEdge's CEO.  Before that, Lando was the Company's Vice President of Global Sales.  Ronen Faier has been the Company's CFO since 2011.

---

[3] This Motion references complete versions of documents cited in the CAC and other SolarEdge filings, all of which the Court may consider on a motion to dismiss.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *Sask. Healthcare Emp's. Pension Plan*, 2024 WL 775195, at *17 (Woods, J.) (The Court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." (citation omitted)).  All such documents are attached as exhibits to the accompanying Declaration of Christopher D. Belelieu in Support of Defendants' Motion to Dismiss ("Belelieu Decl.").

J.B. Lowe has served as the Head of Investor Relations since February 2023.  Lior Danziger served as the SolarEdge Director of Investor Relations and Finance Operations until February 2023.

**B.      THE COMPANY ENGAGES IN TYPICAL FINANCIAL REPORTING DURING THE CLASS PERIOD[4]**

As a public company, SolarEdge discloses financial and business metrics relating to its worldwide operations.  The Company provided this reporting in at least three different forms during the class period:  (i) SEC reporting forms, (ii) quarterly earnings calls, and (iii) industry conferences.  Plaintiffs reference the following three SEC forms in the CAC but do not allege they contained any misstatements: (i) the Form 10-K Annual Report, published February 22, 2023 ("2022 10-K"), and (ii) two Form 10-Qs—one for the quarter ending March 31, 2023 ("Q1 2023 10-Q"), and one for the quarter ending June 30, 2023 ("Q2 2023 10-Q").  Each of these filings contained extensive cautionary language and highlighted several risk factors.[5]

For each of the three SEC filings, the Company held an earnings call.  Plaintiffs allege misstatements were made during the calls on February 13, 2023 ("2022 Earnings Call"); May 3, 2023 ("Q1 2023 Earnings Call"); and August 1, 2023 ("Q2 2023 Earnings Call").  Relevant facts were also discussed during the third quarter earnings call on November 1, 2023 ("Q3 2023 Earnings Call"), though Plaintiffs do not allege any misstatements were made then.  These calls were accompanied by cautionary language similar to that found in the SEC reporting forms.  *See* Appendix B.

The Company's officers also appeared at numerous industry events during the class period.  Plaintiffs allege that misstatements were made at the following six events (*see* Compl. ¶¶ 117-77):

---

[4] The CAC modified the proposed class period to run from February 13 to October 19, 2023.
[5] Appendix B provides a comprehensive overview of all meaningful cautionary language and risk factor discussion contained in the SEC forms.

| Date | Event | Speaker(s)/Officer(s) |
|---|---|---|
| 3/13/2023 | ROTH Conference | Danziger & Lowe |
| 3/28/2023 | Wells Fargo Clean Energy Symposium | Faier |
| 6/21/2023 | JPMorgan Energy, Power & Renewables Conference | Danziger |
| 8/8/2023 | Oppenheimer 26th Annual Technology, Internet & Communications Conference | Faier |
| 9/6/2023 | Barclays CEO Energy-Power Conference | Faier |
| 9/21/2023 | KeyBanc Capital markets Inc.'s Energy Transition Symposium | Lowe |

**C.    SOLAREDGE STRIVES TO MEET POST-PANDEMIC DEMAND FOR ITS PRODUCTS**

**1.    The COVID-19 Pandemic Affects SolarEdge's Business While Macroeconomic Factors Lead to a Surge in Demand for Solar Products**

In 2020, the COVID-19 pandemic and related disruptions hobbled the solar industry and led to an uneven recovery as shipping prices, transit times, and component shortages adversely affected the Company well into 2022. *See* Belelieu Decl. Ex. 1 (Feb. 22, 2023 10-K) at 41. As SolarEdge struggled to forecast economic conditions, demand for solar products exploded, particularly in Europe. *See* Belelieu Decl. Ex. 4 (Feb. 13, 2023 2022 Earnings Call) at 2-3. Historically low global interest rates and enormous government spending programs spurred mass investment in solar, while in Europe, Western sanctions and related retaliation by Russia drove up oil prices and increased the continent's appetite for solar energy. *See* Belelieu Decl. Ex. 1 (Feb. 22, 2023 10-K) at 24, 42.

**2.    SolarEdge Explains the Strong Demand in Europe for Its Products**

SolarEdge was transparent about the complicated environment and optimistic about the Company's ability to meet these challenges. On the 2022 Earnings Call, Lando informed investors that "[t]otal revenues in 2022 grew 58% over the previous year and 63% in the solar business" and explained that factors such as the Russia-Ukraine war and SolarEdge's expanded product portfolio

6

were driving results.  Belelieu Decl. Ex. 4 (Feb. 13, 2023 2022 Earnings Call) at 2-3.  He further explained that the rapid increase in demand paired with post-pandemic logistical challenges meant that "demand [was] far exceeding our ability to manufacture and deliver."  *Id.* at 11.

SolarEdge's 2022 10-K demonstrated how the Company was seeking to meet its customers' needs and mitigate the continuing impact of logistical challenges caused by COVID-19.  For example, the Company announced proprietary advances in its power optimizer assembly process, new manufacturing sites in the United States and Mexico, and plans to expand capacity at the Sella 1 facility in Israel.  Belelieu Decl. Ex. 1 (Feb. 22, 2023 10-K) at 44.

## D.    SOLAREDGE REMAINS OPTIMISTIC ABOUT GROWTH IN 2023

### 1.    SolarEdge's Executives Explain to Investors, with Caveats, Europe's Growing Demand

Early in 2023, Defendants told investors they were expecting growth, as the environment remained similar to the one they observed in late 2022.  On March 13, 2023, when SolarEdge appeared at the ROTH Conference, Danziger told investors the Company expected Europe's strong demand to continue, in part because Europe "lost one-third of its energy resources" due to the conflict with Russia and "[t]here's a great expectation that a large portion of [this energy gap] will be bridged through renewables and from that solar."  Belelieu Decl. Ex. 11 (Mar. 13, 2023 ROTH Conf.) at 3.  Danziger touted SolarEdge's performance in Europe but made clear that the Company would "not guide for a specific growth rate for us in Europe in 2023."  *Id.* at 2.  He also discussed the challenges ramping up capacity and SolarEdge's efforts to decrease lead times.  *Id.* at 4.

On March 28, 2023, Faier struck the same tone at the Wells Fargo Clean Energy Symposium.  He noted relatively low interest rates and high electricity prices in Europe created strong demand there but cautioned against an overly-optimistic outlook in light of questions around European policymaking.  Belelieu Decl. Ex. 12 (Mar. 28, 2023 Wells Symp.) at 3.  Although the

"overall environment in Europe . . . encourages solar," he advised that the EU's stance needed a little more "clarity." *Id.*

### 2. During the Q1 2023 Earnings Call, SolarEdge Explains That While Demand Is High, Inventory Is Also Rising

Q1 2023 results confirmed expectations about demand in Europe: the Company achieved a revenue increase of over 44% in Q1 2023 compared to Q1 2022, with significant growth in Europe and record revenue in several European countries. Belelieu Decl. Ex. 2 (May 8, 2023 10-Q) at 8. Responding to a question on the Q1 2023 Earnings Call about a potential slowdown in Europe, Faier stated that he did not see a change in the existing pattern of European demand due to persistently elevated power prices on the continent, which created a strong return on investment for solar customers. Belelieu Decl. Ex. 5 (May 3, 2023 Q1 2023 Earnings Call) at 9. Inventory was rising as well to meet this demand. *Id.* at 7-8. Faier disclosed to the market that total inventory levels had risen to $874.2 million in Q1 2023 from $729.2 million in Q4 2022, a result of the Company's manufacturing investments. *Id.* Faier also noted that the increased inventory might offer a marginal benefit by allowing the Company to mitigate some logistical burdens resulting from the pandemic, such as increased shipping times and costs. *Id.* The increased inventory also reflected the Company's efforts to stockpile batteries, as Europe's high attachment rates suggested that SolarEdge would sell the batteries with the inverters then on backlog. *Id.* at 18.

