**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE SOLAREDGE TECHNOLOGIES, INC. SECURITIES LITIGATION | No. 1:23-cv-09748-GHW <br><br> **CLASS ACTION** |
| THIS DOCUMENT RELATES TO: <br><br> *ALL ACTIONS* |  |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................ 1

II. STATEMENT OF FACTS ................................................................................. 5

    A. Background of SolarEdge ...................................................................... 5

    B. As Demand Declines, SolarEdge Forces Product on Customers............................ 6

    C. Defendants Misrepresented SolarEdge's Performance, Demand, and Inventory ..................................................................... 10

    D. The Truth Emerges .............................................................................. 11

    E. Post-Class Period Events ...................................................................... 12

III. ARGUMENT...................................................................................................... 12

    A. LEGAL STANDARD........................................................................... 12

    B. THE CAC'S ALLEGATIONS ARE WELL-PLEADED.................................... 13

    C. THE CAC ALLEGES FALSE AND MISLEADING STATEMENTS .............. 18

        1. When Defendants Chose to Tout the Sources of SolarEdge Revenues, They Had a Duty to Make Their Disclosures Complete and Accurate..... 18

        2. Defendants Misled Investors About SolarEdge's Inventory Growth ....... 20

        3. Defendants Mispresented Channel Inventory Levels in Europe............... 24

        4. Defendants Misrepresented Demand in Europe ...................................... 26

        5. Defendants Misled Investors Regarding Sell-Through Forecasts ............ 30

    D. THE CAC ALLEGES A STRONG INFERENCE OF SCIENTER..................... 32

        1. Defendants Knew or Recklessly Disregarded Facts Contradicting Their Public Statements.................................................................... 32

        2. Defendants' Misleading Responses to Questions Support a Scienter Inference ........................................................................... 35

        3. The Magnitude and Timing of Guidance Reduction Supports Scienter ... 35

        4. The CAC Does Not Allege "Fraud by Hindsight"................................... 36

        5. Core Operations Supports an Inference of Defendants' Scienter ............ 37

6. The CAC alleges Lowe and Danziger's Scienter ..................................... 38

7. The CAC Alleges Corporate Scienter for SolarEdge ............................... 38

8. A Holistic View Supports a Strong Inference of Scienter ........................ 39

E. THE CAC PLEADS CONTROL PERSON LIABILITY .................................... 40

F. PLAINTIFFS RESPECTFULLY REQUEST AN OPPORTUNITY TO AMEND ......................................................................................................... 40

IV. CONCLUSION............................................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*380544 Canada, Inc. v. Aspen Tech., Inc.*,
544 F. Supp. 2d 199 (S.D.N.Y. 2008).......................................................................................40

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002).......................................................................................................36

*Anwar v. Fairfield Greenwich Ltd.*,
728 F. Supp. 2d 372 (S.D.N.Y. 2010)..........................................................................19, 22, 28

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................................................................12

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014)......................................................................................................12

*City of Providence v. Aeropostale, Inc.*,
2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ......................................................23, 26, 30, 31

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
587 F. Supp. 3d 56 (S.D.N.Y. 2022)....................................................................................21, 22

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*,
2020 WL 4547217 (S.D.N.Y. Aug. 6, 2020)......................................................................16, 17

*Emps' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015).............................................................................................. *passim*

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)........................................................................17, 29, 30

*Galestan v. OneMain Holdings, Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018)......................................................................................23

*Gavish v. Revlon, Inc.*,
2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004)....................................................................16, 20

*Gross v. AT&T Inc.*
2021 WL 9803956 (S.D.N.Y., 2021)........................................................................................16

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
422 F. Supp. 3d 821 (S.D.N.Y. 2019)..................................................................................14, 38

*In re Allaire Corp. Sec. Litig.*,
    224 F. Supp. 2d 319 (D. Mass. 2002) ..................................................................23

*In re AnnTaylor Stores Sec. Litig.*,
    807 F. Supp. 990 (S.D.N.Y. 1992) .....................................................................36

*In re AppHarvest Sec. Litig.*,
    684 F. Supp. 3d 201 (S.D.N.Y. 2023)......................................................17, 33, 34

*In re AT&T/ DirecTV Now Sec. Litig.*
    480 F. Supp. 3d 507 (S.D.N.Y. 2020)..................................................................20

*In re ATI Techs., Inc. Sec. Litig.*,
    216 F. Supp. 2d 418 (E.D. Pa. 2002) ..................................................................19

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004)..............................................................36, 37

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)..............................................................................16

*In re CommVault Sys., Inc. Sec. Litig.*,
    2016 WL 5745100 (D.N.J. Sept. 30, 2016) ..........................................................17

*In re Comp. Assocs. Class Action Secs. Litig.*,
    75 F.Supp.2d 68 (E.D.N.Y.1999) ..................................................................27, 29

*In re Complete Mgmt. Inc. Sec. Litig.*,
    153 F. Supp. 2d 314 (S.D.N.Y. 2001)..................................................................35

*In re Dentsply Sirona, Inc. Sec. Litig.*,
    665 F. Supp. 3d 255 (E.D.N.Y. 2023) ....................................................15, 21, 27, 30

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
    469 F. Supp. 2d 88 (S.D.N.Y. 2006)................................................................23, 24

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012)..............................................................35, 37

*In re Gentiva Sec. Litig.*,
    971 F. Supp. 2d 305 (E.D.N.Y. 2013) ..................................................................39

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
    20 F.4th 131 (2d Cir. 2021) ...............................................................................39

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) .........................................................37

*In re ITT Educ. Servs., Inc. Sec. Litig.*,
  34 F. Supp. 3d 298 (S.D.N.Y. 2014)......................................................37, 39, 40

*In re ITT Educ. Servs., Inc. Secs. & S'holder Derivatives Litig.*,
  859 F. Supp. 2d 572 (S.D.N.Y. 2012).............................................................20

*In re KeySpan Corp.*,
  2003 WL 21981806 (E.D.N.Y. July 30, 2003) ...............................................36

*In re Nielsen Holdings PLC Sec. Litig.*,
  510 F. Supp. 3d 217 (S.D.N.Y. 2021).............................................................36

*In re Paine Webber Sec. Litig.*,
  1992 WL 725359 (S.D.N.Y. Sept. 18, 1992)...................................................24

*In re Pareteum Sec. Litig.*,
  2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021)..................................................35

*In re Plantronics, Inc. Sec. Litig.*,
  2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ................................................16

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ........................................................................34

*In re Revlon, Inc. Sec. Litig.*,
  2001 WL 293820 (S.D.N.Y. Mar. 27, 2001) ..................................................16

*In re Sadia, S.A. Sec. Litig.*,
  643 F. Supp. 2d 521 (S.D.N.Y. 2009).............................................................14

*In re Salix Pharms., Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)..........................................24, 26, 34

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)..............................................................................13

*In re Scientific-Atlanta, Inc. Securities Litigation*,
  239 F. Supp. 2d 1351 (N.D. Ga. 2002) ..............................................18, 19, 27, 28

*In re Sec. Cap. Assur. Ltd. Sec. Litig.*,
  729 F. Supp. 2d 569 (S.D.N.Y. 2010).............................................................38

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)........................................14, 17, 29

*In re Synchrony Fin. Sec. Litig.*,
  2022 WL 427499 (D. Conn. Feb. 11. 2022) ...........................................35, 38

*In re Telefonaktiebolaget LM Ericsson Sec. Litig.*,
  675 F. Supp. 3d 273 (E.D.N.Y. 2023) ................................................................20

*In re U.S. Interactive, Inc.*,
  2002 WL 1971252 (E.D. Pa. Aug. 23, 2002) ......................................................28

*In re Urb. Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015) ..........................................................26, 29

*In re Vale S.A. Sec. Litig.*,
  2020 WL 2610979 (E.D.N.Y. May 20, 2020) ....................................................22

*In re Van der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005)................................................................18

*In re VEON Ltd. Sec. Litig.*,
  2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017)....................................................39

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
  195 F. Supp. 3d 528 (S.D.N.Y. 2016)................................................................31

*Inst. Inv. Grp. v. Avaya*,
  564 F. 3d 242 (3d Cir. 2009)............................................................................33

*Karimi v. Deutsche Bank Aktiengesellschaft*,
  607 F. Supp. 3d 381 (S.D.N.Y. 2022)................................................................33

*Kopchik v. Town of E. Fishkill, N.Y.*,
  759 F. App'x 31 (2d Cir. 2018) ........................................................................40

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015)........................................................................32, 38

*Lozada v. TaskUs, Inc.*,
  2024 WL 68571 (S.D.N.Y. Jan. 5, 2024) ..........................................................13

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014)..............................................................18, 21, 22

*Moshell v. Sasol Ltd.*,
  481 F. Supp. 3d 280 (S.D.N.Y. 2020)................................................................33

*Murphy v. Precision Castparts Corp.*,
  2017 WL 3084274 (D. Or. June 27, 2017) ................................................. *passim*

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
  709 F.3d 109 (2d Cir. 2013)..............................................................................17

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 Fed. Appx. 10 (2d Cir. 2011) .........................................................................32

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).......................................................................21, 22, 32

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019)................................................................ *passim*

*Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
    595 F.3d 86 (2d Cir. 2010)...................................................................................19

*Pelletier v. Endo Int'l PLC*,
    439 F. Supp. 3d 450 (E.D. Pa. 2020) ....................................................................13

*Pirnik v. Fiat Chrysler Autos., N.V.*,
    2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ..........................................................35

*Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
    2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019) .........................................................34

*Police & Fire Ret. Sys. of the City of Detroit v. Crane*,
    87 F. Supp. 3d 1075 (N.D. Cal. 2015) ..................................................................31

*Pub. Emps' Ret. Sys. of Mississippi v. Mohawk Indus., Inc.*,
    564 F. Supp. 3d 1272 (N.D. Ga. 2021) .................................................................16

*Roofer's Pension Fund v. Papa*,
    2018 WL 3601229 (D.N.J. July 27, 2018)..............................................................22

*Schaffer v. Timberland Co.*,
    924 F. Supp. 1298 (D.N.H. 1996).........................................................................22

*Schiro v. Cemex, S.A.B. de C.V.*,
    396 F. Supp. 3d 283 (S.D.N.Y. 2019)....................................................................20

*SEC v. Infinity Grp. Co.*,
    212 F.3d 180 (3d Cir. 2000)..................................................................................40

*Sgalambo v. McKenzie*,
    739 F. Supp. 2d 453 (S.D.N.Y. 2010)....................................................................34

*Sinnathurai v. Novavax, Inc.*,
    645 F. Supp. 3d 495 (D. Md. 2022) .................................................................33, 34

*Sjunde AP-Fonden v. Gen. Electric Co.*,
    417 F. Supp. 3d 379 (S.D.N.Y. 2019)....................................................................34

