USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/4/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                                    :
IN RE SOLAREDGE TECHNOLOGIES, INC.          :
SECURITIES LITIGATION,                                   :
                                                                    :                    1:23-cv-9748-GHW
                                                                    :
------------------------------------------------------------------ X          MEMORANDUM OPINION &
                                                                                                  ORDER

GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

SolarEdge Technologies, Inc. ("SolarEdge") sells components for solar panel systems

primarily to large distributors, equipment wholesalers, and installers in North America and Europe.

In the third quarter of 2023, SolarEdge's revenues declined, leading to a drop in the company's stock

price.  Plaintiffs allege that the revenue decline was due in part to declining demand for SolarEdge's

products in Europe and an inventory glut caused by the company's practice of forcing distributors

to take delivery of unneeded products at the end of quarters to boost revenue numbers.  Plaintiffs

claim that SolarEdge and its executives made materially false or misleading statements in violation of

Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Specifically,

Plaintiffs allege that Defendants failed to disclose the company's practice of forcing product on

distributors, that Defendants misled investors about inventory levels, that Defendants misled

investors about demand for SolarEdge's products in Europe, and that Defendants misled investors

about sell-through rates.

Defendants move to dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(6), arguing that

Plaintiffs fail to allege both that Defendants' statements were false or misleading and that

Defendants had the requisite scienter.  Defendants' motion to dismiss is GRANTED IN PART and

DENIED IN PART.  Plaintiffs have adequately pleaded that Defendants knowingly misrepresented

inventory levels at SolarEdge's distributors.  But Plaintiffs have failed to adequately plead that

Defendants knew about the alleged practice of forcing unneeded product on customers or that Defendants' statements about demand and sell-through rates were false or misleading. Those claims are therefore dismissed with leave to amend.

## II.    BACKGROUND

### A.    Facts[1]

#### 1.    Parties

Plaintiffs purchased SolarEdge securities between February 13, 2023 and October 19, 2023 (the "Class Period"). Dkt. No. 55, Consolidated Amended Complaint ("CAC"), ¶ 26.

Defendant SolarEdge is a Delaware corporation with principal executive offices located in Israel. *Id.* ¶ 27. SolarEdge "designs, develops, manufactures, and sells" components for solar panel systems. *Id.* ¶ 43. SolarEdge common stock trades on the NASDAQ. *Id.* ¶ 27.

Defendant Zvi Lando was SolarEdge's Chief Executive Officer at all relevant times; Defendant Ronen Faier was SolarEdge's Chief Financial Officer at all relevant times; Defendant Lior Danziger was SolarEdge's Director of Investor Relations and Finance Operations "from prior to the Class Period to at least June 2021";[2] and Defendant J.B. Lowe was SolarEdge's Head of Investor Relations at all relevant times (collectively, the "Individual Defendants"). *Id.* ¶¶ 28–31.

Peter Mathews was SolarEdge's North America General Manager, and he reported to Lando. *Id.* ¶ 34. Shimon Kringel was SolarEdge's Vice President of Operations, North America and reported to Mathews. *Id.* ¶ 34. Amir Cohen was SolarEdge's Vice President North America Sales / General Manager – Solar Business Unit, and he reported to Mathews. *Id.* ¶ 36. Nick Alex was SolarEdge's Vice President of Sales and reported to Cohen. *Id.* ¶ 40. Alon Barel was

---

[1] At the motion to dismiss stage, the Court accepts the following facts set forth in the Consolidated Amended Complaint ("CAC"), Dkt. No. 55.

[2] The CAC alleges that "Danziger was authorized to speak and did speak to investors and analysts on behalf of the Company during the Class Period." CAC ¶ 30.

SolarEdge's Vice President – Global Sales. *Id.* ¶ 37. Alfred Karlstetter was SolarEdge's Europe

General Manager and "oversaw SolarEdge's European business." *Id.* ¶¶ 35, 39. Daniel Huber was

SolarEdge's Chief Revenue Officer, and he reported to Lando. *Id.* ¶ 37. Naama Ohana was

SolarEdge's Vice President and General Manager – Commercial Business Unit, and she reported to

Huber. *Id.* Martin Roger was SolarEdge's Vice President of Customer Success. *Id.* ¶ 69.

### 2. SolarEdge's Alleged Practice of Channel Stuffing

Plaintiffs allege that during the Class Period, SolarEdge had a practice of "achieving its

revenue targets by forcing customers to take unneeded products at the end of each financial

quarter." *Id.* ¶ 4. SolarEdge's customers are "primarily large distributors" who then "'sell through'

those products to end users." *Id.* ¶ 47. SolarEdge "recognizes revenue when its customers receive

products," not when its customers actually tender payment, and "not when [its] customers sell

products through to end users." *Id.* ¶ 48. Thus, SolarEdge can achieve revenue targets simply by

shipping products to distributors. *Id.* ¶¶ 48, 58.

According to confidential witnesses ("CWs") cited in the CAC,[3] SolarEdge would

"repeatedly" "force[] distributors to take delivery on product[s] early" by sending products out

"prematurely, before they were scheduled to go out." *Id.* ¶ 58. *See also id.* ¶ 65 ("CW6 stated that it

---

[3] CW1 was a business intelligence administrator at SolarEdge's Milpitas, California office from May 2022 to October 2023. CAC ¶ 34. CW1 reported to Kringel. *Id.* CW2 was a regional sales manager at SolarEdge from August 2018 to March 2023. *Id.* ¶ 35. CW2 "ran sales at different points in Canada, the northeastern U.S., and the Caribbean" and "interacted directly with SolarEdge sales executives in Europe." *Id.* CW3 was an executive administrator at SolarEdge's Milpitas office from August 2021 to August 2022; he reported to Cohen. *Id.* ¶ 36. CW4 started at SolarEdge in 2015 and served as "Senior Director of National Sales – C&I" (commercial & industrial) from May 2021 to December 2023; he worked "near Washington, D.C." *Id.* ¶ 37. CW4 "reported directly to Cohen, while also reporting via 'dotted line' to SolarEdge's headquarters in Israel," and he would "take direction" from Lando, Huber, Barel, and Ohana. *Id.* CW5 was a "Sales and Operations Associate – Strategic Accounts / Account Management" out of SolarEdge's Milpitas office. *Id.* ¶ 38. CW5 reported to individuals who reported to Kringel. *Id.* CW6 worked for SolarEdge in New York, New York between August 2017 and October 2023 and served as "Director C&I Sales, North America," reporting to CW4. *Id.* ¶ 39. CW7 worked for SolarEdge from February 2021 to December 2023 as a "Senior Inside Sales Manager" in the Milpitas office, reporting to Cohen and Alex. *Id.* ¶ 40. CW8 joined SolarEdge in 2015 and was promoted to "Director of Customer Support" in 2018 or 2019. *Id.* ¶ 41. He worked out of the Milpitas office before moving to Lexington, Kentucky, and he traveled to different SolarEdge locations, including Munich, Germany and Melbourne, Australia. *Id.* He reported to Roger. *Id.* CW9 was an operations manager for CED Greentech, a SolarEdge distributor, from December 2015 to November 2022. *Id.* ¶ 42. He worked in CED Greentech's Bakersfield, California branch. *Id.*

was 'pretty common knowledge' that SolarEdge . . . would 'force distributors to take product at the end of the quarter.'"); *id.* ¶ 66; *id.* ¶ 68 ("CW8 stated that SolarEdge was 'notorious' for 'trying to get shipments out to distributors' at the end of quarters 'to hit numbers.'").  CW2 stated that this happened "very often" to an American distributor, CED Greentech, and CW6 recalled that this happened to European distributor Krannich Solar.  *Id.* ¶¶ 58, 65; *see also id.* ¶ 66 ("CW7 specifically recalled an employee of key SolarEdge distributor CED Greentech screaming at him because 'SolarEdge was shoving product down his throat.'").  CW2 further stated that this consistently "happened near the end of the quarter."  *Id.* ¶ 58.  And when SolarEdge's customers wanted to cancel or push out the early orders, "it would turn into a battle" because SolarEdge "as a general rule did not allow distributors to cancel orders."  *Id.* ¶ 60 (internal quotation marks omitted); *see also id.* ¶ 68 (describing how "SolarEdge was known for 'holding out returns' . . . because the company was 'focused on getting product out to distributors'" to "hit numbers, get shipments out, last day of quarter").  CW5 stated that "because [SolarEdge] wouldn't let [customers] cancel," SolarEdge was able to "mov[e] numerous orders to different quarters."  *Id.* ¶ 64.  These tactics allowed SolarEdge "to hit quarter-end numbers."  *Id.* ¶ 66.  CW7 described this conduct as a "pattern" during his entire tenure at SolarEdge, from February 2021 to December 2023.  *Id.* ¶¶ 66, 40.

