# EXHIBIT 11

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE SOLAREDGE TECHNOLOGIES, INC. SECURITIES LITIGATION | No. 1:23-cv-09748-GHW <br><br> **<u>CLASS ACTION</u>** <br><br> **<u>JURY TRIAL DEMANDED</u>** |
| THIS DOCUMENT RELATES TO: <br><br> *ALL ACTIONS* |  |

**SECOND CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS**
**OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

I.  NATURE OF THE ACTION ................................................................................... 2

II.  JURISDICTION AND VENUE ............................................................................ 10

III.  PARTIES ............................................................................................................. 10

IV.  CONFIDENTIAL WITNESSES ......................................................................... 12

V.  SUBSTANTIVE ALLEGATIONS ...................................................................... 16

    A.  Background of SolarEdge ........................................................................ 16

    B.  Importance of Europe Region to SolarEdge .......................................... 19

    C.  Defendants Pushed Customers to Take Delivery of Products at the End of Quarters So that the Company Could Meet Sales and Revenue Goals, Which Resulted in Massive Inventory Increases ........................................... 21

    D.  Defendants Knew of the Company's Pressure on Customers to Take Products, High Inventory Levels at SolarEdge and Its Distributors, and Decline in Demand in Europe .................................................................. 29

    E.  Defendants Tout to Investors SolarEdge's Performance in Europe and the Increase in the Company's Inventories ................................................... 36

    F.  Investors Learn the Truth ........................................................................ 40

    G.  Relevant Post-Class Period Events ......................................................... 43

VI.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ........................................................................ 46

    A.  Misrepresentations Concerning SolarEdge's Revenues ........................ 47

    B.  Misrepresentations Concerning the Growth of SolarEdge's Inventory ............... 49

    C.  Misrepresentations Concerning Channel Inventory Levels in Europe ................. 52

    D.  Misrepresentations Concerning Demand for SolarEdge Products in Europe ....... 56

    E.  Misrepresentations Concerning Sell-Through Forecasts for SolarEdge Products .............. 62

VII.  THE TRUTH BEGINS TO EMERGE ................................................................. 66

VIII.  PLAINTIFF'S CLASS ACTION ALLEGATIONS ........................................... 73

IX.  UNDISCLOSED ADVERSE FACTS ................................................................. 76

X.  LOSS CAUSATION ............................................................................................ 77

XI.  ADDITIONAL SCIENTER ALLEGATIONS .................................................... 78

XII.  NO SAFE HARBOR ........................................................................................... 80

XIII.  COUNT I ............................................................................................................. 81

XIV.  COUNT II ............................................................................................................ 84

XV.  PRAYER FOR RELIEF ...................................................................................... 85

XVI.  DEMAND FOR TRIAL BY JURY .................................................................... 85

i

**GLOSSARY OF DEFINED TERMS**

| Term | Definition |
|---|---|
| 2022 10-K | SolarEdge Annual Report on Form 10-K for the year 2022, filed with the SEC on February 22, 2023, and signed by Defendants Lando and Faier |
| 2022 Earnings Call | SolarEdge Earnings Call for the fiscal year of 2022, February 13, 2023 |
| AC | Alternating current electricity |
| Alex | SolarEdge's Vice President of Sales Nick Alex |
| Barclays Conference | Barclays CEO Energy-Power Conference, on September 6, 2023 |
| Barel | SolarEdge Vice President – Global Sales Alon Barel |
| BI | SolarEdge's Business Intelligence team in Israel |
| Carraro | SolarEdge General Manager for Europe Christian Carraro |
| Carroll | SolarEdge Vice President of Commercial and Industrial Division, John Carroll |
| C&I | SolarEdge's Commercial and Industrial division, as opposed to its "Residential" division |
| CFRA | CFRA Equity and Fund Research Services |
| Channel Inventory | Inventory held by SolarEdge customers that those customers had not sold through to installers or end users. |
| Class Period | February 13, 2023 and October 19, 2023 |
| Cohen | SolarEdge's Vice President North America Sales / General Manager – Solar Business Unit Amit Cohen |
| Company | SolarEdge Technologies, Inc. |
| CRO | Chief Revenue Officer |
| CW__ | Confidential Witness No. __ |
| Danziger | Defendant Lior Danziger, SolarEdge's Director of Investor Relations and Finance Operations from prior to the Class Period until at least June 2023 |

| DC | Direct current electricity |
|---|---|
| Exchange Act | Securities Exchange Act of 1934 |
| Faier | Defendant Ronen Faier, SolarEdge's CEO at all relevant times |
| Finished goods | Completed products available for sale |
| Frank | SolarEdge's Senior Director of National Sales – Commercial and Industrial Ben Frank |
| Gabel | SolarEdge's Operations Senior Manager, Sales Monica Gabel |
| Gat | Amir Gat, SolarEdge VP of Strategy and Special Projects |
| Huber | SolarEdge ("CRO") Daniel Huber |
| JPM Conference | JPMorgan Energy, Power & Renewables Conference, on June 21, 2023 |
| Karlstetter | SolarEdge's Europe General Manager Alfred Karlstetter. |
| Karp | KeyBanc analyst Sophie Ksenia Karp |
| Kelman | Daniel Kelman, SolarEdge Strategy and Corporate Development |
| KeyBanc Symposium | KeyBanc Capital Markets Inc.'s Energy Transition Symposium on September 21, 2023 |
| Kringel | SolarEdge's then-Vice President of Operations, North America, Shimon Kringel |
| Lando | Defendant Zvi Lando, SolarEdge's CEO at all relevant times |
| Lowe | Defendant J.B. Lowe, SolarEdge's Head of Investor Relations at all relevant times |
| Lugos | SolarEdge's Senior Sales Director of the Distribution Channel in North America, Manny Lugos |
| Mathews | SolarEdge's North America General Manager Peter Mathews |
| Milpitas Office | SolarEdge's corporate office in Milpitas, California |
| Named Plaintiff | Javier Alcides Cascallar |
| NASDAQ | The NASDAQ Global Select Market |

| October Release | SolarEdge's October 19, 2023 press release announcing that the Company would not meet its guidance for the third quarter 2023 |
|---|---|
| Ohana | SolarEdge Vice President and General Manager – Commercial Business Unit Naama Ohana |
| Oppenheimer Conference | Oppenheimer 26th Annual Technology, Internet & Communications Conference, on August 8, 2023 |
| Plaintiffs | Collectively Lead Plaintiffs Mivtachim the Workers Social Insurance Fund Ltd., Keren Hgimlaot Hmerkazit Histadrut Central Pension Fund Ltd., Kerren Makefet Pension and Provident Center Cooperative Society Ltd., the Hadassah Workers Pension Fund Ltd., and Hachshara Insurance Company Ltd., and Named Plaintiff. |
| PV | Photovoltaic |
| PV systems | Photovoltaic solar power systems |
| Q1 2023 | First quarter of 2023 |
| Q1 2023 10-Q | SolarEdge Quarterly Report on Form 10-Q for the first fiscal quarter of 2023, filed with the SEC on May 08, 2023, and signed by Defendants Lando and Faier |
| Q1 2023 Call | SolarEdge Earnings Call for the first financial quarter of 2023, May 3, 2023 |
| Q2 2023 | Second quarter of 2023 |
| Q2 2023 10-Q | SolarEdge Quarterly Report on Form 10-Q for the first fiscal quarter of 2023, filed with the SEC on August 07, 2023, and signed by Defendants Lando and Faier |
| Q2 2023 Call | SolarEdge Earnings Call for the second financial quarter of 2023, August 1, 2023 |
| Q3 2023 | Third quarter of 2023 |
| Q3 2023 10-Q | SolarEdge Quarterly Report on Form 10-Q for the first fiscal quarter of 2023, filed with the SEC on November 06, 2023, and signed by Defendants Lando and Faier |
| Q3 2023 Call | SolarEdge Earnings Call for the third financial quarter of 2023, November 2, 2023 |
| QBR | SolarEdge's internal quarterly business review meetings |

iv

| Residential | SolarEdge's residential division, as opposed to its "C&I" division. |
|---|---|
| ROTH Conference | March 13, 2023, investor conference at which SolarEdge Danziger and Lowe participated in a talk hosted by an analyst |
| ROW | Rest of World |
| SEC | U.S. Securities and Exchange Commission |
| SolarEdge | SolarEdge Technologies, Inc. |
| SOX | Sarbanes-Oxley Act of 2002 |
| SPA | Special pricing agreement |
| Springer | SolarEdge's Sales and Operations Associate Lead Carolyn Springer |
| U.S. | United States |
| Vijayakumar | SolarEdge Sales Director Sadananda Vijayakumar. |
| Wells Symposium | March 28, 2023, Wells Fargo Clean Energy Symposium at which Faier spoke with analysts |

Court-appointed Lead Plaintiffs Mivtachim the Workers Social Insurance Fund Ltd., Keren Hgimlaot Hmerkazit Histadrut Central Pension Fund Ltd., Kerren Makefet Pension and Provident Center Cooperative Society Ltd., the Hadassah Workers Pension Fund Ltd., and Hachshara Insurance Company Ltd., and Named Plaintiff Javier Alcides Cascallar (collectively, "Plaintiffs"), individually and on behalf of all other persons or entities who or which, during the period from February 13, 2023 and October 19, 2023, inclusive (the "Class Period"), purchased or otherwise acquired securities of SolarEdge Technologies, Inc. ("SolarEdge" or the "Company") and were damaged thereby (the "Class")[1] bring this Second Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws against SolarEdge and Zvi Lando ("Lando"), the Company's Chief Executive Officer ("CEO"), Ronen Faier ("Faier"), the Company's Chief Financial Officer ("CFO"), Lior Danziger ("Danziger"), the Company's Director of Investor Relations and Finance Operations, and J.B. Lowe ("Lowe"), the Company's Head of Investor Relations (collectively, "Defendants"). under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

Plaintiffs allege, by and through their attorneys, the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, the investigation conducted by Plaintiffs' counsel, which includes among other things: (a) review and analysis of regulatory filings made by SolarEdge with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) research reports prepared by securities and financial analysts concerning SolarEdge; (c) transcripts of SolarEdge investor conference calls; (d) SolarEdge investor presentations; (e)

---

[1] Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

1

reports by the financial press concerning SolarEdge; (e) SolarEdge securities pricing data; (f) interviews of former SolarEdge employees; (g) consultations with experts; and (h) other material and data identified herein. Lead Counsel's investigation into the factual allegations is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein and will continue to be revealed after Plaintiffs have a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.      This securities fraud class action arises out of false or misleading statements by Defendants that misrepresented the Company's true operations and financial condition. Specifically, Defendants and misrepresented and/or failed to disclose that (i) the Company had reached financial targets, including obtaining "record" revenues, by forcing customers to take delivery of unneeded products at the end of fiscal quarters, with the approval, knowledge and/or direction of Lando and Faier; (ii) the Company's "finished goods" inventories (*i.e.*, inventories of completed products available for sale) and its channel inventories (*i.e.*, inventories held by SolarEdge customers that had not been sold through to installers or end users) were skyrocketing because of declining demand and the above-mentioned forcing of customers to take unneeded products; (iii) demand for the Company's products in Europe, its most important region, was declining sharply; and (iv) the Company's projections for "sell-through" (*i.e.*, sales of its products by distributors through to installers and other end users) were inflated and not based on market reports or SolarEdge's own internal data. These misstatements also concealed the material undisclosed risk that channel inventories would rise so high that customers would need to cancel or push out orders of SolarEdge's products and the Company's revenues would plummet. As the

2

truth emerged and the concealed risk materialized, SolarEdge's share price plummeted *by a total of over 27%*, crushing investors.

2.      SolarEdge predominantly manufactures, markets, and sells solar power systems, including inverter solutions for solar photovoltaic ("PV") power systems. The Company's offerings include power optimizers, inverters, monitoring services, energy storage, and smart energy management via a cloud-based monitoring platform. SolarEdge sells its products worldwide through large distributors, electrical equipment wholesalers, and certain large solar installers. SolarEdge's customers generally resell, or "sell through" the Company's products to "end users" including installers and engineering, procurement, and construction firms that install solar power systems for homes, businesses, and utility plants. SolarEdge recognizes revenue when its customers receive products, not when those customers sell through products to end users.

3.      SolarEdge's most important region by far is Europe. Europe generated 54.3% of the Company's solar revenues in 2022, the year prior to the Class Period, and 64% of its solar revenues in 2023, the year encompassing the Class Period. Early in the Class Period, Danziger touted to investors and analysts that "*it's definitely the case that [Europe] will probably be the fastest growing geographies for us*" in 2023. In addition, when Defendants reported the Company's financial performance over the same period, they touted to investors "*significant growth in revenues coming from Europe*" and large volumes of products "*sold primarily in Europe*."

4.      According to multiple former SolarEdge employees who spoke to Plaintiffs' investigators as confidential witnesses, the Company's Europe business was struggling throughout the Class Period, and Defendants knew it. Demand for SolarEdge products in Europe was declining, and the Company was only achieving its revenue targets by forcing customers to take

unneeded products at the end of each financial quarter. For example, one confidential witness, CW15, a SolarEdge sales representative in the Northeast and Midwest of the U.S. and Canada, stated that "[t]he U.S. market was being pushed to make up for lack of sales in Europe." Specifically, CW15 recalled that in July 2022, North America General Manager Peter Mathews, who reported directly to Lando, told CW15 and his sales team that "Europe is struggling, and we need to step up—we are a global company." Further, another confidential witness, CW13, who worked as a sales representative for the Company in Spain, stated that "The CEO [Lando] had the great idea to try sell the stock as aggressively as possible," *i.e.*, to push unneeded product on distributors. CW13's statements were corroborated by CW11, a Solar Edge sales manager in South Africa, who stated that instructions to push products on distributors "desperately" came from Faier.

5.      SolarEdge would do anything to get products off its books so that it could recognize revenue, including shipping products early, extending payment terms (*i.e.*, giving customers more time to pay), and convincing customers to agree to "free carrier shipping terms," which allowed the Company to transfer ownership of orders (and thus recognize the orders as revenue) before the products were shipped. One confidential witness, CW7, a Senior Inside Sales Manager in the Company's Milpitas Office who worked for SolarEdge throughout the Class Period, specifically recalled an employee of key SolarEdge customer screaming at him because "***SolarEdge was shoving product down his throat***."[2]

6.      The decline in demand in Europe also resulted in skyrocketing channel inventories (*i.e.*, customer inventories) as SolarEdge forced customers to take product that they could not sell. Forcing products on customers not only saturated channel inventories, but also caused SolarEdge's internal inventory of products ready for sale, or "finished goods," to explode as well. Specifically,

---

[2] Confidential witnesses are referred to in the masculine to preserve their anonymity.

the Company held $202 million of finished goods inventory at the start of the Class Period, which grew 64.4% to $303 million by the end of the first quarter of 2023 ("Q1 2023"). At the end of the following quarter ("Q2 2023"), finished goods inventory had risen another 46.4%, or from $303 million to $487 million, and by the end of the third quarter of 2023 ("Q3 2023"), shortly before the end of the Class Period, the Company's finished goods inventory ballooned to ***$731 million***, a ***261.9% increase from the start of the Class Period***, ***only eight months earlier***.

7.      Defendants knew or recklessly disregarded the practice of forcing unneeded products on customers, declining demand and increased channel and internal inventories. For example, CW4, the Company's Director of National Sales – Commercial and Industrial ("C&I"), stated that he directly informed Lando and Faier that demand for SolarEdge products was falling and that "***the market was a lot worse than they thought***," at multiple Quarterly Business Review ("QBR") meetings in the first half of 2023. Defendants also knew the truth about declining demand and increasing channel inventories through regular reports they received from SolarEdge's customers. In fact, Defendants consistently emphasized to analysts and investors that they understood the market for SolarEdge's products because of these reports.

8.      Even though demand was declining and Defendants were forcing customers to take products so that the Company could meet revenue targets, throughout the Class Period Defendants consistently touted the Company's revenues, assured investors that SolarEdge's rising inventories were normal, claimed that channel inventory levels were "low," and touted high demand for the Company's products in Europe. Defendants even stuck to these representations when analysts directly asked about rumors from market-watchers that European demand was falling—right up until ***less than a month before the truth fully emerged***.

