# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE SOLAREDGE TECHNOLOGIES, INC. SECURITIES LITIGATION | No. 1:23-cv-09748-GHW<br><br>**CLASS ACTION** |
| THIS DOCUMENT RELATES TO:<br><br>*ALL ACTIONS* |  |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................ 1

II.     STATEMENT OF FACTS ......................................................................................... 2

        A.      SolarEdge Engages in Channel Stuffing in Response to Declining Demand. ........ 2

        B.      Defendants Misrepresented SolarEdge's Performance, Demand, and
                Inventory. .................................................................................................................. 4

        C.      The Truth Emerges. ................................................................................................... 4

        D.      The Court Denies in Part Defendants' Motion to Dismiss the CAC. ...................... 5

        E.      The SAC's New Allegations. .................................................................................... 5

III.    ARGUMENT ............................................................................................................... 8

        A.      LEGAL STANDARD ................................................................................................ 8

        B.      THE SAC ALLEGES FALSE AND MISLEADING STATEMENTS .................. 9

                1.      Defendants Misled Investors About Declining Demand in Europe. ........... 9

                2.      Defendants Misled Investors About Inventory Growth. ........................... 12

                3.      Defendants Misled Investors When Touting SolarEdge's Revenues. ...... 14

                4.      Defendants Misrepresented SolarEdge's Forecasts. ................................. 15

                5.      Defendants' Misstatements Are Not Protected by a "Safe Harbor." ........ 16

        C.      THE SAC ALLEGES A STRONG INFERENCE OF SCIENTER ..................... 18

                1.      Defendants Knew or Recklessly Disregarded Declining Demand in
                        Europe. ...................................................................................................... 18

                2.      Defendants Knew or Recklessly Disregarded Channel Stuffing. ............. 21

                3.      Defendants Misrepresented Sell-through Forecasts with Scienter. .......... 23

                4.      The SAC Alleges Lowe and Danziger's Scienter. .................................... 24

                5.      Core Operations Strengthens the Inference of Defendants' Scienter. ...... 24

                6.      The SAC Alleges SolarEdge's Corporate Scienter. .................................. 25

        D.      THE SAC PLEADS CONTROL PERSON LIABILITY ..................................... 25

IV.     CONCLUSION ........................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akerman v. Arotech Corp.*,
608 F. Supp. 2d 372 (E.D.N.Y. 2009) .......................................................................18

*City of Providence v. Aeropostale, Inc.*,
2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ........................................................16, 17

*Cornell v. Credit Suisse Group*,
689 F.Supp.2d 629 (S.D.N.Y. 2010)..........................................................................22

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023), *cert. granted sub nom. NVIDIA Corp. v. Ohman J*, 144 S. Ct. 2655 (2024), *and cert. dismissed as improvidently granted*, 604 U.S. 20 (2024)...............................................................................................................24

*Emps' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015).................................................................................18, 21

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010).......................................................................17

*Galestan v. OneMain Holdings, Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018).......................................................................17

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) .....................................................................................12

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
422 F. Supp. 3d 821 (S.D.N.Y. 2019)....................................................................20, 24

*Hubiack v. Li-Cycle Holdings Corp.*,
2024 WL 2943959 (S.D.N.Y. June 10, 2024) ...........................................................11

*In re Alstom SA*,
406 F.Supp.2d 433 (S.D.N.Y. 2005).........................................................................22

*In re American Apparel, Inc. S'holder Litig.*,
2013 WL 174119 (C.D. Cal. Jan. 16, 2013) ..........................................................19, 23

*In re AppHarvest Sec. Litig.*,
684 F. Supp. 3d 201 (S.D.N.Y. 2023)..............................................................14, 15, 20

*In re Cadence Design Sys., Inc. Sec. Litig.*,
692 F. Supp. 2d 1181 (N.D. Cal. 2010) .....................................................................21

*In re Dentsply Sirona, Inc. Sec. Litig.*,
  665 F. Supp. 3d 255 (E.D.N.Y. 2023) ...............................................................10, 13, 20

*In re DNTW Chartered Accountants Sec. Litig.*,
  172 F.Supp.3d 675 (S.D.N.Y. 2016)...............................................................................9

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
  469 F. Supp. 2d 88 (S.D.N.Y. 2006)..............................................................................17

*In re Gen. Elec. Co. Sec. Litig.*,
  857 F. Supp. 2d 367 (S.D.N.Y. 2012)......................................................................22, 25

*In re Initial Pub. Offering Sec. Litig.*,
  544 F. Supp. 2d 277 (S.D.N.Y. 2008)..............................................................................9

*In re ITT Educ. Servs., Inc. Sec. Litig.*,
  34 F. Supp. 3d 298 (S.D.N.Y. 2014)..............................................................................25

*In re KeySpan Corp.*,
  2003 WL 21981806 (E.D.N.Y. July 30, 2003)..........................................................14, 15, 21

*In re Mylan N.V. Sec. Litig.*,
  2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ................................................................22

*In re Pareteum Sec. Litig.*,
  2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021) ................................................................19

*In re Philip Morris Int'l Inc. Sec. Litig.*,
  89 F.4th 408 (2d Cir. 2023) ..............................................................................................8

*In re Salix Pharms., Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)................................................................17

*In re Sierra Wireless, Inc. Sec. Litig.*,
  482 F. Supp. 2d 365 (S.D.N.Y. 2007)............................................................................11

*In re SolarEdge Techs., Inc. Sec. Litig.*,
  2024 WL 4979296 (S.D.N.Y. Dec. 4, 2024) ................................................... *passim*

*In re Synchrony Fin. Sec. Litig.*,
  No. 3:18-CV-1818 (VAB), 2022 WL 427499 (D. Conn. Feb. 11, 2022)...............................24

*In re Urb. Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015) .............................................................................11

*Inst. Inv. Grp. v. Avaya*,
  564 F. 3d 242 (3d Cir. 2009)......................................................................................19, 22

*Jackson v. Abernathy*,
   960 F.3d 94 (2d Cir. 2020)..................................................................................................25

*Karimi v. Deutsche Bank Aktiengesellschaft*,
   607 F. Supp. 3d 381 (S.D.N.Y. 2022)..................................................................................23

*Lako v. Loandepot, Inc.*,
   2023 WL 444151 (C.D. Cal. Jan. 24, 2023) ........................................................................12

*Lematta v. Casper Sleep, Inc.*,
   2022 WL 4637795 (E.D.N.Y. Sept. 30, 2022) ....................................................................18

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015)...................................................................................................8

*Manavazian v. Atec Grp., Inc.*,
   160 F. Supp. 2d 468 (E.D.N.Y. 2001) ...........................................................................14, 15

*Moshell v. Sasol Ltd.*,
   481 F.Supp.3d 280 (S.D.N.Y. 2020)....................................................................................22

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)...........................................................................................16, 18

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)..............................................................................................................13

*Ong ex rel. Ong IRA v. Sears, Roebuck & Co.*,
   388 F. Supp. 2d 871 (N.D. Ill. 2004) ...................................................................................13

*Pirnik v. Fiat Chrysler Autos., N.V.*,
   2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ........................................................................22

*Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
   2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019) ..................................................................19, 20

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*,
   89 F. Supp. 3d 602 (S.D.N.Y. 2015)................................................................................20, 22

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ...............................................................................................23