### E. THE COMPANY DISCLOSES SLOWER-THAN-EXPECTED BUT STILL STRONG GROWTH IN EUROPE

### 1. During the Q2 2023 Earnings Call, While SolarEdge Reported Record Revenue in Europe, It Cautioned That Demand Was More Moderate Than Expected and Inventory Build-Up Had Risen

On August 1, 2023, after announcing record revenue of $991 million, Lando disclosed that "strength in the market is somewhat more moderate than what was anticipated heading into 2023, largely due to a milder winter, reduced concerns over energy resilience, and lower electricity

prices." Belelieu Decl. Ex. 6 (Aug. 1, 2023 Q2 2023 Earnings Call) at 3.  Lando further explained that two unexpected consequences of the pandemic were causing higher-than-optimal inventory levels in Europe:  distributors (i) cutting back after significant stockpiling to guard against supply chain disruptions, and (ii) reducing their portfolio of suppliers after expanding during pandemic-era shortages.  *Id.*  Despite the increasing nominal inventory, data indicated the PV market was still growing.  *Id.* at 5.  Thus, Faier later explained, "when you look at the days outstanding[6] . . . [inventory levels are] not high at all."  *Id.* 11.  Lando twice disclosed on this call there would be an inventory adjustment period that "could continue for the next two quarters."  *Id.* at 3, 22.

Over the next two months, Defendants disclosed the shifting market they were observing at each of the three Q3 industry events Plaintiffs reference.  At the Oppenheimer Conference on August 8, 2023, Faier explained that in 2022, "every distributor laid their hands on whatever piece of equipment that they could get."  Belelieu Decl. Ex. 14 (Aug. 8, 2023 Oppenheimer Conf.) at 2.  By August 2023, however, distributors could "rely better on our supply," so they were holding inventory for fewer months than before.  *Id.* at 3.  In other words, the transition from "over-demand to an extreme oversupply" took everyone by surprise.  *Id.* at 4.  At the Barclays CEO Energy-Power Conference on September 6, 2023, Faier similarly acknowledged distributors were breaking from the past two years of overstocking, leading distributors to delay orders.  Belelieu Decl. Ex. 15 (Sept. 6, 2023 Barclays Conf.) at 5.  On September 23, 2023, at the KeyBanc Symposium, Lowe discussed an additional challenge facing the market in Europe:  distributors were increasingly cash strapped as an influx of cheaper Chinese products devalued their inventories. Belelieu Decl. Ex. 16 (Sept. 21, 2023 KeyBanc Symp.) at 6-7.  Lowe told attendees that even

---

[6] "Days outstanding" and "days on-hand" are common industry language referring to the average number of days a company will hold inventory before selling it.

though underlying demand continued to be strong, distributors would intentionally decrease inventory over the next one to two quarters to correct the working capital imbalance. *Id.* ("You have a situation where the distributors have a working capital problem. So they want to reduce ordering from OEMs like [SolarEdge] as much as possible.").

> **2.    During the Q3 2023 Earnings Call, SolarEdge Executives Disclose an Unexpected Drop in Demand**

As Defendants reviewed and disclosed the Q3 2023 financials, it became clear that the complications in the market were materializing more acutely than expected. On the Q3 Earnings Call on November 1, 2023, Lando explained that although the foregoing factors led to an immense surge in demand in 2022 and the beginning of 2023, SolarEdge's efforts to catch up created an inventory glut. *See* Belelieu Decl. Ex. 7 (Nov. 1, 2023 Q3 2023 Earnings Call) at 2-3. Concurrent sell-through data confirmed the market was experiencing strong underlying long-term demand coupled with a sharp, recent correction. In Germany, for example, sell-through was up 44% year over year but down 37% quarter over quarter. *Id.* at 4. In the combined Belgium-Netherlands market, sales grew 4% year over year but fell 25% quarter over quarter. *Id.* In Italy, megawatt sell-through was up 85% year over year and down 6% quarter over quarter. *Id.* at 5. Indeed, "our highest ever sell-through month . . . in Europe ever was June," *i.e.*, end users in Europe purchased more SolarEdge products in June 2023 than in any other month ever. *Id.* at 20.

Further, because SolarEdge does not receive inventory reports for each month until the 20th of the following month, certain information is delayed in reaching SolarEdge. *Id.* at 23. Thus, the Company did not receive record high sell-through data from June until July 20th. And data about a slowdown in July did not reach the Company until August 20th, nearly three weeks *after* the 2023 Q2 Earnings Call. Faier explained that even when the Company received data of the July 2023 slowdown, it did not raise any alarms because "August numbers are either flat or, I would

10

say, relatively similar to the ones that we see in July." *Id.* Thus, when SolarEdge received slightly lower August numbers in mid-September, the Company saw no cause for concern. *Id.*

**STANDARD OF REVIEW**

To survive a motion to dismiss brought under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Sask. Healthcare Emp's. Pension Plan*, 2024 WL 775195, at \*16 (Woods, J.) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Plaintiffs may not merely "allege facts consistent with liability," but must "nudge claims across the line from conceivable to plausible." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[A] complaint that offers 'labels and conclusions' or 'naked assertions' without 'further factual enhancement' will not survive a motion to dismiss." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

Moreover, "[s]ecurities fraud claims are subject to heightened pleading requirements" under Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *ATSI Commc'ns, Inc.*, 493 F.3d 87, 99 (2d Cir. 2007). Under Rule 9(b), Plaintiffs must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* (citation omitted). Under the PSLRA, Plaintiffs must (1) "specify each statement alleged to have been misleading," (2) "the reason or reasons why the statement is misleading, and" (3) "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Accordingly, Plaintiffs may not merely claim statements "were false and misleading; they must demonstrate with specificity why and how that is so." *Sask. Healthcare Emp.'s Pension Plan*, 2024 WL 775195, at \*16 (quoting *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)).

11

**ARGUMENT**

Plaintiffs have failed to state a claim under Section 10(b) for at least three independent reasons, each of which requires dismissal: (1) Plaintiffs have failed to satisfy the pleading requirements of Rule 9(b) and the PSLRA, and their reliance on purported confidential witness statements does not cure that defect; (2) even crediting the CW statements (which this Court should not do), Plaintiffs still fail to plead any actionable misstatement or omission; and (3) Plaintiffs' allegations do not collectively give rise to a strong inference of scienter.[7]

**A.    PLAINTIFFS HAVE FAILED TO SATISFY THE HEIGHTENED PLEADING REQUIREMENTS FOR SECURITIES FRAUD**

The CAC contains nothing more than generalized allegations that fail to meet the heightened pleading standard under Rule 9(b) and the PSLRA.  And while Plaintiffs have supplemented their initial pleading with a number of statements from a handful of "confidential witnesses" ("CWs"), those additional allegations still fall far short of meeting the high pleading bar here.  Plaintiffs rely on statements from the CWs to claim that the Company failed to disclose four supposedly adverse facts: (1) that the Company's financial performance was the result of SolarEdge's purported practice of forcing customers to take unneeded product (Compl. ¶ 120); (2) that the Company's finished goods and channel inventories were rising because of SolarEdge's purported practice of forcing customers to take unneeded product (*id.* ¶¶ 127, 137); (3) that demand for the Company's products in Europe was declining (*id.* ¶ 148); and (4) that the Company's sell-through projections were inflated and "not based on market reports or internal data" (*id.* ¶ 167). *See also id.* ¶¶ 1, 118, 178.  But the CWs' statements present little more than unfounded speculation

---

[7] To state a claim under Section 10(b), Plaintiffs must allege with specificity: (1) misstatements or omissions of material fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014).

by low- and mid-level employees (***none of whom were based in Europe***) and fail to establish the contemporaneous existence of the facts that the Company allegedly failed to disclose.

In evaluating facts attributed to CWs, "courts have been loathe . . . to sustain as sufficiently particular securities fraud complaints" where (1) CW allegations are not pled with sufficient particularity, (2) CW allegations are not situated in time, and (3) CWs' job descriptions do not make clear they were in a position to know the facts attributed to them. *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 154 (S.D.N.Y. 2023); *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 798-800 (S.D.N.Y. 2020).  Plaintiffs' CW allegations here are defective on all three levels.

***The CW Allegations Are Insufficiently Particular.***  Plaintiffs fail to establish with the requisite particularity the allegations underlying the purportedly adverse facts on which their case depends. *First*, to support their allegation that demand in Europe was declining during the class period, Plaintiffs claim solely that CW2 (a regional manager working in North America) heard a rumor that "Europe wasn't going well."  Compl. ¶¶ 35, 58.  Apart from that alleged hearsay comment, the CAC lacks a *single allegation* that demand in Europe was actually declining before Defendants disclosed more moderate than expected growth (because it was not).