*Sloman v. Presstek, Inc.*,
   2007 WL 2740047 (D.N.H. Sept. 18, 2007) ..........................................................................36

*Snowstorm Acquisition Corp. v. Tecumseh Prod. Co.*,
   739 F. Supp. 2d 686 (D. Del. 2010) .................................................................................23, 31

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
   2024 WL 456745 (S.D.N.Y. Feb. 5, 2024) ...........................................................................22

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
   531 F.3d 190 (2d Cir. 2008) ................................................................................................39

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .............................................................................................................32

*Think Village-Kiwi, LLC v. Adobe Sys., Inc.*,
   2009 WL 3837270 (N.D. Cal. Nov. 16, 2009) .....................................................................24

*Vrakas v. United States Steel Corp.*,
   No. CV 17-579, 2018 WL 4680314 (W.D. Pa. Sept. 29, 2018) ...........................................28

*Weston v. DocuSign, Inc.*,
   669 F. Supp. 3d 849 (N.D. Cal. 2023) .................................................................................34

*York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*,
   2024 WL 1327247 (N.D. Cal. Mar. 27, 2024).....................................................................24

**Statutes**

15 U.S.C. 78u-4 ..............................................................................................................................13

Private Securities Litigation Reform Act of 1995 ...........................................................13, 26, 27

**Rules**

Fed. R. Civ. P. 9............................................................................................................................13

Fed. R. Civ. P. 12..........................................................................................................................12

Court-appointed Lead Plaintiffs Mivtachim the Workers Social Insurance Fund Ltd., Keren Hgimlaot Hmerkazit Histadrut Central Pension Fund Ltd., Kerren Makefet Pension and Provident Center Cooperative Society Ltd., the Hadassah Workers Pension Fund Ltd., and Hachshara Insurance Company Ltd., and Named Plaintiff Javier Alcides Cascallar (collectively, "Plaintiffs"), respectfully submit this memorandum of law in opposition to Defendants'[1] Motion to Dismiss (ECF No. 65, "Mot.") the Consolidated Amended Complaint (ECF No. 55, "CAC").[2]

## I.   INTRODUCTION

Plaintiffs bring this securities fraud class action on behalf of investors in SolarEdge Technologies, Inc. ("SolarEdge," or the "Company") from February 13, 2023, to October 19, 2023, inclusive (the "Class Period"), to recover losses incurred as a result of the repeated false and misleading statements Defendants used to string along shareholders while the Company's solar energy business deteriorated.

During the Class Period Defendants misrepresented that (i) SolarEdge's financial performance resulted from market factors and its product portfolio, when in reality customers were forced to take delivery of unneeded products at the end of fiscal quarters; (ii) the Company's "finished goods" inventories (*i.e.*, inventories of completed products available for sale) and channel inventories (*i.e.*, inventories held by SolarEdge customers that had not been sold through to end users) were at healthy levels, when they were skyrocketing because of declining demand; (iii) demand for the Company's products in Europe, its most important region, was strong, when

---

[1] "Defendants" are collectively SolarEdge Technologies, Inc. ("SolarEdge" or the "Company"), and Zvi Lando ("Lando"), Ronen Faier ("Faier"), Lior Danziger ("Danzinger"), and J.B. Lowe ("Lowe"). Lando., Faier, Danziger, and Lowe collectively are the "Individual Defendants."

[2] References to "¶_" are to paragraphs of the CAC. Capitalized terms not defined herein have the meanings assigned to them in the CAC.

it was declining sharply; and (iv) the Company's projections for "sell-through" (*i.e.*, sales of its products by SolarEdge customers through to installers and other end users) were based informed sources, when in reality they were arbitrarily inflated. When the truth emerged, SolarEdge's share price plummeted by over 27%, crushing investors.

SolarEdge manufactures, markets, and sells solar power systems. Its most important region by far is Europe, which generated 64% of its revenues in 2023, the year encompassing the Class Period. It sells products to customers, who "sell through" those products to "end users," but it recognizes revenue when customers receive products, not when products are sold through.

According to multiple former SolarEdge employees who spoke to Plaintiffs' investigators as confidential witnesses,[3] demand for SolarEdge products in Europe was declining, and the Company was only achieving its revenue targets by forcing customers to take unneeded products at the end of each financial quarter, including by shipping products early, giving customers more time to pay, and finding ways to recognize orders as revenue before the products even shipped.The Company's practice of forcing unneeded products on customers caused channel inventories to skyrocket and, in turn, SolarEdge's internal inventory of products ready for sale, or "finished goods," exploded. Indeed, the Company's finished goods inventory alone ballooned from $202 million to $731 million over the course of the Class Period, *an increase of 261.9%*.

Defendants knew or recklessly disregarded this practice of forcing unneeded products on customers, declining demand, and increased channel and internal inventories. For example, CW4, the Company's former Director of National Sales – Commercial and Industrial ("C&I"), stated that he directly informed Lando and Faier that demand for SolarEdge products was falling and that "***the market was a lot worse than they thought***," at multiple Quarterly Business Review meetings

---

[3] Confidential witnesses are referred to in the masculine to protect their anonymity.

("QBRs") in the first half of 2023. Defendants also knew the truth about declining demand and increasing channel inventories through reports they received from SolarEdge's customers.

Defendants did not disclose to investors the declining demand, forced sales, or saturated channel inventories. Instead, Defendants misattributed the Company's revenues to market developments and its product portfolio, assured investors that SolarEdge's rising internal inventories were normal, claimed that channel inventory levels were "low," and touted high demand for the Company's products in Europe. For example, at the start of the Class Period, Lando touted to investors that "*we continue to see very strong demand from Europe for all products and relatively low inventory levels in the channel*," and "*as far as we can see, the [Europe] market is – the demand is good, and the market is strong, and we are ramping production to meet demand*." Similarly, on May 3, 2023, during an earnings call with investors and analysts, Lando stated that "*not only . . . [do] we see that the level of [channel] inventory is relatively not high, but it's actually that we see record sellout of products coming from the distribution channels*." These and many other statements were false and misleading.

Defendants eventually had no choice but to partially acknowledge the truth during an earnings call with investors on August 1, 2023. On that call, Defendants admitted that the European solar markets were "impacted by higher interest rates and excess inventory" and attributed SolarEdge's own internal increases in finished goods to, among other things, "slower growth rates in Europe." Although the belated disclosures of "excess inventory" and "slowing growth" in Europe rocked the Company's share price, which the following day fell $43.96 per share, or 18.3%, to close at $195.51 per share, Defendants vigorously spun these disclosures to reassure investors. These assurances placated analysts, who continued to tout SolarEdge.

3

Defendants continued misrepresenting demand for SolarEdge products until late September 2023. On September 21, 2023, for example, Lowe attended a question-and-answer session with analysts at KeyBanc Capital Markets Inc.'s Energy Transition Symposium ("KeyBanc Symposium"). At the symposium, an analyst asked Lowe to comment on the "current inventory cycle." Lowe responded that nothing had changed, "***underlying demand for solar is very, very strong***," and "***the data we see from our distributors is continuing to show significant growth in terms of sell-through into Europe***."

On October 19, 2023, less than a month after the KeyBanc symposium, the truth fully emerged, and the undisclosed risks concealed by Defendants' misstatements materialized. After markets closed, SolarEdge issued a press release announcing that "[d]uring the second part of the third quarter of 2023, we experienced substantial unexpected cancellations and pushouts of existing backlog from our European distributors," "third quarter revenue, gross margin and operating income will be below the low end of the prior guidance range," and the Company "anticipates significantly lower revenues in the fourth quarter of 2023 as the inventory destocking process continues." The Company's share price plummeted $31.08 per share, or 27.2%, to close at $82.90 per share. Analysts were stunned—one remarked that Defendants had "signaled much deeper challenges than previously suggested by management commentary."

After the Class Period Defendants effectively acknowledged during an earnings call that demand in Europe had been declining earlier than they previously disclosed, including when they assured the market that demand was strong. Lando stated that demand in Europe "began to slow in the third quarter" and "[a]lthough the dynamics are consistent with what we caution during our second quarter earnings call, the magnitude grew much greater than we anticipated." In other words, at a minimum, while Defendants touted European demand to investors in August and

September 2023, including at the KeyBanc Symposium, demand had slowed. Plaintiffs brought this action to recover the losses they suffered due to Defendants' fraud.

Defendants primarily ask the Court to dismiss the CAC because (i) the CWs cannot be credited; (ii) Defendants had no duty to disclose the allegedly omitted information; (iii) Defendants' alleged misstatements were forward-looking or puffery; and (iv) Defendants lacked scienter. These arguments fail. *First*, the CAC alleges a basis for the CWs' knowledge and facts corroborating their allegations, including Defendants' own admissions, and thus those allegations must be accepted as true. *Second*, by affirmatively characterizing revenues, internal inventories, channel inventories, and demand, Defendants were obligated to disclose the full truth, which they repeatedly failed to do. *Third*, Defendants' statements contained statements of present facts, omitted material information, were not accompanied by meaningful cautionary language, and were made with knowledge of their falsity, and thus are not protected forward-looking statements. *Fourth*, courts consistently hold that statements like Defendants' are sufficiently detailed to not constitute puffery. *Sixth*, Defendants' scienter can be inferred from their knowing or reckless disregard of information contradicting their public statements, misleading responses to analyst questions, and timing and magnitude of revised guidance. The Motion should be denied.

## II.    STATEMENT OF FACTS

### A.  Background of SolarEdge

SolarEdge is an Israel-based company that designs, develops, manufactures, and sells inverter solutions for photovoltaic solar energy systems. ¶¶43-45. The Company's customers are primarily distributors, wholesalers, and installers who "sell through" SolarEdge products to end users. ¶47. The Company recognizes revenue when its customers receive products from SolarEdge, not when those customers sell products through to end users. ¶48. SolarEdge discloses its own inventory, which it breaks up into "raw materials," "work in progress," and "finished goods," *i.e.*, completed

products available for sale. ¶49. It does not disclose "channel inventory," or inventory held by customers that has not been sold through. *Id.* SolarEdge operates in three "regions": the U.S., Europe, and Rest of World. ¶51. Europe is by far the Company's most important region, producing 64% of the Company's revenues in 2023, *i.e.*, the year of the Class Period. *See* ¶¶51-52. Analysts agreed that a main reason to invest in SolarEdge was its Europe business. *See* ¶¶54, 56.

### B. As Demand Declines, SolarEdge Forces Product on Customers

At the start of the Class Period, demand in Europe for SolarEdge products declined and channel inventory increased. Rather than disclose the truth, Defendants pushed customers to take unneeded products so that SolarEdge could meet its revenue targets. ¶57. CW2, for example, a former SolarEdge regional sales manager for Canada, the northeastern U.S., and the Caribbean, stated that he heard in discussions with colleagues, including the Company's Vice President for North America Sales, Amit Cohen ("Cohen"), and North America General Manager, Peter Mathews ("Mathews"), in February/March 2023 concerns that "Europe wasn't going well," *i.e.*, demand was declining. ¶58. In addition, CW4, the Company's former Senior Director of National Sales – C&I, directly informed Lando and Faier (as well as Mathews, Cohen, and other executives) at multiple quarterly business review meetings ("QBRs") in the first half of 2023 that customers were not buying products because demand was declining. ¶82.