Further, supervisors "hounded" CW4 to "get [SolarEdge's] customers to agree to 'free carrier shipping terms,' which allowed SolarEdge to transfer ownership of orders (and thus recognize the orders as revenue) at . . . the manufacturing location, not when the items were received by customers."  *Id.* ¶ 61.  This allowed SolarEdge to recognize revenue "before the orders even shipped."  *Id.*  "[T]hese requests always came at the end of quarters as [SolarEdge] tried to recognize revenue within a quarter and meet its targets."  *Id.*  CW5 also recalled that SolarEdge encouraged customers to change orders to "FOB origin" so that it could recognize the orders as revenue earlier.  *Id.* ¶ 63.

"[E]fforts to get distributors to take inventory at the end of quarters were discussed during directors' meetings." *Id.* ¶ 67. According to CW7, "Cohen, Alex, Mathews and approximately five other directors" attended these meetings weekly. *Id.* However, there is no allegation that the Individual Defendants attended these meetings, and the CAC only alleges that "CW7 *believed* that [] the discussions in the[se] meetings were communicated up to Lando." *Id.* (emphasis added). According to CW8, he had conversations with Mathews, Cohen, Kringle, Alex, and Roger about "getting inventory to distributors to hit numbers." *Id.* ¶ 69. CW8 stated that he is "sure it was coming from Lando or the top of the [c]ompany . . . because Lando was Vice President of Sales before he became CEO and thus would have been involved in the [c]ompany's sales strategy." *Id.* CW1 and CW2 also stated that Lando was "intimately involved" in the details of company's business operations. *Id.* ¶ 72.

### 3. Inventory Rises and Demand Slows in Europe in 2023

Plaintiffs allege that starting in early 2023, demand for SolarEdge's products began to "declin[e] sharply." *Id.* ¶ 1. CW2 stated that "he heard 'concerns and discussions that Europe wasn't going well.'" *Id.* ¶ 58. Included in these discussions were SolarEdge's "upper management in North America, such as Cohen and Mathews." *Id.* CW4 stated that at multiple meetings in the first half of 2023, he directly informed Lando, Faier, Mathew, Cohen, Ohana, and Huber "that demand for SolarEdge products was falling and that 'the market was a lot worse than they thought.'" *Id.* ¶ 82. In a call with analysts and investors to disclose SolarEdge's Q3 2023 performance, Lando stated that the "picture got clearer . . . to us in the second half of the quarter . . . where the installation rate decline took place."[4] *Id.* ¶ 113.

---

[4] The CAC also describes Faier's statement clarifying that "it was difficult for Defendants to recognize the demand decline" at that time "because SolarEdge received sell-through reports late in each month that reflected the prior months sales." CAC ¶ 114.

Plaintiffs similarly allege that starting in early 2023, SolarEdge's inventory and the inventory of SolarEdge's distributor customers became saturated. "CW5 stated that SolarEdge customers were trying to cancel orders at least as early as February 2023 because their inventories were saturated, and that these cancellation attempts continued right up until he left the [c]ompany in October 2023." *Id.* ¶ 64. "CW5 specifically recalled one customer who at this time 'wanted to cancel everything,' which amounted to $50 million in orders, and that CED Greentech . . . wanted to cancel orders as well, starting in late Q2 2023." *Id.* When "SolarEdge's commercial inventories were rising sharply during the first half of 2023, the [c]ompany's executives, including Cohen, began asking" CW4 why customers were not taking product, and CW4 told them multiple times that the customers "don't need it." *Id.* ¶ 82.

Information about inventory levels was available to and specifically shared with Lando and Faier as well as other unspecified "senior leaders." SolarEdge used the "Priority" software system to track "full order details," and this system sent reports to "Lando and other senior leaders." *Id.* ¶ 73. Additionally, Lando and "other senior leadership" received daily inventory reports, which communicated both SolarEdge's inventory and "channel inventory"—the amount of inventory that was sitting with distributors that had not been sold through. *Id.* ¶ 74. Channel distributors also had to provide SolarEdge "regular reports . . . with data on current inventory and point of sale." *Id.* ¶ 75; *see also id.* ¶¶ 76, 78. Lando and Faier were aware of the contents of these distributor reports. *Id.* ¶¶ 77, 84–85. Lando and Faier would also be informed about SolarEdge's European business— specifically inventory, channel inventory, and forecasting updates—by Karlstetter during "Quarterly Business Reviews" ("QBRs"). *Id.* ¶ 79. QBRs were also attended by Mathews, Cohen, Ohana, Barel, and Huber. *Id.* ¶ 80. During QBRs, which were held "for each SolarEdge region (*e.g.*, Europe or North America)," *id.*, company leaders "would share all the financial details, where SolarEdge is

going each quarter, what are the targets, how much are they met, what is expected, [and] what they can provide to achieve their expectations," *id.* ¶ 81.

Plaintiffs also allege, based on information from CW4, that "SolarEdge was 'very aggressive' with its forecasting and goals for sales through to end customers (as opposed to sales to distributors)." *Id.* ¶ 62. CW4 stated that he would create forecasts of sell-through rates from information contained in third-party "market reports" and SolarEdge's own historical data.[5] *Id.* CW4 stated that "SolarEdge leaders, including Mathews, Cohen, Ohana and Huber would respond" that his "numbers are too low." *Id.* CW4 would not change his forecasts, but "Mathews, Cohen, Ohana, and Huber would insist on adopting forecasts that were too high and that [CW4] did not agree with." *Id.*

### 4. Defendants' Statements About Revenue, Demand, Inventory, and Sell-Through Forecasts

During the Class Period, SolarEdge and its executives made several public statements about the company's revenue, demand for its products, inventory levels, and sell-through rates. The CAC outlines several statements alleged to be false or misleading. These statements were all made by the Individual Defendants on earnings calls or at conferences during the Class Period.[6] The Court groups these statements into five categories based on Plaintiffs' allegations: (1) statements discussing SolarEdge's revenue;[7] (2) statements offering explanations for the increase in inventory

---

[5] The CAC does not allege for which geographies CW4 forecasted sales.

[6] The CAC does not allege that any public filings contained false or misleading statements.

[7] This category contains the following statements: CAC ¶ 121 (attributing "record revenues" and "the growth of [SolarEdge's] revenues coming from Europe" in Q4 2022 to "the increase in power prices prior to the beginning of the Ukraine-Russia conflict and the accelerated increases ever since, as well as the expansion of our portfolio to include inverters, EV chargers, and batteries, addressing the specific European market needs"); *id.* ¶ 123 (reporting Q1 2023 "revenues from [SolarEdge's] solar business . . . at a record $909 million . . . mostly driven by record revenues in Europe and Rest of World"); *id.* ("[T]he European residential markets continue to be very strong for us this quarter. As we ramped shipments of three phase residential inverters, in particular, our new backup inverter as well as the three phase residential battery."); *id.* ¶ 125 (reporting Q2 2023 "revenues from [SolarEdge's] solar business . . . at a record $947 million . . . mostly driven by record revenues in Europe").

levels;[8] (3) statements characterizing inventory levels as "low";[9] (4) statements regarding the strength

of demand in Europe;[10] and (5) statements regarding sell-through data.[11]