5

9.     For example, at the start of the Class Period, after markets closed, Defendants held a call with investors and analysts to report the Company's earnings for the fourth quarter and full year 2022 ("2022 Earnings Call"). During that call, Defendants said, among other things, "*we continue to see very strong demand from Europe for all products and relatively low inventory levels in the channel*," and "*as far as we can see, the [Europe] market is – the demand is good, and the market is strong, and we are ramping production to meet demand*." These statements were abjectly false and misleading because demand in Europe was falling.

10.    Similarly, on May 3, 2023, on a call with investors and analysts to report the Company's earnings for the first quarter 2023 ("Q1 2023 Call"), Lando stated that "*not only . . . [do] we see that the level of [channel] inventory is relatively not high, but it's actually that we see record sellout of products coming from the distribution channels*." This statement was false because the opposite was true.

11.    Analysts on the Q1 2023 Call asked Defendants directly about "*more and more chatter . . . to start the year around the potential slowdown in that region [Europe]*," but rather than disclose the truth, Lando denied any decrease in demand, stating, "*we don't see right now a change in the pattern of demand in the market in Europe . . . . [a]nd we don't see, at least until now any change in the dynamic and the market continues to be strong*."

12.    Several weeks later, on June 21, 2023, an analyst again raised negative market chatter in Europe directly to Defendants and, again, Defendants failed to disclose the truth. At a talk with analysts at the JPMorgan Energy, Power, and Renewables Conference ("JPM Conference"), JPMorgan analyst Mark Strouse asked Danziger, "[c]an you just kind of give us the latest and greatest in what you're seeing in Europe . . . *in light of some of the kind of – some of the third-party forecasts that have come out for some flattening in the market*?" Danziger denied

6

that there were any changes in demand in Europe because "*what we're still seeing and observing in Europe is not so much different than what we mentioned after our last earnings . . . . we're still looking at very healthy demand across the board in the markets and in the segments*.

13.     Despite Defendants' efforts to mislead investors and conceal the material risks to SolarEdge's business, they eventually had no choice but to admit part of the truth on a call with investors and analysts to report the Company's performance for the second quarter of 2023 ("Q2 2023 Call"). During that call, Defendants admitted that the European solar markets were "*impacted by higher interest rates and excess inventory*" and attributed SolarEdge's own internal increases in finished goods to, among other things, "*slower growth rates in Europe*." Defendants went to great lengths to spin these disclosures, however, and thus continued to mislead investors.

14.     For example, during the Q2 2023 Call Lando touted the Company's "*[r]evenues from [its] solar business . . . at a record $947 million*," an increase 38% over Q2 2022, "*mostly driven by record revenues in Europe*," and insisted that "*consider[ing] the very high sales through and installation rates, it's not a major bubble, if you will*." In other words, the elevated channel inventory rates and slowing growth were nothing more than blips. Lando omitted, however, that the Company had forced distributors to take product so that SolarEdge could report these "record revenues."

15.     Faier also assured attendees on the Q2 2023 Call that high finished goods inventory levels benefitted the Company because it was "*a healthy way to reduce shipment costs, in the various regions*" and reiterated that while channel inventories were high, "*when you look at the days outstanding, which is a result of the sell-through from the channel, they are not high at all. They're actually at the normal level*." Like Lando, Fair did not mention the Company's

7

practice of forcing distributors to take products, nor did he mention that the Company's own internal high inventory levels were from declining demand and increased channel inventories.

16.     The belated disclosures of "excess inventory" and "slowing growth" in Europe rocked the Company's share price, which the following day fell ***$43.96 per share, or 18.3%***, to close at $195.51 per share, on extraordinarily heavy trading volume. Nevertheless, analysts appeared to buy Defendants' assurances, and analyst firms Oppenheimer and Guggenheim effectively endorsed the view that any revenue declines were "mainly a 3Q event" and "transitory."

17.     Defendants continued misrepresenting demand for SolarEdge products until late September. On September 21, 2023, for example, Lowe attended a question-and-answer session with analysts at KeyBanc Capital Markets Inc.'s Energy Transition Symposium ("KeyBanc Symposium"). During the symposium, an analyst asked Lowe to comment on the "current inventory cycle" and provide "incremental color since the last time you probably spoke about this." Lowe responded that nothing had changed, "***underlying demand for solar is very, very strong***," and "***the data we see from our distributors is continuing to show significant growth in terms of sell-through into Europe***."

18.     On October 19, 2023, less than a month after the KeyBanc symposium, the truth fully emerged, and the undisclosed risks concealed by Defendants' misstatements materialized. After markets closed, SolarEdge issued a press release announcing ("October Release") that "[d]uring the second part of the third quarter of 2023, ***we experienced substantial unexpected cancellations and pushouts of existing backlog from our European distributors***," "***third quarter revenue, gross margin and operating income will be below the low end of the prior guidance range***," and the Company "***anticipates significantly lower revenues in the fourth quarter of 2023***." as the inventory destocking process continues."

8

19. The day after the October Release, the Company's share price fell $31.08 per share, or 27.2%, to close at $82.90 per share, on heavy trading volume. Analysts were shocked; one analyst remarked that Defendants had "*signaled much deeper challenges than previously suggested by management commentary*."

20. After the Class Period ended, on November 1, 2023, after markets closed, Defendants held a call with analysts and investors to disclose the Company's financial performance for the third quarter of 2023 ("Q3 2023 Call"). During that call, Defendants confirmed that revenues from the Company's solar business *had plummeted 23.4% from $947.4 million in Q2 2023 to $725.3 in Q3 2023*. The $725.3 in revenues also meant the guidance—*i.e.*, predictions of the Company's performance for Q3 2023—that Defendants had given on the Q2 2023 Call of solar revenues had overestimated the Company's Q3 solar revenues by 14.7% to 18.5%.

21. Defendants effectively acknowledged during the Q3 2023 Call that demand in Europe had been declining earlier than they had previously disclosed, including while they had been assuring the market that demand was strong. Lando stated that demand in Europe "*began to slow in the third quarter*" and "*[a]lthough the dynamics are consistent with what we caution during our second quarter earnings call, the magnitude grew much greater than we anticipated*." In other words, and as alleged below, at a minimum, while Defendants were appearing at conferences, including the KeyBanc Symposium, in Q3 2023 and touting demand in Europe, that demand was slowing. Further, during the question-and-answer portion of the call, Faier suggested that Defendants had not recognized the demand decline because customers had begun canceling orders and pushing orders to later quarters in the last two weeks of Q3 2023. This explanation was scarcely credible, however, because Faier was suggesting that the Company lost $125 million to $250 million in revenue *in only two weeks*.

9

22. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

23. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

24. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

25. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, SolarEdge's common stock trades on the NASDAQ Global Select Market ("NASDAQ"), which is located in this Judicial District.

26. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

27. Plaintiffs, as set forth in Certifications filed in this Action on January 2, 2024 (*see* ECF No. 34-3), incorporated by reference herein, purchased SolarEdge securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

10

28. Defendant SolarEdge is a Delaware corporation with principal executive offices located at 1 HaMada Street, Herziliya Pituach, 4673335, Israel. SolarEdge common stock trades in an efficient market on the NASDAQ under the ticker symbol "SEDG."

29. Defendant Zvi Lando ("Lando") was SolarEdge's Chief Executive Officer at all relevant times.

30. Defendant Ronen Faier ("Faier") was SolarEdge's Chief Financial Officer at all relevant times.

31. Defendant Lior Danziger ("Danziger") was SolarEdge's Director of Investor Relations and Finance Operations from prior to the Class Period to at least June 2021. Danziger was authorized to speak and did speak to investors and analysts on behalf of the Company during the Class Period.

32. Defendant J.B. Lowe ("Lowe") was SolarEdge's Head of Investor Relations at all relevant times. Lowe was authorized to speak and did speak to investors and analysts on behalf of the Company during the Class Period.

33. Defendants Lando, Faier, Danziger, and Lowe (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the

11

public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

34.     SolarEdge and the Individual Defendants are collectively referred to herein as "Defendants."

## IV.     CONFIDENTIAL WITNESSES[3]

35.     CW1 was a business intelligence administrator at SolarEdge from May 2022 to October 2023. He worked at the Company's Milpitas, California, office ("Milpitas Office") and reported to Shimon Kringel ("Kringel"), SolarEdge's then-Vice President of Operations, North America, who reported to North America General Manager Peter Mathews ("Mathews"), who reported to Lando. CW1's responsibilities included retrieving information from databases for "stakeholders," *i.e.*, employees in various SolarEdge departments, including Finance, Operations, Sales, Sales Operations, and Logistics. Stakeholders, usually at the Vice President level—*i.e.*, the level of his supervisor, Kringel—would ask for CW1 for information concerning products, including information concerning inventory levels, which CW1 would retrieve from the Company's databases. CW1 gave that information directly to stakeholders or worked with developers to create "dashboards" reflecting that information. Towards the end of each quarter, CW1 participated on calls with SolarEdge's Business Intelligence ("BI") team in Israel, during which he provided updates on the North America business and was directed by the BI team to create additional new information "dashboards" during the ensuing quarter.

36.     CW2 was a regional sales manager at SolarEdge from August 2018 to March 2023. During his time at the Company, CW2 "ran sales" at different points in Canada, the northeastern U.S., and the Caribbean. CW2 stated that although he was based in the U.S., he interacted directly

---

[3] All confidential witnesses ("CWs") are referred to in the masculine to preserve their anonymity.

with SolarEdge sales executives in Europe at company functions and during meetings. These interactions often occurred at "big sales week parties" for which the Company brought "all the top people to Israel" and during which CW2 had the chances to "interact with counterparts in regions" across the globe. CW2 said he met "regional directors" and "regional sales managers" from Europe and other regions, including Europe General Manager Alfred Karlstetter ("Karlstetter").

37.    CW3 was an executive administrator at SolarEdge from August 2021 to August 2022. He worked out of the Milpitas Office and reported to Vice President North America Sales / General Manager – Solar Business Unit Amir Cohen ("Cohen"), who reported to Mathews, who reported to Lando. CW3 "worked for the entire sales team" and participated in many sales calls, taking notes, and capturing "action items." CW3 coordinated follow-up tasks from sales calls and handled other administrative assignments.

38.    CW4 joined SolarEdge in May 2015 as a Commercial Sales Manager. From January 2017 to May 2021 CW4 was the Company's Director of National Sales –C&I, and from May 2021 to December 2023 was the Senior Director of National Sales – C&I. CW4 worked near Washington, D.C. and reported directly to Cohen, while also reporting via "dotted line" to SolarEdge's headquarters in Israel. CW4 stated that in his role as Director of National Sales, he targeted customers like engineering firms; engineering, procurement, and construction (EPC) firms; electrical contractors; operations and maintenance providers; financiers and project owners. CW4 said he would "take direction" from Lando; SolarEdge Chief Revenue Officer ("CRO") Daniel Huber ("Huber"); SolarEdge Vice President – Global Sales Alon Barel ("Barel"); and SolarEdge Vice President and General Manager – Commercial Business Unit Naama Ohana ("Ohana") and others on the executive team. CW4 "interacted directly" with Mathews, Cohen and Ohana about forecasting. Ohana reported to Huber, who reported to Lando.

13

39.     CW5 worked for SolarEdge from March 2015 to October 2023 as a Sales and Operations Associate – Strategic Accounts / Account Management. CW5 worked out of the Milpitas Office and reported to Operations Senior Manager, Sales Monica Gabel ("Gabel") and to Sales and Operations Associate Lead Carolyn Springer ("Springer"), who reported to Kringel. Kringel reported to Mathews, who reported to Lando. CW5 worked directly with customers and managed their backlog, including outstanding shipments, and regularly held meetings with multiple customers regarding their backlog. CW5 stated that he generated backlog reports every day for U.S. customers, and that he and his teammates "always knew" about the backlog status. CW5's backlog reports showed orders and shipping dates and were shown to and reviewed by Kringel.

40.     CW6 worked for SolarEdge from August 2017 to October 2023 as a Senior C&I Sales Manager, Eastern North America and Director C&I Sales, North America. CW6 worked in New York, New York, and reported to CW4. CW6 also described meetings among sales personnel from various regions in Israel. CW6 also stated that Karlstetter oversaw SolarEdge's European business, and that SolarEdge convened Karlstetter, CW6, and all the company's sales staff in Israel for an annual "global sales week" each January attended by Lando and others.

41.     CW7 worked for SolarEdge from February 2021 to December 2023 as a Senior Inside Sales Manager in the Company's Milpitas Office. CW7 initially reported to Cohen and later reported to Vice President of Sales Nick Alex ("Alex"). Alex reported to Cohen, who reported to Mathews, who reported to Lando. CW7 worked with customers in the U.S. and helped manage a team of sales representatives.

42.     CW8 joined SolarEdge in June 2015 as Contact Center Manager for North America and oversaw a team of eight employees. CW8 said his role "quickly evolved" to include global

14

processes and he was promoted to Director of Customer Support in 2018 or 2019, where he oversaw 200 employees. CW8 reported to Vice President of Customer Success Martin Rogers, who reported to both Cohen and Mathews, who reported to Lando. He implemented a range of policies and processes for North America, which impressed the company's leadership in Israel. CW8 traveled to different locations – including the company's global call centers in Munich, Germany, and Melbourne, Australia – to help streamline processes and implement a new customer relationship management, or CRM, software. SolarEdge previously used Salesforce but developed its own open-source CRM using an open-source API (or application programming interface) called SuiteCRM. CW8 also helped develop a new application, the "Set" app, which was an "installer commissioning tool to help streamline the process for installing." CW8 initially worked out of the Company's Milpitas Office, before moving to Lexington, Kentucky.

43.     CW9 worked as an operations manager for SolarEdge distributor CED Greentech Bakersfield from December 2015 to November 2022at CED Greentech's Bakersfield, California, branch. As an operations manager, CW9 was "mainly in charge of processing" but also had some sales responsibilities as well.

44.     CW10 worked for SolarEdge from September 2021 to April 2024 as sales manager in the northeast U.S. in the Company's C&I division. He worked remotely from Pennsylvania and across the East Coast, with clients from New York to Florida. His accounts were large distributors and channel partners who sold SolarEdge equipment for commercial and industrial projects. He reported to Senior Director of National Sales – C&I Ben Frank, who reported to reported to Cohen and Mathews. When Frank left the Company, CW10 reported to John Carroll, VP of C&I ("Carroll").

15

45. CW11 worked for SolarEdge in South Africa as a sales manager in the Company's sales department from June 2022 and throughout the Class Period.

46. CW12 worked for SolarEdge in Hungary as a sales manager in the Company's sales department in Hungary beginning in 2022 and continuing throughout during the Class Period. CW13 was a SolarEdge sales representative in Spain during the Class Period.

47. CW14 was a SolarEdge sales representative in France during the Class Period.

48. CW15 was Director of Sales at SolarEdge from February 2022 to May 2023 for the Northeast and Midwest regions of the U.S. and Canada. He oversaw a team of sales managers who dealt directly with customers who did installations of solar equipment. His sales team communicated on behalf of their customers with large distributors to locate products. He reported to Alex and Cohen, and was sales director for the Northeast and Midwest regions of the U.S. He also oversaw the sales team in Canada. The customers he dealt with were mostly large distributors and channel partners.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Background of SolarEdge

49. SolarEdge was founded in 2006. The Company designs, develops, manufactures, and sells direct current ("DC") optimized inverter solutions for photovoltaic systems ("PV systems"). PV systems use photovoltaic panels, a type of solar panel, to absorb the sun's light and convert solar energy into electricity, which can be used directly or stored in batteries. PV systems vary widely in size from small rooftop or portable systems to massive utility-scale generation plants. PV systems can be configured to meet various power requirements and to provide power in conjunction with diesel generators, the "grid" (*i.e.*, the network of transmission lines, pipes, and equipment through which electricity is distributed), battery banks, or any other power source.