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
   732 F. Supp. 3d 300 (S.D.N.Y. 2024)...................................................................................21

*SEC v. Botvinnik*,
   2019 WL 4738900 (S.D.N.Y. Sept. 29, 2019).....................................................................16

*Sharma v. Rent the Runway, Inc.*,
    2024 WL 4287229 (E.D.N.Y. Sept. 25, 2024) ........................................................................11

*Simon v. Abiomed, Inc.*,
    37 F. Supp. 3d 499 (D. Mass. 2014) ....................................................................................16

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)..............................................................................................................18

**Statutes**

15 U.S.C. 78u-4 ...........................................................................................................................8

Private Securities Litigation Reform Act of 1995 ..........................................................................8

**Rules**

Fed. R. Civ. P. 9............................................................................................................................8

Plaintiffs respectfully submit this memorandum of law in opposition to Defendants'[1] Motion to Dismiss (ECF No. 77, "Mot.") the Second Amended Complaint (ECF No. 72, "SAC").[2]

## I.    INTRODUCTION

When it evaluated Plaintiffs' Consolidated Amended Complaint ("CAC"), this Court found that the CAC sufficiently alleged numerous material misstatements by Defendants to investors, including (i) attributing SolarEdge's revenues to increases in energy prices and an expanded product portfolio; (ii) attributing increased finished goods inventories to, among other things, streamlined manufacturing; and (iii) characterizing customer "channel" inventories as "low," when in reality SolarEdge's revenues and swollen finished goods inventories stemmed from channel stuffing, which resulted overstocked channel inventories. *See In re SolarEdge Techs., Inc. Sec. Litig.*, 2024 WL 4979296, at *7-10 (S.D.N.Y. Dec. 4, 2024) (the "CAC Opinion"). The Court then held that the CAC alleged Defendants' scienter for statements concerning "low" channel inventories because they knowingly or recklessly disregarded contradictory facts. *Id.* at *18.

After sustaining the channel inventory statements, however, the Court held that Plaintiffs had failed to allege any misleading statements about declining demand in Europe or unsupported forecasts. *Id.* at *11-12. In addition, the Court held that the CAC failed to allege Defendants' scienter for misstatements concerning revenues or rising finished goods inventories. *Id.* at *14-15.

---

[1] "Defendants" are collectively SolarEdge Technologies, Inc. ("SolarEdge" or the "Company"), and Zvi Lando ("Lando"), Ronen Faier ("Faier"), Lior Danziger ("Danzinger"), and J.B. Lowe ("Lowe"). Lando, Faier, Danziger, and Lowe collectively are the "Individual Defendants."

[2] References to "¶_" are to paragraphs of the SAC, unless otherwise indicated. Capitalized terms not defined herein have the meanings assigned to them in the SAC. *See* ECF No. 72 at ii-v. References to "Motion" or "Mot." are to Defendants' Memorandum of Law in Support of their Motion to Dismiss Plaintiffs' SAC. For ease of reading, all emphasis is added, and internal quotations or citations omitted unless otherwise indicated. References to Belelieu I Decl. are to the Declaration of Christopher Belelieu dated July 15, 2024. ECF No. 67. References to "Belelieu II Decl." are to the Declaration of Christopher Belelieu dated February 10, 2025. ECF No. 78.

The SAC cures these deficiencies. Six new confidential witnesses ("CWs")[3] establish that Defendants Lando and Faier at a minimum knew of declining demand in Europe as early as June 2022, six months prior to the Class Period, and at a minimum recklessly disregarded channel stuffing. CW12, CW14 and CW15, for example, describe how demand in Europe began declining, and inventories began rising, in mid-2022, and CW10 and CW15 state that this demand continued declining in 2023. Further, CW11 and CW13 attest to Faier and Lando, respectively, encouraging channel stuffing, and CW15 describes how C-suite executives, *i.e.*, Defendants, approved the discounts and payment terms that facilitated channel stuffing. These and other new allegations in the SAC, read together with previously credited allegations, sufficiently allege securities fraud.

## II.    STATEMENT OF FACTS

### A.  SolarEdge Engages in Channel Stuffing in Response to Declining Demand.

SolarEdge develops, manufactures, and sells inverter solutions for solar energy systems to distributors and other customers who sell the products through to end users. ¶¶49-53. SolarEdge recognizes revenue when its customers receive products, not when the products are sold through. ¶54. The Company discloses its inventory (¶55) but does not disclose unsold customer inventory ("channel inventory"). *Id.* Europe is by far SolarEdge's most important region. *See* ¶¶57-61. Demand in Europe for SolarEdge products was declining and channel inventories increasing at the start of the Class Period. ¶¶62-63, 100. In fact, CW4 personally alerted Lando, Faier, Amit Cohen ("Cohen"), SolarEdge Vice President for North America Sales, Peter Mathews ("Mathews"), SolarEdge North America General Manager, Daniel Huber ("Huber"), SolarEdge's Chief Revenue Officer, and Naama Ohana ("Ohana"), the Company's Vice President and General Manager – Commercial Business Unit the first half of 2023 to declining demand. ¶100.

---

[3] CWs are referred to in the masculine to preserve their anonymity.

Defendants, however, denied to analysts that demand in Europe was declining (¶¶112, 114) and engaged in "channel stuffing," or forcing customers to take shipments of unneeded product, so that SolarEdge could meet revenue targets. According to CW2, Defendants intentionally shipped product early so the Company could recognize revenue and offered extended "payment terms," or more time to pay, if customers complained. ¶64. Similarly, CW4 said that at the end of quarters, his supervisors would pressure him to get customers to agree to "free carrier shipping terms," which allowed the Company to recognize revenue before shipping. ¶66. CW5 corroborated these accounts and said SolarEdge began asking customers for free carrier shipping terms in Q1 or Q2 2023, even as those customers were trying to cancel orders. ¶¶71-72.

CW7 confirmed that SolarEdge "shove[d] equipment down" the "throats" of U.S. distributors at the end of quarters to hit quarter-end numbers and described customer complaints of high channel inventories in the first half of 2023 (¶¶75-76), while CW6 recalled European distributor Krannich Solar and other customers being "force[d] to take product at the end of the quarters" (¶73). This channel stuffing backfired, however, when SolarEdge's finished goods inventory exploded by *261%* skyrocketed after channel inventories were saturated. ¶¶56, 64, 145.

Defendants knew or recklessly disregarded, declining demand, channel stuffing, and saturated channel inventories. CW7 described attending weekly meetings with Cohen, Mathews, and other directors where forcing unneeded product on distributors at the end of quarters was discussed, and which CW7 believed was communicated up to Lando, given that he was an especially detail-oriented CEO. ¶¶76, 84. CW8 discussed pushing inventory on customers to "hit numbers" with Mathews, Cohen, and other executives, direction he was sure was "coming from Lando or the top of the Company" given Lando's background as head of sales. ¶78. Lando and Faier also had direct knowledge of saturated channel inventories because Europe's general

3

manager met with them weekly to discuss inventory (¶97) and from daily reports on internal and channel inventory that showed the location of every piece of unsold equipment (*see* ¶89). In addition, according to CW2 and CW4, Lando and Faier knew exact inventory levels because customers were contractually required to report channel inventory (¶¶89-94). Lando and Faier reviewed the reports because they directed CW4 to specific distributors worldwide to obtain products. ¶92. Indeed, not only did Lando and Faier assure investors that they reviewed the reports (¶¶102-03), but Lowe also affirmatively represented that he reviewed this data as well (¶182).