*Second*, to support their allegation that the Company's sell-through forecasts "were inflated and not based on market reports or internal data," *id.* ¶ 167, Plaintiffs allege that a single employee based in North America created forecasts that were criticized by certain other employees.  *See id.* ¶ 62. But a *single* unattributed statement calling CW4's numbers "low" fails to establish that the *entire* Company's sell-through forecasts over the class period were "inflated and not based on market reports or internal data."  *Id.* ¶ 167.  Indeed, the CAC does not make even a conclusory allegation that CW4 capitulated to the pressure that the unspecified individuals would purportedly place on him at unspecified times.  Nor is it clear how, even if CW4 did succumb to this purported

13

pressure (which Plaintiffs do not claim), that would jeopardize the propriety of the *entire* Company's sell-through forecasts.

*Third*, Plaintiffs devote most of their CAC to the allegation that the Company was pushing unneeded product on its customers, but the evidence they provide in support of this claim is similarly lacking the particularity required to plead securities fraud. For example, the allegations of CW2 speak about sales practices in generalities, pointing to no concrete, specific episode of a customer forced to take undesired product beyond an unsupported assertion that "this happened very often to distributor CED Greentech." *See id.* ¶ 58. CWs 4, 5, and 6 likewise speak in vague, conclusory terms. They describe SolarEdge's revenue reporting practices, characterize the Company as "aggressive," claim it "didn't treat its distributors well," assert that "[p]eople were wanting to cancel stuff," and offer a maxim about treating "people poorly," all without even once pointing to a particularized example of any customer—much less a European customer—that was "forced" to take unwanted product. *See id.* ¶¶ 60, 61, 63-65. CW8's allegations likewise ascribe certain practices, reputations, and goals to the Company and its management without alleging any time that he witnessed the scheme he alludes to. *See id.* ¶¶ 68-69.

Because Plaintiffs' claim turns on an "allegation of an undisclosed channel stuffing trend on information and belief[, t]hey must therefore state with particularity facts sufficient to support a reasonable belief that the trend existed." *Gavish v. Revlon, Inc.*, 2004 WL 2210269, at *17 (S.D.N.Y. Sept. 30, 2004) (citation omitted). In *Gavish*, the plaintiffs pled several instances, citing specific customers and dates in which customers received or returned unwanted product. *See id.* at *18. But because the plaintiffs failed to "grapple with . . . any measure of sell-through," their allegations were inadequate. *Id.* (citation omitted).

Here, where Plaintiffs do not even approach the level of specificity of the pleadings rejected

14

in *Gavish*, their allegations cannot support liability for non-disclosure of such a purported practice. *See In re Hain Celestial Grp. Inc. Sec. Litig.*, 2022 WL 18859055, at *29 (E.D.N.Y. Nov. 4, 2022), *report and recommendation adopted*, 2023 WL 6360345 (E.D.N.Y. Sept. 29, 2023) (rejecting CWs' vague and conclusory channel stuffing allegations); *Gross v. AT&T Inc.*, 2021 WL 9803956, at *6 (S.D.N.Y. Sept. 27, 2021) (rather than pleading isolated incidents, plaintiffs must plead facts "to support a plausible inference that the alleged fraudulent sales practices were widespread" (citation and internal quotation marks omitted)).  To plead with particularity that SolarEdge was engaged in aggressive sales tactics that would require disclosure, Plaintiffs must allege facts well beyond conclusory assertions that certain North American distributors' employees were disgruntled.

***The CW Allegations Are Temporally Defective.***  The Court can also disregard many of the CW statements because the CAC's allegations "fail[] to anchor the witness statements in the Class Period" and are largely "unmoored in time." *See Long Miao*, 442 F. Supp. 3d at 803; Compl. ¶¶ 60-62, 66, 68-70 (no timeframe specified for allegations); *id.* ¶ 58 (no timeframe except for unspecific allegation in first sentence); *id.* ¶ 67 (no timeframe except for unspecific allegation in last sentence).  Because all but two of the CWs employed during the class period began working at the Company at least four years prior to the start of the eight-month class period, merely specifying the CWs' period of employment does not cure this defect. *See id.* ¶¶ 35, 37, 38, 39, 41 (employment began variously in 2015, 2017, 2018).  The CAC does not specify CW8's period of employment at all, alleging only that CW8 joined SolarEdge in 2015 and received a promotion "in 2018 or 2019." *Id.* ¶ 41.  The CAC does not say whether CW8 was employed during the class period, when CW8 moved to Kentucky, what his connection to SolarEdge was thereafter, or when the facts he alleges took place.  Conversely, the statements of CW2 are unpersuasive because he

15

was employed for only one month of the class period (and 53 months before it).

Where, as here, facts pled are unmoored in time and Plaintiffs' knowledge is not clearly situated within the class period, the CW allegations should be disregarded. *See Long Miao*, 442 F. Supp. 3d at 799-801, 802-03 (noting that where allegations were unmoored in time, plaintiff's complaint was "silent as to any basis to believe either that these witnesses have knowledge as to [the company's] current operations or that their statements about past practice apply to the present" (citations omitted)); *Gregory v. ProNAi Theapeutics Inc.*, 297 F. Supp. 3d 372, 408-09 (S.D.N.Y. 2018) (rejecting two CWs' allegations, even where period of employment specified, because the complaint was "silent as to when within that time window" the relevant information came to light).

Finally, the allegations of CW3 must be rejected for the independent reason that CW3 left the Company in August 2022, six months before the beginning of the class period. *See* Compl. ¶ 36; *In re FuboTV Inc. Sec. Litig.*, 2023 WL 2711826, at *11 (S.D.N.Y. Mar. 30, 2023) (rejecting the allegations of CWs who left defendant months before the class period); *see also Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 208 (S.D.N.Y. 2020) ("[C]ourts have rejected confidential witness allegations where the confidential witnesses 'left the company before the class period'" (quoting *Campo v. Sears Holding Corp.*, 635 F. Supp. 2d 323, 335 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010))).

***The CWs Were Not in Job Positions That Would Allow Them to Have Knowledge of the Relevant Facts.*** Plaintiffs' core allegations—that SolarEdge's ***European*** customers were carrying high inventory levels, *see* Compl. ¶¶ 127, 137, and that demand for the Company's products in ***Europe*** was declining, *see id.* ¶¶ 148, 165—are insufficiently pled because all nine of the CWs were low and mid-level North American sales or administrative personnel based in North America, not Europe, and did not have any specific knowledge of the Company's European business:

16

- CW1 was a business intelligence administrator who reported to the VP of Operations, *North America*, who, in turn, reported to the *North America* General Manager. Compl. ¶ 34. CW1 pulled reports for various "stakeholders" and worked with developers to create "dashboards" with information. *Id.* CW1 alleges he "participated on calls with SolarEdge's Business Intelligence ('BI') team in Israel, during which he provided updates on the *North America business*." *Id.* (emphasis added).

- CW5 was a sales operations associate in the Company's *Milpitas, California* office. Compl. ¶ 38. CW5 was fairly junior in the *North America* business structure, reporting to two managers who reported to the VP of Operations for *North America*, who, in turn, reported to the *North America* General Manager. *Id.* CW5 allegedly "generated backlog reports every day for *U.S. customers*," *id.* (emphasis added), and, at most, allegedly knew that some customers "were trying to cancel orders" between February and October 2023. *Id.* ¶ 64. It is not alleged that the attempted cancellations were related to Europe; in fact, of the two customers that CW5 described, one was unnamed and the other was CED Greentech, a company based in the United States. *Id.* ¶¶ 42, 64.

- CW7 was a sales manager in the Company's *Milpitas, California* office. *Id.* ¶ 40. CW7 initially reported to the VP *North America* Sales/General Manager - Solar Business Unit, who reported to the *North America* General Manager. *Id.* CW7 was later moved down in the *North America* reporting structure, reporting to a VP of Sales, who reported to the VP *North America* Sales/General Manager – Solar Business Unit. *Id.* CW7 "worked with customers in the *U.S.*," *id.*, and was only alleged to have knowledge about "*U.S.* distributors," particularly the above-mentioned U.S.-based CED Greentech. *Id.* ¶ 66.

- CWs 2, 3, 4, 6, and 8 fare no better, as each worked in SolarEdge's *U.S.* or *North American* business, was based in the *United States*, and reported to a *U.S.* or *North American* manager.

- CW9, as discussed above, is not even alleged to be a SolarEdge employee, and his knowledge of the Company comes from interactions with the "Director of Sales for *California, Hawaii, & North America* New Construction." *Id.* ¶ 70 (emphasis added). Further, CW9 did not work at SolarEdge at any point and therefore could not have had knowledge as to the alleged company-wide practices that Plaintiffs purport to establish.