Investment analysts repeatedly confronted Defendants with rumors of declines in Europe, but Defendants denied demand was declining. ¶¶94-96. Finally, in August 2023, during the Q2 2023 Call, Faier revealed that "demand [in Europe in the second quarter] is fairly strong, not maybe as strong as people believed from the very beginning of the year." Belelieu Ex. 6 at 12.[4] A week later,

---

[4] Paragraph 86 of the CAC misquotes Faier, who said, "demand is fairly strong, not maybe as strong as people believed from the very beginning of the year," not "[i]t's a very good underlying

on August 8, at an investor conference ("Oppenheimer Conference"), Faier again acknowledged European demand had been declining, telling attendees that "the underlying demand is very strong, although not as strong as everyone thought." ¶86.

Slowing demand in Europe also was reflected in SolarEdge's own inventory, which skyrocketed during the Class Period. ¶50. While the Company had held $729 million in inventory ($202 million of finished goods) as of December 31, 2022, that inventory had increased 20%, to $874 million (with finished goods inventory increasing 64.4% to $303) at the end of Q1 2023 and rising an additional 12.6%, to $984 million (with finished goods inventory increasing another 46.4% to $487 million), at the end of Q2. *Id.* SolarEdge's inventory rose a total of 35% (and its finished goods inventory rose 141%) during the first half of 2023. *Id.*

In the face of declining European demand, Defendants forced customers to take shipments of unneeded product. ¶¶58-70. This enabled SolarEdge to meet revenue goals because the Company generally recognized revenue when products were received, not sold through to end users. ¶¶48, 60, 63. According to CW2, for example, Defendants forced customers to take product was to intentionally ship product early and, if a customer complained, offer to give the customer more time to pay, or "extend payment terms." ¶58. This allowed SolarEdge to book revenue even though it would not receive cash for months. *See id.* CW2 said that these early shipments "only went one way" and always "happened near the end of the quarter." *Id.* CW2 recalled this happening frequently to CED Greentech, a large customer. ¶85. CW2 said this practice backfired when channel inventories became saturated and distributors could not take any products, which caused the Company's inventories to explode. *Id.* CW5, a former SolarEdge sales and operations associate

demand, not as good as we thought." *Compare* ¶86 *with* Belelieu Ex. 6 at 12. Faier made the latter statement at a conference on September 6, 2023. ¶163; Belelieu Decl. Ex. 15 at 5.

7

with a background in accounting, corroborated this account, and described how customers tried to outright cancel orders as early as February 2023 because of high channel inventories. ¶64. These customers included, among many others, CED Greentech and another customer that sought to cancel a $50 million order. See *id.* CW7, a former Senior Inside Sales Manager who reported to Cohen, corroborated these accounts and described how he heard customers complain of high channel inventory levels in the first half of 2023. ¶67.

Additional CWs corroborated SolarEdge forcing product on customers. For example, CW6, a former Director of C&I sales, who reported to CW4, recalled European distributor Krannich Solar and other customers being "force[d] to take product at the end of the quarters." ¶65. CW7 said SolarEdge consistently "shove equipment down" the "throats" of U.S. distributors at the end of quarters to hit quarter-end numbers, and specifically recalled a CED Greentech employee screaming in protest. ¶66. CW8, the Company's former Director Customer Support, said SolarEdge was so focused on pushing products at quarter ends that customer service operations essentially "shut down." ¶68.

CW4 also described how distributors asked to delay orders, but SolarEdge would refuse and ship the product anyway, especially at the end of a quarter. ¶60. CW4 also stated that at the end of quarters, his supervisors would pressure him to get customers to agree to "free carrier shipping terms," which allowed the Company to accelerate revenue recognition by recognizing revenue at the "point of origin," *i.e.*, manufacturing location. ¶61. CW5 also recalled that the Company began asking customers for such shipping terms in Q1 or Q2 2023 (¶63), and CW4 described how SolarEdge leaders, including Mathews, Cohen, and others, insisted on adopting inflated sales forecasts that were not supported by market reports or internal data. ¶62.

8

The CWs also described how Defendants knew, or recklessly disregarded, the Company's practice of forcing product on customers and the ensuing high channel inventory levels. CW7 for example, attended weekly directors' meetings from 11 AM to 12:30 PM in SolarEdge's Milpitas, California office, which were attended by Cohen, Mathews, and other directors, where efforts to force distributors to take inventory at the end of quarters was discussed. ¶67. CW7 believed these discussions were communicated up to Lando. *Id.* CW8 also discussed pushing inventory on distributors to "hit numbers" with Mathews, Cohen, and other high-level executives, which he was sure was "coming from Lando or the top of the Company" since Lando had been head of sales before becoming CEO and thus would have been involved in sales strategy. ¶69. CW1, a former SolarEdge business intelligence administrator, confirmed that Lando ran SolarEdge's sales for 10 years and was subsequently appointed CEO because he was the person that best understood the Company. ¶72. CW7 characterized Lando as an especially detail-oriented CEO extemporaneously provided "extra details" about the Company's business during regular "all-hands meetings." *Id.*

CW3, a former SolarEdge executive administrator, described how Lando, Faier, Cohen, Mathews, and other executives participated in QBRs and discussed inventory, financial performance, and forecasts. ¶80. CW8 stated that Europe General Manager Alfred Karlstetter had weekly meetings about SolarEdge's business in Europe with Lando and Faier and provided them with internal inventory, channel inventory, and forecasting updates during QBRs as well. ¶81.

CW2 described how Lando and other senior leadership at SolarEdge received daily inventory reports containing levels of channel inventory showing the location of every piece of unsold equipment worldwide. *See* ¶74. CW2 knew of the reports because he discussed them during sales meetings with colleagues (*id.*), while CW4 said that he knew that Lando and Faier reviewed these reports because they could point to specific distributors worldwide where CW4 could obtain

9

products (¶77). CW2 and CW4 both said Defendants knew exact levels of channel inventory because customers were contractually required to provide regular reports of channel inventory and point of sale data. ¶¶74-77. CW9 confirmed that CED Greentech sent such reports to SolarEdge. ¶79. In fact, on earnings calls with investors, Lando and Faier confirmed that they received these reports, the data the reports contained, and that they reviewed the reports. ¶¶84-85. Lowe told investors that he reviewed this data as well. ¶164.

### C. Defendants Misrepresented SolarEdge's Performance, Demand, and Inventory

While demand in Europe declined, customers were forced to take unneeded products, and internal and channel inventory levels soared, Defendants concealed these facts from investors until less than a month before they finally admitted the truth. ¶87. For example, during the 2022 Earnings Call on February 13, 2023, the first day of the Class Period, Lando touted that SolarEdge had "concluded the quarter with record revenues," driven by sales in Europe, which he expressly attributed to the increase in power prices prior to the beginning of the Ukraine-Russia conflict and the Company's expanded portfolio but omitted that Defendants forced customers to take unneeded products. *See* ¶121. Lando also highlighted on the call that SolarEdge forecast that Europe's stellar results would continue in 2023. *See* ¶168. Indeed, Lando repeatedly misattributed the reasons underlying SolarEdge's financial performance well into the Class Period. ¶¶89-91, 121-26.

In addition, Defendants mischaracterized surging internal inventories as "normal" and from "streamlined manufacturing" (*see* ¶¶128, 130, 132), and channel inventories in Europe as "low" and "relatively not high" (¶¶138-41). Defendants also misrepresented European demand as "very strong," "far exceeding our ability to manufacture and deliver," "good," "healthy and robust" (¶¶148-53; *see* ¶¶149-56), even in response to questions from skeptical analysts (¶¶154, 156-57).

On August 1, 2023, towards the end of the Class Period, Defendants grudgingly acknowledged that channel inventories had increased but took pains to continue to mislead

investors. ¶179. Instead of disclosing that channel inventories were clogged with products forced on customers, Defendants insisted that channel inventories were "not high at all," "at the normal level," and a reflection of customers choosing to "rely better on our supply" or "simply overstock[ing]." ¶¶140-46. Defendants also assured investors that the Company forecast that inventories would be cleared quickly (¶¶170-76) and claimed that the demand for the Company's products in Europe was still "high," "very strong," "growing relatively quickly" (¶¶158, 162-64; *see* ¶¶159-61). Incredibly Defendants misrepresented that underlying demand was strong as late as September 21, 2023, when Lowe touted that "underlying demand [in Europe] for solar is very, very strong," and data "is continuing to show significant growth in terms of sell-through." ¶164.

### D.  The Truth Emerges

As described above, Defendants acknowledged on August 1, 2023 that SolarEdge's European distributors were "experiencing higher-than-optimal" channel inventories and that "growth in demand has tapered off." ¶¶179-80. Although Lando emphasized—including in response to direct questions from analysts—that these developments were blips, he disclosed that the Company's "guidance" for Q3 2023 was that quarterly solar revenues would decline from $947.4 million in Q2 2023 to between $850 million and $890 million in Q3. ¶¶186-90. On this news, the Company's share price fell $43.96 per share, or 18.3%, to close at $195.51. ¶¶191-92.

The truth fully emerged on October 19, 2023, when SolarEdge issued a press release disclosing that "[d]uring the second part of the third quarter of 2023, we experienced substantial unexpected cancellations and pushouts of existing backlog from our European distributors" and, as a result, third quarter revenue guidance was further lowered by another approximately 17%, $720 million to $730 million. ¶¶192-93. The Company's share price plummeted again. ¶197.

11

### E. Post-Class Period Events

After the Class Period, Defendants effectively revealed that they had known about declining demand and saturated channel inventories long before they disclosed them. On November 1, 2023, Defendants held the Q3 2023 Call, during which they confirmed that revenues from the Company's solar business had plummeted 23.4% from $947.4 million in Q2 2023 to $725.3 in Q3 2023, and thus Lando's *downwardly revised* earnings guidance on the Q2 Call had had nevertheless overshot Q3 revenues by *14.7%-18.5%*. *See* ¶110. Lando also revealed that demand in Europe "began to slow in the third quarter"—specifically in from mid-August on, when, as described above, Defendants were still assuring investors that demand was strong. ¶¶111-13. On the same call, Faier claimed that this $222.1 million revenue decline had not become apparent until very end of Q3. ¶114. But this post-hoc justification beggared belief given that it suggested that the Company had lost hundreds of millions of dollars in two weeks. *See id.* The following February, Defendants admitted that their guidance and forecasts of revenues, demand, and inventory clearance had been made without speaking to entities on the ground installing SolarEdge products. ¶116. Plaintiffs initiated this action to recover the damages caused by Defendants' fraud.