---

[8] This category contains the following statements: CAC ¶ 128 ("[O]ur inventory levels this quarter include higher levels of finished goods products as a result of streamlined manufacturing.  This finished goods inventory in the various regions will allow us to further improve our customer delivery time and reduce shipping and logistic expenses."); *id.* ¶ 132 ("As a result of the slowdown in the shipments to the United States, slower growth rates in Europe, and more streamlined manufacturing, our finished goods inventory increased substantially [in Q2 2023]. . . .  [It was] a healthy way to reduce shipment costs, in the various regions."); *id.* ¶ 134 ("[B]uilt inventory within the channels . . . will be cleared mostly through the adoption or getting more inverters from us during the third and the fourth quarter."); *id.* ¶ 145 ("The second thing distributors are doing is since they can rely better on our supply right now instead of holding 3 months or sometimes even 4 months of inventory . . . at the end of Q2, we saw in average 2 months of inventory of our product in the channel.  And now they're even sometimes reduced to 5 or 4 weeks.  And this creates a situation or on one hand, you see amazing demand.  But at the same time, since the inventory is still being cleared from the channel going to lower levels, the orders to us or other companies is not happening."); *id.* ¶ 146 (attributing channel inventory levels to the "past 2 years' experience of [distributors] not being able to get all of the products that they wanted," so they "simply overstocked, not just compared to the amount of revenues, but also because they thought that maybe they will not be able to get more products").
[9] This category contains the following statements from Faier and Lando, respectively:  CAC ¶ 138 ("[W]hen we are looking at the inventory on hand, when it comes to our distributors, the channels are pretty, I would say, low on inventory in most cases."); *id.* ¶ 139 ("[I]n Europe, we actually see low [channel] inventory days on hand . . . .  [T]he level of [channel] inventory is relatively not high.").
[10] This category contains the following statements: CAC ¶ 149 ("From a demand and inventory point of view, we continue to see very strong demand from Europe for all products and relatively low inventory levels in the channel. . . .  [I]n many cases, we see that the demand is far exceeding our ability to manufacture and deliver."); *id.* ¶¶ 150, 168 ("[T]o a large extent, our 2023 in Europe will be similar to the condition we were in in 2022, which is more dependent on our ability to produce the volumes than the demand."); *id.* ("[A]s far as we can see, the [Europe] market is – the demand is good, and the market is strong, and we are ramping production to meet demand."); *id.* ¶ 151 ("[I]t's definitely the case that [Europe] will probably be the fastest-growing geographies for us . . . .  We're definitely looking ahead toward a very healthy and robust year in Europe again."); *id.* ("[W]e're expecting extremely healthy and robust demand in Europe. . . .  [W]e're working very hard on solving those couple of bottlenecks that we have to solve.  And then we can probably—and I would say somewhere towards the second half of the year, we should expect some relief coming."); *id.* ¶ 152 ("[T]he situation is that . . . the demand [in Europe] is – continues to be very strong.  And I think that today, most dynamics are related to the – more to the ability to supply rather than the demand."  Faier attributed this to "the combination of relatively low interest rate environment . . . plus the fact that electricity prices hiked."); *id.* ¶ 153 (stating that the "vast majority" of SolarEdge's batteries "continue to be shifted to Europe, driven by the strong adoption and demand for our three-phase inverters"); *id.* ¶ 154 ("[W]e don't see right now a change in the pattern of demand in the market in Europe . . . [a]nd we don't see, at least until now any change in the dynamic and the market continues to be strong."); *id.* ¶ 155 ("[G]rowth is less dependent on demand.  It's more dependent on our ramp of manufacturing, which I mentioned, will take us another couple of quarters until we're at a full scale of matching the supply to demand. . . .  In Europe, the situation is more dependent on our supply and our intent is to continue and increase capacity of three-phase residential inverters.  So the outlook is for likely growth."); *id.* ¶ 156 ("[W]hat we're still seeing and observing in Europe is not so much different than what we mentioned after our last earnings . . . we're still looking at very healthy demand across the board in the markets and in the segments . . . .  But overall, and including both residential and commercial, we're still looking at a very healthy demand in Europe.  And this would probably still be the fastest-growing geographies for us in 2023."); *id.* ¶ 157 ("I think it's a combination of all . . . it's still a very attractive economic investment to do is install a solar system in Europe and we're still seeing driving very strong demand on the residential front.  On the C&I side, there's this layer of ESG-driven demand that we're seeing more and more corporations are starting to take their net zero emissions journey."); *id.* ¶ 158 (stating that distributors were overreacting by "going to a – on the overall offering to low levels of inventory that are maybe lower than those that they would normally carry in this type of a period, especially because the overall demand is still high . . . the market is very active[;] [i]nstallations are up and demand for equipment is strong"); *id.* ("In Europe, installation rates continue to be high in both residential and commercial . . . .  [O]ur growth in Europe in the second quarter was very strong."); *id.* ¶ 159 ("We do not see this stage, as well the case in German, let's say, or Europe in 2013 when the market disappeared.  Again,

### B. Procedural History

Plaintiffs commenced this action on November 3, 2023, Dkt. No. 1, and filed the CAC on April 22, 2024. Plaintiffs assert claims against SolarEdge, Lando, Faier, Danziger, and Lowe for violating Section 10(b) of the Exchange Act and Rule 10b-5 by allegedly making material misrepresentations and omitting material information about SolarEdge's revenue, demand, inventory, and sell-through rates. CAC ¶¶ 221–31. Plaintiffs also assert Section 20(a) claims against the Individual Defendants for exercising their control over SolarEdge to induce the allegedly material misrepresentations and omissions. *Id.* ¶¶ 232–35. On July 15, 2024, Defendants moved to dismiss the CAC for failure to state a claim. Dkt. No. 65. Defendants filed a memorandum of law in support of their motion that same day. Dkt. No. 66 ("MOL"). Plaintiffs filed an opposition to the motion to dismiss on August 26, 2024. Dkt. No. 68 ("Opposition"). Defendants filed their reply on September 16, 2024. Dkt. No. 69.

---

we see it more of a correction rather than a crisis that's going around overall."); *id.* ¶ 160("Europe is growing only 30% to 40% year-over-year. It depends on the country, of course. Europe is made out of many countries. And therefore, we still see very strong underlying demand for – last quarter, for example, we get from our channels and distributors what we call point-of-sale data, is showing how much we're selling out of the channels. We're talking about record high numbers that we haven't seen before. That in some cases, even for our products are close to 100% just compared to about a quarter ago. So the underlying demand is very strong, although not as strong as everyone thought."); *id.* ¶¶ 146, 174 ("[T]he underlying market in Europe is growing and growing very nicely."); *id.* ¶ 161 ("[W]hen we are looking at the point-of-sale data of how much is being sold from the channels, we see record levels over the last two quarters that, to our understanding, are continuing, which means that in that case, the demand is there."); *id.* ¶ 162 ("[SolarEdge] directed a lot of our shipments to Europe, which by the way turned to be a relatively good move given the fact that we see Europe growing relatively quickly right now."); *id.* ¶ 163 ("I'll start by saying that nothing changed from our call with only colors being a little bit more vivid in where do we see things happening. So starting from the underlying demand, the underlying demand in Europe continues to be strong and continues to be very great . . . . I can tell you that in both cases, we see a very nice uplift in all of Europe . . . we see it almost everywhere. It's a very good underlying demand, not as good as we thought."); *id.* ¶ 164 ("[U]nderlying demand [in Europe] for solar is very, very strong.").

[11] This category contains the following statements: CAC ¶ 141 ("In Europe today, what we see is that the inventory levels, on one hand, are relatively high. But when you look at the days outstanding, which is a result of the sell-through from the channel, they are not high at all. They're actually at the normal level."); *id.* ¶ 143 ("I'd say that in Europe, I think that, yes, the correction within the distributors should be relatively quick, given the fact that the inventories levels that Zvi mentioned before are not so high when it reflects inventory days while we still see very high – record-high point-of-sale data."); *id.* ¶ 161 ("[W]hen we are looking at the point-of-sale data of how much is being sold from the channels, we see record levels over the last two quarters that, to our understanding, are continuing, which means that in that case, the demand is there."); *id.* ¶ 164 ("[T]he data we see from our distributors is continuing to show significant growth in terms of sell-through into Europe."); *id.* ¶ 176 ("[A]t the end of the day, 1Q is going into the spring installation season and sell-through being as strong as it is, distributor inventories are going to be depleted fairly quickly.").