50. Two of the main components of a PV system are photovoltaic modules, which are placed in a solar panel and capture energy radiated from the sun, and inverters. Inverters regulate the flow of electrical power and thus make it possible to power a home or grid with solar energy. Homes, generation plants, and the grid are wired to operate on "alternating current" ("AC") power. A solar inverter or photovoltaic inverter is a device that converts DC electricity generated by a solar panel to AC power. Inverters also monitor solar energy systems and provide a portal for communication with computer networks. Inverters are important for almost all solar energy systems and are typically the most expensive component after the solar panels themselves.

51. SolarEdge sells DC-optimized inverter systems for solar PV installations, which include inverters, power optimizers, and a cloud-based monitoring platform, as well as other solar related products, including Lithium-ion cells, batteries, energy storage solutions, electric vehicle powertrain solutions and machinery. The Company operates through two segments: "Solar" and "All Other," The Company's Solar segment includes the design, development, manufacturing, and sales of an inverter solution designed to maximize power generation, and its "All Other" segment includes the design, development, manufacturing and sales of UPS products, energy storage products, e-Mobility products, and automated machines.

52. SolarEdge initially targeted the residential solar energy market but has expanded to the commercial market and more recently the utility-scale market. In recent years, the Company has also expanded beyond inverters to other areas of smart energy technology, including energy storage and e-mobility.

53. SolarEdge's "customers" are primarily large distributors, electrical equipment wholesalers and certain large installers. SolarEdge sells its products to these customers, who in turn "sell through" those products to end users like installers and engineering, procurement, and

construction firms. According to SolarEdge, its "products are fully functional at the time of shipment to the customer" and generally "do not require production, modification, or customization."

54.     SolarEdge recognizes revenue when its customers receive products, not when the Company's customers sell products through to end users. According to the Company's 2022 10-K, SolarEdge "*recognize[s] revenue under the core principle that transfer of control to the customers* should be depicted in an amount reflecting the consideration we expect to receive in revenue . . . . We do not offer rights to return our products other than for normal warranty conditions, and as such, *revenue is recognized based on the transfer of control*." Fair expressed this to analysts and investors directly during a September 6, 2023, talk at the Barclays CEO Energy-Power Conference ("Barclays Conference"). During the talk, an analyst asked Faier if SolarEdge had "any say in how much [distributors] can cut" the price of SolarEdge's products to increase sales to end users, and Faier responded, "[n]o. Not necessarily, because once we sold, it's theirs . . . . [I]t's their decision." SolarEdge's revenues thus depend on how much product its customers take, not the amount of product "sold through" to end users or installed in solar power systems.

55.     When SolarEdge discloses its inventory to investors in its SEC filings, it discloses the inventory held by *the Company*. SolarEdge does *not* disclose levels of inventory held by its customers that had not been sold through to installers or end users, which Defendants referred to as "channel inventory." The filings break down the Company's inventories into "raw materials," "work in progress" and "finished goods," *i.e.*, completed products available for sale.

56.     SolarEdge's inventory exploded during the Class Period, specifically for finished goods. At the start of the Class Period, the 2022 10-K, filed in February 2022, stated that the

18

Company held $729 million inventory, $202 million of which was finished goods. Three months later, however, the Q1 2023 10-Q reported that the Company's overall inventory had grown 20% to $874 million and finished goods inventory had skyrocketed by 64.4% to $303 million. The following quarter, the Q2 2023 10-Q disclosed that the Company's inventory had grown by another 12.6%, from $729 million to $984 million, while finished goods inventory had exploded another 46.4%, or from $303 million to $487 million.

### B. Importance of Europe Region to SolarEdge

57. When speaking to investors, SolarEdge describes its worldwide operations as occurring in three "regions": the U.S., Europe, and "Rest of World" ("ROW"). Of the three, Europe was by far the most important region to the Company. Although the Company's SEC filings do not detail the results of its operations by region, the Company's 2022 10-K, which was filed at the start of the Class Period, stated that the majority of the Company's revenues came from Europe: "In the year ended December 31, 2022, 54.3% of our revenues were generated from Europe, 36.5% of our revenues were generated from the United States and 9.2% of our revenues were generated from ROW." The following year, the Company's annual report on Form 10-K for 2023 (the "2023 10-K"), stated that the share of SolarEdge's revenues attributable to Europe grew to 64% during the Class Period, with 25.5% of revenues coming from the U.S. and 10.5% from ROW.

58. SolarEdge's two Class Period quarterly reports—for the first and second quarters of 2023, (the "Q1 2023 10-Q" and "Q2 2023 10-Q," respectively)—underscore the importance of Europe to SolarEdge. The Q1 2023 10-Q attributed the Company's 44.1% increase in revenue as compared to Q1 2022 to "(i) an increase of $245.4 million related to the number of inverters and power optimizers sold, ***with significant growth in revenues coming from Europe***; and (ii) an increase of $64.6 million related to the number of residential batteries, ***sold primarily in Europe***." In fact, the Q1 2023 10-Q reported that 72.6% of the Company's revenues the first quarter of 2023

19

came from outside the U.S. Similarly, the Q2 2023 10-Q attributed a 36.2% increase in revenue as compared to Q2 2022 to "(i) an increase of $256.3 million related to the number of inverters and power optimizers sold, ***with significant growth in revenues coming from Europe***; and (ii) an increase of $34.7 million related to the number of residential batteries ***sold mainly in Europe***." In Q2 2023, 80.3% of the Company's revenues were from outside the United States.

59.     Analysts recognized the importance of Europe to SolarEdge and communicated this fact to investors. For example, on March 13, 2023, Danzinger participated in a talk at the 35th Annual ROTH Conference ("ROTH Conference"). The first topic raised by the analyst hosting the talk was SolarEdge's Europe business, which the analyst characterized as "a source of strength" for SolarEdge that had shown "tremendous growth." Danziger affirmed this, enthusing that "***it's definitely the case that this will probably be the fastest growing geographies for us***."

60.     Only weeks later, on May 4, 2023, Deutsche Bank released an analyst report upgrading SolarEdge's stock from "Hold" to "Buy" because of its business in Europe. The report stated that Deutsche Bank "[has] been positive on SEDG's business mix, with a diversified mix of residential vs commercial use, but also US exposure (>30%), Europe (~55%) and other international markets where we have been observing strong demand ***(double digits in the 40-60% range for European residential demand in our opinion)***." The report specifically identified the Company's Europe business as a reason why it was "well-positioned in the coming quarters."

61.     Similarly, on June 21, 2023, JPMorgan released a report considering statements by Defendants at JPM Conference. The report pointedly observed that "[t]he company noted very healthy demand in Europe, ***which we believe is a positive given investor concerns over recent third-party market forecasts***." Further, on August 2, 2023, Barclays issued an analyst report that reacted optimistically to the Company's disclosure that European distributors had elevated levels

20

of inventory. Despite the inventory disclosure, the report nevertheless rated the Company "Overweight," meaning that that "the company's stock price should perform better in the future,"[4] because SolarEdge "holds a strong position in both residential and commercial solar markets, both domestically and abroad, and *presents significant upside growth with its European exposure and storage product*."

C. **Defendants Pushed Customers to Take Delivery of Products at the End of Quarters So that the Company Could Meet Sales and Revenue Goals, Which Resulted in Massive Inventory Increases**

62. According to confidential witnesses, at the start of the Class Period demand for SolarEdge products in Europe, the Company's most important segment, began to decline and channel inventory levels of the Company's products, *i.e.*, inventory held by SolarEdge's customers, increased dramatically. Rather than disclose the truth to investors, Defendants pushed product on customers so that the Company could recognize its revenue targets.

63. CW2, for example, stated that, in early 2023, before he left the Company, he heard "concerns and discussions that Europe wasn't going well." These discussions included his sales colleagues, along with SolarEdge's upper management in North America, such as Cohen and Mathews. CW10 also stated that he heard from colleagues in mid-2023 that the Company was seeing a "slowdown" in its European business, along with an "overstock in distribution channels." The "excess inventory, it wasn't moving at the distribution level," CW10 said, because distributors "weren't buying it because of the slowdown" in demand in Europe. In addition, CW15 stated that in July 2022, likely at a national sales meeting in San Jose, North America General Manager Peter Mathews told CW15's sales team that "Europe is struggling, and we need to step up—we are a

---

[4] Steven Nickolas, Overweight Stock Rating, Investopedia, Jan. 30, 2022, https://www.investopedia.com/ask/answers/050115/why-do-analysts-sometimes-give-overweight-recommendation-stock.asp

21

global company." According to CW15, "The U.S. market was being pushed to make up for lack of sales in Europe." CW15 further explained that part of the oversupply of product in North America channels was done to make up for a underperforming sales in Europe. He further stated that "North America was pushing to make up for a lack of sales in Europe." CW15 said the sales in Europe continued to taper off until he left in May 2023.

64. CW2 described how SolarEdge "forced distributors to take delivery on product early, and that saddled distributors with large inventories." CW2 said he saw this occur repeatedly. For example, CW2 described "times when orders for delivery would literally go out prematurely before they were scheduled to go out." When the distributor would call after receiving an early order, CW2 stated SolarEdge would respond, "[o]h, we accidentally shipped this. But hey, we'll extend your terms." CW2 stated that this happened very often to distributor CED Greentech. This meant that the shipments would be recorded in the quarter in which they were shipped, even though the money was not received until much later, because the Company recognized orders for products as revenue when equipment was "shipped under terms to a direct customer or distributor." CW2 said that these early shipments "only went one way, and always "happened near the end of the quarter."

65. CW2 said that he saw the Company's inventories rising throughout 2022 and into 2023 and that these increases "struck me as ominous." CW2 said that internally the build-up of inventory was spun as a "good thing" because the SolarEdge was "not constrained," but that the increasing inventories was "indicative" of SolarEdge "sandbagging," or pushing distributors to take delivery of product early so that SolarEdge could "make numbers," and that "some numbers in quarterly reports were the result of them pulling revenue in rather than organic growth." CW2 further attributed the Company's reports of decreased demand in 2023 and onward to

22

"sandbagging" that had finally backfired on SolarEdge because Companies could not take any more product. CW4 also described how SolarEdge pushed products on its customers. CW4 stated that SolarEdge "did not like to cancel orders" and as a general rule "did not allow distributors to cancel orders." Among solar companies, CW4 said, SolarEdge was "definitely on the more aggressive side and was not very customer-centric and certainly not distribution-friendly." He said he heard in meetings that distributors also wanted to cancel and push out orders on the residential side. Then, "it would turn into a battle" between SolarEdge and distributors, he said. CW4 stated that at SolarEdge, as a general rule, recognized revenue "when an order was placed" and "when it came to the end of the quarter. If we had the product built, it got out the door."

66.    CW4 stated that he knew that Defendants were pushing unneeded products on customers because at the end of financial quarters he would get "hounded" by his supervisors to get the Company's customers to agree to "free carrier shipping terms," which allowed SolarEdge to transfer ownership of orders (and thus recognize the orders as revenue) at a "point of origin," or the manufacturing location, not when the items were received by customers. CW4 said that in these circumstances, SolarEdge recognized revenue before the orders even shipped, and these requests always came at the end of quarters as the Company tried to recognize revenue within a quarter and meet its targets.

67.    Further, according to CW4, SolarEdge was "very aggressive" with its forecasting and goals for sales through to end customers (as opposed to sales to distributors) . CW4 stated that he would create his own forecasts based on "market reports," such as those from IHS Markit, Wood Mackenzie and an "up-and-coming" firm called Ohm Analytics, as well as SolarEdge's own historical data. SolarEdge leaders, including Mathews, Cohen, Ohana and Huber would respond that "[y]our numbers are too low," and CW4 would reply "I'm not going any higher." Ultimately,

23

Mathews, Cohen, Ohana, and Huber would insist on adopting forecasts that were too high and that he did not agree with.

68.    CW10 related how he, like CW4, was effectively forced to revise his forecasts upward. CW10 stated that every year, as part of putting together his sales forecast, he looked at his existing accounts, potential accounts, existing and historical sales, and potential sales. He specifically recalled in late, 2023, *i.e.*, just after the Class Period ended, preparing a forecast for sales of "50 megawatts" for 2024.

69.    Shortly after he submitted the forecast, however, CW10 was told he had to find a way to get to a forecast of 100 megawatts. Specifically, Carroll, CW10's supervisor, responded to CW10's forecast by stating that Carroll had spoken to "management," and that the 50 megawatts "was not going to cut it." "They wanted me to do 100 megawatts," CW10 said. "I had put in 50, and they said, 'Yeah, that's not going to cut it.'" CW10 said that he told Carroll, "I'll revise the number; I'll give you want you're asking for." CW10 said that to get to the number, he had to "[p]ush it, fudge it, estimated guesses." CW10 stated that Carroll was relaying what Cohen and/or Mathews wanted the forecast to be, but that "I didn't have the customers—I had potential customers, but I didn't have existing customers."

70.    CW10 said that his forecasts were used internally to provide manufacturing guidance on upcoming production needs. He also understood that the forecasts would make their way into the financial guidance released publicly by the company.

71.    Like CW4, CW5, who said that he has a background in accounting, also recalled that the Company generally recognized orders as revenue after confirming that the products arrived in customers' warehouses, but during Q1 or Q2 2023, however, CW5 noticed that SolarEdge had begun asking customers to change the orders to "FOB origin," which meant that once the Company

24

shipped the product, the customers owned it and the Company could recognize the orders as revenue earlier.

72. CW5 stated that SolarEdge customers were trying to cancel orders at least as early as February 2023 because their inventories were saturated, and that these cancellation attempts continued right up until he left the Company in October 2023. Specifically, CW5 said, "People were wanting to cancel stuff, and we were telling people per the contract, it was too late to cancel . . . we were moving numerous orders to different quarters because we wouldn't let them cancel." CW5 specifically recalled one customer who at this time "wanted to cancel everything," which amounted to $50 million in orders, and that CED Greentech, another SolarEdge customer, wanted to cancel orders as well, starting in late Q2 2023.

73. CW6 described how the Company forced distributors to take products at the end of quarters. CW6 stated that it was "pretty common knowledge" that SolarEdge "didn't treat" its distributors well and would "force distributors to take product at the end of the quarter." CW6 also stated that this directly caused the declines that occurred in the third quarter of 2023 because "When you treat people poorly and it comes time when they can help you or hurt you, what happens?" CW6 recalled that this happened to European distributor Krannich Solar, which operated both in the U.S. and Europe.

74. Likewise, CW12 said, "I know about the pressure that was created by the company. I was in many meetings where the overstock issue was discussed, From the middle of 2022 the company placed huge pressure on employees asking them to do all they possibly could to improve sales." Specifically, CW12 stated that this pressure came from Huber, Ohana, SolarEdge Sales Director Sadananda Vijayakumar, and SolarEdge General Manager South Europe & Director Embedded Products Europe Christian Carraro.

25

75.    CW7 also recalled the Company's practice of forcing distributors to take products at the end of quarters. Specifically, CW7 stated that every quarter throughout his tenure, SolarEdge consistently "shoved equipment down" the "throats" of U.S. distributors, especially at the end of quarters as the Company was "trying to hit quarter-end numbers." CW7 said that he would accompany his colleagues on visits to distributors. CW7 recalled that SolarEdge's "distributors seemed to be very upset when I would go to visit them because they were getting shoved equipment down their throats, especially" when SolarEdge was "trying to hit quarter-end numbers." CW7 said that the distributors complained that "we have all this equipment shoved down" and wanted to return it to SolarEdge, and that this was a "pattern" during his entire tenure at SolarEdge. CW7 specifically recalled an employee of key SolarEdge distributor CED Greentech screaming at him because "SolarEdge was shoving product down his throat."

76.    CW7 further said that efforts to get distributors to take inventory at the end of quarters were discussed during "directors' meetings" that CW7 attended personally. These meetings were held weekly from 11 a.m. to 12:30 pm. in SolarEdge's Milpitas Office and were attended by Cohen, Alex, Mathews and approximately five other directors. CW7 believed that that the discussions in the meetings were communicated up to Lando, who knew of the practice of forcing distributors to take products at the end of fiscal quarters. CW7 also confirmed that distributors were "saying that they have too much equipment" in the first half of 2023.