### B. Defendants Misrepresented SolarEdge's Performance, Demand, and Inventory.

Rather than disclose the truth to investors, however, Defendants continued concealing declining demand in Europe, channel stuffing, and the reasons underlying soaring internal and channel inventory levels, even in response to skeptical analysts. *E.g.*, ¶¶166-75. Towards the end of the Class Period, on August 1, 2023, Defendants acknowledged rising channel inventories in Europe, but continued to mislead investors through September 21, 2023, less than a month before the end of the Class Period. ¶¶157-64, 197.

### C. The Truth Emerges.

Lando advised on August 1, 2023, that he expected SolarEdge's revenues to decline from $947.4 million in Q2 2023 to under $890 million in Q3, but carefully (and misleadingly) portrayed these developments as blips. ¶¶197-209. On October 19, however, Defendants disclosed "unexpected cancellations" and "pushouts" from European distributors and reduced Q3 guidance by another 17%. ¶¶210-15. Then, on November 1, 2023, Defendants confirmed that SolarEdge revenues in Q3 fell *a total of 23.4%*, *14.7%-18.5% below* Lando's August 1, 2023 revision. *See* ¶128. Lando further disclosed that demand in Europe "began to slow in the third quarter," when Defendants assured investors that demand was strong, and Faier claimed that Defendants had only

become aware of a $222.1 million revenue decline at the very end of Q3. *See* ¶¶129-32. This action commenced, and Defendants moved to dismiss the CAC. *See* ECF No. 65.

### D. The Court Denies in Part Defendants' Motion to Dismiss the CAC.

The CAC Opinion held that the CAC sufficiently alleged channel stuffing, and thus Defendants misled investors by attributing (i) revenues to rising energy prices and an expanded product portfolio and (ii) inventory increases to factors other than channel stuffing, and that statements describing inventory levels as "low" also were misleading, but that no other statements were sufficiently alleged to be misleading. *See SolarEdge*, 2024 WL 4979296, at *4 n.9, 7-11, 13. The Court then held that the CAC alleged Defendants' scienter for statements describing inventory levels as "low," denied the motion to dismiss the CAC as to those statements and as to Plaintiffs' "control person" claims against Lando and Faier, and granted Plaintiffs leave to amend. *See id.* at *14-17. The Court further held that the CAC failed to allege Defendants' scienter as to misleading statements concerning revenues and inventory increases, and it dismissed those claims, as well as all claims against Lowe and Danziger,. *Id.* at 16-17. Plaintiffs then filed the SAC.

### E. The SAC's New Allegations.

The SAC expands upon the CAC by further detailing declining demand in Europe, unsupported forecasts, and Defendants' knowledge or reckless disregard of declining demand, channel stuffing, and unsupported forecasts. For example, CW15, a SolarEdge director of sales in northeast and Midwest U.S. and Canada (¶48), stated that he learned of declining demand in Europe directly from Mathews at a July 2022 national sales meeting in San Jose. ¶63. Mathews told CW15's sales team that "Europe is struggling, and we need to step up," and pushed the U.S. market to make up for a lack of sales in Europe. *Id.* According to CW15, Defendants knew about the demand drop-off because they "live[d] by" monthly reports from distributors of sales and inventory, and those reports indicated that a drop-off in sales was imminent. ¶93. CW15 further

stated that in August 2022 he became extremely worried by overstuffed channels, which he estimated would take four to six quarters to correct. ¶80. CW15 was working with the Company's strategy team in Israel, and asked the strategy team, which had a worldwide focus, "what are you going to do about the impending [sales] collapse." *Id.* CW15 said that Manny Lugos ("Lugos"), Senior Sales Director of the Distribution Channel in North America, shared CW15's concerns, informed SolarEdge leadership, and estimated it would take six to eight quarters to correct. ¶81. CW15 stated that European demand continued to decline until he left SolarEdge in May 2023. ¶63.

CW12, a SolarEdge sales manager in Hungary, corroborated CW15's account. CW12 said he "was in many meetings where the overstock issue was discussed" and that from mid- 2022 onward "the company placed huge pressure on employees asking them to do all they possibly could to improve sales." ¶74. CW12 said pressure came from multiple executives, including CRO Huber, who reported directly to Lando, and Ohana. ¶¶38, 74.

CW10, a SolarEdge sales manager in the northeast U.S., corroborated that the slowdown in European demand continued into 2023. CW10 stated that he heard from colleagues in mid-2023 that the Company was seeing a "slowdown" in its European business and an "overstock in distribution channels." ¶63. According to CW10, excess inventory "wasn't moving at the distribution level," because distributors "weren't buying it because of the slowdown." ¶63.

CW15 stated that the saturated channel inventories directly resulted from SolarEdge "stuffing the channels to make their stock price, to make their [quarterly] numbers." ¶80. This was corroborated by CW14, a SolarEdge sales rep in France, who stated that SolarEdge "really screwed up by not cutting production when everyone else did. When they got stuck with massive overstock, they then made things worse. In fact, they did the worst thing imaginable, they tried all they could to get the stuff into the market. They pushed real hard to market the stuff and they sold it into a

market [Europe] where the product was not ideal." ¶86. This aligned with CW12's account that from mid- 2022 onward CRO Huber (who reported to Lando), Ohana, and others "placed huge pressure on employees asking them to do all they possibly could to improve sales." ¶¶38, 74.

CW15 directly asked Daniel Kelman ("Kelman"), SolarEdge Strategy and Corporate Development, and Amir Gat ("Gat"), VP of Strategy and Special Projects why the Company kept channel stuffing. Kelman and Gat responded, "Yeah, we have numbers to hit." ¶80. CW15 added that Defendants also stuffed channels by requiring customers to purchase full shipping containers. ¶82. For example, if a customer wanted commercial inverters, SolarEdge required that the customer buy a full container, shipped directly from China, which also included residential products that the customer was required to take. *Id.* CW15 also confirmed that SolarEdge would strong-arm customers into taking unneeded product by using extended payment terms. *Id.* CW15 stated that the Individual Defendants were aware of the channel stuffing because they knew about the use of discounts and payment terms given that discounts above $10,000 required approval of the C-suite, and the "discounts and deals weren't being made without executive approval." ¶87.

CW11, a SolarEdge sales manager in South Africa, stated that the entire Company, and thus Defendants, knew about channel stuffing and overstocked warehouses as early as June 2022. According to CW11, "[y]ou ask who knew, well, the whole company knew. The whole company was told there was a crisis. We were told to push stock like hell from about June 2022." ¶96. Despite the crisis, CW11 said that SolarEdge never slowed orders of materials from China and that orders to sell stock "desperately" came from Faier. *Id.* CW13 stated that the practice of pushing unneeded product on distributors came directly from Lando, saying, "The whole board knew. The CEO [Lando] had the great idea to try sell the stock as aggressively as possible—which resulted in most of the stuff being returned….It means massive losses." ¶85.