The CWs' roles "do not suggest that they had been in position to know the facts attributed to them." *Long Miao*, 442 F. Supp. 3d at 799; *Steinberg v. Ericsson LM Telephone Co.*, 2008 WL 5170640, at *6 (S.D.N.Y. Dec. 10, 2008) (rejecting allegations of U.S. employees working for a European-headquartered company because it was "not plausible that they would have direct knowledge about" the region and they were "not shown to have direct knowledge of the non-U.S. contracts" in question); *see also In re DraftKings*, 650 F. Supp. 3d at 154.

Given the lack of nexus between the CWs (and their positions at SolarEdge) and Europe, it is unsurprising that the CWs' alleged statements to Plaintiffs' counsel mention Europe only twice, *see generally*, Compl. ¶¶ 57-70, and those two comments are insufficient to state a plausible claim. In the first reference to Europe, CW6 alleges European distributor Krannich Solar was not treated well, but in the very same paragraph the CAC acknowledges Krannich "operated both in **the U.S.** and Europe," *id.* ¶ 65 (emphasis added), and in any event, failing to treat a distributor well does not amount to securities fraud. With respect to the second reference, there is a lone allegation about Europe from CW2, who allegedly heard "concerns and discussions that Europe wasn't going well." *Id.* ¶ 58. The fact that Europe "wasn't going well" again does not amount to securities fraud. And "[s]uch rumors cannot reasonably satisfy the requirement that the facts alleged provide an adequate basis for believing that the defendants' statements were false." *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 399 (S.D.N.Y. 2020) (citations and internal quotation marks omitted). That is because "[g]eneric and conclusory allegations based upon rumor or conjecture are undisputably insufficient to satisfy the heightened pleading standard of the PSLRA." *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 306 (S.D.N.Y. 2019) (quoting *Campo*, 635 F. Supp. 2d at 336). Moreover, CW2 does not allege when he heard this information or who else was privy to it.

*    *    *

Taken together, and read as liberally as possible, these allegations are not enough to support Plaintiffs' sweeping contention that SolarEdge failed to disclose that "demand for SolarEdge products in Europe, the Company's most important segment, began to decline." Compl. ¶ 57. It is telling that despite alleging that "SolarEdge's most important region by far is Europe," *see, e.g.*, *id.* ¶ 3, Plaintiffs did not cite a single CW from there. Accordingly, Plaintiffs' CW allegations are

18

entitled to no weight.

## B.    PLAINTIFFS HAVE FAILED TO PLEAD AN ACTIONABLE MISSTATEMENT OR OMISSION

Whether the CWs' allegations are credited or not, Plaintiffs have failed to plead an actionable misstatement or omission for four reasons: (1) as to all 34 alleged misstatements, Plaintiffs do not allege any were false when made; (2) as to all 34 alleged misstatements, Plaintiffs fail to establish that they triggered a duty to disclose any purportedly omitted information; (3) eight of Defendants' alleged misstatements are forward-looking statements protected by the PSLRA safe harbor; and (4) eight of Defendants' alleged misstatements are inactionable puffery or corporate optimism.[8]

### 1.    Plaintiffs Do Not Allege Any of Defendants' Statements Were False When Made

For an "affirmative misrepresentation of fact to be actionable, the factual assertion must have been false when made." *In re Lottery.com, Inc. Sec. Litig.*, 2024 WL 454298, at *20 (S.D.N.Y. Feb. 6, 2024) (citations omitted).  Here, not once do Plaintiffs allege that any of the alleged misstatements were *false when made.  See* Compl. ¶¶ 122, 124, 126, 129, 133 (not alleging falsity, only alleging a duty to disclose); *id.* ¶¶ 131, 135, 136, 140, 142, 144, 147, 165, 169, 171, 173, 175, 177 (alleging Defendants failed to disclose one of four adverse facts).

Plaintiffs cannot allege actionable falsity because Defendants' alleged misstatements all provided an accurate picture of the Company's financial condition based on information available at the time to Defendants.  For example, on August 1, 2023 during the Company's Q2 Earnings Call, Lando stated, "[R]evenues from [our] solar business [were] at a record $947 million . . . mostly driven by record revenues in Europe."  Compl. ¶ 125.  Those statements were true.  Q2

---

[8] For the Court's convenience, each alleged misstatement and the reasons it is inactionable are set forth in Appendix C, with examples described herein.

2023 solar business revenue had reached a record $947,360,000, revenue was growing in Europe, and non-U.S. revenue comprised 80% of the Company's total. *See* Belelieu Decl. Ex. 3 (Aug. 7, 2023 10-Q) at 8, F-29. As another example, on February 14, 2023, during the 2022 Earnings Call, Lando stated that the Company was seeing "very strong demand from Europe for all products." Compl. ¶ 149. This statement was also true. In 2022, SolarEdge's revenue in Europe was up by over $230 million year-over-year. *See* Belelieu Decl. Ex. 1 (Feb. 22, 2023 10-K) at F-53.

**2.    Defendants Had No Duty to Disclose Any of the Information Plaintiffs Claim Was Omitted**

Seeming to acknowledge that all of the statements they highlight were true when made, Plaintiffs fall back on the allegation that the statements triggered a duty to disclose additional facts or information. But this argument fails for two reasons: First, Plaintiffs do not sufficiently plead the existence of the additional information that they claim Defendants were obligated to disclose; and second, even if such information did exist, Plaintiffs fail to establish that Defendants had an affirmative duty to make any additional disclosures.

        a.    <u>Plaintiffs Have Failed to Establish the Truth or Existence of Additional Information That They Claim Defendants Had a Duty to Disclose</u>

For Plaintiffs to claim that Defendants had a duty to disclose certain information, they must sufficiently allege the truth or existence of such information. "[W]here an outcome is merely speculative, the duty to disclose does not attach." *Lipow v. Net 1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 170 (S.D.N.Y. 2015) (citation omitted); *see id.* (collecting cases finding companies not subject to a duty to disclose the speculative consequences resulting from alleged improper practices). Here, because Plaintiffs cannot plead the truth or existence of the purportedly adverse facts that they claim Defendants had a duty to disclose, *see supra* Section I, their assertion of Defendants' duty fails on this ground alone. In fact, the CAC is built on an entirely false premises—*i.e.*, that SolarEdge should have disclose its non-existent sales tactics of "forcing"

20

unwanted product on customers.

          b.      <u>Even If Plaintiffs Had Adequately Alleged the Existence of the Purportedly Omitted Information, Defendants' Statements Did Not Trigger a Duty to Disclose</u>

Fatal to their claims, Plaintiffs have failed to establish that statements made by Defendants created a duty to disclose additional information related to each of the alleged four underlying facts. In discussing the four topics the CAC focuses on—*i.e.*, revenue, inventory, European demand, and sell-through forecasts—Defendants never reached the level of specificity required to trigger a duty to disclose the purportedly omitted information. For this independent reason, Plaintiffs also fail to plead any actionable misstatement or omission.

"Silence, absent a duty to disclose, is not misleading under Rule 10b–5." *Macquarie Infrastructure Corp.,* 601 U.S. at 265 (citation omitted). A party who chooses to speak on a subject triggers a duty to be accurate and complete as to that subject. *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 11 (S.D.N.Y. 2016) (citation omitted). Nevertheless, the securities laws do not "create an affirmative duty to disclose any and all material information." *Kleinman*, 706 F.3d at 152 (citation omitted).

***SolarEdge's Revenue Statements Did Not Trigger a Duty to Disclose the Company's Purported Sales Practices.*** The CAC alleges that the Company's statements which accurately reported revenue, *see* Compl. ¶¶ 121, 123, 125, were nevertheless misleading because the Company had a duty to disclose that the Company's revenues were the result of an alleged practice of "forcing customers to take delivery of unneeded products," *id.* ¶ 120. Defendants' statements about the factors underlying their revenues, however, were too general to trigger a duty to disclose in-the-weeds information about the Company's purported sales practices.

"[C]ompanies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014)

(citation and internal quotation marks omitted).  Of particular relevance here, "there is no general duty under the securities laws for a corporation to disclose its use of aggressive or fraudulent sales tactics."[9]  *In re AT&T/ DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 526 (S.D.N.Y. 2020); *see also In re ITT Educ. Servs., Inc. Secs. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012); *Gavish*, 2004 WL 2210269, at *17 ("[T]here is nothing inherently improper in pressing for sales to be made earlier than in the normal course." (citation omitted)).