## III. ARGUMENT

### A. LEGAL STANDARD

To avoid dismissal pursuant to Rule 12(b)(6), the CAC must allege "enough facts to state a claim" that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To that end, this Court only "assess[es] the legal feasibility of the complaint"; it does not "assay the weight of the evidence which might be offered in support thereof." *Id.* at 555.

To state a claim under Section 10(b) of the Exchange Act, plaintiffs must plead: (1) a material misrepresentation or omission; (2) in connection with a purchase or sale of a security; (3) made with scienter; (4) reliance; (5) economic loss; and (6) loss causation. *Carpenters Pension Tr. Fund*

12

*of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014). Under the Private Securities Litigation Reform Act ("PSLRA"), a plaintiff must specify each misleading statement, the reasons why the statement is misleading, and, if an allegation "is made on information and belief," "state with particularity all facts on which the belief is formed." 15 U.S.C. 78u-4(b)(1). Even with the heightened standards of Rule 9(b) and the PSLRA, however, complaints do not need to plead "detailed evidentiary matter." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). Defendants' Motion appears to assert that the CAC fails to allege material misrepresentations or scienter. Since the CAC sufficiently alleges both, the Motion should be denied.

### B.  THE CAC'S ALLEGATIONS ARE WELL-PLEADED

The Motion initially challenges the sufficiency of the CAC's CW allegations. *See* Mot. at 12-19. These must be accepted as true, however, because the CAC describes the CWs "with sufficient particularity to support the probability" that they possessed the information alleged." *See Emps' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015). Allegations of CWs' knowledge are sufficiently particularized where a complaint "specifies each witness's position, length of employment, and job responsibilities." *See id.* at 307. In addition, CW knowledge is adequately pled when allegations are corroborated by other documentary sources or CW testimony. *See Lozada v. TaskUs, Inc.*, 2024 WL 68571, at *25 (S.D.N.Y. Jan. 5, 2024) (crediting based on "corroboration from other former employees"); *Pelletier v. Endo Int'l PLC*, 439 F. Supp. 3d 450, 468 (E.D. Pa. 2020) (crediting CW allegations that are "specific, mutually consistent, and plausibly within the scope of knowledge"); *Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *14 (D. Or. June 27, 2017), *report and recommendation adopted*, 2017 WL 3610523 (D. Or. Aug. 22, 2017) ("four CWs, from different groups . . . who provide consistent (mutually corroborating) accounts" of channel stuffing).

13

Here, the CAC alleges each CW's position, period and location(s) of employment, and job responsibilities.[5] ¶¶34-42. In addition, the CAC details how each CW came to possess the information described—usually first-hand while performing their job responsibilities. *See, e.g., In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *8 (S.D.N.Y. Nov. 26, 2018); *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 851 (S.D.N.Y. 2019) (CW's position as district manager "makes it probable that they would have information about the state of Carmike's theaters"); *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 534 (S.D.N.Y. 2009) ("all three CWs occupied positions within Sadia through which they were privy to the Company's system for monitoring its financial assets and liabilities").

For example, CW2 personally saw SolarEdge repeatedly "force[] distributors to take delivery of product early" (including CED Greentech), which "saddled distributors with large inventories," but enabled the Company to meet revenue targets. ¶¶35, 58-59. According to CW2, these early shipments "only went one way," *i.e.*, from SolarEdge to a customer, and always "happened near the end of the quarter." ¶58. CW6 corroborated these observations and recalled that European distributor Krannich Solar and other customers were forced to take products at the end of quarters. ¶65. CW7 recalled SolarEdge "shoving equipment down" the "throats" of distributors at quarter-ends and a key CED Greentech employee screaming in protest, as well as attending weekly meetings with Cohen, Mathews, and others discussing forcing product on customers. ¶¶66-67. CW4 also said the Company forced unwanted products on customers and changing shipping terms so SolarEdge could recognize revenue earlier, and CW5 confirmed that both occurred in Q1/Q2 2023. ¶¶60-63. CW8, who worked internationally, described how *all* SolarEdge customer service "shut down" at the end of quarters to focus on pushing products to customers. ¶¶66-68.

---

[5] Due to an inadvertent error, the CAC omitted that CW8 left SolarEdge in October 2023. *See* ¶41.

Similarly, CW2's account of stuffed channel inventories (¶59) was corroborated by CW5, who described how customers tried to cancel orders because of high inventories as early as February 2023 (¶64), and CW7, who confirmed customer complaints of high channel inventory levels in the first half of 2023 (¶67). These accounts are further corroborated by SolarEdge's skyrocketing inventories of *finished products* during this time, which indicates that distributors could not take products because of overstocked inventories. *See* ¶50. In fact, **Defendants themselves admitted** that channel inventories had been high by Q2 2023 *at the latest*. ¶¶179.

CW allegations of European demand decline are also mutually corroborative and confirmed by documentary sources, including analysts and Defendants' own admissions. CW2's account of learning from Cohen, Mathews, and others in February/March 2023 that "Europe wasn't going well," *i.e.*, demand was declining (¶58), is consistent with CW4 informing Lando, Faier, Mathews, Cohen, and other executives of declining demand at multiple QBRs in the first half of 2023 (¶82). These allegations are also corroborated by analysts repeatedly confronting Defendants with rumors of demand declines in Europe. ¶¶95-96. Even Defendants admitted, but carefully couched, that demand was declining in Europe in Q2. *See* Belelieu Ex. 6 at 12; ¶86. The Company's skyrocketing finished goods inventories bolster these allegations as well. ¶50; *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 283 (E.D.N.Y. 2023) (surging inventory "supports an inference that, at that time, end-user demand was inadequate").

Defendants assert that CW2's allegations of declines in Europe are uncorroborated hearsay] Mot. at 13 This is contradicted by the CAC, however, which, as described above, corroborates CW2's allegations with statements from analysts, the Company's surging inventories, and Defendants' own admissions. Moreover, there is no bar to hearsay allegations where, as here, CW2 described how he obtained information and his information is corroborated by independent

statements and events. *See City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*, 2020 WL 4547217, at *5 (S.D.N.Y. Aug. 6, 2020) (court "may properly take account of the alleged testimony of CW-1, even though some of his testimony is based on hearsay").

Defendants further object that the CWs do not allege specific dates, times, customers, and amounts of orders forced on customers. *See* Mot. at 14-15. Defendants overlook, however, that "the normally rigorous particularity rule has been relaxed somewhat where," as here, "factual information is peculiarly within the defendant's knowledge or control," *see In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997), and it is well-established that this level of detail is not required to state a claim for securities fraud, *see Blanford*, 794 F.3d at 307 (CW statements do not need to be linked to specific quarters (citing cases); *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *11 (N.D. Cal. Aug. 17, 2022) ("Plaintiffs are not required to identify specific transactions" to allege channel stuffing); *In re Revlon, Inc. Sec. Litig.*, 2001 WL 293820, at *8 (S.D.N.Y. Mar. 27, 2001) ("a plaintiff need not plead dates, times and places with absolute precision, so long as the complaint gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based"). Indeed, Defendants' main authority, *Gavish v. Revlon, Inc.*, 2004 WL 2210269, at *17 (S.D.N.Y. Sept. 30, 2004), has been criticized for requiring such particularity.[6] *Pub. Emps' Ret. Sys. of Mississippi v. Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1296 (N.D. Ga. 2021) ("the law does not require Plaintiff to disaggregate the financial impact of Defendants' alleged schemes to state its claim"). The CWs are from a variety of positions and

---

[6] *Gavish* is also inapposite because the defendants warned that an existing inventory problem "might continue to affect sales," while Defendants denied any inventory problem. *See* 2004 WL 2210269, at *12. Defendants' other cases fare no better. In *Gross v. AT&T* specific numbers of "ghost accounts" allegedly were inaccurate, while the CAC alleges that Defendants' explanations of revenues, inventories, and demand were misleading. *See* 2021 WL 9803956 at *6 (S.D.N.Y., 2021).

geographical areas (¶¶34-42) and provide overlapping, corroborated, and detailed accounts (¶¶57-70, 82). Nothing more is required.

The Motion further asserts that the CWs testimony must be disregarded because they did not work in Europe.[7] Mot. at 16-18. But it is permissible for CWs to rely on "indirect knowledge," *see Warren*, 477 F. Supp. 3d at 132, and multiple CWs spoke about interacting with SolarEdge employees in Europe and a customer who received unwanted product in Europe. ¶¶35, 65. In any event, courts routinely credit CWs without a view of an entire company's operations. *See, e.g.*, *Signet*, 2018 WL 6167889, at *8 (six employees from individual retail stores sufficient to withstand dismissal); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 197 (S.D.N.Y. 2010) ("comprehensive survey of employees is not needed at the pleading stage"). Where, as here, CWs come from multiple locations, cover different products, and provide consistent accounts, then they "collectively support an inference of company-wide operations." *See, e.g.*, *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 263 (S.D.N.Y. 2023). Further, nothing in the CAC provides any "basis for believing that factors unique to the relevant offices" forced unwanted products on customers, "rather than company-wide practices," and the CWs must be credited. *See N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 124 (2d Cir. 2013).

Finally, the Motion incorrectly asserts that CWs are not credible because they were "low- and mid-level employees." Mot. at 12-13. Courts routinely credit statements from CWs who are mid-level employees where, as here, the CW testimony is adequately pled. *See, e.g.*, *Blanford*, 794 F.3d at 301 (reversing dismissal by crediting mid-level witnesses); *In re CommVault Sys., Inc. Sec.*

---

[7] While Defendants also assert that CW3 must be discredited because he left SolarEdge before the Class Period, in the Second Circuit, "allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period." *Blanford*, 794 F.3d at 307. CW3 thus supports an inference of QBRs continuing with Lando and Faier during the Class Period. ¶¶80-81.

*Litig.*, 2016 WL 5745100, at \*7 (D.N.J. Sept. 30, 2016) (rejecting "argument that the CW[s], as low level employees, would not have first-hand knowledge" of relevant facts).

### C. THE CAC ALLEGES FALSE AND MISLEADING STATEMENTS

#### 1. When Defendants Chose to Tout the Sources of SolarEdge Revenues, They Had a Duty to Make Their Disclosures Complete and Accurate

Where a corporation elects to speak on an issue, "there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). To that end, where a company puts "the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success." *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005). This is true where a company attributes reasons for performance but omits that the performance is inflated by forcing customers to take unneeded products. *See, e.g.*, *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 31 (S.D.N.Y. 2019) (failure to disclose excessive sales into channel inventory made statements misleading); *Murphy*, 2017 WL 3084274, at \*9 (failure to disclosure "aggressive[] pulling in sales, offering discounts, and extending payment options to encourage larger sales" made statements misleading) *In re Scientific-Atlanta, Inc. Securities Litigation*, 239 F. Supp. 2d 1351, 1362-63 (N.D. Ga. 2002) (failure to disclose "sales practices that encouraged customers to purchase substantial advance inventories of product" made statements misleading).