### III.    LEGAL STANDARDS

#### A.    Rule 12(b)(6)

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).  To determine plausibility, courts follow a "two-pronged approach." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (alterations and internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678).  Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679).  Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Because claims under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder sound in fraud, they are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"). *Novak v. Kasaks*, 216 F.3d 300, 306–07 (2d Cir. 2000).  Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  To satisfy that requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Novak*, 216 F.3d at 306).  The PSLRA imposes similar requirements on claims brought under the Exchange Act:  "the

complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged misstatement or omission.  15 U.S.C. § 78u-4(b)(2)(A).  A complaint will survive under that heightened standard "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

In resolving a motion to dismiss under Rule 12(b)(6), courts generally may not consider materials extrinsic to the complaint.  Fed. R. Civ. P. 12(d).  However, that rule is not absolute.  In addition to the facts alleged in the complaint, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI*, 493 F.3d at 98.  Courts may also consider "matters of which judicial notice may be taken."  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted).  Furthermore, on a motion to dismiss, the Court can consider statements made in a company's public filings with the SEC.  *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).  However, the Court can consider them "'only to determine what the documents stated,' and 'not to prove the truth of their contents.'"  *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

### B.  Section 10(b) and Rule 10b-5 Liability

Under Section 10(b) and Rule 10b-5, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in

the light of the circumstances under which they were made, not misleading . . . in connection with

the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b); *see also* 15 U.S.C. § 78j(b).  To state a

claim under Section 10(b) and Rule 10b-5 for fraudulent misrepresentations, a plaintiff must allege

"(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection

between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon

the misrepresentation or omission; (5) economic loss; and (6) loss causation." *GAMCO Invs., Inc. v.*

*Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund,*

*Inc.*, 573 U.S. 258, 267 (2014)).

## IV.    DISCUSSION

### A.    Actionable Material Misrepresentations or Omissions

#### 1.    Legal Standard

"A statement is misleading if a reasonable investor would have received a false impression

from the statement." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010)

(citation omitted).  When a company does not have an obligation to speak but does so anyway, it

assumes "a duty to be both accurate and complete." *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312,

331 (2d Cir. 2002); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010)

(explaining that once a corporation makes "a disclosure about a particular topic, whether voluntary

or required, the representation must be complete and accurate" (quotation omitted)).  And "literally

true statements" are actionable if they "create a materially misleading impression . . . ." *SEC v.*

*Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd and remanded on other grounds*, 568 U.S. 442 (2013).  "The

literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of

defendants' representations, taken together and in context." *Morgan Stanley Info. Fund*, 592 F.3d at

366 (internal quotation marks omitted).  Accordingly, plaintiffs "may not cherry pick certain public

statements for [their] complaint and divorce them from the universe of disclosed information to

plausibly allege fraud." *Stichting Depositary APG Developed Mkts. Equity Pool v. Synchrony Fin. (In re Synchrony Fin. Sec. Litig.)*, 988 F.3d 157, 171 (2d Cir. 2021).

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5[,]" *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988), but omissions can also be actionable under Section 10(b). An omission is actionable if the omitted information was subject to "an affirmative legal disclosure obligation" or the omitted information is "necessary to prevent existing disclosures from being misleading." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715–16 (2d Cir. 2011). The key is the "presence of a prior statement that otherwise is or will become materially misleading" because of the omission. *DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 206 (S.D.N.Y. 2019).

To incur liability, misrepresentations or omissions must be material. An omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Levinson*, 485 U.S. at 240 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (internal quotation marks omitted). "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Caiola*, 295 F.3d at 329 (internal quotation marks and citation omitted).

### 2. Plaintiffs Have Adequately Pleaded That Some, But Not All, of Defendants' Statements About Revenue Were Misleading

#### a. Plaintiffs Have Adequately Pleaded That Lando's Statement Attributing Increases in Revenue Solely to Factors Other Than Channel Stuffing Was Materially Misleading

Plaintiffs have adequately pleaded that it was misleading for Lando to attribute increased revenues in late 2022 to a variety of factors meanwhile omitting that part of the increase in revenues was caused by a practice of channel stuffing. When a company does not have an obligation to speak

but does so anyway, it assumes "a duty to be both accurate and complete." *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (explaining that once a corporation makes "a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate" (internal quotation marks omitted)).

In his February 13, 2023 statement, Lando attributed the record revenues in 2022 to "the increase in power prices prior to the beginning of the Ukraine-Russia conflict and the accelerated increases ever since, as well as the expansion of [SolarEdge's] portfolio to include inverters, EV chargers, and batteries, addressing the specific European market needs." CAC ¶ 121. Contrary to Defendants' argument, the factors cited by Lando are sufficiently specific to create a duty to disclose. *See Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 297 (S.D.N.Y. 2019) (dismissing claims where the statements listing causes of revenue growth were "too generic to be actionable"). Lando's statement about increased power prices coinciding with the Ukraine-Russia conflict is a reference to a specific market trend. *See Schiro*, 396 F. Supp. 3d at 297 n.4 (comparing *In re Braskem S.A. Securities Litig.*, 246 F. Supp. 3d 731, 758–59 (S.D.N.Y. 2017) (statements attributing the low cost of raw materials to "market prices," foreign exchange rates, and other factors were misleading in light of the company's failure to disclose a bribery scheme that fixed the materials' prices at a low rate)). Likewise, Lando listed specific new product offerings that he claimed addressed specific European market needs. *Compare In re Telefonaktiebolaget LM Ericsson Securities Litig.*, 675 F. Supp. 3d 273, 289 (E.D.N.Y. 2023), *aff'd sub nom. Boston Ret. System v. Telefonaktiebolaget LM Ericsson*, No. 23-940-CV, 2024 WL 4023842 (2d Cir. Sept. 3, 2024) ("Defendants' statements are vague and refer only to general trends and strengths, such as 'investments in R&D' and 'multiple customers in multiple countries.'").

Therefore, because Lando listed specific factors that led to "the growth of [SolarEdge's] revenues coming from Europe" in 2022, CAC ¶ 121, he was obligated "to tell the whole truth" with respect to the cause of the revenue growth, *In re Vivendi, S.A. Securities Litig.*, 838 F.3d 223, 258 (2d Cir. 2016).  And Plaintiffs sufficiently allege that part of SolarEdge's strategy for hitting revenue targets at the end of quarters was sending orders to customers prematurely in order to pull the revenue from those orders forward.  Multiple confidential witnesses in sales positions provided similar accounts of this practice.  *See* CAC ¶¶ 58, 65, 66, 68.  The confidential witnesses named two customers, CED Greentech and Krannich Solar, to whom they saw this happen.  *Id.* ¶¶ 58, 65, 66.  Specifically, two confidential witnesses describe how SolarEdge supervisors would encourage salespeople to adjust shipping terms so that it would be easier to pull forward revenues, *id.* ¶¶ 61, 63, and others describe how SolarEdge would prevent customers from cancelling orders in order hit the targets, *id.* ¶¶ 60, 64, 68.  This information would be material to investors who might worry that by pulling forward revenue, SolarEdge is creating a risk of underperformance in later quarters.  *See Oklahoma Firefighters Pension and Ret. System v. Lexmark Intl., Inc.*, 367 F. Supp. 3d 16, 33 (S.D.N.Y. 2019) ("[A] reasonable investor would likely have found it significant that printer supplies revenues were driven by inflated channel inventory and not increased end-user demand because those forces fundamentally differ in sustainability.").

Therefore, when Lando chose to "put[] the reasons for [the company's] success at issue, but fail[ed] to disclose [] a material source of its success," specifically the practice of channel stuffing, the statement was materially misleading.  *DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 206 (S.D.N.Y. 2019); *see also Plumbers & Pipefitters Natl. Pension Fund v. Davis*, No. 1:16-CV-3591 (GHW), 2020 WL 1877821, at *9 (S.D.N.Y. Apr. 14, 2020) ("Because [d]efendants specifically cited their strategy as a source of their success, they were obligated to . . . disclos[e] that their sales growth was, at least in part, the result of short-run sales tactics that led to a buildup of

inventory at PSG's customers."). Lando's statement at CAC ¶ 121 is therefore adequately alleged to be materially misleading.