77.    CW8 stated that SolarEdge was "notorious" for "trying to get shipments out to distributors" at the end of quarters "to hit numbers." CW8 said that SolarEdge was known for "holding out returns, holding onto inventory, so customers that need replacements aren't getting replacements" because the company was "focused on getting product out to distributors instead," and that the Company was "very focused on 'have to hit numbers, get shipments out, last day of

quarter – have to get X number of inverters out.'" CW8 further stated that he knew of this practice because SolarEdge's customer service operation would essentially "shut down" during these times because the company was "focused on the sales side." CW8 stated that "Customers would go weeks without getting replacements."

78. CW8 further stated that he personally participated in discussions at SolarEdge regarding getting inventory to distributors to "hit numbers." CW8 stated that these conversations included Mathews, Kringel, Cohen, Alex, and Vice President of Customer Success Martin Roger. CW8 stated that he was "sure it was coming from Lando or the top of the Company" to push inventory to distributors to hit numbers, including because Lando was Vice President of Sales before he became CEO and thus would have been involved in the Company's sales strategy.

79. CW9, who worked for CED Greentech, one of the Company's key customers, SolarEdge regularly asked CED Greentech to take product at the end of quarters so that the Company could hit its numbers. CW9 said that the amount of product SolarEdge asked CED Greentech to take at the end of quarters varied depending on the quarter, but that CED Greentech typically wound up taking the Company's products. "It might be a few pallets of material, like two to six pallets of material," he said. "It'd be like, 'Hey, can you take these two pallets of 7600s, this pallet of 3800s and these two pallets of optimizers?'" he said, referring to different types of SolarEdge products. CW9 would tell SolarEdge, "'I don't need them yet,'" he said, to which SolarEdge would reply something like, "Well, it would really help us out." CW9 said that although CED Greentech's contacts at SolarEdge changed regularly, CED Greentech also dealt frequently with SolarEdge Director of Sales California, Hawaii & North America New Construction Amir Maki, who was difficult to deal with.

27

80.     CW15 stated that in the summer of 2022, he began to worry about an impending collapse of sales for SolarEdge due to overstuffed channels. "I was saying, 'The sky is falling,'" he said. "In August of '22, I was working with the strategy team out of Israel, and I was telling them, 'What are you going to do about the impending collapse?'" CW15 stated expressed his concerns directly to Daniel Kelman, SolarEdge Strategy and Corporate Development, and Amir Gat, VP of Strategy and Special Projects, and predicted to them that the problem would take four to six quarters to correct. CW15 further stated that "Part of my role was to work with the strategy team out of Israel," and "I was talking to them in regard to the massive oversupply of product. My customers were pushing back. SolarEdge was strong arming them to take products." CW15 attributed the problem to SolarEdge "stuffing the channels to make their stock price, to make their [quarterly] numbers." CW15 stated that SolarEdge's strategy team in Israel had a worldwide focus for the Company, and their work was not limited to any one market. CW15 stated that when he talked to Kelman and Gat about his concerns and asked why the company keeps stuffing the market so much, he they responded, "Yeah, we have numbers to hit."

81.     CW15 further stated that in the summer of 2022 he had conversations with Manny Lugos, Senior Sales Director of the Distribution Channel in North America ("Lugos"), about CW15's concerns about the impending collapse of sales. CW15 stated that said Lugos reported to Cohen and Mathews, and was in charge of the distribution channel for North America and had an even better view than CW15 of the level of product in the channels. CW15 said Lugos also recognized the impending collapse and said that he, too, had informed the Company's leadership. Lugos also told CW15 that he informed the Company's leadership of his estimate of the time it would take to correct the problem: six to eight quarters.

28

82.     CW15 also recalled how SolarEdge consistently required customers to buy product that they did not want or need. If a customer wanted commercial inverters, CW15 said, SolarEdge told them they had to buy a full shipping container, which was shipped directly from China, that was also filled with residential products. They were told they would have to buy a container of products," he said.  "If you wanted commercial product, you'd have to take the rest of the container—the rest would be 'resi' (residential) product. The distributors would be pushed – 'Yes, we can sell you those (commercial inverters), but you have to fill a full container with all these other products.'" CW15 confirmed the above was happening with the company's largest customer, CED Greentech. CW15 also confirmed that when strong-arming customers into taking product, SolarEdge would offer a discount or extend terms. Defendants Knew of the Company's Pressure on Customers to Take Products, High Inventory Levels at SolarEdge and Its Distributors, and Decline in Demand in Europe

83.     Defendants knew or at a minimum were reckless in not knowing that during the Class Period (i) demand for the Company's products was declining in Europe, (ii) inventory levels for SolarEdge customers were high to the point of saturation, (iii) the Company nevertheless pushed products on customers so that the Company could meet revenue targets, and (iv) these circumstances created a material undisclosed risk that customers would cancel orders *en masse* and SolarEdge's revenues would plummet.

84.     CW1 described Lando's close attention to SolarEdge's business, stating that Lando was a particularly detail-oriented CEO who would orally provide "extra details" about the Company's business during all-hands meetings that were not included in PowerPoint slides. This was corroborated by CW2, who stated that Lando was "most definitely" involved in and aware of specific details of the Company's operations. CW2 stated that, prior to becoming CEO, Lando ran

SolarEdge's sales division for almost 10 years and was "intimately involved" in its business operations. In fact, CW2 said, Lando was selected to be SolarEdge's CEO specifically because he was "thought to be the person that understood" the Company the best.

85.     CW13 stated that the practice of pushing unneeded product on distributors came from Lando. Specifically, CW13 said, "You want to know who knew the situation with regard [to] stock? The whole board knew. The CEO [Lando] had the great idea to try sell the stock as aggressively as possible—which resulted in most of the stuff being returned. You know what that means? It means massive losses."

86.     Similarly, CW14 stated that, SolarEdge "really screwed up by not cutting production when everyone else did. When they got stuck with massive overstock, they then made things worse. In fact, they did the worst thing imaginable, they tried all they could to get the stuff into the market. They pushed real hard to market the stuff and they sold it into a market [Europe] where the product was not ideal."

87.     CW15 further stated that the Individual Defendants knew about the use of discounts and payment terms to push product on customers because any discounts above a certain number, which CW15 recalled as $10,000, required approval from the C-suite. Accordingly, the practice was known at the top levels of the company, *i.e.*, the Individual Defendants, because "[t]hose discounts and deals weren't being made without executive approval."

88.     According to CW1, CW2, and CW5, SolarEdge tracked backlog and inventory using an Israeli-made enterprise resource planning software called "Priority," which showed vendors, points of contact, and full order details, including monetary amounts, specific products, and couriers used to make deliveries. CW1 knew about Priority's capabilities because he

30

personally accessed the system, and CW2 had heard about the system from colleagues. CW1 further stated that Lando and other senior leaders received reports from the Priority system.

89. According to CW2, daily inventory reports were shared with Lando, as well as other senior leadership at SolarEdge, because they were "one of the basic metrics" for "assessing" SolarEdge's business. These daily inventory reports also communicated the levels of "channel inventory," *i.e.*, the amount of inventory that was sitting with customers that had not been sold through because the reports showed the number of "days on hand they have in every single distribution channel of every single product." "Days on hand," according to CW2, referred to "how much inventory exists in a particular channel" (e.g., with a distributor or installer), based on the rate at which the equipment was sold. For example, CW2 said, "if you said they have 80 days on hand, that means based on the rate they're selling equipment," how long sales could continue before the product would run out. CW2 knew of these reports because they were discussed during sales meetings he attended with his North America colleagues at SolarEdge. CW2 stated that, for example, if he needed to source a product for a project he was working on for a customer, he could obtain a report within seconds showing "every piece of equipment like that that existed in the world."

90. CW2 also said that Defendants knew exactly how much inventory was sitting with customers because all channel distributors had to provide SolarEdge "regular reports, I think daily or weekly," with data on current inventory and point of sale. The requirement for these reports was included in the master service agreements, or MSAs, between SolarEdge and distributors, he said. These reports were "one of the primary ways of understanding" SolarEdge's business, and if Lando didn't receive the reports, it "would indicate criminal negligence."

31

91.     CW4 corroborated the existence of these channel inventory reports and recalled that distributors were required to send SolarEdge Monthly point-of-sale and inventory-on-hand reports. CW4 said he knew of the reports because "[m]ost distributors don't like sharing that information," but SolarEdge wanted the reports to give credit for the salespeople who made sales and because knowing the inventory on hand at distributors helped allowed SolarEdge to "help customers find it."

92.     CW4 said that to ensure it received the reports, SolarEdge also would "leverage" a "special pricing agreement" ("SPA") process in which it "gave back-end rebates to distributors based upon agreed upon pricing with the end customer." CW4 said that distributors would only receive the rebates if they sent SolarEdge the point-of-sale reports. CW4 said he knew that Lando and Faier knew the content of the reports because when he asked his supervisors—*e.g.*, Ohana, Mathews, and Cohen—for certain products, they would tell him that Lando and Faier had questioned CW4's need for the products given that, according to Lando and Faier, specific distributors had those products and CW4 could get the products from those distributors.

93.     CW15 corroborated that every distributor that bought product from SolarEdge was required to submit a monthly report of its sales and inventory to the Company showing "point of sale information, who bought which products, inventory levels, and a 'days on hand' number." The days on hand number indicated how well stocked the distributor was at the end of the month, which was "how SolarEdge would track inventory and sales." CW15 stated that "the management team up to the C-level," *i.e.*, including the Individual Defendants, "live by them," *i.e.*, the monthly reports. According to CW15, the monthly reports from 2022 and 2023 showed inventory levels reflecting that a drop-off in sales was coming in 2023, and that "top leadership" at SolarEdge were aware from the reports of the drop-off.

32

94. CW9 described how CED Greentech specifically sent regular reports to SolarEdge with data on "movement," or the amount of inventory sold over a certain period of time. CW9 recalled that he could look at such data in a monthly format. "It would go to SolarEdge, and our sales rep would have access to it," he said.

95. CW10 stated that he and other U.S.-based employees received big-picture updates on SolarEdge's Europe and international business during annual calls with Lando and Faier and sometimes during quarterly calls. The quarterly calls were usually led by Mathews, sometimes attended by Lando and Faier, and were typically held when SolarEdge conducted its "financial review with Wall Street," he said. These calls reviewed how the company was doing, whether revenue was up or down and an overview of "stock levels" or distribution levels.

96. CW11 stated that he and the entire Company (and thus Defendants), knew as early as June 2022 that the Company's warehouses were overstocked. Specifically, CW11 stated, "You ask who knew, well the whole company knew. The whole company was told there was a crisis. we were told to push stock like hell from about June of 2022. However, at no time did the company slow down the orders they placed from China. Instead, the orders kept arriving—while company managers pushed staff by saying they needed to sell stock 'desperately.'" CW11 stated that the Company's managers were repeating what, Faier, SolarEdge's CFO, instructed had instructed them to say, and the managers passed that instruction from Faier on to SolarEdge's sales managers, including CW11 personally.

97. According to CW8, Europe General Manager Alfred Karlstetter had weekly meetings about SolarEdge's European business with Defendants Lando and Faier. Karlstetter also provided inventory and channel inventory as well as forecasting updates to Defendants Lando and Faier during "Quarterly Business Reviews" ("QBRs").

98.     QBRs were meetings for each SolarEdge region (*e.g.*, Europe or North America) in which Lando and Faier participated. According to CW3, Mathews and Cohen participated in North America QBRs along with Lando and Faier, who would travel to California for the meetings "along with a few other C-level people." CW4 said these additional attendees included as Ohana, Barel, and Huber.

99.     CW3 stated that during the QBRs, the Company's leaders—*i.e.*, Lando, Faier, Mathews, and Cohen—"would share all the financial details, where [SolarEdge] is going each quarter, what are the targets, how much are they met, what is expected, what they can provide to achieve their expectations." These details would be communicated through PowerPoint presentations, detailing earnings, projections, and volumes of inverters and batteries sold. CW4 stated that the QBRs were typically held around the same time as the Company's quarterly earnings calls, as Lando and Faier "would like to be in North America to present to Wall Street."

100.    CW4 stated that at multiple QBRs in the first half of 2023, he directly informed Lando and Faier, as well as Mathew, Cohen, Ohana, and Huber, that demand for SolarEdge products was falling and that "the market was a lot worse than they thought." CW4 said, "all they wanted to hear was" why was the Company was "not shipping more." CW4 further recalled that as SolarEdge's commercial inventories were rising sharply during the first half of 2023, the Company's executives, including Cohen, began asking "how come nobody's taking the product?" CW4 said he responded, "because I told you they don't need it."

101.    CW1, CW2, and CW3 also stated that the Company also generated inventory reports using "Qlik Sense" software, which showed inventory coming in, going out, and current manufacturing volume. CW1 knew first-hand the contents of Qlik Sense inventory reports because he oversaw the dashboards within the software, and CW2 had discussed Qlik Sense with

34

colleagues. CW3 also discussed Qlik Sense with colleagues and had access because he was a part of the Company's sales team, which used the platform. CW3 had his own login and access to Qlik Sense.

102. On earnings calls with investors, Lando and Faier confirmed the existence of these reports, their access to them, and their review of them in connection with the Company's quarterly earnings reports to investors. For example, on the 2022 Earnings Call, Lando described how, "[i]n North America, **residential sell-through reports from our distributors** for the fourth quarter were seasonally down more so than we have seen in the recent years—in the recent past," and that "we continue to see very strong demand from Europe for all products and relatively low inventory levels in the channel," which was "validated by **our distribution sell-through data for Europe**."

103. Likewise, on the Q2 2023 Call, Faier told attendees, "**when we are looking at the point-of-sale data of how much is being sold from the channels**, we see record levels over the last two quarters that, to our understanding, are continuing, which means that in that case, the demand is there." Moreover, when Faier spoke with analysts on August 8, 2023, at the Oppenheimer 26th Annual Technology, Internet & Communications Conference ("Oppenheimer Conference"), he assured attendees that they could rely on the Company's statements about strong demand for SolarEdge products in Europe because "**we get from our channels and distributors what we call point-of-sale data, [which] is showing how much we're selling out of the channels**." Faier reiterated these comments a month later on September 6, 2023, during his talk with analysts at the Barclays Conference, where he stated, "**[w]e are seeing every quarter the sell-through data coming from our distributors**."

104. Further, in the second half of the Class Period, Defendants made off-hand remarks suggesting that they understood that demand for SolarEdge products had declined long before they

disclosed the declines to investors. For example, on the Q2 2023 Call and at the Oppenheimer Conference, Faier both touted and downplayed the demand for SolarEdge products in Europe in the same sentence. On the Q2 2023 Call, Faier said, "[i]t's a very good underlying demand, not as good as we thought," and at the Oppenheimer Conference he told attendees, "[s]o the underlying demand is very strong, although not as strong as everyone thought." Defendants also appeared to be being less than forthright with investors a month later, at the Barclays Conference, when Faier apprised attendees that customers were pushing orders out: "We do see that in some cases, [distributors] ask to delay orders. Sometimes even delay orders that they know that they will need in Q4, they will ask to delay right now, because they do not want to take any cash flow obligations that they will not be able to meet."

D.      **Defendants Tout to Investors SolarEdge's Performance in Europe and the Increase in the Company's Inventories**

105.    Even though, as alleged above, demand was declining and Defendants were forcing customers to take products so that the Company could meet revenue targets, both of which resulted in soaring inventory levels at SolarEdge and its customer channels, throughout the Class Period Defendants consistently touted the Company's revenues, assured investors that SolarEdge's rising inventories were normal, claimed that channel inventory levels were "low," and touted high demand for the Company's products in Europe. Defendants even reaffirmed these representations when analysts directly asked about rumors from market-watchers that European demand was falling, right up until **_less than a month before the truth fully emerged_**.

106.    For example, on February 13, 2023, at the start of the Class Period, after markets closed, Defendants held a call with investors and analysts to report the Company's earnings for the fourth quarter and full year 2022 ("2022 Earnings Call"). During that call, Defendants said, among other things, "[a] key highlight of 2022 was the growth of our revenues coming from Europe,

36

which grew by 89% year over year," "we continue to see very strong demand from Europe for all products and relatively low inventory levels in the channel," and "as far as we can see, the [Europe] market is – the demand is good, and the market is strong, and we are ramping production to meet demand."