7

Finally, CW10 described how, in late-2023, he was forced by his supervisor, at the instruction of SolarEdge management, specifically Mathews and Cohen, to create a forecast doubling his sales for 2024 even though CW10 did not have customers to support those sales. ¶¶68-69. CW10's forecast was to make its way into the Company's public financial guidance. ¶70. CW10 further stated that he participated in annual and quarterly calls led by Mathews and sometimes attended by Lando and Faier. ¶95. These calls occurred when SolarEdge conducted its "financial review with Wall Street," *i.e.*, developed the Company's public disclosures, and reviewed the Company's performance. *Id.*

As set forth below, the SAC's new allegations, read together with facts initially alleged in the CAC, cure the deficiencies identified in the CAC Opinion and the Motion should be denied.

## III.    ARGUMENT

### A.  LEGAL STANDARD

To state a Section 10(b) securities fraud claim, the SAC must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 417 (2d Cir. 2023). Although Rule 9(b) requires that fraud be alleged with "particularity," the "alleged fraud need only be ***plausible***," not "more likely than" alternatives. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 174 (2d Cir. 2015) (emphasis in original). Further, under the Private Securities Litigation Reform Act ("PSLRA"), the SAC must specify each misleading statement, the reasons why the statement is misleading, and, if an allegation "is made on information and belief," "state with particularity all facts on which the belief is formed." 15 U.S.C. 78u-4(b)(1). Finally, the Court must the SAC's

8

allegations collectively, not just its newly added allegations, in evaluating the SAC. *See In re DNTW Chartered Accountants Sec. Litig.*, 172 F.Supp.3d 675, 686 (S.D.N.Y. 2016).

The Motion asserts that the SAC does not cure deficiencies in the CAC's falsity and scienter allegations identified in the CAC Opinion. *See SolarEdge*, 2024 WL 4979296, at \*1. Since the SAC cures these deficiencies, the Motion should be denied.[4]

## B. THE SAC ALLEGES FALSE AND MISLEADING STATEMENTS

### 1. Defendants Misled Investors About Declining Demand in Europe.

The SAC details how demand in Europe declined from mid-2022 through the end of the Class Period. For example, CW15 stated that he learned of declining demand in Europe directly from Mathews at a July 2022 national sales meeting in San Jose, where Mathews said, "Europe is struggling, and we need to step up—we are a global company." ¶63. A month later, in August 2022, CW15 became extremely worried by overstuffed channels, which he estimated would take four to six quarters to clear and sounded alarms to SolarEdge's Company's strategy team in Israel. ¶80. One of CW15's colleagues estimated that the problem would take six to eight quarters to correct and raised the same concerns to SolarEdge leadership. ¶81. According to CW15, who knew of European demand from inventory reports and Mathews' efforts to push North America to make up for Europe's declines, demand continued falling through his departure in May 2023. ¶¶63, 93.

CW12 corroborated CW15's account and said he (CW12) "was in many meetings where the overstock issue was discussed" and that from mid- 2022 onward "the company placed huge

---

[4] Although this Court sustained Plaintiffs' claims concerning "low" channel inventory levels, *SolarEdge*, 2024 WL 4979296, at \*17, the Motion asserts these claims fail. *See* Mot. at 1 n.2, 14-15, 23-24. The Motion also asserts that misstatements regarding revenue (¶139) and inventory increases (¶¶146, 148, 150-51) are not misleading, even though the CAC Opinion held otherwise. *See* Mot. at 12-13 & n.13, n.15. These rulings are the "law of the case," and Plaintiffs thus do not address Defendants' arguments beyond asserting that the Court correctly rejected them. *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 284 (S.D.N.Y. 2008)

pressure on employees asking them to do all they possibly could to improve sales." ¶74. CW12 said pressure came from multiple executives, including Ohana and CRO Huber, who, like Mathews, reported directly to Lando, and which is consistent with CW4's description of Huber and Ohana's knowledge of demand declines. ¶¶38, 74, ¶100. Similarly, CW10 heard from colleagues in mid-2023 that the Company was seeing a "slowdown" in Europe and an "overstock" in channels caused by distributors who "weren't buying it because of the slowdown" which corroborates CW2's account of hearing (with Cohen, Mathews, and others) "concerns and discussions that Europe wasn't going well" in early 2023, and CW4's allegation that he told Lando, Faier, Mathews, Cohen, Ohana and Huber in the first half of 2023 that inventories were rising "because I told you [customers] don't need it." ¶¶63, 100. This also dovetails with analyst's concerns about declining demand at this time. ¶¶112, 114.

These allegations of slowing demand are also bolstered by the SAC's detailed account of channel stuffing from mid-2022 onward, including allegations the Court held sufficiently alleged channel stuffing, ¶¶64, 66, 71-73, 75-78, 82; *SolarEdge*, 2024 WL 4979296, at *8-9, and new allegations from CW10, CW11, CW12, CW13, CW14, and CW15, who describe pressure from management, including Lando and Faier, pushback from customers, shipping of unneeded goods, and extended payment terms (*see* ¶¶74, 80, 82, 85-87, 96). These allegations reflect declining demand because not only do CW14 and CW15 link channel stuffing to demand declines, but it strains credulity that Defendants stuffed channels when there was no decline. *See* ¶¶63, 86. Further, CW2, CW10, CW11, CW12, CW14, and CW15 each describe massive inventory increases (¶¶63-64, 80-81, 86, 96), which are corroborated by the *261% increase* in the Company's finished goods inventory (¶¶56, 145-46), and which support an inference of insufficient demand. *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 283 (E.D.N.Y. 2023).

Defendants touts of strong demand or denials of declines cannot be squared with these allegations. For example, on the 2022 Earnings Call, Lando boasted that "*we continue to see very strong demand from Europe for all products and relatively low inventory levels in the channel*" and "*in many cases, we see that the demand is far exceeding our ability to manufacture and deliver*" (¶167). These and other similar statements (¶¶168-82), were false because demand had been declining since June 2022. ¶¶6, 63, 74, 85-86, 96; *see In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 648 (E.D. Pa. 2015). Similarly, Lando's response to an analyst's query on the Q1 2023 Call that, "we don't see right now a change in the pattern of demand in the market in Europe," (¶172), as well as other statements that demand in Europe was growing (¶¶168-170, 173-74, 181), were misleading because distributors "weren't buying…because of the slowdown" in Europe (¶63), inventories were skyrocketing (¶56), and the Company was in a "crisis" (¶96).

While the Motion asserts that the SAC adds "no new allegations" pleading weak demand in Europe (*see* Mot. 8-9), this is contradicted by CW15's specific allegations of the time, place, and source from which he learned of declines in European demand in mid-2022 and his personal knowledge of those declines through May 2023, which are corroborated by CWs 11, 12, and 13. ¶¶4, 63, 74, 96.[5] Further, CW10 and CW15's allegations are not "vague and conclusory"[6]: they relate information from internal meetings. ¶¶63, 69-70, 80-81, 95; *see Sharma v. Rent the Runway, Inc.*, 2024 WL 4287229, at *11, *15 (E.D.N.Y. Sept. 25, 2024) (crediting CW who "related what they heard top brass…discuss at internal…meetings they attended in person or virtually").[7]

---

[5] Unlike *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007), the SAC alleges CW2 and CW15's responsibilities and sources (¶¶36, 44, 48, 63).

[6] The Motion does not assert that CW12, CW13, and CW14's allegations are vague or conclusory.