"[A]ccurately reported financial statements do not automatically become misleading by virtue of the company's nondisclosure of suspected misconduct that may have contributed to the financial results." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 98-99 (2d Cir. 2021).  Rather, only when a company puts at issue with sufficient specificity the factors underlying reported financials does it create a duty to disclose misconduct potentially contributing to those results.  Importantly, disclosure is only required at the same level of generality as the statement that triggered the duty to disclose.  *In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, 675 F. Supp. 3d 273, 287-90 (E.D.N.Y. 2023) (no duty to disclose alleged corruption in defendant's operations where statements were "too general" and "did not delve into specific details in their recitations of the sources of [their] growth"); *In re ITT Educ. Servs., Inc.*, 859 F. Supp. 2d at 579 (statements "not misleading because they do not suggest that the undisclosed improper activity alleged by Plaintiff was not occurring" (citation omitted)).

Here, in accurately reporting the Company's financial performance, SolarEdge attributed its results to "growth in the United States," an "increase in power prices," "expansion of our portfolio," "record revenues in Europe," and shipments of batteries and inverters, two of the

---

[9] For the avoidance of doubt, the Company did not engage in any misconduct or fraudulent conduct related to its sales practices.  Indeed, Plaintiffs do not allege as much.  They simply allege that SolarEdge was aggressive with respect to its sales practices.

Company's main products.  *See* Compl. ¶¶ 122, 124, 126.  These were true statements; the CAC does not allege otherwise.  Courts have found that these types of general statements do not trigger a duty to disclose more detailed information.  *See, e.g.*, *Schiro*, 396 F. Supp. 3d at 296-97, n.4 (defendant's omission of improper conduct did not render actionable company's general statements that it was "strengthening its footprint with expansion projects" and had a "solid asset base . . . [and] unique portfolio of business solutions"); *Telefonaktiebolaget*, 675 F. Supp. 3d at 287-90 (no duty to disclose improper conduct in Iraq where company made general statements that "network sales growth in the Middle East was mainly driven by some major mobile broadband projects," and "we see investments in R&D paying off including strong performance, a good momentum in North America but also Latin America and Middle East").

The Company's statements about revenue were "far too generic" to require the disclosure of information about "forcing customers" to take on product (which could not have been disclosed for the additional reason that the statement is not true).  *Schiro*, 396 F. Supp. 3d at 297.  Accordingly, even if Plaintiffs here had adequately alleged the existence of the conduct they claim the Company should have disclosed (which Plaintiffs have not), Defendants still did not have to disclose that conduct because the alleged omissions related to general statements about the Company's growth and operations.

***SolarEdge's Inventory Statements Did Not Trigger a Duty to Disclose the Company's Purported Sales Practices***.  Because SolarEdge did not speak on the topics of finished goods inventory or channel inventory with sufficient specificity, its statements did not trigger a duty to disclose information about sales practices.  The CAC alleges that SolarEdge's inventory-related statements, *see* Compl. ¶¶ 127, 128, 130, 132, 134, 138, 139, 141, 143, 145, 146, triggered a duty to disclose that (1) the Company's finished goods inventory levels, and (2) customers' channel

23

inventory levels were the result of the Company's alleged practice of "forcing customers to take delivery of unneeded products." *See id.* ¶¶ 127, 137.

Plaintiffs allege that the Company put at issue the allegedly improper sales practices by attributing their finished goods inventory figures to factors such as "streamlined manufacturing" (*id.* ¶¶ 129, 133), a "normal mode of operation" (*id.* ¶ 131), and "slower growth rates in Europe" (*id.* ¶ 133).[10] Consistent with the case law cited above, none of these generalized comments related to finished goods inventory reached the level of specificity required to trigger a duty to disclose a purported practice of forcing excess product on customers. Rather, Defendants' statements on streamlining, normalcy in operations, and slowing growth rates are "too general" and "did not delve into specific details." *See, e.g.*, *Telefonaktiebolaget*, 675 F. Supp. 3d at 287-290.

Plaintiffs' allegations about channel inventory fare no better. Plaintiffs argue that SolarEdge put at issue the alleged channel stuffing scheme through statements about channel inventory levels, first pointing to statements containing generalized, high-level reporting of trends (for example, "low . . . in most cases," "relatively not high," "normal," and "not so high"). *See* Compl. ¶¶ 138, 139, 141, 143. These four statements are too general to require disclosure of purportedly aggressive sales practices. Plaintiffs also cite the statement that distributors grew to "rely better" on SolarEdge's supply over time and that in the two years preceding September 2023,

---

[10] In laying out statements that identify the causes of finished goods inventory levels, Plaintiffs at times sweep in statements that characterize the *implications* of those levels. *See, e.g.*, Compl. ¶ 129 (discussing the attribution of SolarEdge's finished goods inventory to "streamlined manufacturing" alongside SolarEdge's conceptually distinct statements that "these increased inventory levels benefitted the Company"); *id.* ¶ 133 (discussing the attribution of SolarEdge's finished goods inventory to "slower growth rates" and "streamlined manufacturing" alongside SolarEdge's conceptually distinct assessment that the levels would lead to "a healthy way to reduce shipment costs"). Because statements describing the causes of a trend are distinct from those describing the implications of that trend, Plaintiffs' claim that the Company triggered a duty to disclose the factors underlying inventory figures cannot be sustained through the Company's choice to speak on the *implications* of—rather than the factors behind—the figures.

24

distributors had trouble getting enough of SolarEdge's products.  Both statements relate only to distributors' choices navigating the changing dynamics of the post-pandemic market, not to channel inventory levels, let alone any underlying sales practices.  *See id.* ¶¶ 145, 146.  The Company's statements here did not even delve into the reasons behind channel inventory levels, and therefore could not have triggered a duty to disclose the purportedly omitted information.[11]

**SolarEdge's Statements About European Demand Did Not Create a Duty to Disclose That Demand Was Falling Because Demand Was Not Falling in Europe**.  The CAC alleges that the Company's statements about demand for SolarEdge's products in Europe, *see* Compl. ¶¶ 149-64, triggered a duty to disclose that demand in Europe was falling, *see id.* ¶ 165.  As explained above, because Plaintiffs have pled no facts showing that demand for SolarEdge's products in Europe was falling at this time, there was nothing further for the Company to disclose.

Throughout the class period, demand in Europe was still rising.  *See* Belelieu Decl. Ex. 1 (Feb. 22, 2023 10-K) at F-53; Belelieu Decl. Ex. 2 (May 8, 2023 10-Q) at 8; Belelieu Decl. Ex. 3 (Aug. 7, 2023 10-Q) at 8.  Plaintiffs nevertheless assert that these statements triggered a duty to make statements **contradicting** accurately reported metrics.  And when demand did begin to grow more slowly, the Company explained as much.  SolarEdge was under no duty to represent—and it would have been inaccurate had they done so—that demand was falling when it was not.

**SolarEdge's Statements Related to Product Sell-Through Did Not Create a Duty to Disclose the Methodologies Behind Those Forecasts**.  The CAC alleges that the Company's statements on sell-through forecasts for SolarEdge's products, *see* Compl. ¶¶ 168, 170, 172, 174,

---

[11] Additionally, Plaintiffs confound in several instances channel inventory levels with the distinct concept of inventory days.  *See* Compl. ¶¶ 139, 141, 143, 145.  Given that in these instances the Company was not even speaking about channel inventory levels, Plaintiffs cannot claim such statements triggered any duty to disclose additional information about such levels.

176, triggered a duty to disclose that those forecasts were artificially inflated at the insistence of the Company's executives. As outlined above, Plaintiffs plead almost no facts (beyond one assertion that one CW was told that his numbers were "low") showing that forecasts were inaccurate or improperly manipulated, or that Company executives participated in any such manipulation. *See id.* ¶ 62.

All but one of the statements Plaintiffs use to claim that SolarEdge had a duty to disclose purportedly improper sell-through forecasts are recycled from elsewhere in the CAC. *See id.* ¶¶ 168, 170, 172, 174, 176. Not one of these statements discusses SolarEdge's sell-through forecasts with any specificity, let alone the methodology used to generate those forecasts. Even assuming the purportedly improper methodologies were used (which they were not), without choosing to speak on the topic of how the Company generated its sell-through forecasts, SolarEdge's statements did not trigger a duty to disclose the purported practices undergirding these forecasts. *See Siegel v. Bos. Beer Co., Inc.*, 2022 WL 17417111 (S.D.N.Y. Dec. 5, 2022), at *8 (holding that, even where plaintiffs alleged specific deficiencies in defendant's demand forecasting system, plaintiffs failed to plead defendant "had any independent duty to describe the sufficiency of its forecasting processes to the public" or that it "had to describe the reliability of its forecasting mechanisms in order to prevent any particular disclosure it did make from being misleading").