This is precisely what the CAC alleges. During the Class Period, Defendants attributed SolarEdge's "record" financial performance in (i) Q4 and FY 2022 to "increase[s] in power prices," "expansion of [the Company's] "product portfolio," and "significant quarter-over-quarter growth in the United States"; (ii) Q1 2023 to "record revenues in Europe" and "shipments . . . of three phase residential inverters"; and (iii) Q2 2023 to "record revenues in Europe." ¶¶121-25. These statements were misleading because Defendants failed to disclose that the Company's

18

record revenues were the result of forcing distributors, like those in *Lexmark*, *Murphy*, and *Scientific-Atlanta*, to take unneeded inventory (¶¶57-70).

Defendants respond that their statements were literally true. *See* Mot. 19-20. "The veracity of a statement or omission," however, "is measured not by its literal truth, but by its ability to accurately inform rather than mislead." *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010). Accordingly, even **revenue amounts** were literally true, they misinformed investors that revenues were driven by end-user demand, when it was not. *See In re ATI Techs., Inc. Sec. Litig.*, 216 F. Supp. 2d 418, 436 (E.D. Pa. 2002) ("attributing the performance to the wrong source, is misleading under the securities laws").

Defendants next assert that the CAC fails to allege products were forced on customers. Mot. at 20. Per Sections II.B and III.B, *supra*, however, multiple CWs detail the practice of "shov[ing] product down [customers'] throat[s]" to "hit quarter-end numbers." *See* ¶66; *see also* ¶¶57-66. Defendants also deny that they forced products on customers. *See* Mot. 20-21, 23. But these self-serving assertions should be disregarded because they create issues of fact not suitable for resolution on a motion to dismiss. *See Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 423 (S.D.N.Y. 2010) (dismissal denied where motion "essentially denies Plaintiffs' allegations").

Finally, Defendants are wrong that their alleged misstatements did not trigger a duty to disclose their sales practices. *See* Mot. at 21-23. Defendants assert that there is no "general duty" to disclose "aggressive or fraudulent sales tactics" (*see id.* at 21-22), but the CAC does not allege any "general duty" of disclosure; it alleges that Defendants' affirmative decision to attribute reasons for SolarEdge's financial performance created a duty to disclose that the Company's

19

performance stemmed from forcing products on customers.[8]. For the same reason, Defendants'

insistence that "accurately reported financial statements do not automatically become misleading

by virtue of the company's nondisclosure of suspected misconduct" is irrelevant because CAC

alleges that attribution of revenue sources was misleading, not revenue figures. *See* Mot. at 22.

Finally, Defendants cite *In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, 675 F. Supp. 3d 273,

287-90 (E.D.N.Y. 2023), and *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 306 (S.D.N.Y.

2019), to assert that the misstatements alleged in the CAC are too general to create duties to

disclose. But the *Telefonaktiebolaget* defendants vaguely reference "growth," 675 F. Supp. 3d at

287-90, and the *Schiro* defendants alluded to "expansion projects" and "unique portfolio," 396 F.

Supp. 3d at 306. Here, Defendants identified specific factors driving performance. *Compare*

¶¶121-26 *with Lexmark*, 367 F. Supp. 3d at 32 ("robust," "good," or "strong" end-user demand);

*Murphy*, 2017 WL 3084274, at *9 ("robust aerospace performance").

### 2. Defendants Misled Investors About SolarEdge's Inventory Growth

SolarEdge's inventories rose 35% from December 31, 2022 to June 30, 2023, or from $729

million to $984 million. *See* ¶50. Virtually the entire increase was attributable to exploding

finished goods inventory, which shot up 141%, or from $202 million to $487 million. *See* ¶50.

---

[8] Defendants' cases are inapposite. The complaint in *In re AT&T/ DirecTV Now Sec. Litig.* Alleged that the specific amounts of account holders were inaccurate because many of the accounts were "fake," while the CAC alleges that ***descriptions*** of revenue sources are misleading. *See* 480 F. Supp. 3d 507, 527-28 (S.D.N.Y. 2020). *In re ITT Educ. Servs., Inc. Secs. & S'holder Derivatives Litig.*, the Court held that there was no connection between the alleged misstatements and undisclosed conduct. 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012)). Here, however, attributing revenues to, for example, "power prices" and the "product portfolio," at a minimum conveyed that customers wanted to buy products, when in truth Defendants were pushing unneeded products on customers. *See* ¶¶57-70. Further, *Gavish* holds that defendants' assurances about addressing an inventory problem does create a duty to disclose conduct exacerbating the inventory problem, but that plaintiffs had failed to allege that the defendants actually made the problem worse. *See* 2004 WL 2210269, at *17. Here, however, there is no question that Defendants implemented a program to inflate revenues by forcing product on customers. ¶¶57-70.

During earnings calls, Defendants attributed the inventory increases to "streamlined manufacturing" and a "return to a more normal mode of operation," that could be remedied through "more inverters." ¶¶128, 130, 132, 134. In addition, to ensure that investors viewed inventory increases positively, Defendants insisted that inventory increases ***benefitted SolarEdge*** by enabling it to "to further improve our customer delivery time," "reduce shipping costs and logistic expenses," "use normal shipping routes," "reduce lead times," and "reduce shipment[] costs." *See id.* These statements were false and misleading, however, because Defendants failed to disclose that the increased inventory stemmed from channel inventories saturated by forcing customers to take unneeded products as a result of declining demand. *See* ¶¶59, 64-67; 82.

Defendants elected to positively characterize these increases and attribute them to specific causes and thus had a duty to disclose the full truth. *See Meyer*, 761 F.3d at 250. By failing to disclose that increases were the result of forcing customers to take unneeded products and declining demand, Defendants' statements are actionable. *See, e.g.*, *Novak v. Kasaks,* 216 F.3d 300, 315 (2d Cir. 2000) (statements that inventory was "in good shape" or "under control" were "plainly false and misleading" because the defendants allegedly knew that the contrary was true); *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 88 (S.D.N.Y. 2022) ("Having chosen to speak" reasons for increased sales, defendants had duty to disclose misleading marketing campaign"). In addition, the surge in SolarEdge's inventory "supports an inference that, at that time, end-user demand was inadequate, and [the company] held a glut of inventory that it could not sell." *Dentsply*, 665 F. Supp. 3d at 283.

Defendants also assured investors that the increased inventory "will be cleared mostly through the adoption or getting more inverters from us during the third and the fourth quarter." ¶134. Not only did this statement mislead investors by attributing the increased inventories to a

lack of inverters (*i.e.*, too few products), rather than to saturated channel inventories (*i.e.*, too many products), it also left investors with the misimpression that Defendants' proposed solution was based on informed sources, when Defendants had not spoken with entities selling through SolarEdge's products to end users. ¶¶59, 64-67; 116; *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *3 (S.D.N.Y. Feb. 5, 2024) ("[a] reasonable investor would take that statement as a description of or at least informed by facts on the ground").

Defendants again appear to (i) assert that these statements are not actionable because they were literally true (Mot. at 19) and (ii) deny the CAC's allegations (Mot. at 20), but these arguments fail because Defendants failed to disclose the full truth, *Meyer*, 761 F.3d at 250, and raise an irresolvable factual dispute. *Anwar*, 728 F. Supp. 2d at 423.

Defendants again baldly assert that these statements are "too general" to trigger a disclosure, but these statements are as detailed as statements held to be misleading. *See, e.g.*, *Novak*, 216 F.3d at 315 (inventory was "in good shape"); *Sterling*, 587 F. Supp. 3d at 88 ("clear patient and physician preference" for product); *Turquoise*, 625 F. Supp. 3d 164, 232 (S.D.N.Y. 2022) ("ground conditions" caused delays). In any event, "[w]hether a disclosure is required is best left to the trier of fact." *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *12 (D.N.J. July 27, 2018).

Defendants further assert that statements that statements using the words "normal" and "streamlined" are puffery (*see* Mot. at 28). But courts routinely hold that references to "normal" are actionable. *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *10 (E.D.N.Y. May 20, 2020) ("completely normal"); *Schaffer v. Timberland Co.*, 924 F. Supp. 1298, 1314 (D.N.H. 1996) ("normal course of business"). Here, as in *Vale* and *Schaffer*, Defendants described inventory increases as "normal" even though customers had stopped taking products because channel inventories were saturated. ¶¶59, 64-66, 82. Further, Defendants' use of word "streamlined" does

not make paragraphs 128 and 132 misleading; rather, those statements "omitted the current truth" by misattributing inventory levels to manufacturing. *See In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 334 (D. Mass. 2002) (omission of "current truth" not puffery). Defendants' references to "more inverters" in paragraph 134 left investors with the misimpression that a specific product could remedy overstocked inventories, and thus is not puffery. *See Snowstorm Acquisition Corp. v. Tecumseh Prod. Co.*, 739 F. Supp. 2d 686, 704 (D. Del. 2010) (statement making "specific impression" not puffery).

Finally, Defendants assert that portions of statements concerning inventory levels are misleading because they are protected by the PSLRA's so-called "safe harbor" for forward-looking statements. *See* Mot. at 27 (citing ¶¶128, 134). The safe harbor only protects material statements accompanied by meaningful cautionary language where defendants did not have actual knowledge of falsity. *See Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 297 (S.D.N.Y. 2018).

"'[M]ixed' statements that have both a forward-looking aspect and a representation of present or historical fact are not protected with respect to the latter." *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at \*13 (S.D.N.Y. Mar. 25, 2013). Paragraph 128 misattributes *present* levels of finished goods inventory to "streamlined manufacturing," and thus that portion of the statement is not protected. *See id.* Further, "the safe harbor does not apply to material omissions," *see id.* at \*12, and thus paragraph 134 is actionable because it claims inventory will be cleared with ***more products*** but omits that channel inventories had ***too many products***. ¶¶59, 64-66, 82.