> **b. The Confidential Witnesses Allege Channel Stuffing with Sufficient Particularity**

Contrary to Defendants' arguments, the confidential witnesses' allegations relating to channel stuffing are sufficiently particular, even though the witnesses worked out of North America rather than Europe. Courts may "rely on unnamed sources so long as 'they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp.*, 709 F.3d 109, 123–24 (2d Cir. 2013) (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)). In *New Jersey Carpenters*, the Second Circuit evaluated confidential witness allegations and determined that the plaintiffs had provided an adequate basis for believing that the defendants' statements were false. 709 F.3d at 123. There, the plaintiffs attributed a number of allegations to "eight unnamed prior employees" of the defendant that had held various positions, including former quality control auditors and account managers. *Id.* at 118. The defendants argued that the confidential witness allegations should be discounted because "those few employees could have conceivably described [the company's] practices at only a tiny fraction of its 432 offices." *Id.* at 123. But the Second Circuit rejected that argument: while it recognized that the employees had worked only at regional offices, it nonetheless determined that the allegations were sufficient because the complaint did not include allegations supporting the inference that the relevant practices were experienced only in those regions, rather than on a company-wide level. *Id.* at 123–24. Additionally, "courts have found at the pleading stage that the accounts of confidential witnesses support a company-wide inference where, for example, they emanate from several geographic areas; (2) span different levels of the company hierarchy; and (3) remain consistent across different time

period[s]." *In re AppHarvest Securities Litig.*, 684 F. Supp. 3d 201, 262–63 (S.D.N.Y. 2023) (internal quotation marks omitted).

In this case, the confidential witnesses' accounts are sufficient to infer a company-wide practice of channel stuffing. The relevant CWs were sales managers, including a Senior Director of National Sales, and a Director of Customer Support. CAC ¶¶ 35, 37, 38–41. Another was an operations manager from a SolarEdge distributor. *Id.* ¶ 42. There is a reasonable probability that the people in these positions would have information about SolarEdge's sales and customer engagement. The CWs worked out of multiple offices in California, Washington, D.C., New York, Kentucky, and Canada, and they interacted directly with executives and traveled to locations in North America, Europe, and Australia. *Id.* ¶¶ 35, 37, 38–41. And their experience spans years before the alleged events—e.g., CW6 worked as a senior sales manager starting in 2017—up through the Class Period. *See id.* ¶ 39. Importantly, their accounts of channel stuffing all corroborate one another's.

And the CAC "provide[s] no basis for believing" that this practice was dependent on "factors unique to the [CW's] relevant offices." *New Jersey Carpenters*, 709 F.3d at 124. Rather multiple CWs cite pressure from high-level supervisors to engage in channel stuffing. CAC ¶¶ 61, 67, 69. And there are sufficient allegations that this conduct persisted through the Class Period. *See id.* ¶ 66 (describing channel stuffing as a "pattern during [CW7's] entire tenure at SolarEdge").[12] For

---

[12] Defendants' citations to cases requiring a specific "time window" of a CW's allegations are inapposite. MOL at 16. In those cases, the CWs were offering an account of a particular event, which the court could not situate within the class period. *See, e.g., Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 803 (S.D.N.Y. 2020) (noting that the anonymous interviewee's "purported statements that Fanhua had backed and paid for two defaults by Lai's entities" were "unmoored in time"); *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 408–09 (S.D.N.Y. 2018), *aff'd*, 757 Fed. App'x 35 (2d Cir. 2018) (holding that the allegations are "problematic" because they are "silent as to when within that time window ProNAi's scientists had concluded that that study had come up empty"). By contrast, Plaintiffs allege here that SolarEdge had a pattern and practice that persisted *through time*, including through the Class Period. Plaintiffs' allegations support the existence of this practice through the Class Period. *See Employees' Ret. System of Govt. of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) ("[T]he Second Circuit has held that allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period.").

all these reasons, it is "reasonable inference" that channel stuffing was a "widespread practice." *New Jersey Carpenters*, 709 F.3d at 124.

Contrary to Defendants' argument, the CWs provide particular details, such as the policies that allegedly allowed SolarEdge to effectively achieve its goal of forcing product and hitting revenue targets. CAC ¶¶ 61, 63, 64, 68. The CWs even offer examples of specific American and European customers who experienced this conduct. *Id.* ¶¶ 58, 65, 70. And the CWs provide both personal anecdotes and "statements from [people] in management positions with a broader knowledge" of the company's practices. *Employees' Ret. System of Govt. of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) (crediting the existence of fraudulent inventory practices where individual CWs offered "stories" of brewers being "loaded onto trucks right before an audit, and put back in stock immediately after the auditors left"). And CW "managers reported to [the company's] executives who discouraged questions about the inventory practices and ignored their repeated complaints." *Id. See* CAC ¶¶ 67, 69. The Court therefore credits the CWs' mutually reinforcing and sufficiently particularized allegations of a pattern and practice of channel stuffing at SolarEdge during the relevant period.

### c. The Remaining Statements About Revenue Are Not Alleged to Be False or Misleading

The remaining statements regarding SolarEdge's revenues simply state the amount and source of the revenue.[13] These statements are not alleged to be factually inaccurate: Plaintiffs do not allege that the Q1 or Q2 2023 revenues were not $909 million and $947 million, respectively. Nor do these statements attribute the growth in revenue to any specific cause. The statement at

---

[13] These statements are as follows: CAC ¶ 123 (reporting Q1 2023 "revenues from [SolarEdge's] solar business . . . at a record $909 million . . . mostly driven by record revenues in Europe and Rest of World"); *id.* ("[T]he European residential markets continue to be very strong for us this quarter. As we ramped shipments of three phase residential inverters, in particular, our new backup inverter as well as the three phase residential battery."); *id.* ¶ 125 (reporting Q2 2023 "revenues from [SolarEdge's] solar business . . . at a record $947 million . . . mostly driven by record revenues in Europe").

CAC ¶ 123 merely states that revenues in Europe, specifically shipments of residential inverters, drove the growth. It does not attribute this growth to any particular cause and therefore does not create a duty among Defendants to offer up SolarEdge's channel stuffing as a cause. *See In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 270 (S.D.N.Y. 2023) ("Defendants' failure to disclose certain negative impacts on its sales in conjunction with [statements reporting net sales] was not misleading . . . . Defendants' factual statement on net sales for the first quarter of 2021 did not leave investors with the misleading impression that AppHarvest faced no challenges impacting its sales for that quarter . . . ." (internal citations and quotation marks omitted)). The statements at CAC ¶¶ 123 and 125 are therefore not alleged to be materially misleading.

### 3. Plaintiffs Have Adequately Pleaded That Defendants' Statements Attributing Increases in Inventory to Factors Other Than Channel Stuffing Were Materially Misleading

Plaintiffs have adequately pleaded that it was misleading for Defendants to attribute increased inventory in 2023 to a variety of factors meanwhile omitting that part of the increase in inventory was caused by a practice of channel stuffing. Defendants attributed SolarEdge's rising finished goods inventories in Q2 2023 to "slower growth rates in Europe and more streamlined manufacturing." CAC ¶ 132. Defendants attributed rising channel inventories to distributors' inventory preferences, *id.* ¶ 145, and a fear of "not being able to get all of the products that they wanted," *id.* ¶ 146. Defendants also asserted that channel inventories would be cleared "mostly through the adoption or getting more inverters from us," which implies that the cause of inventory buildup was a backlog of necessary components. *Id.* ¶ 134. In speaking on the causes of rising inventory, Defendants assumed "a duty to be both accurate and complete." *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002).

Defendants' statements were allegedly misleading because they omitted that rising inventories were caused at least in part by SolarEdge's practice of channel stuffing.[14] As outlined above, Plaintiffs sufficiently allege that SolarEdge engaged in a practice of "forcing customers to take delivery of unneeded products." CAC ¶ 178. This practice allegedly caused SolarEdge's "finished goods inventories and its customers' channel inventories [to] skyrocket[]." *Id.* By attributing rising inventories to other factors and omitting mention of channel stuffing, Defendants' statements misled investors about the alleged reason that inventories were rising. *See Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000) (holding that "reassurances that inventory was under control or giving false explanations for its growth" constituted "conscious misstatements"). And these misleading omissions are material because, Plaintiffs allege, a buildup of inventory based on channel stuffing "would inevitably require a drawdown in future quarters." *Oklahoma Firefighters Pension and Ret. System v. Lexmark Intl., Inc.*, 367 F. Supp. 3d 16, 35 (S.D.N.Y. 2019).

### 4. Plaintiffs Have Adequately Pleaded That Statements Characterizing Inventory Levels as "Low" Were Materially Misleading

Plaintiffs have adequately pleaded that the statements characterizing inventory levels as "low" were materially misleading.[15] Plaintiffs have pleaded with particularity facts showing that, contrary to Defendants' statements, inventory held by both SolarEdge and its distributors was growing in the first half of 2023 and reaching inordinately high levels. According to CW4, "SolarEdge's commercial inventories were rising sharply during the first half of 2023." CAC ¶ 82.