107. Lando further touted that "[f]rom a demand and inventory point of view, we continue to see very strong demand from Europe for all products and relatively low inventory levels in the channel." When asked, "[w]hat do you expect for European growth here in 2023?" and Lando responded, "in many cases, we see that the demand is far exceeding our ability to manufacture and deliver."

108. Analysts reacted positively to these and other statements from Defendants. On February 14, 2023, for example, analyst CFRA Equity and Fund Research Services ("CFRA") Equity Analyst Matthew Miller announced that that CFRA was "Keep[ing] Buy Opinion on Shares of SolarEdge" in large part because "In addition, we see Europe demand remaining strong in 2023 following 69% growth."

109. Given analysts' reactions and the importance of Europe to the Company's bottom line, these positive statements by Defendants about demand and SolarEdge's performance in Europe were rocket fuel for the Company's share price. Within two days of the 2022 Earnings Call, the Company's share price had soared 10.7% from $310.71 per share to $343.98 per share. The skyrocketing share price was clearly attributable to the Company's performance in Europe, because on the 2022 Earnings Call Faier assured investors that any weakness in the Company's North America residential market would be more than made up for by "the demand that we see in Europe and the rest of the world," and thus "the deviation between U.S. or Europe is not very much impacting our guidance at this point."

110. Similarly, on May 3, 2023, after markets had closed, Defendants held the Q1 2023 Call with investors and analysts to report the Company's earnings for Q3 2023. During that call, Lando reported that "[r]evenues from our solar business were at a record $909 million . . . . [m]ostly driven by record revenues in Europe and Rest of World," and that "[t]he European residential markets continues to be very strong for us this quarter as we ramp shipments of three-phase residential inverters . . . . We expect this momentum to continue in the coming quarters" given the "strong demand for this product." Lando further stated that "in Europe, we actually see low [channel] inventory days on hand," and "not only . . . [do] we see that the level of [channel] inventory is relatively not high, but it's actually that we see record sellout of products coming from the distribution channels."

111. Separately, Faier represented on the Q1 2023 Call that SolarEdge's increased finished products inventory was the "result of streamlined manufacturing" and SolarEdge's business would benefit from the excess inventory because "Company because it "will allow us to further improve our customer delivery time and reduce shipping and logistic expenses." Faier also emphasized that the high levels of finished goods inventory were a sign that the Company had "returned to a more normal mode of operation."

112. When analysts on the Q1 2023 Call asked Lando and Faier directly about SolarEdge's "more and more chatter . . . to start the year around the potential slowdown in that region [Europe]," rather than disclose the truth, Lando denied any decrease in demand, stating, "we don't see right now a change in the pattern of demand in the market in Europe . . . . [a]nd we don't see, at least until now any change in the dynamic and the market continues to be strong."

113. Based on these statements, within two days of the Q1 2023 Call, the Company's share price had soared 11.4%, from $263.82 to $293.99.

38

114. Several weeks later, on June 21, 2023, an analyst again raised negative market chatter in Europe directly to Defendants and, again, Defendants failed to disclose the truth. At a talk with analysts at the JPMorgan Energy, Power, and Renewables Conference, JPMorgan analyst Mark Strouse asked Danziger, "[c]an you just kind of give us the latest and greatest in what you're seeing in Europe . . . in light of some of the kind of – some of the third-part forecasts that have come out for some flattening in the market?" Danziger denied that there were any changes in demand in Europe because "what we're still seeing and observing in Europe is not so much different than what we mentioned after our last earnings . . . . we're still looking at very healthy demand across the board in the markets and in the segments.

115. As alleged in more detail below, during the Q2 2023 Call, Defendants disclosed that the solar markets were "impacted by higher interest rates and excess inventory" and "[a]s a result of the slowdown in the shipments to the United States, slower growth rates in Europe, and more streamlined manufacturing, [SolarEdge's] finished goods inventory increased substantially this quarter." Although the truth regarding declining demand and SolarEdge's elevated internal inventory and channel inventory was becoming harder and harder to deny, Defendants nevertheless continued to mislead investors.

116. For example, during the Q2 2023 Call Lando touted the Company's "[r]evenues from [its] solar business . . . at a record $947 million," an increase 38% over Q2 2022, "mostly driven by record revenues in Europe." Lando did not mention, however, that the Company had forced distributors to take products so that SolarEdge could report these numbers. Without mentioning that the Company's own internal high inventory levels were the result of declining demand and increased channel inventories, Faier assured investors that the high finished goods inventory levels benefitted the Company because it was "a healthy way to reduce shipment costs,

39

in the various regions" and that while channel inventories were high, "when you look at the days outstanding, which is a result of the sell-through from the channel, they are not high at all. They're actually at the normal level."

117.    Defendants' denials of reality continued until less than a month before the truth fully emerged and risks concealed by their misstatements materialized. On August 8, 2023, Faier appeared at the Oppenheimer Conference and assured attendees, "we still see very strong underlying demand . . . . [w]e're talking about record high numbers that we haven't seen before."

118.    These and many other statements by Defendants, as set forth in Section VI, *infra*, touting demand for SolarEdge's products in Europe and the Company's performance in that region were materially false and misleading, however, because Defendants were inflating SolarEdge's performance in Europe by forcing customers—*e.g.*, distributors—take products so that the Company could book sales in certain fiscal quarters and meet revenue targets, which caused channel inventories to soar. Customers could not continue to take the products that were being pushed on them because their own "channel inventories" were soaring as a result of declining demand for SolarEdge's products. This decline was also evidenced by the Company's massive increase in inventory during the Class Period. In addition to misleading investors, Defendants' conduct and misrepresentations concealed the material risk that customer inventories would become saturated, orders would be canceled or pushed out, and SolarEdge's revenues would plummet.

## E.    Investors Learn the Truth

119.    Investors began to learn truth underlying Defendants' misstatements about SolarEdge's revenues, the Company's skyrocketing inventories, high channel inventory levels, and declining demand for the Company's products in Europe on August 1, 2023, when Defendants held the Q2 2023 Call to disclose the Company's Q2 2023 financial performance.

40

120. On that call, after consistently denying for months that there was slowing demand or excess channel inventory in Europe—including in response to direct questions from analysts as recently as six weeks earlier—Lando abruptly informed analysts and investors that "[t]he solar market is going through a transition, emerging from the recent period of component shortages, high energy prices, and rapid growth *to one now impacted by higher interest rates and excess inventory*." According to Lando, these inventories were because, as "*growth in demand has tapered off*, distributors are taking a more cautious approach in order to better manage their cash flow." For his part, Faier provided guidance for Q3 2023—*i.e.*, predictions of the Company's future financial performance—that estimated a modest *decline* in quarterly solar revenues from $947.4 million in Q2 2023 to between $850 million and $890 million in Q3 2023, as well as gross margin declines from 34.7% to between 30% and 33%.

121. Defendants' disclosures on the Q2 2023 Call did not fully disclose the truth about demand and inventory levels, and those statements continued to conceal the material risk that channel inventories would become saturated and the Company's revenues would precipitously decline when customers were forced to cancel, push out, or reduce their orders of SolarEdge's products.

122. For example, Lando tried to walk his disclosure back by qualifying that that the "strength" in the [European] market" was only "*somewhat more moderate* than what was anticipated heading into 2023." Further, he touted that "[i]n Europe, *installation rates continue to be high in both residential and commercial*," "*our growth in Europe in the second quarter was very strong*," and "*sell-through by our distributors in the second quarter was up*."

123. Similarly, Faier also worked hard to soften the Company's negative disclosures. Faier emphasized that the Company's solar business had met its Q2 2023 guidance of $930 to $980

41

million in revenue and gross margins of 34% to 37% for Q2 2023 by reaping $947.4 million in revenue with gross margins of 34.7%. He further highlighted in response to analysts' questions that "when we are looking at the point-of-sale data of how much is being sold from the channels, we see record levels over the last two quarters that, to our understanding, are continuing, which means that in that case, the demand is there." Later during the call, Faier reiterated that "Europe is growing, and the commercial side is also growing . . . . If you combine those two, yes, the expectation should be that, in 2024, where we believe that, first of all Europe will come back to course – course much quicker than the United States."

124. The disclosures of high inventory levels in Europe rocked the Company's share price, which the following day fell *$43.96 per share, or 18.3%*, to close at $195.51 per share, on extraordinarily heavy trading volume. Over the prior four months, trading volume in SolarEdge common stock was 1.09 million shares per day. On August 2, 8.51 million SolarEdge shares traded, an increase of *681%*. Nevertheless, analysts appeared to buy these assurances, with analyst firms Oppenheimer and Guggenheim effectively endorsing Defendants' view that any revenue declines were "mainly a 3Q event" and "transitory."

125. On October 19, 2023, however, the other shoe dropped, the truth fully emerged, and undisclosed risks concealed by Defendants' misstatements materialized. After markets closed, SolarEdge issued a press release announcing its preliminary financial results for Q3 2023 that disclosed that "[d]uring the second part of the third quarter of 2023, *we experienced substantial unexpected cancellations and pushouts of existing backlog from our European distributors*," "*third quarter revenue, gross margin and operating income will be below the low end of the prior guidance range*," and the Company "*anticipates significantly lower revenues in the fourth quarter of 2023*." as the inventory destocking process continues."

126.     This disclosure was astonishing, as *less than a month earlier*, Lowe had assured analysts and investors attending the KeyBanc Symposium that "*underlying demand for solar is very, very strong*." Lowe continued, "*like the data we see from our distributors is continuing to show significant growth in terms of sell-through into Europe*."

127.     Following the release, analysts expressed shock at the disclosure, including stating that Defendants had "*signaled much deeper challenges than previously suggested by management commentary*," and many analysts downgraded SolarEdge. The Company's share price fell $31.08 per share, or 27.2%, to close at $82.90 per share on October 20, 2023, on heavy trading volume. In the two months prior to Defendants' October 19, 2023 disclosures, the average trading volume of SolarEdge common stock was 1.7 million shares per day. On October 19, 2023, 21.3 million shares of the Company's common stock traded, an increase of *1,131%*.

### F.     Relevant Post-Class Period Events

128.     Two weeks after the October 19 press release, on November 1, 2023, after markets closed, Defendants held a call with analysts and investors to disclose the Company's financial performance for the third quarter of 2023 ("Q3 2023 Call"). During that call, Defendants confirmed that revenues from the Company's solar business *had plummeted 23.4% from $947.4 million in Q2 2023 to $725.3 in Q3 2023*. The $725.3 in revenues also meant that Defendants' guidance, given on the Q2 2023 Call, of solar revenues of $850 to $890 million, had overestimated the Company's Q3 solar revenues by 18.5% to 14.7%.

129.     Defendants effectively acknowledged during the Q3 2023 Call that demand in Europe had been declining at the same time they had been assuring the market that demand was strong. In a show of understatement, Lando deadpanned to call attendees that demand in Europe "began to slow in the third quarter," and revealed that "[a]lthough the dynamics are consistent with what we caution during our second quarter earnings call, the magnitude grew much greater than

43

we anticipated." Lando left no doubt that the Company's massive guidance miss and revenue shortfall stemmed solely from European sales because "in Europe, [SolarEdge's] sell-through in the third quarter was . . . down 22% quarter-over-quarter," while in "the U.S. [w]e have not seen a significant change in market dynamics since" the Q2 2023 Call. Lando also confirmed that the demand downturn was not a short-term hiccup, as "[t]o align with reduced demand," SolarEdge had "discontinued manufacturing of our products in Mexico and reduced capacity in China."

130. After Lando completed his scripted remarks on the Q3 2023 Call, Faier confirmed in his scripted remarks that "[a] significant portion of our revenues decline in Europe are attributed to lower sales of batteries or a combination of inventories in the beginning of the quarter *and lower demand than anticipated by our customers* led to an accumulation of large quantities in the channels."

131. During the question-and-answer portion of the Q3 2023 Call, analyst Mark Strouse of JPMorgan observed that "it kind of sounds like the distributor cancellations, the order cancellations and delays that you saw, it accelerated in the latter half of the quarter," *i.e.*, at a minimum when Defendants assuring investors that there was *no* slowdown in demand at the Oppenheimer Conference, Barclays Conference, and KeyBanc Symposium. Lando agreed, confirming that Defendants' statements at those events were knowingly false and misleading: "So the shift in pattern was around the summer and the picture got clearer, as mentioned during the -- to our distributors, *and then to us in the second half of the quarter. And that is where the installation rate decline took place*."

132. Later in the question-and-answer session, in response to a question from Julien Dumoulin-Smith, an analyst with Bank of America, Faier sought to clarify Lando's earlier statements by first claiming that it was difficult for Defendants to recognize the demand decline

because SolarEdge received sell-through reports late in each month that reflected the prior months sales, and Defendants had mistaken demand declines in July and August for typical seasonal declines, and the Company's customers had only begun canceling orders in the last two weeks of the quarter. This post-hoc justification beggared belief, however, because Faier was suggesting that the Company lost $125 million to $250 million in revenue *in only two weeks*.

133. Among other things, Defendants also effectively confirmed on the Q3 2023 Call CW4's description of SolarEdge's refusal to allow customers to cancel orders. During the call, Lando disclosed that SolarEdge's European customers had made a "large amount of requests to cancel or push out orders" in the third quarter, and that "while these orders are technically binding on our distributors, the nature of our relationship with these customers assess [SIC] that we accommodated most of these requests."

134. Months after the Class Period ended, and long after investors had been devastated by Defendants' misrepresentations, Defendants revealed that they had insisted that demand in Europe was strong during the Class Period *without speaking to the individuals and businesses who actually were contracted to install SolarEdge products*. During an February 20, 2024 call with analysts and investors to disclose the Company's financial results for the fourth quarter and full year 2023 (the "2023 Earnings Call"), Defendant Faier revealed that "Throughout this quarter [*i.e.*, Q4 2023], we did a lot of work going deeper into our channels to understand what's happening there, looking at installation rates, dissecting almost every country by the various trends that we see there, and talking, by the way, to a lot of the installers to actually understand exactly what they see as well, *which was one of the things that we did a little bit less prior to this period*."

45

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

135.    Plaintiffs allege that the statements highlighted in ***bold and italics*** within this section were materially false and misleading because they omitted to disclose material information of which Defendants were aware or were reckless in not knowing. As alleged herein, such statements artificially inflated or artificially maintained the price of SolarEdge's publicly traded common stock and operated as a fraud or deceit on all persons or entities who purchased or otherwise acquired those securities during the Class Period. Because Defendants chose to speak on the issues described below, they had a duty to not mislead investors or withhold material information. As described below, Defendants' statements created an impression of a state of affairs at SolarEdge that differed in a material way from the one that actually existed.

136.    Specifically, as detailed below, throughout the Class Period, Defendants misrepresented the Company's true operations and financial condition by making false or misleading statements and/or failing to disclose that the Company (i) had reached financial benchmarks, including obtaining "record" revenues by forcing customers to take delivery of unneeded products at the end of fiscal quarters; (ii) the Company's "finished goods" inventories (*i.e.*, inventories of products ready to ship) and its customers' inventories (*i.e.*, "channel inventories") was skyrocketing because of declining demand and forcing customers to take unneeded products; (iii) demand for the Company's products in Europe, its most important region, was declining sharply, and (iv) the Company's projections for "sell-through" (i.e., sales of its products by distributors through to installers and other end users) were inflated and not based on market reports or SolarEdge's own internal data.. Defendants' misstatements also concealed the material undisclosed risks that channel inventories would rise so high that customers would need to cancel or push out orders of SolarEdge's products and the Company's revenues would plummet.

46

137.    Defendants' misrepresentations and omissions concealed the true condition of SolarEdge's business and the risks to its financial success, as well as misled investors about the risks associated with the purchase or sale of the Company's securities. The misrepresentations and omissions thus caused the price of SolarEdge's stock to trade at prices that were higher than what the market price would have been had the true facts concealed by Defendants' fraud been known. Defendants' misstatements and omissions thereby caused economic harm to Class members who purchased SolarEdge stock during the Class Period.

### A.    Misrepresentations Concerning SolarEdge's Revenues

138.    During the Class Period, Defendants touted the Company's financial performance, including meeting its prior revenue guidance. These statements were materially false and misleading, however, because Defendants knew, but intentionally or recklessly failed to disclose that the Company's performance was the result of its practice at the end of fiscal quarters of forcing customers to take delivery of unneeded products so that the Company could meet its revenue goals.