[7] Contrary to the Motion, Plaintiffs may rely on hearsay at the pleading stage. *Hubiack v. Li-Cycle Holdings Corp.*, 2024 WL 2943959, at *6 n.7 (S.D.N.Y. June 10, 2024) (crediting hearsay).

The Motion incorrectly asserts that this Court cannot credit any new CW. Mot. 8-9. While CW12 and CW13, for example, do not allege the specific demand decline applicable to each of their region, their allegations squarely corroborate CW15 because CW12 alleges that pressure to make up for declining demand Europe began in mid-2022, and CW13 alleges that Lando pushed channel stuffing. *See* ¶63, 74, 85; *see Lako v. Loandepot, Inc.*, 2023 WL 444151, at *6 (C.D. Cal. Jan. 24, 2023) (crediting allegations "present[ing] overlapping and corroborative information"). Further, while the Motion attacks each CW individually, their allegations must be considered holistically and should be credited because they are corroborative and confirmatory. *See, e.g.*, *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.,* 63 F.4th 747, 771 (9th Cir. 2023) ("[t]hough the CWs, as individuals, might not have known about corporate-level trends, their statements combine to tell a plausible story."). Indeed, this Court previously credited such "mutually reinforcing and sufficiently particularized" allegations. *See SolarEdge*, 2024 WL 4979296, at *8.

### 2.  Defendants Misled Investors About Inventory Growth.

Although the Court held Defendants misled investors by (i) characterizing inventory as "low" (¶¶156-57 (CAC ¶¶138-39)) or (ii) attributing rising inventory to factors other than channel stuffing (¶¶150, 152, 163-64 (CAC ¶¶132, 134, 145-45)), it dismissed other inventory statements (¶¶146, 148, 159, 161 (CAC ¶¶128, 130, 141, 143)). *See SolarEdge*, 2024 WL 4979296, at *4, *10-11 & n.8, 11, 14-15. As newly alleged in the SAC, however, these statements are actionable.

*First*, on the Q1 2023 Call, Faier attributed a 64.4% increase in finished goods to "***streamlined manufacturing***." ¶146 (CAC ¶128). This statement is misleading for the same reason paragraph 150 (CAC ¶132)—which the Court sustained—is misleading: it attributes increases to factors other than channel stuffing. *See SolarEdge*, 2024 WL 4979296, at *4.

*Second*, Faier further asserted on the Q1 2023 Call that SolarEdge had returned to a "***more normal mode of operation***," and is "at a point where our manufacturing capacity is able to meet

12

demand and we can use normal shipping routes, ***build inventory***, and reduce lead times." ¶148 (CAC ¶130). This was misleading because the Company was neither operating "normally," nor "building inventory." Rather, inventory was piling up because customers had stopped taking products (¶63), "huge pressure" was being applied (¶74), employees feared an "impending collapse" (¶¶80-81), and Defendants would not reduce orders from China (¶¶63, 85, 96). *See Ong ex rel. Ong IRA v. Sears, Roebuck & Co.*, 388 F. Supp. 2d 871, 905 (N.D. Ill. 2004) (statement that credit portfolio "will look maybe a little bit more like the normal portfolio" misleadingly omitted "deterioration of the credit portfolio [and] unsound techniques that caused it.").

*Third*, analysts questioned channel inventory levels, but rather than disclose demand declines, channel stuffing, or saturated inventories (¶¶80-81), Faier assured investors, "***when you look at the days outstanding, which is a result of the sell-through….They're actually at the normal level***" (¶159), "we believe…inventory corrections, at least in Europe, ***are going to be a little bit quicker***, and "I think…***the correction within the distributors should be relatively quick given the fact that the inventories levels that Zvi mentioned before are not so high***" (¶161).[8] By claiming inventories could be cleared quickly based on "sell-through" and "days on hand," Defendants had a duty to disclose the truth, which they breached by omitting customers' refusal to take more products and inventories saturated by channel stuffing.[9] ¶¶63, 74, 80-82, 85-86.

---

[8] Although the Court treated these statements as allegedly being misleading for failing to disclose that forecasts were not based on market reports or internal data, *see SolarEdge*, 2024 WL 4979296, at *4 n.11, they are also allegedly misleading for misrepresenting channel inventory (¶¶159-62).

[9] These statements were in response to questions about specific issues, and thus are not puffery. *See, e.g.*, *Dentsply*, 665 F. Supp. 3d at 284-85. In addition, while the statements include words like "believe" or "think," they are nevertheless misleading because they omitted material facts going to their basis: customers' refusal to take products and channel stuffing. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192-93 (2015).

13

### 3.   Defendants Misled Investors When Touting SolarEdge's Revenues.

In the CAC Opinion, the Court held that Lando's statements on the Q1 2023 Call, that SolarEdge's solar revenues were "*a record $909 million….mostly driven by record revenues in Europe and Rest of World*" (¶141), and Q2 2023 Call, that the Company had achieved "*[r]evenues from [its] solar business…at a record $947 million….mostly driven by record revenues in Europe*" (¶143), were not misleading because they were not allegedly inaccurate and did not attribute revenue growth to any specific cause. *SolarEdge*, 2024 WL 4979296, at *9.

The SAC's new allegations demonstrate, however, that these statements are actionable because they positively characterized SolarEdge's business but omitted adverse trends. *See In re KeySpan Corp.*, 2003 WL 21981806, at *8, *14 (E.D.N.Y. July 30, 2003); *Manavazian v. Atec Grp., Inc.*, 160 F. Supp. 2d 468, 473, 480–81 (E.D.N.Y. 2001). In *KeySpan*, for example, statements "reporting *record* first-quarter consolidated earnings and highlighting the earnings of [a parent company] in particular," were materially misleading because they omitted that a "business segment[] had an exceptionally negative outlook." *See* 2003 WL 21981806, at *14. Likewise, in *Manavazian*, positive characterizations of a company's current and future business," including "a *record* year," were misleading because of a known "adverse business trend" *See* 160 F. Supp. 2d at 473, 480–81. Like *KeySpan* and *Manavazian*, Defendants touted "record revenues" that were the result of the performance of a specific business segment, *i.e.*, Europe (¶¶139, 141), and paired these touts with assurances that (i) surging inventories were not a concern (¶¶110, 116), and (ii) European demand was not declining. These statements were misleading because demand for SolarEdge products in Europe had been declining since June 2022 and Defendants knew that inventories were skyrocketing because of declining demand. ¶¶63, 74, 80-82, 85, 87, 93, 96.

Further, these facts distinguish the SAC from *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 270 (S.D.N.Y. 2023), upon which the Court relied in the CAC Opinion. The *AppHarvest*

14

defendants did not characterize a company as having a "record" performance, while here, as in *KeySpan* and *Manavazian*, Defendants emphasized "record" performance to convey SolarEdge's condition. *Compare id.* with ¶¶141, 143. Further, in *AppHarvest*, allegedly concealed information was disclosed only "a few months" prior to the defendants' disclosure. *See* 684 F. Supp. 3d at 271-72. Here, adverse trends arose a year before Lando's misrepresentations. *See* ¶¶63, 96, 141, 143.