## C. SEVERAL OF DEFENDANTS' STATEMENTS ARE FORWARD-LOOKING STATEMENTS PROTECTED BY THE PSLRA'S SAFE-HARBOR PROVISION

In addition to the foregoing, several of the alleged statements in the CAC are inactionable for the independent reason that they fall within the PSLRA's safe harbor for forward-looking statements. *See* Compl. ¶¶ 128, 134 (same as 170), 143, 150 (same as 168), 151, 155, 156, 176.

The PSLRA provides a "safe harbor" that protects from securities liability "any forward-looking statement, whether written or oral." 15 U.S.C. § 78u–5(c)(1). Such statements are not

26

actionable under the PSLRA if they were either (1) not made "with actual knowledge" of falsity, or (2) accompanied by "meaningful cautionary statements."  15 U.S.C. § 78u-5(c)(1)(A)-(B).

Forward-looking statements include statements (i) projecting revenue, income, expenditures, and other financial items; (ii) setting forth plans and objectives for future operations; (iii) describing future economic performance; and (iv) on the assumptions underlying or relating to any of the foregoing.  *In re Turquoise Hill Res. Ltd.*, 625 F. Supp. 3d at 209 (citing 15 U.S.C. § 78u-5(i)(1)).  The alleged misstatements listed in Appendix B contain quintessential forward-looking language, including: (1) "will allow us to further improve" (Compl. ¶ 128), (2) "will be cleared" (*id.* ¶¶ 134, 170), (3) "will be similar to" (*id.* ¶¶ 150, 168), (4) "will probably be" (*id.* ¶ 151), (5) "will take us another couple of quarters" (*id.* ¶ 155), and (6) "are going to be" (*id.* ¶ 176).  Because all of these statements projected financial items and economic performance or set forth plans and objectives for future operations, they are forward-looking statements.  *In re Turquoise Hill Res.*, 625 F. Supp. 3d at 209; *see also Slayton v. Am. Express Co.*, 604 F.3d 758, 766-67 (2d Cir. 2010).  Plaintiffs fail to allege that the Company had "actual knowledge" of the falsity of any of these forward-looking statements.  *See In re Turquoise Hill Res.,* 625 F. Supp. 3d at 212 (under this prong of the safe harbor, plaintiffs "must show more than recklessness . . . they must show actual subjective knowledge").  As such, they are inactionable under the PSLRA safe-harbor.

Further, many of the forward-looking statements (*i.e.*, Compl. ¶¶ 128, 134 (same as 170), 143, 150 (same as 168), 151, 155, 176), were accompanied by "meaningful cautionary language" as set forth in Appendix B and are therefore protected by the PSLRA's safe harbor on this independent basis.  Meaningful cautionary language must "convey substantive information about factors that realistically could cause results to differ materially from those projected," but it "need not directly precede or follow the forward-looking statement."  *In re Turquoise Hill Res.*, 625 F.

27

Supp. 3d at 213 (citation omitted); *Slayton*, 604 F.3d at 768-69 (noting the cautionary language was several pages away). Cautionary language may also be incorporated by reference from a separate document. *See In re Turquoise Hill Res.*, 625 F. Supp. 3d at 215 (collecting cases where statements on earnings calls incorporated cautionary language by reference). Here, because participants on each of the three earnings calls at issue were directed to contemporaneously filed press releases that themselves directed readers to SEC filings covering the time period discussed, "the investor conference calls incorporated by reference the cautionary language in the press releases and, in turn, the cautionary language in the [SEC] Forms." *See id.* at 216. Accordingly, where relevant, Appendix B sets forth meaningful cautionary language from each earnings call and from the documents incorporated therein by reference.

**D.    SEVERAL OF DEFENDANTS' STATEMENTS ARE INACTIONABLE CORPORATE OPTIMISM AND PUFFERY**

Several of the Company's statements are inactionable because they are statements of corporate optimism or puffery too general to incur securities liability. *See* Compl. ¶¶ 128, 130, 132, 134 (same as 170), 149, 151, 159, and 162. "General statements of optimism and puffery are non-actionable under federal securities laws because they are not sufficiently specific that a reasonable investor could rely on [them]." *Sask. Healthcare Emp's. Pension Plan*, 2024 WL 775195, at \*20 (alteration in original) (citation and internal quotation marks omitted)). "Even 'misguided optimism is not a cause of action, and does not support an inference of fraud.'" *Id.* (quoting *Shield v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994)). To be actionable, statements of optimism and puffery must contradict facts known to a defendant. *Id.*

Certain alleged misstatements characterized SolarEdge's "mode of operation" as "normal" (Compl. ¶ 130) and manufacturing as "streamlined" (*id.* ¶¶ 128, 132). This is inactionable puffery. The phrase "a more normal mode of operation" and the word "streamlined" constitute the sort of

28

generally optimistic corporate-speak too generic to cause the reliance of a reasonable investor. *See In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021) ("[v]ague positive statements" are non-actionable corporate puffery because defendant is permitted to be confident about its "business model at this level of generality without risking liability"); s*ee also Rombach*, 335 F.3d at 174 (unfocused expressions of puffery and corporate optimism not actionable). Two additional alleged misstatements cast existing facts in a vaguely positive light. In one, Faier stated the situation in Q2 2023 was not like "Europe in 2013" but that "we see it more of a correction rather than a crisis that's going around overall." Compl. ¶ 159. In another, Faier reflected that directing a lot of the Company's shipments to Europe "by the way turned to be a relatively good move given the fact that we see Europe growing relatively quickly right now." *Id.* ¶ 162. Such open-ended interpretations, "[u]nlike specific, factual statements [are] vague descriptions [that] offer only generally optimistic opinions [and] are not actionable under section 10(b) and Rule 10b–5." *In re Turquoise Hill Res.*, 625 F. Supp. 3d at 221 (third alteration in original) (citation and internal quotation marks omitted).

Several additional alleged misstatements merely tout in general terms how the Company was working through an existing scenario and sought to convert it into future opportunities. The Company stated that higher inventory levels would "allow us to further improve our customer delivery time and reduce shipping and logistic expenses" (Compl. ¶ 128) and were a "healthy way to reduce shipment costs, in the various regions" (*id.* ¶ 132); that built channel inventory "will be cleared mostly through the adoption or getting more inverters from us during the third and fourth quarter" (*id.* ¶¶ 134, 170); that "to a large extent, our 2023 in Europe will be similar to the condition we were in in 2022" (*id.* ¶ 150); and that "we're working very hard on solving those couple bottlenecks that we have to solve. . . . I would say somewhere towards the second half of the year,

29

we should expect some relief coming" (*id.* ¶ 151). These too are inactionable puffery, as each reflects the sort of "purely aspirational language [that] . . . is inactionable." *Kusnier v. Virgin Galactic Holdings Inc.*, 639 F. Supp. 3d 350, 373-74 (E.D.N.Y. 2022) (citation omitted); *see also In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 572-73 (S.D.N.Y. 2014) ("rosy predictions . . . loosely optimistic regarding a company's well-being" not actionable (citations and internal quotation marks omitted)).

Because a reasonable investor would not rely upon any of the statements described in this section, Defendants could only incur liability for such statements if they knew facts contradicting these statements. Because Plaintiffs have failed to plead any such facts, these statements of corporate optimism and puffery cannot form the basis of a claim.

## E.  PLAINTIFFS HAVE NOT ADEQUATELY PLEADED SCIENTER

In addition to their failure to allege that any of Defendants' statements were false or misleading, Plaintiffs' sweeping and conclusory allegations of intent to defraud do not satisfy the PSLRA's stringent scienter requirement. To adequately state a claim under Rule 10b-5, the PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A), *i.e.*, "intent[] to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (citation and internal quotation marks omitted). To plead a "strong inference" of scienter, Plaintiffs must allege "facts showing (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022) (citation and internal quotation marks omitted). Plaintiffs fail to plead either element.

### 1.  The CAC Does Not Allege That Defendants Had Motive and Opportunity

As an initial matter, Plaintiffs fail to allege that the Individual Defendants had the motive

30

and opportunity to defraud investors.  To establish motive and opportunity, a plaintiff must assert that the Individual Defendants received some "concrete and personal" benefit from the purported fraud.  *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000).  "Motives that are generally possessed by most corporate directors and officers," like "the desire for the corporation to appear profitable" or "keep stock prices high to increase officer compensation" will not suffice.  *Kalnit v. Eichler*, 264 F. 3d 131, 139 (2d Cir. 2001).  Nowhere in the 80-plus pages of the CAC do Plaintiffs allege that any Individual Defendant received a personal benefit from the alleged fraud.  Thus, they have not pleaded motive and opportunity.