Further, the statements in paragraphs 128 and 134 were not accompanied by meaningful cautionary language. *See* Mot. at 27. "To be meaningful, cautionary language must precisely address the substance of the specific statement or omission that is challenged." *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102 (S.D.N.Y. 2006). As an initial matter, ***the***

23

***Motion*** does not cite ***any*** cautionary language. *See* Mot. at 27-28. Instead, it refers to "Appendix B," which sets forth a nesting doll of references to cautionary language over three distinct documents. *See* Mot. App'x B at 1-2. Appendix B (and Defendants' other appendices) is designed to evade page limits applicable to briefing in this action, which have already been extended by 33% (*see* ECF No. 63) and thus should be disregarded. *See In re Paine Webber Sec. Litig.*, 1992 WL 725359, at *1 n.2 (S.D.N.Y. Sept. 18, 1992); *Think Village-Kiwi, LLC v. Adobe Sys., Inc.*, 2009 WL 3837270, at *7 (N.D. Cal. Nov. 16, 2009). Even if the Court considers the referenced language, which it should *not*, that language does not refer to inventory, and thus is not meaningful. *See EVCI*, 469 F. Supp. 2d at 102. Indeed, in *Salix*, the court expressly held that the exact cross-references to long lists of risk factors that do not address subject matter of statements at issue is not meaningful. *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) ("[d]efendants cannot escape liability by referring generally to every factor that has ever been mentioned in any one of their public statements or SEC filings"). Finally, the CAC alleges Defendants' knowledge of the falsity of their statements in paragraph 128 and 134. *See* ¶82.

### 3. Defendants Mispresented Channel Inventory Levels in Europe

It is well-established that misrepresentations of channel inventory levels are actionable. *York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*, 2024 WL 1327247, at *19 (N.D. Cal. Mar. 27, 2024) (misrepresenting that channel inventories were "slightly above" target); *Salix*, 2016 WL 1629341, at *6. For example, in *Lexmark*, the court denied a motion to dismiss where the defendants represented that "channel inventory levels were 'flat,' 'neutral' or that they only increased 'a bit,'" but omitted that channel inventory remained at "elevated levels" or that distributors had "stocked up" on products to avoid price increases. *See* 367 F. Supp. 3d 16, 31.

This is what the CAC alleges. As in *Lexmark*, Defendants assured investors that SolarEdge's channel inventory levels in Europe were "pretty, I would say, low on inventory in most cases"

(¶138) and "the level of [channel] inventory is relatively not high," (¶139). These statements were false because during this time CW4 directly informed Defendants that channel inventories were saturated. ¶82. This was corroborated by CW5, who described customers trying to cancel orders because their inventories were flooded as early as February 2023 (¶64), CW7, who described customers complaining of overstocked channel inventories in the first half of 2023 (¶¶67), and CW2, who learned in February/March 2023 from VP of North America Sales Cohen and North America General Manager Mathews of problems in Europe (¶¶58-59). In fact, not unlike the distributors in *Lexmark*, SolarEdge's channel inventories were saturated because of the equivalent of "stocking up" early—taking products the Company had forced on them. ¶¶57-70.

When Defendants began to acknowledge that European channel inventories were saturated (¶141), they still refused to disclose the whole truth, telling investors that "the correction . . . should be relatively quick" and that channel inventories were "not high at all," "actually at the normal level," and "not so high" based on "days outstanding." ¶¶141, 143. Defendants also tried to justify their out-of-nowhere allusion to high channel inventories by claiming that customers chose to hold less inventory. ¶¶145-46. This was misleading because channel inventory levels were so high that distributors could not take more product (¶¶58-59, 64, 67) and by identifying reasons for increased inventories, Defendants had to disclose the truth (¶¶57-70). *See Lexmark*, 367 F. Supp. 3d at 31.

Similarly, a week later, during an August 8, 2023, talk at the Oppenheimer Conference, Faier affirmatively attributed inventory surpluses to changes in distributors' inventory preferences, saying, "since [customers] can rely better on our supply right now" they are ordering less." ¶145. Likewise, on September 6, 2023, and the Barclays Conference, Defendant Faier assured attendees that surplus channel inventories were because distributors had "simply overstocked," after two years "of not being able to get all the products they wanted," and "do not want to take any cash

25

flow obligations." ¶¶86, 146. These statements were not only false and misleading based on the above statements from Defendants and CWs, but post-Class Period Defendants effectively admitted that channel inventories were saturated in August and September. *See* ¶193. Specifically, Lando stated in a press release that "[d]uring the **second part of the third quarter of 2023**, we experienced substantial unexpected cancellations and pushouts [in Europe]," and "We attribute these cancellations and pushouts to **higher than expected inventory in the channels**." *Id.* In other words, Defendants knew of saturated channel inventories in August and September 2023. *See id.*

Defendants again respond by that their statements are literally true (Mot. at 19), denying the CAC's allegations (Mot. at 20), and claiming their statements are "too general" to trigger a duty to disclose (Mot. at 24-25). These arguments fail for the reasons set forth in Sections III.C.1-2 *supra*. Defendants also incorrectly assert that Faier's statement that "the correction within the distributors should be relatively quick, given the fact that the inventories levels . . . are not so high" is protected by the PSLRA's safe harbor. Mot. at 27 (citing ¶143). A portion of the statement states that channel inventories levels are presently "not so high," and thus is not forward-looking. *See Aeropostale*, 2013 WL 1197755, at *13. Further, Faier's characterization of inventory clearance as "relatively quick" is actionable because it *omits* why channel inventories were high. *See id.* at *12. Finally, the CAC alleges that Defendants knew that channel inventories were high (¶¶57-70, 82), Defendants' cautionary language does not address European channel inventory, and thus the statement is not protected under the PSLRA.[9] *See Salix*, 2016 WL 1629341, at *11.

### 4. Defendants Misrepresented Demand in Europe

Statements that misrepresent the strength of demand for a company's products are actionable. *See, e.g.*, *Blanford*, 794 F.3d at 306; *In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635,

---

[9] As set forth in Section III.C.2 *supra*, Defendants' appendices should be disregarded.

26

648 (E.D. Pa. 2015) ("a Complaint which alleges the defendant CEO in a securities fraud case misrepresented to investors that the demand for his company's products was "solid," "strong," and "good" when the actual condition of sales was "disappointing" and had "declined," is sufficiently particularized to satisfy PSLRA requirements"); *Scientific-Atlanta*, 239 F. Supp. 2d at 1359 ("[d]efendants falsely reported that demand was accelerating when demand was falling"); *In re Comp. Assocs. Class Action Secs. Litig.*, 75 F.Supp.2d 68 (E.D.N.Y.1999) ("business fundamentals are strong," and that the company was "solidly positioned for growth" misleading).

Throughout the Class Period, Defendants consistently and falsely assured investors that demand for SolarEdge products in Europe was "strong," "good," and/or outpacing supply. *See* ¶¶149-64. For example, Defendants assured investors that "we continue to see very strong demand for Europe," and "very healthy demand across the board." ¶149; *see* ¶¶150, 152-57. Defendants also touted that "our 2023 in Europe will be similar to the condition we were in in 2022," "it's definitely the case that [Europe] will probably be the fastest-growing geographies for us," and "we're expecting extremely healthy and robust demand in Europe." ¶¶150-51, 153.

These statements are actionable because Defendants made them when demand was declining. As described above, CW2 stated that, before he left SolarEdge in March 2023, he heard from Cohen, Mathews, and other colleagues that Europe was not going well, *i.e.*, demand was declining. ¶58. Analysts corroborated this by repeatedly confronting Defendants with the fact that they understood that demand in Europe was declining (¶¶154, 156), and the Company's skyrocketing inventories, particularly of finished goods, further corroborate these allegations. ¶50; *see Dentsply*, 665 F. Supp. 3d at 283 (rising inventory "supports an inference that, at that time, end-user demand was inadequate"). Further, CW4 stated that he personally told Defendants multiple times during the first half of 2023 that demand for SolarEdge products was falling. ¶82. Defendants'

27

representations of demand thus were misleading. *See Vrakas v. United States Steel Corp.*, No. CV 17-579, 2018 WL 4680314, at \*10 (W.D. Pa. Sept. 29, 2018); *Sci.-Atlanta*, 239 F. Supp. 2d at 1363-64; *In re U.S. Interactive, Inc.*, 2002 WL 1971252, at \*18 (E.D. Pa. Aug. 23, 2002). Defendants also effectively corroborated that demand had been slowing over the first two quarters of 2023, acknowledging on the Q2 Call that "demand is fairly strong, not maybe as strong as people believed from the very beginning of the year" (Belelieu Ex. 6 at 12) and reaffirming a week later that "underlying demand is very strong, although not as strong as everyone thought" (¶86).

Even while making these admissions, Defendants insisted that "overall demand is still high," "demand for equipment was strong," and "very strong underlying demand" (¶¶158-63). These touts culminated on September 21, 2023, when Lowe assured investors that "underlying demand for solar is very, very strong." ¶164. These statements were not only misleading based on the statements from CWs and analysts and the surge in internal inventory, but Defendants admitted on October 19, 2023, that European demand had been declining *at the same time* they were touting demand. *See* ¶¶112, 113 ("the shift in pattern was around the summer and the picture got clearer . . . to our distributors, and then to us in the second half of the quarter"), 193 ("installation rates for the third quarter [*i.e.*, demand] were much slower *at the end of the summer and in September*"). Since Defendants knew demand was declining, at a minimum their statements in September 2023, in response to specific questions from analysts, were false. *See* ¶¶123-24.

Defendants again assert that these statements were literally true (*see* Mot. at 19), which, as set forth above, is contradicted by the statements in paragraphs 149-64. Defendants also appear to deny that demand was falling in Europe during the Class Period (*see* Mot. at 25), but not only does this assertion raise a factual dispute, *Anwar*, 728 F. Supp. 2d at 423, it is contradicted by Defendants' admissions that demand was lower in the first half of 2023 and declining from August

28

2023 onward. *See* ¶¶86, 160, 163, 193; Belelieu Ex. 6 at 12. Curiously, Defendants insist that *demand* was not declining during the Class Period by citing to *revenue* statements in SEC filings. *See* Mot. at 25, *citing* Belelieu Decl. Exs. 1-3. But these filings say nothing about Defendants' statements in Q3 2023. ¶¶158-65, 193. They are also belied by the SolarEdge's skyrocketing inventory, which suggests that customers had products they could not sell. ¶50. Most importantly, SolarEdge recognized revenue *when products were shipped* and exploited this to meet revenue targets. *See* ¶¶48, 60-61, 63, 67-68. Accordingly, SolarEdge's revenues *do not reflect underlying demand for the Company's products*, they reflect *what Defendants forced on customers*.

Finally, Defendants assert that certain misstatements concerning demand are puffery (*see* Mot. at 28-30, citing ¶¶149, 151, 159, 162) or forward-looking (*see* Mot. at 26-28, citing ¶¶150, 151, 155, 156). Defendants are wrong on both counts. As an initial matter, allegedly "puffing" language in paragraphs 149 ("very strong demand") and 151 ("extremely health and robust demand") have been held to be actionable, particularly where, as here, it concerns the Company's core business (¶¶51-56). *See, e.g.*, *Urb. Outfitters*, 103 F. Supp. 3d at 650-51 ("sales trends continue to be strong" where sales "make up a dominant share of Urban's business"); *Comp. Assocs.*, 75 F. Supp. 2d at 73 ("strong worldwide demand" for core products), Similarly, statements in paragraphs 159 ("correction rather than a crisis") and 162 ("growing relatively quickly") are not puffery because they responded to direct questions and positively characterized current and future business when Defendants knew of declining demand. *Signet*, 2018 WL 6167889, at *12 (responses "to direct questions" not puffery); *Freudenberg*, 712 F. Supp. 2d at 191 (touts of current and future business conditions not puffery when Defendants knew of adverse trends).