---

[14] Some of the challenged statements in this group also contain assertions about the benefits of higher inventories. *See, e.g.,* CAC ¶ 128 ("This finished goods inventory in the various regions will allow us to further improve our customer delivery time and reduce shipping and logistic expenses."); *id.* ¶ 132 (calling increased inventory "a healthy way to reduce shipment costs, in the various regions"). For clarity, these portions of the statements are not misleading because putting a positive gloss on the consequences of a trend does not mislead investors about the cause of that trend, and Plaintiffs have not alleged that the increased inventory would not reduce shipping costs or logistic expenses.

[15] There is one statement that Plaintiffs allege constitutes a misleading statement about inventory but that the Court does not include in this group of statements. The statement at CAC ¶ 130 describes a return to a "normal mode of operation" with respect to the "supply chain issues and logistic constraints" that had since eased from the prior two years. This statement does not make an assertion about the level of inventory at that time.

It was CW4's understanding that distributors were in a position where they did not "need" more product. *Id.* This is corroborated by allegations from CW5 that distributors "were trying to cancel orders at least as early as February 2023 because their inventories were saturated." *Id.* ¶ 64. And "these cancellation attempts continued right up until . . . October 2023." *Id.* CW7 also heard distributors "saying that they have too much equipment in the first half of 2023." *Id.* ¶ 67. This circumstance is consistent with Plaintiffs' allegations that in Q1 and Q2 of 2023, SolarEdge was "forcing" product on customers who did not need it or were not ready for it. *See id.* ¶¶ 57–70. In an October 19, 2023 press release, Lando stated that SolarEdge "experienced substantial unexpected cancellations and pushouts of existing backlog from our European distributors" attributed to "higher than expected inventory in the channels." *Id.* ¶ 193.

Taking these alleged facts as true, Defendants' statements that inventory levels were "low" would be false and misleading. *See In re Salix Pharm., Ltd.*, No. 14-CV-8925 (KMW), 2016 WL 1629341, at *10 (S.D.N.Y. Apr. 22, 2016) (holding that representations that current inventory levels were "typical" despite being temporarily inflated constituted actionable misstatements). *Cf. San Antonio Fire and Police Pension Fund v. Dentsply Sirona Inc.*, No. 22-CV-6339 (AS), 2024 WL 1898512, at *5 (S.D.N.Y. May 1, 2024) ("[T]here are two statements in which Gomez said the company didn't expect inventory levels to rise. Those statements would also be misleading if, in fact, Defendants were planning on or had already begun channel stuffing."). These misstatements were material because "investors would have wanted to know that [the company's] channel inventory had swollen to unusual levels during the Class Period." *Oklahoma Firefighters Pension and Ret. System v. Lexmark Intl., Inc.*, 367 F. Supp. 3d 16, 31 (S.D.N.Y. 2019).

### 5. Plaintiffs Have Not Adequately Pleaded That Defendants' Statements About Strong Demand in Europe Were False or Misleading

Plaintiffs have failed to plead with particularity the falsity of Defendants' statements assuring investors that demand for SolarEdge's products in Europe was strong. In support of their allegation

that demand in Europe was actually "declining sharply," CAC ¶ 118, Plaintiffs offer predominantly

"rumor or conjecture" that does not meet the PSLRA's or Rule 9(b)'s heightened pleading standard.

*Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 306 (S.D.N.Y. 2019).  Plaintiffs cite to the

statement of CW2, who "in early 2023" merely "heard concerns and discussions that Europe wasn't

going well."  CAC ¶ 58.  This "vague and conclusory allegation," *In re Fed Ex Corp. Securities Litig.*,

517 F. Supp. 3d 216, 232 (S.D.N.Y. 2021), is not the type of "specific fact" that Rule 9(b) and the

PSLRA require in support of falsity, *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004).  *See also In re*

*Fed Ex Corp. Securities Litig.*, 517 F. Supp. 3d at 232 (holding that a CW's allegation that "there was

significant doubt within the Company about its ability to meet the operating income improvement

target" was "insufficient to demonstrate the falsity of the income-improvement statements").  CW2

does not state from whom he heard these rumors or what "wasn't going well" about Europe, much

less demand for SolarEdge products in Europe.  *See Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp.

3d 193, 220 (S.D.N.Y. 2020) ("The [c]omplaint fails to identify the specific

information . . . discussed at the meetings, nor how such information contradicted [d]efendants'

public statements.").

Plaintiffs likewise cannot rely on the statements of third-party analysts who asked

Defendants about "chatter . . . around the potential slowdown" in Europe.  CAC ¶ 154; *see also id.*

¶ 156 (quoting an analyst regarding "some of the third-part forecasts that have come out for some

flattening in the market").  First, these statements are similarly rumor, conjecture, and unspecific.

Second, Plaintiffs fail to allege that these projections of a "slowdown" or a "flattening" in Europe

contradict Defendants' statements that demand was healthy and strong.  Demand growth can flatten

or slow and at the same time remain at a high level.  Third, the CAC

> does not reveal how the analysts it cites were selected, how large a group they were
> selected from, or whether these analysts' poor predictions are representative of
> broader financial analysis at the relevant time. Absent such information, it is
> impossible to determine whether the analysts who are cited are the few who were

wrong, or whether their mistaken estimates are indicative of a broader market understanding.

*In re Skechers USA, Inc. Securities Litig.*, 444 F. Supp. 3d 498, 521 (S.D.N.Y. 2020) (quoting *Plumbers and Steamfitters Local 137 Pension Fund v. Am. Express Co.*, No. 15-CV-5999 (PGG), 2017 WL 4403314, at *14 (S.D.N.Y. Sept. 30, 2017)).[16]

Plaintiffs also point to CW4's statements at "multiple QBRs" in the first half of 2023, where he "directly informed Lando and Faier" as well as others that "demand for SolarEdge products was falling and that the market was a lot worse than they thought." CAC ¶ 82. Putting aside the issue of whether one employee's pessimistic projections of SolarEdge's demand is "sufficient" to show that Defendants' contrary statements were false,[17] CW4's statement lacks the necessary particularity to support the contention that demand *in Europe* was weak. Plaintiffs do not allege that CW4's warnings about weak demand were specific to the European market. Without any such allegation, the Court cannot infer that CW4's statements were specific to Europe because in the first half of 2023, CW4 served as SolarEdge's "Senior Director of *National* Sales – C&I" based near Washington, D.C. CAC ¶ 37 (emphasis added). Plaintiffs fail to plead that an American director of national sales "would be in a position to know about" demand for SolarEdge's products in Europe or indeed that his comment related to sales outside of his region. *In re Sierra Wireless, Inc. Securities Litig.*, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007); *see also Steinberg v. Ericsson LM Tel. Co.*, No. 07-CV-9615 (RPP), 2008 WL 5170640, at *6 (S.D.N.Y. Dec. 10, 2008) ("As part of North American operations . . . , it is not plausible that [the confidential witnesses] would have direct knowledge about . . . rollouts in the pipeline for [emerging market countries]."). Furthermore, CW4 raised his concerns during QBRs,

---

[16] Plaintiffs argue that SolarEdge's "skyrocketing inventories, particularly of finished goods, further corroborate these allegations," Opposition at 27, but it is also consistent with the pleadings that inventory was rising because of SolarEdge's practice of channel stuffing. Inventories can rise with strong end-user demand if indeed SolarEdge was pushing product out to distributors prematurely.

[17] Notably, CW4's assertion about demand "do[es] not specify . . . [his] source[] of knowledge," *In re DraftKings Inc. Securities Litig.*, 650 F. Supp. 3d 120, 155 (S.D.N.Y. 2023), and "merely parrots the conclusory allegations contained in the complaint," *In re Sierra Wireless, Inc. Securities Litig.*, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007).

which the CAC alleges were "meetings for *each SolarEdge region* (*e.g.*, Europe *or* North America)."
CAC ¶ 80 (emphasis added).  The plausible inference, absent any contrary allegation, is therefore
that CW4, an American director of national sales, was participating in the North American meetings.
Without more particularized allegations, the Court will not make an unfounded assumption that
CW4 was discussing European demand at such meetings.  For these reasons, CW4's vague and
general statements that demand "was falling" and "a lot worse" than expected are not particular
enough to demonstrate the falsity of Defendants' statements about strong demand in Europe.