139.    On February 13, 2023, after markets closed, SolarEdge held the 2022 Earnings Call. During the call, Lando reported that the Company had "*concluded the quarter with record revenues* of $890 million and record revenues for the year 2022 of $3.1 billion." During the call Lando touted that "[a] key highlight of 2022 was the growth of our revenues coming from Europe," which he expressly attributed "*the increase in power prices prior to the beginning of the Ukraine-Russia conflict and the accelerated increases ever since, as well as the expansion of our portfolio to include inverters, EV chargers, and batteries, addressing the specific European market needs*." Later in the call, Lando touted, "[t]his quarter, we generated *record revenues for the company*, *led by record revenues from our global solar business driven from significant quarter-over-quarter growth in the United States*."

140. By touting the Company's "record revenues" for the year and fourth quarter revenues driven by "growth in the United States," and by attributing SolarEdge's sales growth in Europe to an "increase in power prices," an "expansion of our portfolio" and "addressing specific European market needs," Defendants had an obligation to disclose the entire truth about how it achieved those revenues. Defendants breached this duty, however, by failing to disclose that SolarEdge's revenues reflected the Company's practice of pushing customers to take unneeded products at the end of financial quarters so that the Company could meet revenue targets.

141. On May 3, 2023, on the Q1 2023 Call, Lando reported that the Company had achieved "*[r]evenues from [its] solar business . . . at a record $909 million*," an increase of 9% over Q1 2022, "*mostly driven by record revenues in Europe and Rest of World*." During the Call, Lando touted that "*the European residential markets continue to be very strong for us this quarter. As we ramped shipments of three phase residential inverters, in particular, our new backup inverter as well as the three phase residential battery*."

142. By touting SolarEdge's "record" revenues, and expressly attributing those revenues to "record revenues in Europe," and European revenues to "shipments of three phase residential inverters," "our new backup inverter," and "the three phase residential battery," Defendants had an obligation to disclose the entire truth about how it achieved those revenues. Defendants breached this duty, however, by failing to disclose that SolarEdge's revenues reflected the Company's practice of pushing customers to take unneeded products at the end of financial quarters so that the Company could meet revenue targets.

143. On the Q2 2023 Call on August 1, 2023 Lando reported that in the quarter the Company had achieved "*[r]evenues from [its] solar business . . . at a record $947 million*," an increase 38% over Q2 2022, "*mostly driven by record revenues in Europe*."

144.    By touting SolarEdge's "record" revenues, and expressly attributing those revenues to "record revenues in Europe," Defendants had an obligation to disclose the entire truth about how it achieved those revenues. Defendants breached this duty, however, by failing to disclose that SolarEdge's revenues reflected the Company's practice of pushing customers to take unneeded products so that the Company could meet revenue targets.

### B.    Misrepresentations Concerning the Growth of SolarEdge's Inventory

145.    As described below, throughout the Class Period, Defendants made materially false and misleading statements and omissions that assured investors that the massive ***261% increase*** in the Company's finished goods inventory—from $203 million at the start of the Class Period to $730 million at the conclusion of the Class Period—was "normal," the result of "streamlined manufacturing," and a benefit to the Company. These statements were materially false and misleading, however, because Defendants knew, but intentionally or recklessly failed to disclose that SolarEdge's finished goods inventory levels were the result of lower demand for its products and its customers' high inventory levels in Europe, which were the result of result of Company's practice at the end of fiscal quarters of forcing customers to take delivery of unneeded products so that the Company could meet its revenue goals.

146.    SolarEdge's 2022 10-K stated that the Company held $729 million in inventories, $203 million of which was finished goods, which had risen $89.4 million, or 79%, in Q4 2022. This sharp rise in finished goods inventory continued in Q1 2023, where the Company's finished products inventory rose another 64.4%, or from $203 million to $333 million. During the Q1 2023 Call, Faier asserted that the increased finished products inventory reflected the strength of SolarEdge's business and would benefit the Company:

> As of March 31, our inventory level net of reserve was at a level of $874.2 million compared to $729.2 million in the prior quarter. It's important to note that ***our inventory levels this quarter include***

> *higher levels of finished goods products as a result of streamlined manufacturing. This finished goods inventory in the various regions will allow us to further improve our customer delivery time and reduce shipping and logistic expenses*.

147. By attributing SolarEdge's increased finished goods inventory to "streamlined manufacturing," and by asserting that these increased inventory levels benefitted the Company, by allowing it to "improve customer delivery time" and "reduce shipping and logistic expenses," Defendants had an obligation to disclose the entire truth about the reasons for the increase in finished goods inventory. Defendants violated this duty, however, by failing to disclose that SolarEdge's finished goods inventory levels were the result of lower demand for its products and its customers' high inventory levels in Europe, which were the result of result of Company's practice at the end of fiscal quarters of forcing customers to take delivery of unneeded products so that the Company could meet its revenue goals.

148. During the Q1 2023 Call, Faier emphasized to analysts and investors that there was nothing unusual about SolarEdge's increased inventory levels:

> Over the last 2 years, we have dealt with challenges around components availability, supply chain issues and logistic constraints. The general improvement in the market combined with the actions that we have taken have *allowed us to return to a more normal mode of operation. In most product areas, we are at a point where our manufacturing capacity is able to meet demand and we can use normal shipping routes, build inventory, and reduce lead times.*

149. By affirmatively electing to characterize SolarEdge's skyrocketing inventory as its "normal mode of operation," Defendants communicated to investors that demand for the Company's products was normal and misled investors into believing that the SolarEdge benefitted from increased finished inventory levels. These statements were false and misleading, however, because SolarEdge's finished goods inventory levels were the result of lower demand for its products and its customers' high inventory levels in Europe, which were the result of result of

Company's practice at the end of fiscal quarters of forcing customers to take delivery of unneeded products so that the Company could meet its revenue goals.

150.    Although the truth regarding SolarEdge's elevated inventory partially emerged during the Q2 2023 Call, Defendants nevertheless concealed the reasons for those increases and misrepresented the Company's ability to reduce those inventories. For example, Faier stated that "[a]s of June 30, our inventory level net of reserve was $984.2 million compared to $874.2 million the prior quarter. ***As a result of the slowdown in the shipments to the United States, slower growth rates in Europe, and more streamlined manufacturing, our finished goods inventory increased substantially this quarter***." He further assured investors that the high finished goods inventory levels benefitted the Company because it was "***a healthy way to reduce shipment costs, in the various regions***."

151.    By attributing SolarEdge's increased inventory levels to "slower growth rates in Europe," "more streamlined manufacturing," "batteries shipments [that] were a little bit faster than our ability to ramp up the inverters that come with them," and assuring investors that they were "a healthy way to reduce shipment costs, in the various regions," Defendants had an obligation to disclose the entire truth about the reasons for the Company's increased finished goods inventory. Defendants violated this duty, however, by failing to disclose that SolarEdge's finished goods inventory levels were the result of lower demand for its products and its customers' high inventory levels in Europe, which was the result of result of Company's practice at the end of fiscal quarters of forcing customers to take delivery of unneeded products so that the Company could meet its revenue goals.

152.    Faier then assured attendees on the Q2 2023 Call that while, "there is a built inventory within the channels there that needs to be cleared in order to continue and grow," "***this***

*will be cleared mostly through the adoption or getting more inverters from us during the third and the fourth quarter*."

153. Defendants' assurances that "this will be cleared mostly through the adoption or getting more inverters from us during the third and the fourth quarter" were materially false and misleading in and of themselves because Defendants intentionally or recklessly failed to disclose that SolarEdge's inventory surplus was caused by customers' high inventory levels and decreased demand for the Company's products, and also because while Defendants' statements communicated to investors that Defendants' had informed themselves about installation rates in Europe, they failed to disclose that the Company had not consulted with installers on the ground in Europe when predicting that inventory surpluses would be cleared by producing more inverters.

154. By affirmatively electing to characterize SolarEdge's skyrocketing inventory as its "normal mode of operation," Defendants communicated to investors that demand for the Company's products was normal and misled investors into believing that the SolarEdge benefitted from increased finished inventory levels. These statements were false and misleading, however, because SolarEdge's finished goods inventory levels were the result of lower demand for its products and its customers' high inventory levels in Europe, which were the result of result of Company's practice at the end of fiscal quarters of forcing customers to take delivery of unneeded products so that the Company could meet its revenue goals.

**C.    Misrepresentations Concerning Channel Inventory Levels in Europe**

155. During the first half of the Class Period, from February 13, 2023, to August 1, 2023, Defendants repeatedly assured investors that "channel inventories" in Europe, or inventories at SolarEdge's European customers, were low, which indicated strong demand for the Company's products in that region. These statements were materially false and misleading, however, because Defendants knew, but intentionally or recklessly failed to disclose, that channel inventory levels

52

in Europe at this time were high because of declining demand and the Company's practice at the end of fiscal quarters of forcing customers to take delivery of unneeded products so that SolarEdge could meet its revenue goals, and also concealed the material risk that customers would start cutting, cancelling, or pushing orders out into later quarters, which would cause the Company's revenues to plummet.

156. For example, on March 28, 2023, during the Wells Symposium, Faier assured investors that channel inventory in Europe was low. When asked about backlog and lead times for SolarEdge products, Faier touted, "***when we are looking at the inventory on hand, when it comes to our distributors, the channels are pretty, I would say, low on inventory in most cases***."

157. Similarly, during the Q1 2023 Call on May 3, 2023, analyst Philip Shen of ROTH Capital Partners observed, based on Defendants' prior statements, that channel inventory in the U.S. was "heavy" (*i.e.*, overstocked), while channel inventory in Europe was "tight" (*i.e.*, understocked). Shen then asked, "[d]o you expect massive destocking at some point? Just talk us through what you're seeing with the channel?" Rather than disclosed the truth, Lando reinforced Shen's misconception, and said, "in Europe, ***we actually see low [channel] inventory days on hand***," and "not only . . . [do] we see that ***the level of [channel] inventory is relatively not high***, but it's actually that we see ***record sellout of products coming from the distribution channels***."

158. Defendants' statements characterizing channel inventory levels as "low," and "relatively not high," and experiencing "record sellout of products," were materially false and misleading because Defendants knew, but intentionally or recklessly failed to disclose, that channel inventory levels in Europe at this time were high because of declining demand and the Company's practice at the end of fiscal quarters of forcing customers to take delivery of unneeded products so that SolarEdge could meet its revenue goals, and also concealed the material risk that

customers would start cutting, cancelling, or pushing orders out into later quarters, which would cause the Company's revenues to plummet.

159. On the Q2 2023 Call, Defendants acknowledged that SolarEdge's customers were experiencing high inventory levels, contrary to their repeated prior assurances channel inventory levels were low. During the call, analyst Brian Lee of Goldman Sachs asked about the "timing of inventory balance," and Faier responded, "[i]n Europe today, what we see is that the inventory levels, on one hand, are relatively high. ***But when you look at the days outstanding, which is a result of the sell-through from the channel, they are not high at all. They're actually at the normal level***."

160. Defendants' statements characterizing channel inventory levels as "not high at all," and "at the normal level," were materially false and misleading because Defendants knew, but intentionally or recklessly failed to disclose, that channel inventory levels in Europe at this time were high because of declining demand and the Company's practice at the end of fiscal quarters of forcing customers to take delivery of unneeded products so that SolarEdge could meet its revenue goals, and also concealed the material risk that customers would start cutting, cancelling, or pushing orders out into later quarters, which would cause the Company's revenues to plummet.

161. Later in the call, Citi analyst Vikram Bagri observed, "on Europe, it sounds like, the inventory rebalancing required is not – the magnitude is not that big. So, it seems like most of the rebalancing happens in third quarter." Bagri then asked, "if you can comment on the magnitude, if you can characterize what the impact on revenue is, and the cadence. How much of the rebalancing happens in fourth quarter or third quarter?" Faier responded, "we believe that the inventory corrections, at least in Europe, are going to be a little bit quicker, and "I'd say that in Europe, I think that, yes, ***the correction within the distributors should be relatively quick***, ***given***

*the fact that the inventories levels that Zvi mentioned before are not so high when it reflects inventory days while we still see very high – record-high point-of-sale data*."

162. Defendants' statements that "the correction within the distributors should be relatively quick" and characterizing channel inventory levels as "not so high" were materially false and misleading because Defendants knew, but intentionally or recklessly failed to disclose, that channel inventory levels in Europe at this time were high because of declining demand and the Company's practice at the end of fiscal quarters of forcing customers to take delivery of unneeded products so that SolarEdge could meet its revenue goals, and also concealed the material risk that customers would start cutting, cancelling, or pushing orders out into later quarters, which would cause the Company's revenues to plummet.

163. Approximately a week later, on August 8, 2023, during a talk at the Oppenheimer Conference, Faier affirmatively attributed inventory surpluses at SolarEdge's customers to changes in distributors' inventory preferences:

> *The second thing distributors are doing is since they can rely better on our supply right now* instead of holding 3 months or sometimes even 4 months of inventory . . . at the end of Q2, we saw in average 2 months of inventory of our product in the channel. And now they're even sometimes reduced to 5 or 4 weeks. And *this creates a situation or on one hand, you see amazing demand. But at the same time, since the inventory is still being cleared from the channel going to lower levels, the orders to us or other companies is not happening*.

164. A month later, on September 6, 2023, Faier assured Barclays Conference attendees that surplus channel inventories were because after the "*past 2 years' experience of not being able to get all of the products that they wanted*," distributors had "*simply overstocked, not just compared to the amount of revenues, but also because they thought that maybe they will not be able to get more products*. This resulted in a situation where although we see record high sell-

through every month, we see that the channels are relatively packed," but "*the underlying market in Europe is growing and growing very nicely*."

165. Defendants' statements in paragraphs 163-64 above characterizing high channel inventory levels as the result of distributors strategic preferences were materially false and misleading because Defendants knew, but intentionally or recklessly failed to disclose, that channel inventory levels in Europe at this time were high because of declining demand and the Company's practice at the end of fiscal quarters of forcing customers to take delivery of unneeded products so that SolarEdge could meet its revenue goals, and also concealed the material risk that customers would start cutting, cancelling, or pushing orders out into later quarters, which would cause the Company's revenues to plummet. Further, by affirmatively electing to characterize the reasons for high channel inventory levels, Defendants took on an obligation to disclose the entire truth about those inventory levels. Defendants breached this duty, however, by failing to disclose increased inventory levels were the result of declining demand and the Company's practice of pushing customers to take unneeded products at the end of financial quarters so that the Company could meet revenue targets.

### D.  Misrepresentations Concerning Demand for SolarEdge Products in Europe

166. Throughout the Class Period, Defendants misrepresented to investors that demand for SolarEdge's products in Europe was strong even though they knew or recklessly disregarded that demand was declining.

167. For example, during the 2022 Earnings Call, Lando touted, "[f]rom a demand and inventory point of view, *we continue to see very strong demand from Europe for all products and relatively low inventory levels in the channel*." Later during the 2022 Earnings Call, analyst Alex Vrabel of Bank of America Merrill Lynch followed up by asking, "[w]hat do you expect for

56

European growth here in 2023?" and Lando responded, "***in many cases, we see that the demand is far exceeding our ability to manufacture and deliver***."

168.    Also on the 2022 Earnings Call, Philip Shen, an analyst from Roth Capital Partners asked, "I know you just talked about how you can't quantify the '23 outlook for Europe. But I was wondering if you could talk through the trends you might be seeing by quarter. Are you seeing any signs of a slowdown?" Lando responded:

> ***[T]o a large extent, our 2023 in Europe will be similar to the condition we were in in 2022, which is more dependent on our ability to produce the volumes than the demand***. I can give you an indicator which is true for the company as a whole, but it's most pronounced in Europe, that our current backlog for 2023 is well above what we delivered in 2022 globally and in particular, in Europe. So, ***as far as we can see, the market is – the demand is good, and the market is strong, and we are ramping production to meet demand***."