### 4. Defendants Misrepresented SolarEdge's Forecasts.

The SAC further alleges that Defendants' statements that SolarEdge's (i) "2023 in Europe will be similar to the condition we were in, in 2022" because "[s]o far as we can see, the market is – the demand is good and the market is strong (¶186); and (ii) clogged channel inventories would be cleared "through the adoption or getting more inverters" (¶188) and "relatively quick[ly]" (¶¶190, 194; *see* ¶172)) communicated to investors that Defendants had analyzed the market and used credible sources to support their forecasts. *See* ¶¶185-95. The Court held that these statements were not actionable because the CAC relied on a single employee, CW4, who did not state when he created his forecasts or if they Defendants adopted them. *SolarEdge*, 2024 WL 4979296, at \*13.

The SAC cures these deficiencies by adding CW10's allegations that in late-2023 he was forced by his supervisor, at the instruction of SolarEdge Mathews and Cohen, to create a forecast that doubled expected sales even though he lacked customers to support the forecast, and that his forecast was to make its way into the Company's public statements. ¶¶69-70. These allegations align with CW4 in that both CW4 and CW10 created forecasts based on industry and internal data that were rejected by Cohen and Mathews (who reported to Lando) and which CW4 and CW10 ultimately revised even though they lacked support. ¶¶35, 67-70. These allegations are bolstered by CW15 and Lugos raising alarms of an impending sales collapse based on SolarEdge's internal sales reports that were reviewed by Defendants. ¶¶80-81, 93. Rather than provide forecasts reflecting this internal data, Defendants assured investors that "2023 in Europe will be similar to

15

the condition we were in, in 2022," channel inventories would be cleared quickly, and the underlying market in Europe is growing nicely. ¶¶186-195.

Defendants largely assert that this Court cannot credit CW10 because he alleges events that barely post-date the Class Period. But CW10's allegations match CW4's allegations which concern events during CW4's employment, which overlapped the Class Period (¶38), and are consistent with CW15 and Lugos's interpretation of sales data (¶¶80-81), and thus allege Defendants' use of unsupported forecasts occurred during the Class Period. *See Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000) (inventory information "six months after the Class Period…supports the inference that inventory during the Class Period was similar"); *Simon v. Abiomed, Inc.*, 37 F. Supp. 3d 499, 515 (D. Mass. 2014) (conduct outside class period supports inference of class period misconduct).

### 5. Defendants' Misstatements Are Not Protected by a "Safe Harbor."

In footnotes[10] the Motion asserts that statements in paragraphs 146, 152, 161, 168, 173-74, 186, 188, 190, and 194 are forward-looking and protected by the PSLRA's "safe harbor." *See* Mot. 9 n.9, 11 n.11, 14 n.15. These statements, however, are misleading for omitting current material facts and thus the safe harbor does not apply. *See* ¶¶147, 153, 162, 169, 183, 187, 189, 191 and 195; *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013). Moreover, the misleading portions of paragraphs 146 (inventory increases from "streamlined manufacturing"), 168 ("the market is strong"),186 ("demand is good"), 173 ("the situation is more dependent on our supply"), and 174 ("we're still looking at very healthy demand") are statements of ***present fact*** and not forward-looking. *See Aeropostale*, 2013 WL 1197755, at *13.

---

[10] Arguments which appear in footnotes are generally deemed to have been waived. *SEC v. Botvinnik*, 2019 WL 4738900, at *6 (S.D.N.Y. Sept. 29, 2019).

Further, the safe harbor is not applicable because these statements were not accompanied by meaningful cautionary language, and Defendants knew their falsity. *See Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 297 (S.D.N.Y. 2018). Meaningful cautionary language "must precisely address the substance of the specific statement or omission that is challenged." *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102 (S.D.N.Y. 2006). For statements in paragraphs 146, 148, 168, 173, and 186, Defendants cite boilerplate statements read aloud on earnings calls or in press releases, or cross-references to lists of risk factors that do not address the statement's subject matter. *See* Mot. App'x B; *Aeropostale*, 2013 WL 1197755, at *12 (boilerplate cautionary language not meaningful); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) (general references to "public statements or SEC filings" not meaningful). Defendants also directly contradicted these risk factors by repeatedly downplaying risks. ¶¶168, 173; *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 194 (S.D.N.Y. 2010) (misstatements "contradicted, and thus, nullified any risk disclosures").

Moreover, passing references to an "inventory adjustment period," "higher interest rates" "excess battery inventory" on the Q2 2023 Earnings Call (Mot. App'x B. at 3-4), and "short term upheavals in the distributor market" at the KeyBanc Symposium (Mot. App'x B. at 8), are do not warn that SolarEdge's channels inventories were saturated by channel stuffing in response to declining demand (¶¶152, 161) or forecasts were not based on market reports or internal data (¶¶190-95). Finally, the SAC alleges Defendants' knowledge of the falsity of their statements in paragraphs 146 and 148 regarding finished goods inventory levels (¶¶63, 74, 89-93, 96-97, 102-03), declining demand in Europe (¶¶63, 80-81, 85-87, 93, 97), saturated channel inventories (¶¶63, 74, 86-87, 96-97), and unsupported forecasts (¶¶67-70).

17

### C. THE SAC ALLEGES A STRONG INFERENCE OF SCIENTER

Scienter is adequately pled by alleging conscious misbehavior or recklessness, or motive and opportunity to defraud. *Lematta v. Casper Sleep, Inc.,* 2022 WL 4637795 at *14 (E.D.N.Y. Sept. 30, 2022). Courts "accept all factual allegations in the complaint as true," and consider "all of the facts alleged, taken collectively" rather than "any individual allegation, scrutinized in isolation," to determine if an inference of scienter is "cogent and at least as compelling" as the competing inference. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308, 309-10 (2007). A "tie goes to the plaintiff." *Akerman v. Arotech Corp.,* 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009). As set forth below, the SAC alleges Defendants' conscious misbehavior or recklessness.[11]

#### 1. Defendants Knew or Recklessly Disregarded Declining Demand in Europe.

The SAC alleges Defendants' scienter for misstatements omitting, downplaying, or denying declining demand for SolarEdge products in Europe by alleging their knowledge of and access to "information suggesting that their public statements were not accurate." *See Emps' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015); *Novak*, 216 F.3d at 311. CW10, for example, described Mathews, who reported directly to Lando, leading quarterly and annual calls attended by Lando discussing SolarEdge's business in Europe, and CW15 stated that Mathews informed CW15's sales team in July 2022 that "Europe is struggling," and ¶¶63, 84, 95. These allegations align with CW12's description of Huber, who also reported directly to Lando, and Ohana pressuring sales staff in Europe "to do all they possibly could to increase sales" in Europe. ¶74. These allegations are bolstered CW4's statements to Lando, Faier, Mathews, and Huber in early 2023 that demand for SolarEdge's products was falling, and that "the market was a

---

[11] Although the SAC does not allege motive (*see* Mot. at 15), the Supreme Court has held that "the absence of a motive allegation is not fatal." *Tellabs*, 551 U.S. at 325.

lot worse than they thought" (¶100), and CW8's description of weekly meeting to discuss Europe between Lando, Faier, and Europe General Manager Alfred Karlstetter (¶97). The Court thus can infer Lando and Faier's knowledge or reckless disregard of declining European demand from these allegations. *See In re American Apparel, Inc. S'holder Litig.*, 2013 WL 174119 at *21 (C.D. Cal. Jan. 16, 2013) (allegations that individuals who worked one or two levels below defendants knew truth "support[s] an inference that the information was communicated to" defendants).