### 2. The CAC Fails to Allege That Any of the Individual Defendants Engaged in Conscious Misbehavior or Recklessness

Far from pleading that any of the Defendants acted with a culpable state of mind or engaged in deliberate illegal behavior, *see Gluck v. Hecla Mining Co.*, 657 F. Supp. 3d 471, 487 (S.D.N.Y. 2023) (citation omitted) (defining conscious misbehavior and recklessness), Plaintiffs' allegations instead amount to a classic case of "fraud by hindsight," as they never specify what information contradicted Defendants' statements or when that information became available to them.

"Recklessness" in the 10b-5 context is "a state of mind approximating actual intent, which can be established by conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *City of Pontiac Policemen's and Firemen's Ret. Sys.*, 752 F.3d at 184 (citation and internal quotation marks omitted).  Recklessness is not "merely enhanced negligence," and "allegation[s] that a defendant [] ought to have known" will not suffice.  *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 535 (S.D.N.Y. 2009) (citations and internal quotation marks omitted).  Rather, to adequately plead recklessness, Plaintiffs must allege that "[1] *specific* contradictory information was available to

31

the defendants [2] *at the same time* they made their misleading statements." *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019) (citation omitted). Moreover, to survive a motion to dismiss, any inference of recklessness "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

Plaintiffs have failed to meet this burden because they do not allege *specific* contradictory information was available to Defendants. In attempting to plead scienter, Plaintiffs allege Defendants: (1) received inventory reports and attended meetings where sales were discussed, but they do not cite the contents of those reports or meetings; (2) covered up unfavorable sales metrics through aggressive sales practices, but they do not allege that Defendants were aware of those practices; (3) should have known about declining sales in Europe because Lando was "detail-oriented" and had worked in the sales department years ago, but they do not allege he was actually aware of the practices or market conditions they now bring claims about; (4) made subsequent statements reflecting changing market forces, but they do not explain why updating one's views of the market demonstrates scienter; and (5) artificially inflated sell-through forecasts, but they do not explain why these forecasts were allegedly inflated. As a result, these allegations repeatedly fail to demonstrate what specific contradictory information Defendants had at the time of their public statements and thus do not sufficiently allege conscious misbehavior or recklessness.

a. Plaintiffs Do Not Allege That Inventory Reports and Meeting Information Contradicted Defendants' Public Statements

Plaintiffs' allegations that Defendants received inventory reports and attended meetings where sales and inventory were discussed do not establish recklessness because Plaintiffs' allegations about those meetings and reports fail to specify what contradictory information they contained. "Where plaintiffs contend defendants had access to contrary facts, they must

32

specifically identify the reports or statements containing this information to indicate how it was inconsistent with the statements made." *In re Hardinge, Inc. Sec. Litig.*, 696 F. Supp. 2d 309, 331 (W.D.N.Y. 2010) (citations omitted). "Plaintiffs must do more than simply assert that a statement is false—'they must demonstrate with specificity why and how that is so.'" *Gluck*, 657 F. Supp. 3d at 489 (quoting *Rombach*, 355 F.3d at 174). Thus, mere implication that a defendant possessed contrary knowledge by virtue of internal reports or meetings is insufficient. The plaintiff must identify the specific information in the report that contradicted Defendants' statements and "any dates or time frame in which Defendants were put on notice of contradictory information." *Plumbers & Steamfitters Loc. 773 Pension Fund v. Can. Imperial Bank of Com.*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010) (citations omitted); *see Loc. No. 38 Int'l. Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010) (scienter not sufficiently pled where a CW alleged he prepared executives' reports on consumer spending and that the CFO received monthly reports on delinquency rates because the allegations "[did] not establish what specific contradictory information the Individual Defendants received or when they received it" (citation omitted)).

Plaintiffs' allegations do not meet this burden because they only allege that Defendants received reports and attended meetings concerning inventory; they do not allege these reports and meetings contradicted Defendants' public statements. Specifically, CW2 alleges "daily inventory reports" communicating the level of channel inventory "were shared with Lando, as well as other senior leadership at SolarEdge, because they were 'one of the basic metrics' for 'assessing' SolarEdge's business." Compl. ¶ 74. CW2 also alleges that "all channel distributors had to provide SolarEdge 'regular reports, I think daily or weekly,' with data on current inventory and point of sale." *Id.* ¶ 75. CW9, a sales manager at U.S. distributor CED Greentech, alleged his

33

employer "sent regular reports to SolarEdge with data on 'movement,' or the amount of inventory sold over a certain period of time." *Id*. ¶ 78.  Finally, CW8 alleges "Europe General Manager Alfred Karlstetter had weekly meetings about SolarEdge's European business with Defendants Lando and Faier," where Karlstetter "provided inventory and channel inventory as well as forecasting updates." *Id.* ¶ 79.  Each of these allegations is insufficient to allege conscious misbehavior or recklessness because they do not contend that any of the information was contrary to any Defendant's statements.

In *In re Federated Department Stores, Inc. Sec. Litig.*, 2005 WL 696894 (S.D.N.Y. Mar. 25, 2005), the Court declined to infer scienter based on allegations that similarly failed to state that the information the defendants received contradicted their public statements.  *Id.* at *4.  There, a putative shareholder class asserted claims under Rule 10b-5 against individual executives for allegedly misrepresenting the aggregate balance of accounts receivable of a recently-acquired subsidiary.  To support their scienter allegations, the plaintiffs alleged that the defendants must have known about the balance of receivables because they received Flash Reports and a Weekly Revolving Charge Monitor and attended quarterly meetings at which receivables were discussed. The plaintiffs even alleged these reports contained statistical and financial information about the accounts receivable, their age, and the growing number of dormant accounts with a balance. Nevertheless, the Court found the allegations insufficient because the complaint did not make clear what information in these reports would have "alerted Defendants to the problem." *Id.*

Like the *Federated Department Stores* plaintiffs, Plaintiffs here do not allege how the inventory reports or meetings "alerted Defendants to the problem."  Instead, the CAC alleges that Defendants must have known about falling demand because Lando and Faier discussed "sell-through reports from our distributors" and "point-of-sale data" on two quarterly earnings calls.

Compl. ¶¶ 84-85.  But Plaintiffs ultimately fail to "provide specific instances in which Defendants received information that was contrary to their public declarations." *Plumbers & Steamfitters Loc. 773 Pension Fund*, 694 F. Supp. 2d at 299 (citation omitted).  Such barebones allegations do not meet the PSLRA's exacting particularity standards.  *See Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 238 (S.D.N.Y. 2020) (dismissing claims where plaintiff failed to "plausibly allege what information was actually included in those reports or discussed at those meetings" and "fail[ed] to plead 'specific contradictory information' that was available to any Defendant at the time they made any challenged statement." (footnote omitted)).

> b.    <u>The CAC Does Not Sufficiently Allege Any Defendant Was Aware of the Alleged Sales Tactics</u>

Knowledge held by employees, whether rank-and-file or senior executives, cannot be attributed to other employees, senior managers, or the individual defendants without clear allegations connecting them to the information.  *See Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 589-91 (S.D.N.Y. 2011) ("[E]ven confidential high level executives' statements will be insufficient absent some allegation that the witness communicated with the individual defendants claimed against in the case, or else that the witness was privy to the individual defendants' knowledge." (citation omitted)).  The CAC omits this crucial link.

For example, CW4, who worked at as a sales manager and director of national sales for the Company's commercial and industrial market between 2015 and 2023, stated he "knew that Defendants were pushing unneeded products on customers because . . . he would get 'hounded' by his supervisors to get the Company's customers to agree to 'free carrier shipping terms.'"  Compl. ¶ 61.  But "his supervisors" are not the Individual Defendants.  CW4 reported to the VP North America Sales, who reported to the North America General Manager with a "dotted line" to SolarEdge's HQ in Israel, under which he "took direction" from several different individuals.  *Id.*

35

¶ 37. Moreover, because CW4 allegedly worked at SolarEdge for seven years leading up to the beginning of the class period, it is not clear whether these instructions were given during "any date[] or time frame" relevant to the CAC. *Plumbers & Steamfitters Loc. 773 Pension*, 694 F. Supp. 2d at 300. Nor does the allegation explain who gave these instructions or how seeking a certain shipping term implies Defendants had knowledge of any allegedly aggressive sales tactics.