Further, the portions of misstatements in CAC paragraphs 150 ("the market is strong"), 155 ("the situation is more dependent on our supply"), and 156 ("very healthy demand") that represent

*present* facts are not protected forward-looking statements. *See Aeropostale*, 2013 WL 1197755, at *13. And the cautionary language associated with each of the statements in CAC paragraphs 150 and 155 was not meaningful because it stated that demand changes "could" cause results to differ when demand was already declining.[10] ¶¶57-70, 82; *Aeropostale, Inc.*, 2013 WL 1197755, at *12 (cautionary language not meaningful where risks had materialized). Defendants also *directly contradicted* these vague risk factors regarding demand by repeatedly *downplaying* the idea that demand was declining. ¶¶150, 155; *see Freudenberg*, 712 F. Supp. 2d at 194 (misstatements "contradicted, and thus, nullified any risk disclosures"). Finally, Defendants knew demand was declining when touting its strength. *See* ¶¶57-70, 82, 86; Belelieu Decl. Ex. 12 at 6.

### 5.  Defendants Misled Investors Regarding Sell-Through Forecasts

Defendants also falsely assured investors that (i) Europe "will be similar to the condition we were in , in 2022" because "[s]o far as we can see, the market is – the demand is good and the market is strong (¶168); and (ii) clogged channel inventories would be cleared "through the adoption or getting more inverters" (¶170 "relatively quick[ly]" (¶¶172, 176; *see* ¶174). These statements communicated that Defendants used credible sources like market reports or internal data to forecast sell-through. *See* ¶¶168-74. They were materially misleading, however, because, as described by CW4, SolarEdge executives reporting directly to Defendants insisted on adopting unsupported forecasts. ¶62. CW4's experience was corroborated when Defendants were forced to restate guidance because they had massively overestimated demand and sell-through, among other

---

[10] Defendants' Appendix B, which purports to associate forward-looking statements with cautionary language, does not identify cautionary language applicable to paragraphs 151 or 156. *See* App'x B. Defendants thus have waived the issue. *Dentsply*, 2024 WL 1898512, at *4. Regardless, per Section III.C.2 *supra*, this Court should disregard Defendants' appendices.

things[11] (¶¶110-13), as well as by Defendants' admission that they had not talked to businesses selling products to end users. ¶116. These statements are actionable. *See Police & Fire Ret. Sys. of the City of Detroit v. Crane*, 87 F. Supp. 3d 1075, 1083 (N.D. Cal. 2015) (statements misleading that left "the public with a misimpression about the health of the company").

Defendants again assert that their misstatements were literally true (Mot. at 19) and deny CW4's allegations (Mot. at 24-25). These arguments fail for the reasons set forth in Sections III.C.1-4 *supra*. Defendants further argue that the statements cannot be misleading because they do not describe forecasting methodology (*see* Mot. at 26), but this misconstrues the CAC. Plaintiffs allege that Defendants' statements about performance in Europe and clearing channel inventories falsely communicated to investors that those predictions were based on credible sources, not made up at the insistence of executives (¶¶168-74, 110-13, 116).[12] In addition, the assertion that "more inverters" could clear excess channel inventory is *not* puffery because it indicated that a specific product could clear clogged inventories. *See* ¶170; Mot. at 29; *Snowstorm*, 739 F. Supp. 2d at 704.

Finally, Defendants assert that multiple alleged misstatements are inactionable because they are forward-looking. *See* Mot. at 27-28, citing ¶¶168, 170, 176. But these statements are actionable because risks warned of in cautionary language had materialized, *see Aeropostale, Inc.*, 2013 WL 1197755, at *12, and Defendants they were false. *See* ¶¶57-70, 82, 86; Belelieu Decl. Ex. 12 at 6.

---

[11] Defendants challenge CW4's allegations, but they are first-hand, stem from his responsibilities, identify who pressured him and under what circumstances, describe how forecasts were increased over his objections (¶¶37, 62), and are effectively corroborated by Defendants twice downwardly revising the Company's guidance by 8% and 16%, respectively, *see In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 539 (S.D.N.Y. 2016) (crediting allegations from single CW).

[12] Defendants' case law is inapposite because it concerned a "flawed" forecasting system, not statements that were misleading because they implied sources that were never consulted. *See* Mot. at 26, citing *Siegel v. Bos. Beer Co., Inc.*, 2022 WL 17417111, at *1, *8 (S.D.N.Y. Dec. 5, 2022).

### D.  THE CAC ALLEGES A STRONG INFERENCE OF SCIENTER

In assessing whether the CAC adequately pleads scienter, the Court must determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). "The inference that the defendant[s] acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. Instead, the inference must be only "cogent and at least as compelling as any opposing inference." *Id.* Scienter may be pled either by alleging facts constituting "strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307. Recklessness exists if defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Blanford*, 794 F.3d at 306. A corporation's scienter is adequately alleged where "high-level employees" knew of the facts making statements misleading. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177–78 (2d Cir. 2015). Here, the CAC alleges conscious misbehavior or recklessness.[13]

### 1.  Defendants Knew or Recklessly Disregarded Facts Contradicting Their Public Statements

The CAC alleges Defendants "knew facts or had access to information suggesting that their public statements were not accurate," *i.e.*, bedrock allegations of scienter. *See Blanford*, 794 F.3d at 306; *Novak*, 216 F.3d at 308-09. For example, at multiple QBRs in the first half of 2023, CW4 informed Lando and Faier, as well as Mathews, Cohen, and other executives, that demand for SolarEdge products was falling and that "the market was a lot worse than they thought." ¶82; *see New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 Fed. Appx. 10, 13 (2d Cir. 2011) (CW

---

[13] Although the CAC does not allege motive (*see* Mot. at 30-31), the Supreme Court has held that "the absence of a motive allegation is not fatal." *Tellabs*, 551 U.S. at 325.

providing information about rising inventory levels directly to defendants raises strong inference of scienter). While Defendants object that CW4's statements cannot be credited, as set forth in Sections II.B and III.B *supra*, his allegations must be accepted as true.

Similarly, CW7 stated that he personally attended "directors' meetings" attended by Cohen, Mathews, and other directors where they discussed forcing customers to take products, and that the substance of these conversations were reported up to Lando. ¶67; *see Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 389 (S.D.N.Y. 2022) (allegations that information was reported up to defendants supports scienter inference); *Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 290 (S.D.N.Y. 2020) (finding that a CWs allegation that key information "would have gone to the company's Vice President" supported scienter inference). While CW7 does not claim to have personally provided information from the meetings to Lando (*see* Mot. at 36), allegations of scienter need not provide this type of "smoking-gun" evidence. *See Inst. Inv. Grp. v. Avaya*, 564 F. 3d 242, 268–69 (3d Cir. 2009) (rejecting the argument that CW allegations did not give rise to a strong inference of scienter because the plaintiffs did not point to a particular conversation in which the CW brought the issues in question to the defendants); *Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 526 (D. Md. 2022) (crediting CWs that "do not allege that they personally provided specific problematic information" to defendant). In any event, the CAC alleges that Lando and Faier attended QBRs where demand, sales, and forecasts were discussed, as well as that Europe General Manager Karlstetter met weekly with Lando and Faier, and he also provided inventory, channel inventory, and forecasting updates to Lando and Faier during QBRs. ¶¶79-81; *see AppHarvest*, 684 F. Supp. 3d at 248 (meetings throughout class period support scienter).

Further, multiple CWs described how Lando and Faier received reports detailing demand in Europe, internal inventory, channel inventory, and sell-through data, including daily inventory

reports and reports provided by customers (*i.e.*, distributors).  ¶¶73-77. These reports described individual orders and channel inventory levels, down to individual products, for each distributor. *Id.* Similar allegations have been found to support an inference of scienter. *See, e.g.*, *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017) (CW's personal knowledge of defendants' real-time access to Salesforce reports forecasting quarterly sales supported an inference of scienter); *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 883 (N.D. Cal. 2023) (same); *Sjunde AP-Fonden v. Gen. Electric Co.*, 417 F. Supp. 3d 379, 408-09 (S.D.N.Y. 2019) (CW statements that facts underlying the fraud were recorded in regular reports for the company's leadership supported an inference of scienter); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 481-82 (S.D.N.Y. 2010) (allegations of channel inventory reports support scienter). These allegations are further bolstered by the fact that distributors were contractually required or incentivized to report channel inventory and sell-through data to Defendants. ¶¶75, 77; *Sinnathurai*, 645 F. Supp. 3d at 529 (legal obligation to provide reports to defendant company supports scienter).

In addition, the CAC alleges that Lando and Faier read these reports because (i) they directed employees to specific distributors for products based on the reports (¶77), and (ii) repeatedly represented to investors that they received and closely monitored the reports (¶¶84-85). Defendants' touts of monitoring the reports supports scienter. *See, e.g.*, *Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, 2019 WL 2360942, at \*6 (S.D.N.Y. Mar. 4, 2019) (scienter pled where, *inter alia*, "the effects of competition were being closely monitored by the company's management"); *Salix*, 2016 WL 1629341, at \*14 (statements touting knowledge of "precise inventory levels" support scienter). Indeed, Defendants began acknowledging as early as August 1, 2023, based on report data, that demand was declining and channel inventories were saturated (¶¶85, 102), before ultimately admitting that the reports showed demand declines and

34

overstocked channel inventories at the same time they were representing strong European demand and "not high" channel inventories to analysts and investors (¶¶112-13, 146, 162, 164).

## 2. Defendants' Misleading Responses to Questions Support a Scienter Inference

It is also well-established that misleading responses to direct questions support a strong inference of scienter, and Defendants repeatedly made misleading statements in response to direct questions. ¶¶139, 141, 143, 145-46, 149-52, 154-57, 159-64, 168, 172, 174, 176. *See, e.g., In re Synchrony Fin. Sec. Litig.*, 2022 WL 427499, at *10 (D. Conn. Feb. 11. 2022). These statements also reflect how Defendants consistently addressed demand, Company inventory, channel inventory, and forecasts throughout the Class Period, which further supports an inference of their scienter. *See, e.g.*, *Pirnik v. Fiat Chrysler Autos., N.V.*, 2016 WL 5818590, at *7 (S.D.N.Y. Oct. 5, 2016) (frequent discussion of topic supports scienter); *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395–96 (S.D.N.Y. 2012) (same).