Finally, Plaintiffs argue that Defendants admitted that demand was falling in 2023, but the
statements to which Plaintiffs point do not go so far as to refute Defendants' earlier statements.
Defendants' statements that "demand is very strong, although not as strong as everyone thought"
are not an admission that they were wrong about demand being strong; rather, they are a
reaffirmation of Defendants' belief that demand was strong.  CAC ¶ 160; *see also id.* ¶¶ 112, 163, 193.
Holding Defendants liable for failing to predict exact demand forecasts is precisely the fraud by
hindsight that is not permissible in this Circuit.  *In re Lululemon Securities Litig.*, 14 F. Supp. 3d 553,
571 (S.D.N.Y. 2014), *aff'd*, 604 Fed. App'x 62 (2d Cir. 2015) ("Falsity is a failure to be truthful—it is
not a misapprehension, misunderstanding, or mistake of fact at the time a statement was made.").
Likewise, Lando's statement that an "installation rate decline took place" in Q3 2023 does not
contradict Defendants' statements that demand in Europe was generally strong.  CAC ¶ 113.
Contrary to Plaintiffs' assertion, none of Defendants' Q3 2023 statements "assur[ed] investors that
there was **no** slowdown in demand."  *Id.* (emphasis in original).

Because Plaintiffs have failed to allege with particularity facts that support their contention that demand in Europe in 2023 was not strong or healthy, Defendants have failed to plead that Defendants' statements about demand in Europe were false or misleading when made.[18]

### 6. Plaintiffs Have Not Adequately Pleaded That Defendants' Statements Regarding Sell-Through Rates Were False or Misleading

Plaintiffs have failed to plead with particularity that Defendants' statements regarding sell-through rates were false or misleading. Plaintiffs provide only one factual allegation regarding the falsity of Defendants' sell-through forecasts: CW4 stated that he would create his own forecasts and that these forecasts would be rejected by Mathews, Cohen, Ohana, and Huber for being "too low." CAC ¶ 62. "Mathews, Cohen, Ohana, and Huber would insist on adopting forecasts that . . . [CW4] did not agree with." *Id.* This single allegation is not enough to support Plaintiffs' claims that the five statements challenged in the CAC regarding sell-through forecasts were false. First, CW4 does not specify when he created his forecasts, and therefore he does not show that his forecasts contradicted the forecasts Defendants referenced "at the time the statements were made." *Ray v. StoneCo Ltd.*, No. 1:21-CV-9620 (GHW), 2024 WL 4308130, at *9 (S.D.N.Y. Sept. 25, 2024). Second, CW4 does not assert that the forecasts "adopted" by Mathews, Cohen, Ohana, and Huber were ultimately adopted by Defendants. Thus, the fact that Mathews, Cohen, Ohana, and Huber would adopt sell-through forecasts higher than CW4's does not mean that the forecasts referenced by Defendants in the challenged statements were higher than CW4's or otherwise erroneous.

Third, a single employee's disagreement with the forecasting method of Mathews, Cohen, Ohana, and Huber is insufficient to support the inference that their chosen forecasts were false or misleading. *See Siegel v. Boston Beer Co., Inc.*, No. 21-CV-7693 (DLC), 2022 WL 17417111, at *8

---

[18] Defendants also argue that a number of these statements constitute inactionable corporate optimism and puffery or are protected by the PSLRA's safe harbor for forward-looking statements. *See* MOL at 26–30. Because the Court finds that these statements are not misleading, the Court need not analyze whether they constitute puffery or forward-looking statements.

(S.D.N.Y. Dec. 5, 2022), *aff'd sub nom. Hassan v. Boston Beer Co., Inc.*, 2023 WL 8110940 (2d Cir. Nov. 22, 2023) (holding that "information received from [a confidential witness] that BBC's 'flawed and outdated forecasting system' meant that BBC could not reliably predict future performance . . . [is] insufficient . . . to plead falsity"). And Plaintiffs have offered no allegation that any forecast adopted by Mathews, Cohen, Ohana, Huber, or Defendants was "unsupported."[19]  Opposition at 30.  In sum, Plaintiffs have not provided particularized allegations that "SolarEdge was very aggressive with its forecasting" such that Defendants' statements regarding sell-through rates were false or misleading.  CAC ¶ 62.

### B.  Scienter

#### 1.  Legal Standard

Under the heightened pleading standards of Fed. R. Civ. P. 9(b) and the PSLRA, a plaintiff alleging securities fraud must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A); *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007).  The question "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 551 U.S. at 322–23.

An "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  If an inference of fraudulent intent is not "at least as compelling" as a contrary inference, it is inadequate, even in a "close case."  *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 777 (2d Cir. 2010).  An inference of scienter need not be "irrefutable, i.e., of the 'smoking-gun' genre, or even

---

[19] While Plaintiffs attempt to spin Faier's statement at CAC ¶ 116 as an "admission that they had *not* talked to businesses selling products to end users" prior to creating their sell-through forecasts, Plaintiffs are over-playing their hand. Opposition at 31 (emphasis added).  Faier's statement says only that SolarEdge had talked to installers "a little bit less prior."  CAC ¶ 116.  Plaintiffs are presumably aware that having done something "a little bit less" is not the same as "not" having done that thing at all.

the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324 (quotation omitted); *see also City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) ("[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff.").  "But generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard." *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 336 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010).  "Thus, a complaint 'which fails to adduce any specific facts supporting an inference of knowledgeable participation in the alleged fraud, will not satisfy even a relaxed standard.'" *Faulkner v. Verizon Commc'ns, Inc.*, 156 F. Supp. 2d 384, 393 (S.D.N.Y. 2001) (quoting *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir.1987)).

"While 'the absence of a motive allegation is not fatal,' motive can be a relevant factor, and 'personal financial gain may weigh heavily in favor of a scienter inference.'" *Slayton*, 604 F.3d at 776 (quoting *Tellabs*, 551 U.S. at 325).  Absent a showing of motive, "the strength of [Plaintiff's] circumstantial allegations must be correspondingly greater." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)).  In sum, "[t]he inquiry on a motion to dismiss is as follows:  '[w]hen the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" *In re Scot. Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 383 (S.D.N.Y. 2007).

### 2.  Plaintiffs Have Failed to Plead Defendants' Scienter with Respect to Channel Stuffing

Plaintiffs fail to allege facts that support a strong inference that the Individual Defendants were aware of the alleged practice of channel stuffing, and therefore Plaintiffs fail to plead that Defendants' actionable omissions were made with fraudulent intent.  Plaintiffs only allege that "efforts to get distributors to take inventory at the end of quarters were discussed during directors' meetings."  CAC ¶ 67.  They do not allege that the Individual Defendants were present at these

meetings. To the contrary, it is reasonable to infer that Lando was not present at these meetings because CW7 stated that he "believed that [] the discussions in the[se] meetings were communicated up to Lando." *Id.* This belief alone, without supporting facts, is not enough to draw a strong inference that Lando was indeed made aware of any channel stuffing. *See In re Citigroup Inc. Securities Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010) ("Plaintiffs cannot rely on assertions that the information presented by confidential witnesses was known or common knowledge within the company.").[20] There is likewise insufficient alleged factual support for CW8's statement that he is "sure it was coming from Lando or the top of the [c]ompany." CAC ¶ 69. CW8 justifies his belief "because Lando was Vice President of Sales before he became CEO and thus would have been involved in the [c]ompany's sales strategy." *Id.* However, "[c]ourts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight." *Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010). The argument "that high-level executives who are involved in a key undertaking would necessarily know" about the alleged conduct "is conclusory and insufficient under the relevant pleading standard." *Nandkumar v. AstraZeneca PLC*, No. 22-2704-CV, 2023 WL 3477164, at *4 (2d Cir. May 16, 2023). Although the CAC alleges that Lando was "intimately involved" in the details of the company's business operations, CAC ¶ 72, that fact alone is insufficient to support an inference that he was aware of this specific conduct by SolarEdge's sales teams. *See Nandkumar*, 2023 WL 3477164, at *4 ("[T]he importance of the vaccine and the

---

[20] The case law Plaintiffs cite does not counsel a different conclusion. There is a difference between a factual allegation that specific information "would have [been] reported" though formal "reporting chains," *Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 389 (S.D.N.Y. 2022), and what is alleged in the CAC, which is only a vague "belief" that information had been communicated up. *See, e.g.*, *Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 290 (S.D.N.Y. 2020) ("[T]he $11.7 billion Change Order . . . '*would have* gone to' the company's Vice President, 'who in turn *would have* submitted the Change Order to the senior executives.'" (emphasis added)). And while Plaintiffs point to a Third Circuit case in which no "particular document or conversation" was required to infer scienter, that court still found "an array of circumstantial evidence," which is not present here. *Institutional Inv'rs Group v. Avaya, Inc.*, 564 F.3d 242, 268–69 (3d Cir. 2009).