169.    On March 13, in a talk with analysts at the ROTH Conference, Danziger, speaking on behalf of the Company as its Director of Investor Relations and Finance Operations, touted Defendants' expectations for SolarEdge's performance in Europe in 2023, stating, "***it's definitely the case that [Europe] will probably be the fastest-growing geographies for us . . . . [w]e're definitely looking ahead toward a very healthy and robust year in Europe again***." Later in the talk, Danziger not only reiterated that "***we're expecting extremely healthy and robust demand in Europe***," he also emphasized that prior sales in Europe had been held down by supply chain constraints, and thus sales in the second half of 2023 would be stronger: "***we're working very hard on solving those couple of bottlenecks that we have to solve. And then we can probably -- and I would say somewhere towards the second half of the year, we should expect some relief coming***."

170.    On March 28, 2023, Faier participated in an interview with an analyst at the Wells Fargo Clean Energy Symposium ("Wells Symposium"). During the Symposium an analyst observed, "I think you had a 6-month backlog [in Europe]," and asked, "Where does that stand

today . . . . [M]aybe talk through like lead times you have in Europe right now and where that – where do you think that's going?" Faier responded, "*the situation is that . . . the demand is – continues to be very strong. And I think that today, most dynamics are related to the – more to the ability to supply rather than the demand*." Faier even went so far as to attribute this purportedly "booming" demand in Europe to "*the combination of relatively low interest rate environment . . . plus the fact that electricity prices hiked*."

171. Later in the Q1 2023 Call, Faier touted that the "vast majority" of SolarEdge's batteries "continue to be shifted to Europe, *driven by the strong adoption and demand for our three-phase solution*."

172. Analysts participating in the Q1 2023 Call also asked Lando and Faier directly about SolarEdge's prospects in Europe. Brian Lee, an analyst from Goldman Sachs, stated, [t]here's been more and more chatter, I feel like, to start the year around the potential slowdown in that region [Europe]." Rather than disclose the truth, Lando responded, *"we don't see right now a change in the pattern of demand in the market in Europe . . . . [a]nd we don't see, at least until now any change in the dynamic and the market continues to be strong*."

173. Later in the Q1 2023 Call, Deutsche Bank analyst Corinne Blanchard said, "I want to go back on the European market and try[] to get a sense on expectation in 2Q and 3Q versus the first quarter," and asked, "[c]an we expect the same growth in the same cadence there?" Lando responded that the European residential market and C&I markets were "three-phase based," which meant that "*growth is less dependent on demand. It's more dependent on our ramp of manufacturing, which I mentioned, will take us another couple of quarters until we're at a full scale of matching the supply to demand*." Moments later, in response to a follow-up question from Blanchard about the United States, Lando reiterated, "*[i]n Europe, the situation is more*

***dependent on our supply and our intent is to continue and increase capacity of three-phase residential inverters. So the outlook is for likely growth***."

174. Several weeks later, on June 21, 2023, Danziger participated in a talk with analysts at the JPM Conference. JPMorgan analyst Mark Strouse began the talk by asking Danziger, "[c]an you just kind of give us the latest and greatest in what you're seeing in Europe? And I think especially in light of some of the kind of – some of the third-part forecasts that have come out for some flattening in the market?" Danziger responded by denying that there were any changes in demand in Europe:

> [W]hat we're still seeing and observing in Europe is not so much different than what we mentioned after our last earnings . . . . ***we're still looking at very healthy demand across the board in the markets and in the segments*** . . . . But overall, and including both residential and commercial, ***we're still looking at a very healthy demand in Europe. And this would probably still be the fastest-growing geographies for us in 2023***.

175. Strouse immediately followed up by asking "do you think that, that is a function of the overall market growing still? Or is that kind of more share gains, do you think, or new customers, new geographies?" Danziger responded:

> I think it's a combination of all . . . it's still a very attractive economic investment to do to install a solar system in Europe and ***we're still seeing driving very strong demand on the residential front. On the C&I side, there's this layer of ESG-driven demand that we're seeing more and more corporations are starting to take their net zero emissions journey***. And usually, to start with the solar system is a fairly good step to start with.

176. On the Q2 2023 Call, Defendants acknowledged that SolarEdge's customers were experiencing high inventory levels, contrary to their repeated prior assurances channel inventory levels were low. To try to soften the blow, and to prop up the Company's share price, Lando emphasized, however, that the high inventory levels did not reflect declining demand for the Company's products and that distributors were overreacting by "going to a – on the overall offering

to low levels of inventory *that are maybe lower than those that they would normally carry in this type of a period, especially because the overall demand is still high* . . . . the market is very active. *Installations are up and demand for equipment is strong*." Lando further assured investors that "*[i]n Europe, installation rates continue to be high in both residential and commercial*" and "*our growth in Europe in the second quarter was very strong*."

177.    On the Q2 2023 Call, in response to a question from Philip Shen, a ROTH MKM analyst, Faier reiterated that demand for solar products remained strong, stating that "[w]e've been and we've seen through various stages of the solar market. *We do not see this stage, as well the case in German, let's say, or Europe in 2013 when the market disappeared. Again, we see it more of a correction rather than a crisis that's going around overall*."

178.    A week later, on August 8, 2023, at the Oppenheimer Conference, Faier touted the demand for SolarEdge products in Europe, stating:

> Europe is growing only 30% to 40% year-over-year. It depends on the country, of course. Europe is made out of many countries. *And therefore, we still see very strong underlying demand for -- last quarter, for example, we get from our channels and distributors what we call point-of-sale data, is showing how much we're selling out of the channels. We're talking about record high numbers that we haven't seen before.* That in some cases, even for our products are close to 100% just compared to about a quarter ago. So the underlying demand is very strong, although not as strong as everyone thought.

179.    During the question-and-answer period of the Q2 2023 Call, Faier further emphasized that "*when we are looking at the point-of-sale data of how much is being sold from the channels, we see record levels over the last two quarters that, to our understanding, are continuing*, *which means that in that case, the demand is there*."

180.    A month later, on September 6, 2023, Faier participated in a question-and-answer session with analysts at the Barclays Conference. Rather than acknowledge that SolarEdge's

European customers were cancelling orders, trying to push orders into future quarters, and refusing to take additional products because of declining demand, Faier told attendees that, in 2022, SolarEdge, "*directed a lot of our shipments to Europe, which by the way turned to be a relatively good move given the fact that we see Europe growing relatively quickly right now*."

181. Moments later, the analyst hosting the talk observed, "I think the market was generally a little surprised at your comments around the Europe kind of inventory for both the inverters and batteries" on the Q2 2023 Call, and asked "[s]o now that it has been a couple of months, can you give us an update on what you're seeing here today?" Faier responded:

> I'll start by saying that **nothing changed from our call** with only colors being a little bit more vivid in where do we see things happening. So starting from the underlying demand, **the underlying demand in Europe continues to be strong and continues to be very great . . . . I can tell you that in both cases, we see a very nice uplift in all of Europe . . . we see it almost everywhere**. It's a very good underlying demand, not as good as we thought.

182. On September 21, 2023, Lowe attended a question-and-answer session with analysts at the KeyBanc Symposium. During the symposium, KeyBanc analyst Sophie Ksenia Karp ("Karp") asked Lowe to comment on the "current inventory cycle"—"something [Lowe] probably get[s] asked a lot"—and provide "incremental color since the last time you probably spoke about this." Lowe responded that nothing had changed, touting to attendees that "[t]he situation that European distributors have in terms of having too much inventory . . . especially on solar panels, which is the largest cost component of the solar system . . . . [i]s a real problem for them" because solar panel prices had fallen, even though European "*underlying demand for solar is very, very strong*." Lowe continued, "*like the data we see from our distributors is continuing to show significant growth in terms of sell-through into Europe*."

183. The above statements identified in paragraphs 166-182 communicated to or gave investors the impression that demand for SolarEdge products in Europe was high. These

statements were materially false and/or misleading, however, because Defendants knowingly or recklessly failed to disclose that demand in Europe was falling, channel inventory levels at European distributors were high because of the Company's practice at the end of fiscal quarters of forcing customers to take delivery of unneeded products so that the Company could meet its revenue goals the Company pushing SolarEdge customers to take delivery of product they did not need so that the Company could meet its revenue targets, and, as a result, there was a material undisclosed risk that customers would cancel orders and SolarEdge's revenues would plummet.

184. Further Defendants' misstatements at the ROTH Conference, JPM Conference and Q2 2023 Call in paragraphs 169, 174, and 176 above, including that "it's definitely the case that [Europe] will probably be the fastest-growing geographies for us . . . . [w]e're definitely looking ahead toward a very healthy and robust year in Europe again"; "we're expecting extremely healthy and robust demand in Europe"; "we're still looking at a very healthy demand in Europe. And this would probably still be the fastest-growing geographies for us in 2023"; and [i]n Europe, installation rates continue to be high in both residential and commercial" were not only misleading for the reasons stated in paragraph 183 above, but also because Defendants knowingly or recklessly failed to disclose that the Company had not consulted with installers on the ground in Europe before making these statements.

**E. Misrepresentations Concerning Sell-Through Forecasts for SolarEdge Products**

185. Throughout the Class Period, Defendants gave investors the misimpression that the Company's projections for "sell-through" (i.e., sales of its products by distributors through to installers and other end users) were based on market reports and SolarEdge's internal data, when in reality those forecasts were inflated and not based on market reports or internal data.

186.    On the 2022 Call, in response to a question from a ROTH analyst, Lando touted to investors that "*to a large extent, [SolarEdge's] 2023 in Europe will be similar to the condition we were in, in 2022, which is more dependent on our ability to produce the volumes than the demand*. I can give you an indicator which is true for the company as a whole, but it's most pronounced in Europe, that our current backlog for 2023 is well above what we delivered in 2022 globally and in particular, in Europe." Lando went on to say, "*So as far as we can see, the market is -- the demand is good and the market is strong, and we are ramping production to meet that demand*."

187.    Lando's statements in paragraph 186 above were materially false and misleading because that statement gave investors the impression that SolarEdge had analyzed the market for sell-through of its products to installers and other end users were using credible sources like market reports and SolarEdge's own internal data. These statements were materially false and misleading, however, because Defendants knowingly or recklessly failed to disclose that the Company's forecasts were artificially inflated at the insistence of the Company's executives, and, as a result, there was a material undisclosed risk that customers would cancel orders and SolarEdge's revenues would plummet.

188.    On the Q2 2023 Call, Faier assured attendees that while "there is a built inventory within the channels there that needs to be cleared in order to continue and grow," "*this will be cleared mostly through the adoption or getting more inverters from us during the third and the fourth quarter*."

189.    Faier's statements in paragraph 169 above gave investors the impression that SolarEdge's internal projections for sell-through of its products to installers and other end users were based on credible sources like market reports and SolarEdge's own internal data. These

statements were materially false and misleading, however, because Defendants knowingly or recklessly failed to disclose that the Company's forecasts were artificially inflated at the insistence of the Company's executives, and, as a result, there was a material undisclosed risk that customers would cancel orders and SolarEdge's revenues would plummet.

190. Later in the call, Citi analyst Vikram Bagri observed, "on Europe, it sounds like, the inventory rebalancing required is not – the magnitude is not that big. So, it seems like most of the rebalancing happens in third quarter." Bagri then asked, "if you can comment on the magnitude, if you can characterize what the impact on revenue is, and the cadence. How much of the rebalancing happens in fourth quarter or third quarter?" Faier responded, "we believe that the inventory corrections, at least in Europe, are going to be a little bit quicker, and "I'd say that in Europe, I think that, yes, *the correction within the distributors should be relatively quick*, *given the fact that the inventories levels that Zvi mentioned before are not so high when it reflects inventory days while we still see very high – record-high point-of-sale data*."

191. Faier's statements that "the correction within the distributors should be relatively quick" and characterizing channel inventory levels as "not so high" were materially false and misleading because those statements gave investors the impression that SolarEdge's internal projections for sell-through of its products to installers and other end users were based on credible sources like market reports and SolarEdge's own internal data. These statements were materially false and misleading, however, because Defendants knowingly or recklessly failed to disclose that the Company's forecasts were artificially inflated at the insistence of the Company's executives, and, as a result, there was a material undisclosed risk that customers would cancel orders and SolarEdge's revenues would plummet.

192. On September 6, 2023, Faier appeared at the Barclays Conference, where he attributed surplus channel inventories to the "past 2 years' experience of [distributors] not being able to get all of the products that they wanted," and thus distributors had "simply overstocked, not just compared to the amount of revenues, but also because they thought that maybe they will not be able to get more products. This resulted in a situation where although we see record high sell-through every month, we see that the channels are relatively packed," but "*the underlying market in Europe is growing and growing very nicely*."

193. Faier's statement that "the underlying market in Europe is growing and growing very nicely" were materially false and misleading because that statement gave investors the impression that SolarEdge had analyzed the market for sell-through of its products to installers and other end users were using credible sources like market reports and SolarEdge's own internal data. These statements were materially false and misleading, however, because Defendants knowingly or recklessly failed to disclose that the Company's forecasts were artificially inflated at the insistence of the Company's executives, and, as a result, there was a material undisclosed risk that customers would cancel orders and SolarEdge's revenues would plummet.

194. During the KeyBanc Symposium, on September 21, 2023, Lowe assured attendees that "*at the end of the day, 1Q is going into the spring installation season and sell-through being as strong as it is, distributor inventories are going to be depleted fairly quickly*."

195. Lowe's statements in paragraph 194 above were materially false and misleading because that statement gave investors the impression that SolarEdge had analyzed the market for sell-through of its products to installers and other end users were using credible sources like market reports and SolarEdge's own internal data. These statements were materially false and misleading, however, because Defendants knowingly or recklessly failed to disclose that the Company's

65

forecasts were artificially inflated at the insistence of the Company's executives, and, as a result, there was a material undisclosed risk that customers would cancel orders and SolarEdge's revenues would plummet.

## VII. THE TRUTH BEGINS TO EMERGE

196. The misstatements by Defendants alleged in above misrepresented the Company's true operations and financial condition by misrepresenting and/or failing to disclose that the Company's (i) financial performance was the result of its practice at the end of fiscal quarters of forcing customers to take delivery of unneeded products so that the Company could meet its revenue goals; (ii) the Company's finished goods inventories and its customers' channel inventories was skyrocketing because of declining demand and its practice of forcing customers to take unneeded products; and (iii) demand for the Company's products in Europe was declining. Defendants' misstatements also concealed the material undisclosed risks that channel inventories would become saturated and the Company's revenues would precipitously decline when customers were forced to cancel, push out, or reduce their orders of SolarEdge's products.

197. The truth underlying these misstatements began to emerge, and the undisclosed risks began to materialize, on August 1, 2023. That day, after markets closed, Defendants held the Q2 2023 Call to disclose SolarEdge's second quarter 2023 financial results to investors. Lando began by touting SolarEdge's record $947 million in solar revenues, which were "mostly driven by record revenues in Europe." After consistently denying for months that there was slowing demand or excess inventory in Europe, however, Lando reversed course and informed analysts and investors that "*[t]he solar market is going through a transition, emerging from the recent period of component shortages, high energy prices, and rapid growth to one now impacted by higher interest rates and excess inventory*." In other words, contrary to Defendants' statements as

recently as six weeks earlier at the JPM Conference, the European solar markets and demand had been weak all along.

198.    Perhaps recognizing that his statements directly contradicted Defendants' assurances, Lando tried to walk his disclosure back by qualifying that that the "strength" in the [European] market" was only "somewhat more moderate than what was anticipated heading into 2023." He nevertheless acknowledged, for the first time, that the Company's distribution channels in Europe were "***experiencing higher-than-optimal inventory levels, especially as it relates to solar modules***." Lando went on to state that although "[d]uring the recent period of shortages and expectations for high growth, distributors placed large orders for modules and inverters in order to ensure stability of supply to support the growing demand," as "***growth in demand has tapered off, distributors are taking a more cautious approach in order to better manage their cash flow***."

199.    Lando further moderated his disclosures by touting that "[i]n Europe, installation rates continue to be high in both residential and commercial," "our growth in Europe in the second quarter was very strong," and "sell-through by our distributors in the second-quarter was up 49% year over year in residential and up 115% year over year in commercial."