Defendants' own public statements and regular discussion of demand in Europe with analysts strengthen the inference of scienter created by these allegations. *See* ¶¶102-03, 167-68, 170, 172-75, 181; *Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, 2019 WL 2360942, at *6 (S.D.N.Y. Mar. 4, 2019) (scienter pled where, inter alia, "the effects of competition were being closely monitored by the company's management"). Defendants' consistent denial of declining demand in Europe strengthens a scienter inference as well. *See* ¶¶168, 170, 172-75, 177, 181-82; *Inst. Inv. Grp. v. Avaya*, 564 F. 3d 242, 269–70 (3d Cir. 2009). Here, as in *Avaya*, Defendants did not "simply make statements inconsistent" with a slowdown in demand; here Lando and Faier "flatly denied" a slowdown in Europe "in statements evincing certitude." *Compare id.* (answering question on changes in pricing environment by saying "the pricing environment has been fairly stable") *with* ¶¶168 (answering "[a]re you seeing any signs of a slowdown" by stating "the demand is good, the market is strong, and we are ramping production to meet demand."). Likewise, the magnitude of Defendants' reduction in guidance—***a total of 23.4%, 14.7%-18.5% below*** Lando's August 1, 2023 revision (¶128), *i.e.*, a ***$222.1 million revenue decline*** in only a matter of days—strengthens an inference of their scienter for the decline in demand. *See, e.g., In re Pareteum Sec. Litig.,* 2021 WL 3540779, at *16 (S.D.N.Y. Aug. 11, 2021) (reduction of revenues by $9 million or 28% supports scienter).

19

Defendants object that the Court cannot infer their scienter from their access to and review of inventory and sell-through reports (*see* Mot. at 17), but these allegations further support a scienter inference. *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 617–18 (S.D.N.Y. 2015) (scienter pled where Defendant attended meetings, issues were discussed including sales practices misrepresented in statements). In fact, rather than relying on an assumption that information would be communicated up the chain, the SAC pleads that Lando and Faier *personally* participated in numerous meetings—weekly meetings with the Europe General Manager, QBRs for Europe, a global sales week, and annual and quarterly calls describing the big picture of business in Europe. ¶¶ 40, 95, 97-100. *See AppHarvest*, 684 F. Supp. 3d at 247-48 (meetings throughout class period support scienter). At those meetings, attendees discussed the overall state of the business in Europe, as well as "forecasting updates," "financial details…what are the targets, how much they are met, what is expected, what they can provide to achieve their expectations," and "point-of-sale data" (which represents demand) reported by channel distributors. ¶¶ 88-93, 97, 99, 103; *Dentsply*, 665 F. Supp. 3d 255, 291 (E.D.N.Y. 2023) (scienter pled where contract required "detailed monthly" reports).

Moreover, Lando and Faier directed CW4 to this data and repeatedly told the market that they were actively monitoring this information. ¶¶92, 102-03. *Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, 2019 WL 2360942, at *6 (S.D.N.Y. Mar. 4, 2019) (scienter pled where, inter alia, "the effects of competition were being closely monitored by the company's management"). Indeed, Lando and Faier were even more likely to educate themselves on these topics given the frequent direct questions from analysts on the subject. ¶¶ 102-03, 167-68, 170, 172-75, 181; *see, e.g., Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 850 (S.D.N.Y. 2019).

Finally, the SAC does **not** merely assert "fraud by hindsight." *See* Mot. 8, 17-18. The CAC alleges Defendants knew facts contradicting their public statements when they spoke. *See* ¶¶63-96; *In re KeySpan Corp.*, 2003 WL 21981806, at *12 (E.D.N.Y. July 30, 2003).

### 2. Defendants Knew or Recklessly Disregarded Channel Stuffing.

As set forth in Sections III.B.2-3, *supra*, Defendants misrepresented SolarEdge's revenues and inventory during the Class Period by failing to disclose channel stuffing. *See* ¶¶141, 143, 146, 148, 150, 152, 159, 161, 163-64. The SAC alleges scienter for these misstatements via Defendants' knowledge or reckless disregard of channel stuffing. *See Blanford*, 794 F.3d 297, 306.

For example, Lando knew of channel stuffing because, according to CW13, it was his "idea to try to sell the stock as aggressively as possible." ¶85. Similarly, Faier knew of the conduct because, per CW11, he instructed company managers to instruct staff to sell stock "desperately." ¶96. The Court can infer scienter from these allegations. *See In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1187–88 (N.D. Cal. 2010) (allegations that defendant "gave instructions to VP of Sales" who "communicated [Defendant]'s instructions to…the Account Executives" supports inference of scienter). Indeed, CW14 corroborates these allegations by stating that the Company "did the worst thing imaginable, they tried all they could to get the stuff into the market," "pushed real hard to market the stuff," *i.e.*, stuffed channels. ¶86; *see San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 321 (S.D.N.Y. 2024) ("aggressive sales targets" support scienter inference).

In addition, CW4 and CW5 described SolarEdge's practice of extending payment terms to pull revenue forward (*see* ¶¶66, 71), allegations that the Court found helped demonstrate the existence of channel stuffing, *see SolarEdge*, 2024 WL 4979296, at *7. CW15 connects these practices to Lando and Faier by describing how C-suite approval was required before extending payment terms and offering other discounts. ¶87. These allegations demonstrate Lando and Faier's

oversight or, at a minimum, reckless disregard, of channel stuffing. *See, e.g., Orthofix*, 89 F. Supp. 3d at 615-16 (allegations that defendants directed "discounted sales" as part of revenue manipulation support scienter inference); *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *17 (S.D.N.Y. Mar. 28, 2018) (scienter pled where CW alleged defendants "actively participated in pricing decisions," because decisions "would have been against corporate self-interest").

These allegations are bolstered by CW13's description of how "everyone knew" about the situation at SolarEdge, including the board of directors. ¶85; *see Cornell v. Credit Suisse Group*, 689 F.Supp.2d 629, 637-38 (S.D.N.Y. 2010) (allegations that "everyone knew" bolster scienter inference). Indeed, CW13 aligns with CW15's August 2022 meeting with SolarEdge's worldwide strategy team in Israel, where Lando, Faier, and Danziger are based (see ¶¶28-31, 98; ECF No. 58 at 3), and where Kelman and Gat reacted nonchalantly to questions about channel stuffing by saying "Yeah, we have numbers to hit," which suggests they were well aware of channel stuffing.

Further, the inference of Defendants' scienter is amplified by their misleading responses to questions about inventory declines. ¶¶170, 181-62; *see Avaya*, 564 F. 3d at 268–69. These statements also reflect how Defendants consistently addressed demand, Company inventory, channel inventory, and forecasts throughout the Class Period, which further supports an inference of their scienter. *See, e.g.*, *Pirnik v. Fiat Chrysler Autos., N.V.*, 2016 WL 5818590, at *7 (S.D.N.Y. Oct. 5, 2016) (frequent discussion of topic supports scienter); *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395–96 (S.D.N.Y. 2012) (same).

Contrary to the Motion (Mot. at 20-21), the SAC's allegations that Defendants would have signed off on discounts support a scienter inference. *See Moshell v. Sasol Ltd.*, 481 F.Supp.3d 280, 290 (S.D.N.Y. 2020). Nor must Plaintiffs allege the specific "volume, frequency, or timeframe of the alleged discounts." *See In re Alstom SA*, 406 F.Supp.2d 433, 504-05 (S.D.N.Y. 2005).