In another example, CW7 alleges that "efforts to get distributors to take inventory at the end of the quarters were discussed during "'directors' meetings' that CW7 attended personally." Compl. ¶ 67. CW7 does not allege that any of the Individual Defendants attended these meetings; rather, he "*believed* that that [sic] the discussions in the meetings were communicated up to Lando." *Id.* (emphasis added.) Regardless of how prevalent information within a company allegedly was, failure to explain how Defendants became aware of the information in some particular way renders the scienter allegation too vague and conclusory to satisfy the PSLRA. *See In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 244-45 (S.D.N.Y. 2010) ("Fatal to plaintiffs' claims, however, is that they do not allege with specificity that any of the confidential witnesses relied upon in the Complaint presented information [about an alleged widespread company practice] to the individual defendants." (footnote omitted)).

Furthermore, because the CWs allege no facts concerning the European market, Plaintiffs' allegation that Defendants "inflat[ed] SolarEdge's performance in Europe by forcing customers— e.g., distributors—take [sic] products," Compl. ¶ 100, is conclusory and unsupported. Thus, the channel-stuffing allegations provide no evidence contradicting Defendants' statements.[12]

---

[12] The same reasoning applies to allegations that CW4 warned Defendants Lando and Faier about falling demand. Compl. ¶ 82. As described at length above, CW4 was a member of the U.S. sales team with no connection to Europe. The Company's guidance on the U.S. market reflected any warning he may have given Defendants.

c.      The CAC's Allegations About Lando's Background and Personal
        Qualities Do Not Support an Inference of Scienter

In a desperate attempt to maintain a claim where none exists, Plaintiffs focus on Lando's

personal qualities and sales experience to try to meet the scienter requirement.  The CAC alleges,

for example, that Lando's detail-oriented nature and familiarity with Company sales provide

evidence that he would have known facts contrary to Defendants' statements regarding demand

and inventory levels in Europe.  *Id.* ¶ 72.  "But simply alleging that executive defendants are

closely involved in running their business is not enough to show they had access to contrary

information."  *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781

(S.D.N.Y. 2021) (citation and internal quotation marks omitted).   "If recklessness means

something more culpable than negligence, as it must, then an allegation that a defendant merely

'ought to have known' is not sufficient to allege recklessness."  *Hart v. Internet Wire, Inc.*, 145 F.

Supp. 2d 360, 368 (S.D.N.Y. 2001) (citation omitted).  Here, Plaintiffs' allegations do no more

than "state in conclusory fashion what Defendants should have known" because of Lando's nature

and background.  *In re Am. Express Co. Sec. Litig.*, 2008 WL 4501928, at *6 (S.D.N.Y. Sept. 26,

2008) (citations omitted).  These allegations "are not entitled to any weight" and have been rejected

time and again by this Court.  *Id.*; *see, e.g.*, *Sask. Healthcare Emp.'s Pension Plan*, 2024 WL

775195, at *28 (finding scienter allegations inadequate where the plaintiffs relied on the

defendants' high-level positions within the company, participation in the management of the

company, and awareness of and access to the company's propriety information concerning its

business, operations, financial statements, and financial conditions).

d.      Defendants' Statements About Changing Market Dynamics Are Not
        Evidence of Scienter

Contrary to Plaintiffs' allegations, a defendant's decision to revise prior growth, demand,

or revenue projections is not evidence of recklessness.   "Corporate officials need not be

37

clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Novak*, 216 F.3d at 309 (citation omitted). "A statement believed to be true when made, but later shown to be false, is insufficient" to establish scienter. *Robeco Cap. Growth Fund SICAV – Robeco Glob. Consumer Trends v. Peloton Interactive Inc.*, 665 F. Supp. 3d 522, 540 (S.D.N.Y. 2023) (citing *San Leandro Emergency Medical Grp. Profit Sharing Plan v. Philip Morris Cos., Inc*, 75 F.3d 801, 812-13 (2d Cir. 1996)).

Here, instead of alleging that Defendants knew their statements were false when made, Plaintiffs blame Defendants for tempering prior optimism in response to an unexpected market slowdown. For example, the CAC asserts Defendants "understood that demand for SolarEdge products had declined long before they disclosed the declines" simply because Faier noted on the Q2 2023 Earnings Call that demand in Europe was "very good" but "not as good as we thought." Compl. ¶ 86. "Courts have routinely rejected such fraud by hindsight pleadings." *In re Citigroup Inc.*, 753 F. Supp. 2d at 246 (citing *Novak*, 216 F.3d at 309) (rejecting the argument that subsequent writedowns on the value of certain holdings showed that prior disclosures were misleading). "In the absence of any compelling and specific showing by Plaintiffs, it is far more plausible that Defendants were not deceitful but mistaken" when they update expectations. *In re WEBMD Health Corp. Sec. Litig.*, 2013 WL 64511, at *12 (S.D.N.Y. Jan. 2, 2013) (concluding that subsequent adverse business conditions did not render prior statements false and misleading). Thus, Defendants' more cautious optimism about the European market in the second half of 2023 does not establish scienter, particularly since Defendants did not receive inventory or sell-through reports for each month until the 20th of the following month.

          e.      <u>The CAC Does Not Sufficiently Allege Any Defendant Was Aware of the Allegedly Inflated Sell-Through Forecasts</u>

Plaintiffs also do not allege Defendants were aware of any information that contradicted

their sell-through forecasts.  They simply assert that CW4 "did not agree" with North American managers' forecasts.  Compl. ¶ 62.  But this allegation does not demonstrate Defendants were in possession of the same information CW4 allegedly had, that the information actually contradicted Defendants' forecasts, or that Defendants were aware of the "aggressive" forecasting.  CW4 also does not say when this interaction occurred, casting doubt on whether the data he allegedly relied on was even available during the class period.  The allegation thus falls far short of demonstrating that any Defendant knew these "forecasts were artificially inflated."  Compl. ¶ 169.

> **3.      Plaintiffs Have Not Pleaded Any Scienter Allegations Against Defendants Lowe or Danziger**

At a very minimum, the Court should dismiss Defendants Lowe and Danziger from the case because the CAC asserts no allegations of scienter against them.  *See In re Citigroup Inc.*, 753 F. Supp. 2d at 206 ("For plaintiffs to state a claim against the individual defendants, they must plead scienter adequately for each.").  There are no allegations that either Lowe or Danziger signed any of the securities filings at issue, and the two are only mentioned a handful of times throughout the CAC.  Nor do Plaintiffs allege that either would have been aware of specific contradictory information when making the few alleged misstatements that are attributed to them.  In other words, the CAC contains no substantive allegations concerning the information Lowe or Danziger possessed or when they received it.  Moreover, the CAC does not explain why two individuals primarily responsible for investor relations would receive, analyze, or even fully understand the type of market data Plaintiffs rely on.  *See In re Sec. Cap. Assurance, Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 595 (S.D.N.Y. 2010)  ("Plaintiffs' broad allegations that Defendants received and were aware of information contradicting their public statements because they held management roles is not enough to allege scienter." (citations omitted)).

39

**F.      PLAINTIFFS FAIL TO STATE A 20(a) CLAIM BECAUSE THEY FAIL TO STATE A 10(b) CLAIM**

Plaintiffs' Section 20(a) claim also fails because, as demonstrated above, the CAC does not adequately allege any Defendant is liable for a primary violation of Section 10(b).  Where a plaintiff "fails to allege any primary violation . . . it cannot establish control person liability." *ATSI Commc'ns. Inc.*, 493 F.3d at 108; *Rombach*, 355 F.3d at 177-78 (describing control person liability as "necessarily predicated upon a primary violation of securities law").

## CONCLUSION

For the above reasons, the CAC should be dismissed in its entirety, together with such other relief as the Court deems just and proper.

Dated: July 15, 2024                             Respectfully submitted,
       New York, New York
                                                 GIBSON, DUNN & CRUTCHER LLP


                                                 By:/s/ Christopher D. Belelieu
                                                     Christopher D. Belelieu

                                                 Christopher D. Belelieu
                                                 Nathan C. Strauss

                                                 GIBSON, DUNN & CRUTCHER LLP
                                                 200 Park Avenue
                                                 New York, NY  10166-0193
                                                 Telephone:  212.351.4000
                                                 Facsimile:  212.351.4035
                                                 CBelelieu@gibsondunn.com
                                                 NStrauss@gibsondunn.com


                                                 *Attorneys for Defendants*

40