## 3. The Magnitude and Timing of Guidance Reduction Supports Scienter

The magnitude of a reduction also can support a strong inference of scienter. *See, e.g.*, *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *16 (S.D.N.Y. Aug. 11, 2021) (reduction of revenues by $9 million or 28% supports scienter); *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 327 (S.D.N.Y. 2001) ("here the magnitude of the write-off is compelling evidence that defendants' theretofore rosy projections were not entirely forthright"). On the Q2 call, Defendants predicted revenue declines in Q3 2023 of $57.4 million to $97.4 million, or six-to-ten percent. ¶102. After the Class Period ended, however, Defendants revealed that the Company's revenues had plummeted ***$222.1 million***, or ***23.4%*** from Q2 2023, an additional ***14.7% to 18.5%*** below the already-lowered guidance provided on the Q2 call. ¶¶19, 110. Given Defendants' repeated assurances of low channel inventory levels and strong demand, these reductions provide striking evidence of recklessness bordering on intent. *See In re Nielsen Holdings PLC Sec. Litig.*, 510 F.

Supp. 3d 217, 237 (S.D.N.Y. 2021) ("Defendants' repeated assurances about GDPR's de minimis impact on Nielsen throughout the first half of 2018 and the magnitude of the event support an inference that Defendants knew facts or had access to information suggesting that these statements were materially misleading").

Further, Defendants disclosed this income decline on October 19, 2019, less than a month after Lowe assured investors of the strength of demand in Europe, a short timeframe that amplifies a scienter inference. ¶¶107-08, 164; *In re AnnTaylor Stores Sec. Litig.*, 807 F. Supp. 990, 1006-07 (S.D.N.Y. 1992) (temporal proximity between misstatement and disclosure supports scienter).

Defendants object that their guidance revisions and failure to meet revised guidance alone does not suggest recklessness. *See* Mot. at 37-38. Even if that were true, however, Defendants admitted that they knew of demand declines and excessive channel inventory by mid-August 2023 and nevertheless continued to assure investors that demand was strong. ¶¶112-13, 146, 162, 164.

### 4. The CAC Does Not Allege "Fraud by Hindsight"

In passing, Defendants characterize the CAC's allegations as "fraud-by-hindsight." *See* Mot. at 31. Courts, however, reject such incantations of fraud-by-hindsight where, as here, a complaint alleges that "the company failed to take into account information that was available to it" when defendants made misstatements. *See, e.g.*, *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 494-95 (S.D.N.Y. 2004). Here, the CAC alleges that Defendants knew information at the same time they made their false statements, and that Defendants admitted as such. ¶¶57-70, 72-82, 84-86, 110-113, 193; *see Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002) ("Cross essentially admitted to the 1998 contingencies in 1999"); *Sloman v. Presstek, Inc.*, 2007 WL 2740047, at *9 (D.N.H. Sept. 18, 2007) (company "essentially admitted" to knowing this information in subsequent corrective disclosures"); *In re KeySpan Corp.*, 2003 WL 21981806, at *12 (E.D.N.Y. July 30, 2003) ("Plaintiffs allege facts demonstrating with

36

particularity that defendants were aware of severe financial and operational difficulties at Roy Kay—difficulties that posed a clear threat to KeySpan's earnings—in January 2001 at the latest.")

### 5. Core Operations Supports an Inference of Defendants' Scienter

"When a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made." *Atlas*, 324 F. Supp. 2d at 489; *accord In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) ("core operations doctrine" permits an inference that a company and its senior executives have knowledge of information concerning the "core operations" of a business). Here, SolarEdge's business was selling solar power inverter systems (¶43). Europe was by far its most important market, representing 64% of its revenues during the Class Period. ¶51. In addition, Class Period filings attributed revenue increases to sales in Europe (¶¶51-52) and analysts highlighted Europe as a key differentiator in the Company's business case (¶¶53-56). Further, Lando was an unusually detail-oriented CEO, who, prior to becoming CEO, ran SolarEdge's sales division for almost 10 years and was selected to be SolarEdge's CEO specifically because he was "thought to be the person that understood" the Company the best. ¶72.

Under these circumstances, it is inconceivable that Defendants, particularly Lando, were unaware of efforts to force products on customers, declining demand in Europe, and rising internal and channel inventory levels. *Gen. Elec.*, 857 F. Supp. 2d at 395 (inferring scienter "where it would be absurd to suggest that management was without knowledge of the matter.").[14]

---

[14] Defendants assert that allegations of Lando's management style "are not entitled to any weight." Mot. at 37. But allegations of "hands-on" management can contribute to an inference of scienter. *See, e.g., In re ITT Educ. Servs., Inc. Sec. Litig.*, 34 F. Supp. 3d 298, 308 (S.D.N.Y. 2014).

### 6.  The CAC alleges Lowe and Danziger's Scienter

Contrary to the Motion, the CAC does allege Lowe and Danziger's scienter. *See* Mot. at 39. Lowe, for example, affirmatively represented that he had reviewed customer data about demand when he told investors that "underlying demand for solar is very, very strong." *See* ¶108 (telling investors, "***like the data we see from our distributors*** is continuing to show significant growth in terms of sell-through into Europe"). As Defendants later admitted, when Lowe made this representation, that data showed slowing demand and elevated channel inventory. See ¶¶113, 193.

In addition, as "Director of Investor Relations," and "Head of Investor Relations," Danziger and Lowe, respectively, were empowered to speak on behalf of SolarEdge, and thus the Court can infer that they educated themselves before they spoke. *See Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 850 (S.D.N.Y. 2019) ("to speak so knowledgeably" the defendant "must have educated himself . . . presumably by reviewing data").

Further, Danziger and Lowe both gave misleading responses to analysts' direct questions, which bolsters an inference of their scienter. ¶¶151, 156-57, 164. *Synchrony*, 2022 WL 427499, at *10. Finally, while Defendants object that the CAC does not explain why investor relations employees would receive or analyze market data (*see* Mot. at 39), this is contradicted by conference transcripts where Lowe and Danziger discussed the Company's products and solar market in detail (*see, e.g.*, Belelieu Decl. Ex. 13 at 3 (Danziger), Ex. 16 at 7-8 (Lowe)).[15]

### 7.  The CAC Alleges Corporate Scienter for SolarEdge

A corporation's scienter is adequately alleged where "high-level employees" knew of facts making statements misleading. *Loreley*, 797 F.3d at 177–78. As set forth above, the CAC alleges

---

[15] Defendants' citation to *In re Sec. Cap. Assur. Ltd. Sec. Litig.* is inapposite because that case addressed group pleading, which is not at issue. *See* 729 F. Supp. 2d 569, 595 (S.D.N.Y. 2010).

38

each Individual Defendant's scienter, and thus SolarEdge's scienter. *In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342, at \*10 n.3 (S.D.N.Y. Sept. 19, 2017). ("the most straightforward way to raise [a scienter] inference for a corporate defendant will be to plead it for an individual defendant").

Even if the Court finds that scienter has not been pleaded for each Individual Defendant, Plaintiffs still allege SolarEdge's scienter by alleging facts "creat[ing] a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). The CAC alleges that Cohen and Mathews (i) knew that demand was declining in Europe in the first half of 2023 (¶58) and (ii) attended meetings discussing forcing unneeded product on customers (¶¶67, 69). Further, CW4 described how his supervisors insisted on inflating his forecasts and thus knew that forecasts were not based on Company or market data. ¶¶37, 62. Finally, declining demand, rising inventories, and saturated channel inventories were "so important and dramatic that" statements about them "would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false" given the impact the circumstances would have on the Company. *See In re Gentiva Sec. Litig.*, 971 F. Supp. 2d 305, 329 (E.D.N.Y. 2013), *on reconsideration in part* (Dec. 10, 2013).

### 8. A Holistic View Supports a Strong Inference of Scienter

The CAC's scienter allegations must be considered holistically, not individually. *See, e.g.*, *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 138 (2d Cir. 2021). The CAC pleads a strong inference of scienter by alleging that Defendants (i) knew or recklessly disregarded information contradicting their statements; (ii) repeatedly issued misleading denials in response to direct questions to placate investors; (iii) made massive reductions in revenue guidance; and (iv) misrepresented the Company's core business. These allegations are akin to *ITT*, where Judge Oetken held that allegations that the defendants "had access to detailed data . . . that they closely

39

monitored" (combined with other allegations) sufficiently alleged that, "at some point during the class period, [d]efendants knew that student loan defaults were going to be a serious problem and yet continued to assure investors that they would not be." *See* 34 F. Supp. 3d at 309. Here, as in *ITT*, Defendants assured investors that everything was fine despite knowing of forced sales, declining demand, and saturated internal and channel inventories.

Defendants do not proffer *any* innocent inference for their misstatements. *See* Mot. at 30-39. To the extent that their passing references to "surprise" or "unexpected" declines imply good faith (*see id.* at 9-10), "[a] good faith belief is not a 'get out of jail free card.' It will not insulate the defendants from liability if it is the result of reckless conduct." *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 193 (3d Cir. 2000). This inference is especially inappropriate because SolarEdge claims to have unexpectedly lost up to $250 million in revenue *in only two weeks*, which strains credulity.

### E.  THE CAC PLEADS CONTROL PERSON LIABILITY

Defendants contend that because Plaintiffs have failed to adequately plead a predicate Section 10(b) violation, Plaintiffs' claim under Section 20(a) should also be dismissed. Mot. at 40. However, because Plaintiffs have adequately pled a Section 10(b) claim, their argument fails. *See 380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 231 (S.D.N.Y. 2008).

### F.  PLAINTIFFS RESPECTFULLY REQUEST AN OPPORTUNITY TO AMEND

Since this is the Court's first opportunity to formally assess any complaint in this action, if the Court grants any part of the Motion, Plaintiffs respectfully request the opportunity to amend. *See Kopchik v. Town of E. Fishkill, N.Y.,* 759 F. App'x 31, 38 (2d Cir. 2018) (opportunity to amend "appropriately presented *after the district court rules* on" a motion to dismiss).

### IV.    CONCLUSION

For the reasons stated above, Defendants' Motion should be denied in its entirety.

DATED:  August 26, 2024

Respectfully submitted,

**POMERANTZ LLP**

By: */s/ Brian Calandra*
Jeremy A. Lieberman
Brian Calandra
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
E-mail: jalieberman@pomlaw.com
E-mail: bcalandra@pomlaw.com

*Counsel for Lead Plaintiffs Mivtachim the Workers Social Insurance Fund Ltd., Keren Hgimlaot Hmerkazit Histadrut Central Pension Fund Ltd., Kerren Makefet Pension and Provident Center Cooperative Society Ltd., the Hadassah Workers Pension Fund Ltd., and Hachshara Insurance Company Ltd., Named Plaintiff Javier Alcides Cascallar, and the Class*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 26, 2024, a copy of the foregoing was filed electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties whose counsel has appeared in this action, by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

<u>/s/ *Brian Calandra*   </u>
Brian Calandra