[i]ndividual [d]efendants' senior executive positions, involvement in a key company undertaking, and repeated interaction with pharmaceutical industry analysts—do not add to the plausibility of the scienter allegations. These allegations lack specificity as to what information the [i]ndividual [d]efendants allegedly knew."). The facts alleged in the CAC are therefore insufficient to support a strong inference that the Individual Defendants were aware of channel stuffing.

"Because Plaintiff[s'] other allegations fall far short of supporting a compelling inference of scienter . . . , Plaintiff[s'] core-operations allegations do not fill the gap." *In re AppHarvest Securities Litig.*, 684 F. Supp. 3d 201, 246 (S.D.N.Y. 2023). "Under the core operations doctrine, a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of income." *Id.* (quoting *Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, 2023 WL 3569068, at *17 (S.D.N.Y. May 19, 2023)). "The core operations doctrine, however, 'has been thrown into doubt by the enactment of the PSLRA in 1995.'" *Id.* (quoting *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 239 (S.D.N.Y. 2022)); *see also In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (Sullivan, J.). "As a result of these doubts as to the doctrine's continuing import, the core operations inference may be considered as part of a court's holistic assessment of the scienter allegations, but it is not independently sufficient to raise a strong inference of scienter." *In re AppHarvest*, 648 F. Supp. 3d at 246 (quoting *In re Turquoise Hill*, 625 F. Supp. 3d at 239). "Put differently, 'core-operations allegations are 'supplementary'; that is, they are not independently sufficient means to plead scienter.'" *Id.* (quoting *Saraf v. Ebix, Inc.*, 632 F.Supp.3d 389, 398 (S.D.N.Y. 2022)). Here, Plaintiffs provide no factual allegations that the Individual Defendants had knowledge of channel stuffing, and even if sales to Europe were core operations, Plaintiffs offer no reason to infer that the sales practice of shifting deliveries to the end of the quarter would be part of SolarEdge executives' oversight into this operation.

Plaintiffs also fail to plead corporate scienter.  Pleading corporate scienter requires "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)).  "[M]ost courts look to the discrete roles played by the corporate actors who are connected to the alleged misrepresentation to determine which (if any) fall within the locus of a company's scienter." *Id.*  "[T]he most straightforward way to raise a strong inference of corporate scienter is to impute it from an individual defendant who made the challenged misstatement." *Id.*  "The scienter of the other officers or directors who were involved in the dissemination of the fraud may also be imputed to the corporation, even if they themselves were not the actual speaker." *Id.*

The Court cannot impute Mathews's, Cohen's, Kringle's, Alex's, or Roger's intent to SolarEdge.  While the CAC alleges that these individuals were involved in meetings where channel stuffing practices were discussed, CAC ¶¶ 67, 69, none of them are alleged to have made the challenged statements or to have been "involved in the dissemination" of the statements. *Jackson*, 960 F.3d at 98.  As a result, Plaintiffs "provide[] no connective tissue between those employees and the alleged misstatements." *Id.* at 99 (citing *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 440–41 (S.D.N.Y. 2017) (acknowledging that it is insufficient to "*separately* allege misstatements by some individuals and knowledge belonging to some others where there is no strong inference that, in fact, there was a connection between the two")).

### 3. Plaintiffs Have Adequately Pleaded Defendants' Scienter with Respect to the Misleading Statements About Inventory Levels

Plaintiffs have adequately pleaded that Lando and Faier had knowledge of or recklessly disregarded information that inventory levels in the channels were becoming saturated when they stated that inventory levels were low.  As discussed above, information about inventory levels was available to and specifically shared with the Individual Defendants.  Lando and "other senior

leadership" received "daily inventory reports," which communicated both SolarEdge's inventory and channel inventory. CAC ¶ 74. Channel distributors also provided SolarEdge regular reports—daily, weekly, or monthly—with data on inventory and point of sale. *Id.* ¶¶ 75–76, 78. Plaintiffs allege that Lando and Faier demonstrated their awareness of the content of these reports by questioning subordinates with specific knowledge of distributors' inventories and needs. *Id.* ¶ 77. And Lando and Faier touted these inventory reports to investors, *id.* ¶ 84–85, which further supports an inference that Lando and Faier had knowledge of the contents of the reports. *See In re Salix Pharm., Ltd.*, No. 14-CV-8925 (KMW), 2016 WL 1629341, at *14 (S.D.N.Y. Apr. 22, 2016) (holding that a defendant's statement to analysts about "how he knew inventory levels with specificity . . . weighs in favor of scienter"). According to the CAC, Lando and Faier would also be informed about inventory and channel inventory in Europe by Karlstetter during QBRs. CAC ¶ 79.

Plaintiffs' allegations are sufficient for the Court to infer that these reports and meetings contradicted Defendants' public statements. Plaintiffs have "specifically identified [] reports [and] statements" as well as "time frame[s] in which Defendants were put on notice of contradictory information." *Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 299–300 (S.D.N.Y. 2010) (holding that a "broad reference to raw data is not sufficient" (internal quotation marks omitted)). Contrary to Defendants' argument, *see* MOL at 33–34, the CAC does "plausibly allege what information was actually included in those reports [and] discussed at those meetings." *Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, 238 (S.D.N.Y. 2020); *compare Loc. No. 38 Intern. Broth. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010) ("[T]hese allegations do not establish what specific contradictory information the [i]ndividual [d]efendants received or when they received it."). As discussed in Section IV.A.4 above, Plaintiffs sufficiently allege that inventories were increasingly becoming saturated during the Class Period. Therefore, it is reasonable to infer that the inventory data being

31

presented to Defendants reflected that trend, which contradicted their statements that inventories were low.

This situation is unlike the principal case cited by Defendants, in which the plaintiffs alleged that the defendant knew about a "customer receivables problem" because of weekly reports that "contained unspecified information . . . that may or may not have alerted Defendants to the problem." *In re Federated Dept. Stores, Inc. Securities Litig.*, No. 00-CV-6362 (RCC), 2005 WL 696894, at *4 (S.D.N.Y. Mar. 25, 2005). By contrast, the inventory reports here allegedly showed that inventories were too high, which would directly alert Defendants to the falsity of their statements that inventories were low. *Compare id.* (holding that data on delinquent receivables does not necessarily "provide[] any information that . . . [the] bad-debt reserve was too low to account for the delinquencies").

### C.  Section 20(a) Claims

Plaintiffs' Section 20(a) claims fail where the CAC does not adequately plead that Defendants are liable for a primary violation of Section 10(b). *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) ("ATSI fails to allege any primary violation; thus, it cannot establish control person liability."); *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 207 (2d Cir. 2009). Defendants provide no other argument for dismissing the Section 20(a) claims. Therefore, the Court does not dismiss Plaintiffs' Section 20(a) claims regarding Defendants' statements that inventories were low.

### V.    LEAVE TO AMEND

Defendants' motion to dismiss is granted in part with leave to amend as described below. "The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, leave may be denied "for good reason, including futility, bad faith, undue delay, or undue

prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).

Plaintiffs have failed to adequately plead that demand in Europe was weak or that Defendants' sell-through forecasts were improperly inflated, and Plaintiffs have failed to adequately plead that the Individual Defendants were aware of the alleged channel stuffing. The Court cannot conclude that further amendment would not cure these deficiencies in the CAC. The Court therefore grants Plaintiffs leave to file a second amended complaint solely to cure the deficiencies identified with respect to these claims no later than 30 days from the date of this order. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 191 (2d Cir. 2015).

## VI.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

Plaintiffs have adequately stated claims for Section 10(b) and Section 20(a) liability with respect to the statements by Defendants Lando and Faier that inventory levels in 2023 were low. Claims arising from the remaining statements are dismissed with leave to amend as described above. As such, all claims against the Individual Defendants other than Lando and Faier are dismissed without prejudice.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 65.

SO ORDERED.

Dated:  December 4, 2024
        New York, New York

_____
GREGORY H. WOODS
United States District Judge