200.    Lando also highlighted that the slowdown in demand and growth in inventory were temporary and would not significantly impact SolarEdge's bottom line. For example, although Lando stated that Defendants "expect[ed] this inventory adjustment period could continue for the next two quarters," they also viewed "this environment as an opportunity to grow market share based on our offering that is very suitable to the growing complexity of the European grid," and "I believe that our portfolio and positioning within diverse markets and applications will benefit us as markets continue to grow in some areas and we begin to recover in others."

201. Later in the call, in response to a question from a JPMorgan analyst, Lando emphasized that distributors were overreacting, the inventory surplus did not reflect demand, and thus the impact on SolarEdge would not be substantial. Specifically, Lando said, distributors "are resolving that by going to a—on the overall offering to low levels of inventory that are maybe lower than those that they would normally carry in this type of a period, especially because the overall demand is still high . . . . the market is very active. Installations are up and demand for equipment is strong."

202. Still later in the call, in response to a question from ROTH MKM analyst Philip Shen, Lando reiterated that SolarEdge's customers were overreacting because, while "historically, these are very reasonable inventory levels for the European market," customers were "taking the risk or being on the edge in terms of the overall inventory that they are holding." Lando then emphasized that "I think that the inventory levels in Europe are in that range and considered reasonable, may on the high end of reasonable. But consider the very high sales through and installation rates, it's not a major bubble, if you will."

203. Despite these efforts to spin the Company's disclosures about rising inventories in Europe, during the Q2 2023 Faier disclosed that the Company's guidance for the third quarter of 2023 predicted that quarterly solar revenues would decline from $947.4 million in Q1 2023 to between $850 million and $890 million, and gross margins would decline from 34.7% to between 30% and 33%.

204. Faier also made multiple statements on the Q2 2023 Call to try to limit the damage of these disclosures to the Company's share price. For example, during Q1 2023, Defendants had disclosed earnings "guidance"—*i.e.*, predictions of SolarEdge's financial performance—for Q2 2023 of $930 to $980 million in revenue and gross margins of 34% to 37% for the Company's

solar business, and, on the Q2 2023 Call, Faier highlighted that SolarEdge's solar business had met its guidance for the second quarter of 2023 by reaping $947.4 million in revenue with gross margins of 34.7%.

205. Faier then emphasized that the increases in inventory in Europe would have a limited effect on SolarEdge. For example, Faier stated that in the third quarter of 2023, "[r]evenues from batteries grew slightly . . . in Europe, limited by the fact that we are still constrained by three-phase inverter supply, which is needed for battery-coupled systems." He continued, "We do identify some excess battery inventory in the European channels, which will lead to lower battery shipments in the second half of the year," but assured investors that "[t]his inventory buildup will be alleviated as the ramp-up in deliveries of our new three-phase residential backup inverter catches up with our battery manufacturing and delivery pace." During the question-and-answer period of the Q2 2023 Call, Faier further emphasized that "when we are looking at the point-of-sale data of how much is being sold from the channels, we see record levels over the last two quarters that, to our understanding, are continuing, which means that in that case, the demand is there."

206. Later during the call, Faier emphasized that "Europe is growing, and the commercial side is also growing . . . . If you combine those two, yes, the expectation should be that, in 2024, where we believe that, first of all Europe will come back to course – course much quicker than the United States." Faier further described the Company's skyrocketing finished goods inventory, which had more than doubled from $202,537 at the start of the Class Period to $487,393 at end of Q2 2023, as "a healthy way to reduce shipment costs, in the various regions."

207. Later in the call, Citi analyst Vikram Bagri observed, "on Europe, it sounds like, the inventory rebalancing required is not – the magnitude is not that big. So, it seems like most of

69

the rebalancing happens in third quarter." Bagri then asked, "if you can comment on the magnitude, if you can characterize what the impact on revenue is, and the cadence. How much of the rebalancing happens in fourth quarter or third quarter?" Faier responded, "as you've mentioned, and rightfully so . . . we believe that the inventory corrections, at least in Europe, are going to be a little bit quicker . . . . I'd say that in Europe, I think that, yes, the correction within the distributors should be relatively quick, given the fact that the inventories levels that Zvi mentioned before are not so high when it reflects inventory days while we still see very high – record-high point-of-sale data."

208. Later in the Q2 2023 Call, in response to a question from analyst Brian Lee of Goldman Sachs about the "timing of inventory balance," Faier stated that, "[i]n Europe today, what we see is that the inventory levels, on one hand, are relatively high. But when you look at the days outstanding, which is a result of the sell-through from the channel, they are not high at all. They're actually at the normal level."

209. This news rocked the Company's share price, which the following day fell *$43.96 per share, or 18.3%*, to close at $195.51 per share, on extraordinarily heavy trading volume. Over the prior four months, trading volume in SolarEdge common stock was 1.09 million shares per day. On August second, 8.51 million SolarEdge shares traded, an increase of *681%*.

210. Analysts, however, appeared persuaded by Defendants' assurances that the high inventory levels in Europe would not have an extensive and substantial effect on the SolarEdge. For example, on August 2, 2023, analyst firm Oppenheimer & Co.("Oppenheimer") published a report that stated that "Management sees European inventory reduction as mainly a 3Q event, with three-phase inverter supply gating sell-through of battery inventory." Similarly, on the same day, Guggenheim analysts Joseph Osha and Hilary Cauley observed that while SolarEdge's outlook for

70

Q3 2023 was negative, "In Europe, problems are more transitory in SEDG's view and ours, although we note that competitive pressure from Chinese vendors is clearly increasing."

211. On October 19, 2023, the truth underlying Defendants' misrepresentations, however, fully emerged, and the material undisclosed risk that the Company's revenues would precipitously decline when customers were forced to cancel, push out, or reduce their orders of SolarEdge's products because of channel inventory levels as a result the Company's practice of forcing customers to take delivery of products so that the Company could reach its revenue targets, fully materialized. That day, after the market closed, SolarEdge issued a press release announcing its preliminary financial results for Q3 2023. In the press release, the Company disclosed that "[d]uring the second part of the third quarter of 2023, we experienced substantial unexpected cancellations and pushouts of existing backlog from our European distributors" and "[a]s a result, third quarter revenue, gross margin and operating income will be below the low end of the prior guidance range."  As a result, the Company also disclosed that it "anticipates significantly lower revenues in the fourth quarter of 2023 as the inventory destocking process continues." In greater part, the Company stated:

> "During the second part of the third quarter of 2023, *we experienced substantial unexpected cancellations and pushouts of existing backlog from our European distributors*," said Zvi Lando, Chief Executive Officer of SolarEdge. *"We attribute these cancellations and pushouts to higher than expected inventory in the channels* and slower than expected installation rates. In particular, installation rates for the third quarter were much slower at the end of the summer and in September where traditionally there is a rise in installation rates."

> *As a result, third quarter revenue, gross margin and operating income will be below the low end of the prior guidance range. Additionally, the Company anticipates significantly lower revenues in the fourth quarter of 2023 as the inventory destocking process continues.*

> \* \* \*

> *Third quarter revenue is now expected to be in the range of $720 million to $730 million, compared to the previous expectation of $880 million to $920 million.*

212.    This disclosure was astonishing, as *less than a month earlier*, Lowe had assured analysts and investors attending the KeyBanc Symposium that "*underlying demand for solar is very, very strong*." Lowe continued, "*like the data we see from our distributors is continuing to show significant growth in terms of sell-through into Europe*."

213.    Analysts were stunned. Schaeffer's Research, for example, stated that the press release "sent shockwaves through the solar sector."[5] Oppenheimer released a report stating that came right up to the line of accusing Defendants of having previously misrepresented the Company's financial condition, stating "[w]ith Thursday's pre-announcement, *[SolarEdge] signaled much deeper challenges than previously suggested by management commentary*."

214.    In addition, following the press release, many analysts downgraded SolarEdge. On October 23, 2023, for example, stock analyst CFRA Research ("CFRA") downgraded the Company to "Hold" from "Buy" while noting that Defendants' prior public statements had not fully disclosed SolarEdge's financial condition: "[i]t is clear that sluggish residential solar demand in the U.S. and Europe is going to take more time than expected to recover. *We previously thought that all the bad news was baked into solar stocks*, but the bad news got worse last week and we expect more negative sentiment in the coming weeks as more solar companies provide guidance."

215.    On this news, the Company's share price fell $31.08 per share, or 27.2%, to close at $82.90 per share on October 20, 2023, on heavy trading volume. In the two months prior to Defendants' October 19, 2023 disclosures, the average trading volume of SolarEdge common stock was 1.7 million shares per day. On October 19, 2023, 21.3 million shares of the Company's common stock traded, an increase of *1,131%*.

---

[5] Patrick Martin, The Culprit Behind the Solar Sector Selloff, Oct. 20, 2023, https://www.schaeffersresearch.com/content/news/2023/10/20/the-culprit-behind-the-solar-sector-selloff

## VIII.   PLAINTIFF'S CLASS ACTION ALLEGATIONS

216.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired SolarEdge securities during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

217.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SolarEdge's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of SolarEdge shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by SolarEdge or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

218.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

219.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

220.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a.  whether the federal securities laws were violated by Defendants' acts as alleged herein;

    b.  whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of SolarEdge; and

    c.  to what extent the members of the Class have sustained damages and the proper measure of damages.

221.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

222.    The market for SolarEdge's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, SolarEdge's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of SolarEdge's securities and market information relating to SolarEdge, and have been damaged thereby.

223.    During the Class Period, the artificial inflation of SolarEdge's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about SolarEdge's business, prospects, and operations. These material misstatements

and/or omissions created an unrealistically positive assessment of SolarEdge and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

224. At all relevant times, the market for SolarEdge's securities was an efficient market for the following reasons, among others:

    a. SolarEdge shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

    b. As a regulated issuer, SolarEdge filed periodic public reports with the SEC and/or the NASDAQ;

    c. SolarEdge regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

    d. SolarEdge was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

225. As a result of the foregoing, the market for SolarEdge's securities promptly digested current information regarding SolarEdge from all publicly available sources and reflected such

information in SolarEdge's share price. Under these circumstances, all purchasers of SolarEdge's securities during the Class Period suffered similar injury through their purchase of SolarEdge's securities at artificially inflated prices and a presumption of reliance applies.

226. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## IX. UNDISCLOSED ADVERSE FACTS

227. The market for SolarEdge's securities was open, well-developed, and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, SolarEdge's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired SolarEdge's securities relying upon the integrity of the market price of the Company's securities and market information relating to SolarEdge, and have been damaged thereby.

228. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of SolarEdge's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or

misleading because they failed to disclose material adverse information and/or misrepresented the truth about SolarEdge's business, operations, and prospects as alleged herein.

229. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about SolarEdge's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## X.    LOSS CAUSATION

230. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

231. During the Class Period, Plaintiff and the Class purchased SolarEdge's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## XI.    ADDITIONAL SCIENTER ALLEGATIONS

232.    As set forth above, Defendants each had scienter as to the false and misleading nature of their statements because, among other things, they each knew or, at a minimum, recklessly disregarded the facts described above for the following reasons.

a.  Lando had direct knowledge of pushing products on distributors who did not need them according to CW13, who stated that "You want to know who knew the situation with regard [to] stock? The whole board knew. The CEO [Lando] had the great idea to try sell the stock as aggressively as possible."

b.  CW12 stated that instructions to push products on customers had been passed down to him from Faier, as well as individuals who reported directly to Lando.

c.  CW15 stated that SolarEdge's executives, *i.e.*, including Lando and Faier, knew of the use of discounts to push unneeded product on distributors because those executives approved the individual discounts.

d.  CW7 personally attended "directors' meetings" where efforts to get customers to take products at the end of financial quarters were discussed. These discussions were communicated up to Lando;

e.  Lando and other senior leaders received daily inventory reports from SolarEdge's Priority system that included channel inventory levels;

f.  All SolarEdge channel distributors were contractually obligated to provide SolarEdge with regular reports with data on current inventory and point of sale, *i.e.*, demand, which Lando and Faier represented to investors that they regularly reviewed;

g.  Defendants repeatedly gave false or misleading responses to direct questions from analysts;

h.  Lando and Faier were so familiar with inventory levels that they could direct SolarEdge employees to specific distributors to obtain certain products;

i.  Lando was an unusually detail-oriented CEO, who, prior to becoming CEO, ran SolarEdge's sales division for almost 10 years and was selected to be SolarEdge's CEO specifically because he was "thought to be the person that understood" the Company the best;

j.  Europe General Manager Karlstetter had weekly meetings about SolarEdge's European business with Lando and Faier. Karlstetter also provided inventory and channel inventory as well as forecasting updates to Defendants Lando and Faier during QBRs;

78

k. At multiple QBRs in the first half of 2023, CW4 directly informed Lando and Faier, as well as Mathew, Cohen, Ohana, and Huber, that demand for SolarEdge products was falling and that "the market was a lot worse than they thought."

l. Defendants' disclosure of $125 to $250 million in losses less than a month after assuring investors and analysts at the KeyBanc symposium that demand was strong supports an inference of scienter.

233. In addition to the above allegations, which on their own create a strong inference of scienter, additional factors support a strong inference of Defendants' scienter. Lando and Faier each knew of the false and misleading nature of the statements discussed above, or at a minimum were reckless for not knowing these matters.

234. Lando was SolarEdge's CEO throughout the Class Period, and the Company identified him as an "Executive Officer" during the Class Period. As SolarEdge's CEO, Lando was privy to all material information concerning the Company's inventory, its channel inventory, and the demand for its products.

235. Faier was SolarEdge's CFO throughout the Class Period, and the Company identified him as an "Executive Officer" during the Class Period. As SolarEdge's CFO, Faier was privy to all material information concerning the Company's inventory, its channel inventory, and the demand for its products.

236. The fraud alleged herein relates to the core business and operations of SolarEdge so knowledge of the fraud may be imputed to Defendants. Europe was by far SolarEdge's largest sales region by revenues before and during the Class Period, with 54.3% of the Company's revenues in 2022 and 64% of its revenues in 2023 coming from Europe. In addition, Danziger's appearance at the ROTH Conference on March 13, 2023, began with an analyst characterizing the Company's Europe business as "a source of strength" and Danziger responding, "it's definitely the case that this will probably be the fastest growing geographies for us." Accordingly, it is

79

appropriate to presume that Defendants were apprised of, had access to, or had actual knowledge of all material information related to SolarEdge's Europe business during the Class Period, including the material information that was improperly withheld and/or misrepresented to investors.

237. Further, by virtue of their receipt of information reflecting the true facts regarding SolarEdge's operations and its marketplace, as well as their control over and/or receipt of the Company's materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning SolarEdge, Defendants were active and culpable participants in the fraudulent scheme alleged herein. Defendants knew of and/or recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public. The fraud as described herein could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including Defendants.

## XII. NO SAFE HARBOR

238. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker

had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of SolarEdge who knew that the statement was false when made.

## XIII.   COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

239.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

240.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase SolarEdge's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

241.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for SolarEdge's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

242.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

81

continuous course of conduct to conceal adverse material information about SolarEdge's financial well-being and prospects, as specified herein.

243. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of SolarEdge's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about SolarEdge and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

244. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

245. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing SolarEdge's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

246. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of SolarEdge's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired SolarEdge's securities during the Class Period at artificially high prices and were damaged thereby.

247. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that

SolarEdge was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their SolarEdge securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

248. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

249. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## XIV.  COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

250. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

251. The Individual Defendants acted as controlling persons of SolarEdge within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these

84

statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

252. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

253. As set forth above, Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XV.    **PRAYER FOR RELIEF**

254. **WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

## XVI.    **DEMAND FOR TRIAL BY JURY**

255. Plaintiff hereby demands a trial by jury.

Dated:  January 3, 2025

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Brian Calandra*
Brian Calandra
Jeremy A. Lieberman
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
bcalandra@pomlaw.com
jalieberman@pomlaw.com


*Attorneys for Lead Plaintiffs and the Class*

## CERTIFICATION OF SERVICE

I, Brian Calandra, hereby certify that I filed true and correct copy of the foregoing

Amended Class Action Complaint with the Clerk of Court using the CM/ECF system, which will

send notification of such filing to all counsel of record.

Dated: January 3, 2025

By: <u>*Brian Calandra*</u>
Brian Calandra