The Motion asserts that the SAC merely alleges "an aggressive sales strategy." Mot. at 22. Not so. As set forth in the CAC Opinion, Plaintiffs alleged the existence of channel stuffing. *See SolarEdge*, 2024 WL 4979296, at *9. CW11 and CW13 attested to Lando and Faier's knowledge of this conduct (¶¶85, 96), and CW15 described how a commercial customer was required to buy a "full shipping container" that included residential products and Defendants' approval of discounts and extended terms (¶¶82, 87). At bottom, Defendants ask the Court to ignore the obvious—their oversight of a massive program of channel stuffing. This Court, however, "need not close [its] eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

### 3. Defendants Misrepresented Sell-through Forecasts with Scienter.

The SAC alleges Lando and Faier's scienter for their misstatements regarding sell-through forecasts. As set forth in Section III.C.4, *supra*, CW4 and CW10 detailed the practice of rejecting forecasts based on market reports and internal data in favor of unsourced inflated forecasts, and CW15 described how internal data reviewed by Defendants showed an impending sales collapse. *See* ¶¶67-70, 80-81, 93, 190-95. Plaintiffs allege that Defendants knew or recklessly disregarded inflated forecasts because (i) Defendants reviewed reports (¶93), (ii) Mathews, who demanded these forecasts (¶69), led annual and quarterly calls attended by Lando and Faier that were held when the Company conducted its "financial review with Wall Street," *i.e.*, determined the content of its public disclosures (¶¶95, 99), and (iii) the disclosures "would make their way into the financial guidance" that SolarEdge publicly released (¶70). *See Karimi v. Deutsche Bank Aktiengesellschaft,* 607 F. Supp. 3d 381, 389-90 (S.D.N.Y. 2022) (allegations that information "would have [been] reported" support scienter). Further, Mathews reported to Lando (¶37), an especially detail-oriented CEO (¶84). *See American Apparel*, 2013 WL 174119 at *21.

### 4.   The SAC Alleges Lowe and Danziger's Scienter.

Although the CAC Opinion did not address Lowe and Danziger's scienter, *see SolarEdge*, 2024 WL 4979296, at *14-16, the SAC alleges their scienter based on their access to information, roles, and responses to analysts. On September 21, 2023, Lowe touted his review of customer "data we see from our distributors" before representing that "underlying demand for solar is very, very strong," and Defendants eventually admitted that this data showed slowing demand and elevated channel inventory. *See* ¶¶114, 182, 193. Further, Danziger and Lowe both gave misleading responses to analysts' direct questions, which bolsters an inference of their scienter. ¶¶114, 169, 174-75; Belelieu II Decl. Ex. 7 at 2; 151, 174-75, 182. *Synchrony*, 2022 WL 427499, at *10.

Further, as SolarEdge's "Director of Investor Relations" and its "Head of Investor Relations," Danziger and Lowe, respectively, were empowered to speak on behalf of the Company. ¶¶31-32. The Court thus can infer that they educated themselves before they spoke especially given their detailed discussions of SolarEdge products and the solar energy market. *E.g.*, Belelieu I Decl. Ex. 13 at 3 (Danziger); Belelieu II Decl. Ex. 10 at 7-8 (Lowe)); *see AMC*, 422 F. Supp. 3d at 850.

Finally, contrary to the Motion (Mot. at 24), Lowe's review of distributors' sell-through data supports an inference of his scienter because Plaintiffs need not allege specific data. *See* ¶126; *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 940 (9th Cir. 2023) (allegations that defendant "monitor[ed] sales data" sufficient), *cert. granted sub nom. NVIDIA Corp. v. Ohman J*, 144 S. Ct. 2655 (2024), *and cert. dismissed as improvidently granted*, 604 U.S. 20 (2024).

### 5.   Core Operations Strengthens the Inference of Defendants' Scienter.

Europe was by far SolarEdge's most important market, Class Period filings attributed revenue increases to sales in Europe, and analysts highlighted Europe as a key differentiator for the Company. ¶¶57-62. Further, Lando was an unusually detail-oriented CEO, who had run SolarEdge's sales division for almost 10 years, and became CEO because he was "thought to be

the person that understood" the Company the best. ¶84; *see In re ITT Educ. Servs., Inc. Sec. Litig.*, 34 F. Supp. 3d 298, 308 (S.D.N.Y. 2014) (management style contributes to an inference of scienter). It thus is inconceivable that Defendants, particularly Lando, were unaware of declining demand in Europe, rising inventories, and channel stuffing. *See Gen. Elec.*, 857 F. Supp. 2d at 395.

### 6. The SAC Alleges SolarEdge's Corporate Scienter.

As set forth in Sections D.1-6 *supra*, the SAC sufficiently alleges each Individual Defendants' scienter, and thus SolarEdge's corporate scienter. *See Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020). In addition, the SAC alleges that Mathews reported directly to Lando, knew of declines in SolarEdge's European business, saturated inventories, and channel stuffing. ¶¶37, 63, 76, 78, 81. Matthews also led calls attended by Lando and Faier that discussed revenues and inventory levels and were held when the Company conducted its "financial review with Wall Street," *i.e.*, what Lando and Faier would disclose to investors. *See* ¶95. Further, the SAC alleges that CW10's forecasts changed at Cohen and Mathews's direction and then "made their way into" SolarEdge's financial guidance. *See* ¶¶69-70, 190-95. This "connective tissue" alleges Cohen and Mathews's, and thus SolarEdge's, scienter. *See SolarEdge*, 2024 WL 4979296, at *15.

### D. THE SAC PLEADS CONTROL PERSON LIABILITY

Contrary to the Motion (*see* Mot. at 25) as set forth above, the SAC adequately alleges primary securities law violations by Defendants and thus Plaintiffs state control person claims.

### IV. CONCLUSION

As set forth above, Plaintiffs the Motion should be denied in its entirety.[12]

---

[12] If the Court grants the Motion with regard to any alleged misstatement, Plaintiffs respectfully request the opportunity to amend to further develop their factual allegations. *See Francisco v. Abengoa, S.A.*, 481 F.Supp.3d 179, 215-16 (S.D.N.Y. 2020) (dismissing complaint with leave to file a third amended complaint "Plaintiffs [could] plead additional facts to remedy some of the deficiencies identified in this opinion without prejudice to Defendants").

DATED:  February 24, 2025

Respectfully submitted,

**POMERANTZ LLP**

By: */s/ Brian Calandra*
Jeremy A. Lieberman
Brian Calandra
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
E-mail: jalieberman@pomlaw.com
E-mail: bcalandra@pomlaw.com

*Counsel for Lead Plaintiffs Mivtachim the Workers Social Insurance Fund Ltd., Keren Hgimlaot Hmerkazit Histadrut Central Pension Fund Ltd., Kerren Makefet Pension and Provident Center Cooperative Society Ltd., the Hadassah Workers Pension Fund Ltd., and Hachshara Insurance Company Ltd., Named Plaintiff Javier Alcides Cascallar, and the Class*

26

**CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2025, a copy of the foregoing was filed electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties whose counsel has appeared in this action, by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ *Brian Calandra*
Brian Calandra