```
                                                    ┌─────────────────────────────┐
                                                    │ USDC SDNY                   │
                                                    │ DOCUMENT                    │
UNITED STATES DISTRICT COURT                        │ ELECTRONICALLY FILED        │
SOUTHERN DISTRICT OF NEW YORK                       │ DOC #: _____    │
----------------------------------------------- X   │ DATE FILED:  4/6/2025       │
                                             :      └─────────────────────────────┘
                                             :
  IN RE SOLAREDGE TECHNOLOGIES, INC.         :            1:23-cv-9748-GHW
  SECURITIES LITIGATION                      :
                                             :      MEMORANDUM OPINION &
                                             :                 ORDER
----------------------------------------------- X
GREGORY H. WOODS, United States District Judge:
```

## I.    INTRODUCTION

SolarEdge Technologies, Inc. ("SolarEdge") sells components for solar panel systems primarily to large distributors, equipment wholesalers, and installers in North America and Europe. In the third quarter of 2023, SolarEdge's revenues declined, leading to a drop in the company's stock price. Plaintiffs allege that the revenue decline was due in part to declining demand for SolarEdge's products in Europe and an inventory glut caused by the company's practice of forcing distributors to take delivery of unneeded products at the end of quarters to boost revenue numbers. Plaintiffs claim that SolarEdge and its executives made materially false or misleading statements in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Specifically, Plaintiffs allege that Defendants failed to disclose the company's practice of forcing product on distributors, that Defendants misled investors about inventory levels, that Defendants misled investors about demand for SolarEdge's products in Europe, and that Defendants misled investors about sell-through rates.

Defendants move to dismiss Plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(6), arguing that Plaintiffs fail to allege both that Defendants' statements were false or misleading and that Defendants had the requisite scienter. Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

## II.    BACKGROUND

### A.    Facts[1]

#### 1.    Parties

Plaintiffs purchased SolarEdge securities between February 13, 2023 and October 19, 2023 (the "Class Period").  Dkt. No. 72, Second Consolidated Amended Complaint ("SCAC"), ¶ 27.

Defendant SolarEdge is a Delaware corporation with principal executive offices located in Israel.  *Id.* ¶ 28.  SolarEdge "designs, develops, manufactures, and sells" components for solar panel systems.  *Id.* ¶ 49.  SolarEdge common stock trades on the NASDAQ.  *Id.* ¶ 28.

Defendant Zvi Lando was SolarEdge's Chief Executive Officer at all relevant times; Defendant Ronen Faier was SolarEdge's Chief Financial Officer at all relevant times; Defendant Lior Danziger was SolarEdge's Director of Investor Relations and Finance Operations "from prior to the Class Period to at least June 2021";[2] and Defendant J.B. Lowe was SolarEdge's Head of Investor Relations at all relevant times (collectively, the "Individual Defendants").  *Id.* ¶¶ 29–32.

Peter Mathews was SolarEdge's North America General Manager, and he reported to Lando.  *Id.* ¶ 35.  Shimon Kringel was SolarEdge's Vice President of Operations, North America and reported to Mathews.  *Id.* ¶ 35.  Amir Cohen was SolarEdge's Vice President North America Sales / General Manager – Solar Business Unit, and he reported to Mathews.  *Id.* ¶ 37.  Nick Alex was SolarEdge's Vice President of Sales and reported to Cohen.  *Id.* ¶ 41.  Alon Barel was SolarEdge's Vice President – Global Sales.  *Id.* ¶ 38.  Alfred Karlstetter was SolarEdge's Europe General Manager and "oversaw SolarEdge's European business."  *Id.* ¶¶ 36, 40.  Daniel Huber was SolarEdge's Chief Revenue Officer, and he reported to Lando.  *Id.* ¶ 38.  Naama Ohana was

---

[1] At the motion to dismiss stage, the Court accepts the following facts set forth in the Second Consolidated Amended Complaint (the "SCAC"), Dkt. No. 72.

[2] The SCAC alleges that "Danziger was authorized to speak and did speak to investors and analysts on behalf of the Company during the Class Period."  SCAC ¶ 31.

SolarEdge's Vice President and General Manager – Commercial Business Unit, and she reported to Huber. *Id.* Martin Roger was SolarEdge's Vice President of Customer Success. *Id.* ¶ 42.

## 2. SolarEdge's Alleged Practice of Channel Stuffing

Plaintiffs allege that during the Class Period, SolarEdge had a practice of "achieving its revenue targets by forcing customers to take unneeded products at the end of each financial quarter." *Id.* ¶ 4. SolarEdge's customers are "primarily large distributors" who then "'sell through' those products to end users." *Id.* ¶ 53. SolarEdge "recognizes revenue when its customers receive products," not when its customers actually tender payment, and "not when [its] customers sell products through to end users." *Id.* ¶ 54. Thus, SolarEdge can achieve revenue targets simply by shipping products to distributors. *Id.* ¶¶ 54, 64.

According to confidential witnesses ("CWs") cited in the SCAC,[3] SolarEdge would "repeatedly" "force[] distributors to take delivery on product[s] early" by sending products out "prematurely, before they were scheduled to go out." *Id.* ¶ 64. *See also id.* ¶ 73 ("CW6 stated that it

---

[3] CW1 was a business intelligence administrator at SolarEdge's Milpitas, California office from May 2022 to October 2023. SCAC ¶ 35. CW1 reported to Kringel. *Id.* CW2 was a regional sales manager at SolarEdge from August 2018 to March 2023. *Id.* ¶ 36. CW2 "ran sales at different points in Canada, the northeastern U.S., and the Caribbean" and "interacted directly with SolarEdge sales executives in Europe." *Id.* CW3 was an executive administrator at SolarEdge's Milpitas office from August 2021 to August 2022; he reported to Cohen. *Id.* ¶ 37. CW4 started at SolarEdge in 2015 and served as "Senior Director of National Sales – C&I" (commercial & industrial) from May 2021 to December 2023; he worked "near Washington, D.C." *Id.* ¶ 38. CW4 "reported directly to Cohen, while also reporting via 'dotted line' to SolarEdge's headquarters in Israel," and he would "take direction" from Lando, Huber, Barel, and Ohana. *Id.* CW5 was a "Sales and Operations Associate – Strategic Accounts / Account Management" out of SolarEdge's Milpitas office. *Id.* ¶ 39. CW5 reported to individuals who reported to Kringel. *Id.* CW6 worked for SolarEdge in New York, New York between August 2017 and October 2023 and served as "Director C&I Sales, North America," reporting to CW4. *Id.* ¶ 40. CW7 worked for SolarEdge from February 2021 to December 2023 as a "Senior Inside Sales Manager" in the Milpitas office, reporting to Cohen and Alex. *Id.* ¶ 41. CW8 joined SolarEdge in 2015 and was promoted to "Director of Customer Support" in 2018 or 2019. *Id.* ¶ 42. He worked out of the Milpitas office before moving to Lexington, Kentucky, and he traveled to different SolarEdge locations, including Munich, Germany and Melbourne, Australia. *Id.* He reported to Roger. *Id.* CW9 was an operations manager for CED Greentech, a SolarEdge distributor, from December 2015 to November 2022. *Id.* ¶ 43. He worked in CED Greentech's Bakersfield, California branch. *Id.* CW10 was a sales manager in the C&I division in the northeastern U.S. from September 2021 to April 2024. *Id.* ¶ 44. He reported to the Senior Director of National Sales – C&I, who reported to Cohen and Mathews. *Id.* CW11 worked as a sales manager for SolarEdge in South Africa from June 2020 through the Class Period. *Id.* ¶ 45. CW12 worked as a sales manager for SolarEdge in Hungary from 2022 through the Class Period. *Id.* ¶ 46. CW13 was a sales representative for SolarEdge in Spain during the Class Period. *Id.* CW14 was a SolarEdge sales representative in France during the Class Period. *Id.* ¶ 47. CW15 was a Director of Sales at SolarEdge for regions of the U.S. and Canada from February 2022 to May 2023. *Id.* ¶ 48. He reported to Alex and Cohen.

was 'pretty common knowledge' that SolarEdge . . . would 'force distributors to take product at the end of the quarter.'"); *id.* ¶ 75; *id.* ¶ 77 ("CW8 stated that SolarEdge was 'notorious' for 'trying to get shipments out to distributors' at the end of quarters 'to hit numbers.'"); *id.* ¶ 82.  CW2 stated that this happened "very often" to an American distributor, CED Greentech, and CW6 recalled that this happened to European distributor Krannich Solar.  *Id.* ¶¶ 64, 73; *see also id.* ¶ 75 ("CW7 specifically recalled an employee of key SolarEdge distributor CED Greentech screaming at him because 'SolarEdge was shoving product down his throat.'"); *id.* ¶ 82.  CW2 further stated that this consistently "happened near the end of the quarter."  *Id.* ¶ 64.  And when SolarEdge's customers wanted to cancel or push out the early orders, "it would turn into a battle" because SolarEdge "as a general rule did not allow distributors to cancel orders."  *Id.* ¶ 65 (internal quotation marks omitted); *see also id.* ¶ 77 (describing how "SolarEdge was known for 'holding out returns' . . . because the company was 'focused on getting product out to distributors'" to "hit numbers, get shipments out, last day of quarter").  CW5 stated that "because [SolarEdge] wouldn't let [customers] cancel," SolarEdge was able to "mov[e] numerous orders to different quarters."  *Id.* ¶ 72.  These tactics allowed SolarEdge "to hit quarter-end numbers."  *Id.* ¶ 75.  CW7 described this conduct as a "pattern" during his entire tenure at SolarEdge, from February 2021 to December 2023.  *Id.* ¶¶ 41, 75.

Further, supervisors "hounded" CW4 to "get [SolarEdge's] customers to agree to 'free carrier shipping terms,' which allowed SolarEdge to transfer ownership of orders (and thus recognize the orders as revenue) at . . . the manufacturing location, not when the items were received by customers."  *Id.* ¶ 66.  This allowed SolarEdge to recognize revenue "before the orders even shipped."  *Id.*  "[T]hese requests always came at the end of quarters as [SolarEdge] tried to recognize revenue within a quarter and meet its targets."  *Id.*  CW5 also recalled that SolarEdge encouraged customers to change orders to "FOB origin" so that it could recognize the orders as

revenue earlier. *Id.* ¶ 71. The Individual Defendants were made aware of the use of discounts and payment terms because the C-suite had to approve any discounts above a certain amount. *Id.* ¶ 87.

"[E]fforts to get distributors to take inventory at the end of quarters were discussed during directors' meetings." *Id.* ¶ 76. According to CW7, "Cohen, Alex, Mathews and approximately five other directors" attended these meetings weekly. *Id.* However, there is no allegation that the Individual Defendants attended these meetings, and the SCAC only alleges that "CW7 *believed* that [] the discussions in the[se] meetings were communicated up to Lando." *Id.* (emphasis added). According to CW8, he had conversations with Mathews, Cohen, Kringle, Alex, and Roger about "getting inventory to distributors to hit numbers." *Id.* ¶ 78. CW8 stated that he is "sure it was coming from Lando or the top of the [c]ompany . . . because Lando was Vice President of Sales before he became CEO and thus would have been involved in the [c]ompany's sales strategy." *Id.* CW1 and CW2 also stated that Lando was "intimately involved" in the details of company's business operations. *Id.* ¶ 84.

Multiple CWs recounted that SolarEdge leadership urged sales teams to sell product aggressively. *See, e.g., id.* ¶ 74. CW13 alleged that "[t]he whole board knew" about the "situation with regard to stock." *Id.* ¶ 85. He stated that "Lando had the great idea to try [to] sell the stock as aggressively as possible," leading to "massive losses." *Id.* CW11 added that Faier instructed the team to sell product "desperately." *Id.* ¶ 96.

### 3. Inventory Rises and Demand Slows in Europe in 2023

Plaintiffs allege that starting in early 2023, demand for SolarEdge's products in Europe began to "declin[e] sharply." *Id.* ¶ 1. CW2 stated that "he heard 'concerns and discussions that Europe wasn't going well.'" *Id.* ¶ 63. Included in these discussions were SolarEdge's "upper management in North America, such as Cohen and Mathews." *Id.* In July 2022, Mathews told CW15's sales team that "Europe is struggling." *Id.* As a result, "[t]he U.S. market was being pushed

to make up for [the] lack of sales in Europe." *Id.* According to CW15, "sales in Europe continued to taper off until he left in May 2023." *Id.*; *see also id.* ¶ 93. CW10 also stated that he heard from colleagues in mid-2023 that there was a "slowdown" in SolarEdge's European business. *Id.* ¶ 63. Inventory "wasn't moving at the distribution level" because distributors "weren't buying." *Id.*

CW4 stated that at multiple meetings in the first half of 2023, he directly informed Lando, Faier, Mathew, Cohen, Ohana, and Huber "that demand for SolarEdge products was falling and that 'the market was a lot worse than they thought.'" *Id.* ¶ 100. In a call with analysts and investors to disclose SolarEdge's Q3 2023 performance, Lando stated that the "picture got clearer . . . to us in the second half of the quarter . . . where the installation rate decline took place."[4] *Id.* ¶ 131.

Plaintiffs similarly allege that starting in early 2023, SolarEdge's inventory and the inventory of SolarEdge's distributor customers became saturated. "CW5 stated that SolarEdge customers were trying to cancel orders at least as early as February 2023 because their inventories were saturated, and that these cancellation attempts continued right up until he left the [c]ompany in October 2023." *Id.* ¶ 72. "CW5 specifically recalled one customer who at this time 'wanted to cancel everything,' which amounted to $50 million in orders, and that CED Greentech . . . wanted to cancel orders as well, starting in late Q2 2023." *Id.* When "SolarEdge's commercial inventories were rising sharply during the first half of 2023, the [c]ompany's executives, including Cohen, began asking" CW4 why customers were not taking product, and CW4 told them multiple times that the customers "don't need it." *Id.* ¶ 100.

Information about inventory levels was available to and specifically shared with Lando and Faier as well as other unspecified "senior leaders." SolarEdge used the "Priority" software system to track "full order details," and this system sent reports to "Lando and other senior leaders." *Id.* ¶ 88.

---

[4] The SCAC also describes Faier's statement clarifying that "it was difficult for Defendants to recognize the demand decline" at that time "because SolarEdge received sell-through reports late in each month that reflected the prior months sales." SCAC ¶ 132.

Additionally, Lando and "other senior leadership" received daily inventory reports, which communicated both SolarEdge's inventory and "channel inventory"—the amount of inventory that was sitting with distributors that had not been sold through. *Id.* ¶ 89. Channel distributors also had to provide SolarEdge "regular reports . . . with data on current inventory and point of sale." *Id.* ¶ 90; *see also id.* ¶¶ 91, 93–94. Lando and Faier were aware of the contents of these distributor reports. *Id.* ¶¶ 92–93, 102–103. Lando and Faier would also be informed about SolarEdge's European business—specifically inventory, channel inventory, and forecasting updates—by Karlstetter during "Quarterly Business Reviews" ("QBRs"). *Id.* ¶ 97. QBRs were also attended by Mathews, Cohen, Ohana, Barel, and Huber. *Id.* ¶ 98. During QBRs, which were held "for each SolarEdge region (*e.g.*, Europe or North America)," *id.*, company leaders "would share all the financial details, where SolarEdge is going each quarter, what are the targets, how much are they met, what is expected, [and] what they can provide to achieve their expectations," *id.* ¶ 99.

Plaintiffs also allege, based on information from CW4, that "SolarEdge was 'very aggressive' with its forecasting and goals for sales through to end customers (as opposed to sales to distributors)." *Id.* ¶ 67. CW4 stated that he would create forecasts of sell-through rates from information contained in third-party "market reports" and SolarEdge's own historical data.[5] *Id.* CW4 stated that "SolarEdge leaders, including Mathews, Cohen, Ohana and Huber would respond" that his "numbers are too low." *Id.* CW4 would not change his forecasts, but "Mathews, Cohen, Ohana, and Huber would insist on adopting forecasts that were too high and that [CW4] did not agree with." *Id.* CW10 likewise recounted an instance in late 2023, "just after the Class Period ended," in which he prepared a sales forecast of which "management"—specifically "Cohen and/or Mathews"—disapproved. *Id.* ¶¶ 68–69. In order to get his forecast to the level that management requested, he had to "push it, fudge it, [make] estimated guesses." *Id.* ¶ 69. CW10 "understood that

---

[5] The SCAC does not allege for which geographies CW4 forecasted sales.

the forecasts would make their way into the financial guidance released publicly by the company."

*Id.* ¶ 70.

### 4. Defendants' Statements About Revenue, Demand, Inventory, and Sell-Through Rates

During the Class Period, SolarEdge and its executives made several public statements about

the company's revenue, demand for its products, inventory levels, and sell-through rates.  The SCAC

outlines several statements alleged to be false or misleading.  These statements were all made by the

Individual Defendants on earnings calls or at conferences during the Class Period.[6]  The Court

groups these statements into five categories based on Plaintiffs' allegations:  (1) statements

discussing SolarEdge's revenue;[7] (2) statements offering explanations for the increase in inventory

levels;[8] (3) statements characterizing inventory levels as "low";[9] (4) statements regarding the strength

---

[6] The SCAC does not allege that any public filings contained false or misleading statements.

[7] This category contains the following statements:  SCAC ¶ 139 (attributing "record revenues" and "the growth of [SolarEdge's] revenues coming from Europe" in Q4 2022 to "the increase in power prices prior to the beginning of the Ukraine-Russia conflict and the accelerated increases ever since, as well as the expansion of our portfolio to include inverters, EV chargers, and batteries, addressing the specific European market needs"); *id.* ¶ 141 (reporting Q1 2023 "revenues from [SolarEdge's] solar business . . . at a record $909 million . . . mostly driven by record revenues in Europe and Rest of World"); *id.* ("[T]he European residential markets continue to be very strong for us this quarter.  As we ramped shipments of three phase residential inverters, in particular, our new backup inverter as well as the three phase residential battery."); *id.* ¶ 143 (reporting Q2 2023 "revenues from [SolarEdge's] solar business . . . at a record $947 million . . . mostly driven by record revenues in Europe").

[8] This category contains the following statements:  SCAC ¶ 146 ("[O]ur inventory levels this quarter include higher levels of finished goods products as a result of streamlined manufacturing.  This finished goods inventory in the various regions will allow us to further improve our customer delivery time and reduce shipping and logistic expenses."); *id.* ¶ 150 ("As a result of the slowdown in the shipments to the United States, slower growth rates in Europe, and more streamlined manufacturing, our finished goods inventory increased substantially [in Q2 2023]. . . .  [It was] a healthy way to reduce shipment costs, in the various regions."); *id.* ¶ 152 ("[B]uilt inventory within the channels . . . will be cleared mostly through the adoption or getting more inverters from us during the third and the fourth quarter."); *id.* ¶ 163 ("The second thing distributors are doing is since they can rely better on our supply right now instead of holding 3 months or sometimes even 4 months of inventory . . . at the end of Q2, we saw in average 2 months of inventory of our product in the channel.  And now they're even sometimes reduced to 5 or 4 weeks.  And this creates a situation or on one hand, you see amazing demand.  But at the same time, since the inventory is still being cleared from the channel going to lower levels, the orders to us or other companies is not happening."); *id.* ¶ 164 (attributing channel inventory levels to the "past 2 years' experience of [distributors] not being able to get all of the products that they wanted," so they "simply overstocked, not just compared to the amount of revenues, but also because they thought that maybe they will not be able to get more products").

[9] This category contains the following statements from Faier and Lando, respectively:  SCAC ¶ 156 ("[W]hen we are looking at the inventory on hand, when it comes to our distributors, the channels are pretty, I would say, low on inventory in most cases."); *id.* ¶ 157 ("[I]n Europe, we actually see low [channel] inventory days on hand . . . .  [T]he level of [channel] inventory is relatively not high.").

of demand in Europe;[10] and (5) statements regarding sell-through rates in Europe.[11]

---

[10] This category contains the following statements:  SCAC ¶ 167 ("From a demand and inventory point of view, we continue to see very strong demand from Europe for all products and relatively low inventory levels in the channel. . . .  [I]n many cases, we see that the demand is far exceeding our ability to manufacture and deliver."); *id.* ¶¶ 168, 186 ("[T]o a large extent, our 2023 in Europe will be similar to the condition we were in in 2022, which is more dependent on our ability to produce the volumes than the demand."); *id.* ("[A]s far as we can see, the [Europe] market is – the demand is good, and the market is strong, and we are ramping production to meet demand."); *id.* ¶ 169 ("[I]t's definitely the case that [Europe] will probably be the fastest-growing geographies for us . . . .  We're definitely looking ahead toward a very healthy and robust year in Europe again."); *id.* ("[W]e're expecting extremely healthy and robust demand in Europe. . . .  [W]e're working very hard on solving those couple of bottlenecks that we have to solve.  And then we can probably—and I would say somewhere towards the second half of the year, we should expect some relief coming."); *id.* ¶ 170 ("[T]he situation is that . . . the demand [in Europe] is – continues to be very strong.  And I think that today, most dynamics are related to the – more to the ability to supply rather than the demand."  Faier attributed this to "the combination of relatively low interest rate environment . . . plus the fact that electricity prices hiked."); *id.* ¶ 171 (stating that the "vast majority" of SolarEdge's batteries "continue to be shifted to Europe, driven by the strong adoption and demand for our three-phase solution"); *id.* ¶ 172 ("[W]e don't see right now a change in the pattern of demand in the market in Europe . . . [a]nd we don't see, at least until now any change in the dynamic and the market continues to be strong."); *id.* ¶ 173 ("[G]rowth is less dependent on demand.  It's more dependent on our ramp of manufacturing, which I mentioned, will take us another couple of quarters until we're at a full scale of matching the supply to demand. . . .  In Europe, the situation is more dependent on our supply and our intent is to continue and increase capacity of three-phase residential inverters.  So the outlook is for likely growth."); *id.* ¶ 174 ("[W]hat we're still seeing and observing in Europe is not so much different than what we mentioned after our last earnings . . . we're still looking at very healthy demand across the board in the markets and in the segments . . . .  But overall, and including both residential and commercial, we're still looking at a very healthy demand in Europe.  And this would probably still be the fastest-growing geographies for us in 2023."); *id.* ¶ 175 ("I think it's a combination of all . . . it's still a very attractive economic investment to do to install a solar system in Europe and we're still seeing driving very strong demand on the residential front.  On the C&I side, there's this layer of ESG-driven demand that we're seeing more and more corporations are starting to take their net zero emissions journey."); *id.* ¶ 176 (stating that distributors were overreacting by "going to a – on the overall offering to low levels of inventory that are maybe lower than those that they would normally carry in this type of a period, especially because the overall demand is still high . . . the market is very active[;] [i]nstallations are up and demand for equipment is strong"); *id.* ("In Europe, installation rates continue to be high in both residential and commercial . . . .  [O]ur growth in Europe in the second quarter was very strong."); *id.* ¶ 177 ("We do not see this stage, as well the case in German, let's say, or Europe in 2013 when the market disappeared.  Again, we see it more of a correction rather than a crisis that's going around overall."); *id.* ¶ 178 ("Europe is growing only 30% to 40% year-over-year.  It depends on the country, of course.  Europe is made out of many countries.  And therefore, we still see very strong underlying demand for – last quarter, for example, we get from our channels and distributors what we call point-of-sale data, is showing how much we're selling out of the channels.  We're talking about record high numbers that we haven't seen before.  That in some cases, even for our products are close to 100% just compared to about a quarter ago.  So the underlying demand is very strong, although not as strong as everyone thought."); *id.* ¶¶ 164, 192 ("[T]he underlying market in Europe is growing and growing very nicely."); *id.* ¶ 179 ("[W]hen we are looking at the point-of-sale data of how much is being sold from the channels, we see record levels over the last two quarters that, to our understanding, are continuing, which means that in that case, the demand is there."); *id.* ¶ 180 ("[SolarEdge] directed a lot of our shipments to Europe, which by the way turned to be a relatively good move given the fact that we see Europe growing relatively quickly right now."); *id.* ¶ 181 ("I'll start by saying that nothing changed from our call with only colors being a little bit more vivid in where do we see things happening.  So starting from the underlying demand, the underlying demand in Europe continues to be strong and continues to be very great . . . .  I can tell you that in both cases, we see a very nice uplift in all of Europe . . . we see it almost everywhere.  It's a very good underlying demand, not as good as we thought."); *id.* ¶ 182 ("[U]nderlying demand [in Europe] for solar is very, very strong.").

[11] This category contains the following statements:  SCAC ¶ 159 ("In Europe today, what we see is that the inventory levels, on one hand, are relatively high.  But when you look at the days outstanding, which is a result of the sell-through from the channel, they are not high at all.  They're actually at the normal level."); *id.* ¶ 161 ("I'd say that in Europe, I think that, yes, the correction within the distributors should be relatively quick, given the fact that the inventories levels that Zvi mentioned before are not so high when it reflects inventory days while we still see very high – record-high point-of-sale data."); *id.* ¶ 179 ("[W]hen we are looking at the point-of-sale data of how much is being sold from the

### B. Procedural History

Plaintiffs commenced this action on November 3, 2023, Dkt. No. 1. Plaintiffs assert claims against SolarEdge, Lando, Faier, Danziger, and Lowe for violating Section 10(b) of the Exchange Act and Rule 10b-5 by allegedly making material misrepresentations and omitting material information about SolarEdge's revenue, demand, inventory, and sell-through rates. *See* SCAC ¶¶ 239–49. Plaintiffs also assert Section 20(a) claims against the Individual Defendants for exercising their control over SolarEdge to induce the allegedly material misrepresentations and omissions. *See id.* ¶¶ 250–53.

On July 15, 2024, Defendants moved to dismiss the first consolidated amended complaint for failure to state a claim. Dkt. No. 65. On December 4, 2024, the Court issued a memorandum opinion and order granting in part and denying in part Defendants' motion. Dkt. No. 70 (the "First MTD Opinion"); *In re SolarEdge Techs., Inc. Securities Litig.*, No. 1:23-cv-9748 (GHW), 2024 WL 4979296 (S.D.N.Y. Dec. 4, 2024). The Court held that Plaintiffs had adequately pleaded that Defendants knowingly misrepresented inventory levels at SolarEdge's distributors. First MTD Opinion at 1. But the Court dismissed Plaintiffs' claims with respect to all other allegedly false or misleading statements because Plaintiffs failed to adequately plead that Defendants knew about the alleged practice of forcing unneeded product on customers or that Defendants' statements about demand and sell-through rates were false or misleading. *Id.* at 1–2.

Plaintiffs filed the SCAC on January 3, 2025. On February 10, 2025, Defendants moved to dismiss the SCAC for failure to state a claim. Dkt. No. 76. Defendants filed a memorandum of law in support of their motion that same day. Dkt. No. 77 ("MOL"). Plaintiffs filed an opposition to

---

channels, we see record levels over the last two quarters that, to our understanding, are continuing, which means that in that case, the demand is there."); *id.* ¶ 182 ("[T]he data we see from our distributors is continuing to show significant growth in terms of sell-through into Europe."); *id.* ¶ 194 ("[A]t the end of the day, 1Q is going into the spring installation season and sell-through being as strong as it is, distributor inventories are going to be depleted fairly quickly.").

the motion to dismiss on February 24, 2025. Dkt. No. 79 ("Opposition"). Defendants filed their

reply on March 3, 2025. Dkt. No. 80 ("Reply").

### III.    LEGAL STANDARD

#### A.  Rule 12(b)(6)

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must allege

sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711

F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). To

determine plausibility, courts follow a "two-pronged approach." *Ashcroft v. Iqbal*, 556 U.S. 662, 679

(2009). "First, although a court must accept as true all of the allegations contained in a complaint,

that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72

(2d Cir. 2009) (alterations and internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678).

Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true,

'plausibly give rise to an entitlement to relief.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010)

(quoting *Iqbal*, 556 U.S. at 679). Determining whether a complaint states a plausible claim is a

"context-specific task that requires the reviewing court to draw on its judicial experience and

common sense." *Iqbal*, 556 U.S. at 679.

Because claims under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder sound

in fraud, they are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the

Private Securities Litigation Reform Act (the "PSLRA"). *Novak v. Kasaks*, 216 F.3d 300, 306–07 (2d

Cir. 2000). Rule 9(b) requires that the complaint "state with particularity the circumstances

constituting fraud." Fed. R. Civ. P. 9(b). To satisfy that requirement, the complaint must "(1)

specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state

where and when the statements were made, and (4) explain why the statements were fraudulent."

*ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Novak*, 216 F.3d at 306). The PSLRA imposes similar requirements on claims brought under the Exchange Act: "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged misstatement or omission. 15 U.S.C. § 78u-4(b)(2)(A). A complaint will survive under that heightened standard "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

In resolving a motion to dismiss under Rule 12(b)(6), courts generally may not consider materials extrinsic to the complaint. Fed. R. Civ. P. 12(d). However, that rule is not absolute. In addition to the facts alleged in the complaint, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI*, 493 F.3d at 98. Courts may also consider "matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted). Furthermore, on a motion to dismiss, the Court can consider statements made in a company's public filings with the SEC. *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). However, the Court can consider them "'only to determine what the documents stated,' and 'not to prove the truth of their contents.'" *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

### B. Section 10(b) and Rule 10b-5 Liability

Under Section 10(b) and Rule 10b-5, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b); *see also* 15 U.S.C. § 78j(b). To state a claim under Section 10(b) and Rule 10b-5 for fraudulent misrepresentations, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *GAMCO Invs., Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

## IV.  DISCUSSION

Defendants contend that Plaintiffs have failed to adequately allege either the existence of any material misrepresentations and omissions or Defendants' scienter.

### A. Actionable Material Misrepresentations or Omissions

#### 1. Legal Standard

"A statement is misleading if a reasonable investor would have received a false impression from the statement." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010) (citation omitted). When a company does not have an obligation to speak but does so anyway, it assumes "a duty to be both accurate and complete." *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (explaining that once a corporation makes "a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate" (quotation omitted)). And "literally true statements" are actionable if they "create a materially misleading impression . . . ." *SEC v.*

*Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd and remanded on other grounds*, 568 U.S. 442 (2013).  "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context."  *Morgan Stanley Info. Fund*, 592 F.3d at 366 (internal quotation marks omitted).  Accordingly, plaintiffs "may not cherry pick certain public statements for [their] complaint and divorce them from the universe of disclosed information to plausibly allege fraud."  *Stichting Depositary APG Developed Mkts. Equity Pool v. Synchrony Fin. (In re Synchrony Fin. Sec. Litig.)*, 988 F.3d 157, 171 (2d Cir. 2021).

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5[,]" *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988), but omissions can also be actionable under Section 10(b).  An omission is actionable if the omitted information was subject to "an affirmative legal disclosure obligation" or the omitted information is "necessary to prevent existing disclosures from being misleading."  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715–16 (2d Cir. 2011).  The key is the "presence of a prior statement that otherwise is or will become materially misleading" because of the omission.  *DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 206 (S.D.N.Y. 2019).

To incur liability, misrepresentations or omissions must be material.  An omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Levinson*, 485 U.S. at 240 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (internal quotation marks omitted).  "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions."  *Caiola*, 295 F.3d at 329 (internal quotation marks and citation omitted).

### 2.    Statements Regarding Revenue

In the First MTD Opinion, the Court held that some but not all of Defendants' statements regarding revenue are adequately alleged to be false or misleading.  First MTD Opinion at 13–16, 18–19.  Specifically, the Court held that Plaintiffs "adequately pleaded that it was misleading for Lando to attribute increased revenues in late 2022 to a variety of factors meanwhile omitting that part of the increase in revenues was caused by a practice of channel stuffing."  *Id.* at 13.  "While Defendants do not challenge that holding for purposes of this motion, Defendants renew their assertion, for preservation purposes, that Defendants fail to plead an actionable misstatement as to that statement."  MOL at 12.  The Court also held that "[t]he remaining statements regarding SolarEdge's revenues"—those that "simply state the amount and source of the revenue"—"are not alleged to be factually inaccurate" or otherwise "materially misleading."  *Id.* at 18–19.  The SCAC contains no new allegations that affect the Court's prior analysis, so the Court refers to the First MTD Opinion at 18–19 and concludes that the statements at SCAC ¶¶ 141, 143 are not alleged to be false or misleading.[12]

### 3.    Statements Regarding Factors Driving Increased Inventory

In the First MTD Opinion, the Court held that "Plaintiffs have adequately pleaded that it was misleading for Defendants to attribute increased inventory in 2023 to a variety of factors meanwhile omitting that part of the increase in inventory was caused by a practice of channel

---

[12] While Plaintiffs offer no new allegations regarding the falsity of these statements, Plaintiffs do offer additional case law in their Opposition to persuade the Court to reconsider its prior decision.  *See* Opposition at 14.  These cases are inapposite because the defendants were not faulted for providing only "record first-quarter . . . earnings," *In re KeySpan Corp.*, No. 01-cv-5852 (ARR), 2003 WL 21981806, at *14 (E.D.N.Y. July 30, 2003), or for touting "a record year," *Manavazian v. Atec Group, Inc.*, 160 F. Supp. 2d 468, 473 (E.D.N.Y. 2001).  They were faulted for then providing inflated forecasts and presenting an "unvarnished public image" with "rosy public representations."  *KeySpan*, 2003 WL 21981806, at *8, *14–15.  They were faulted for highlighting record revenues "in connection with" misleading statements about "present performance and future growth."  *Manavazian*, 160 F. Supp. 2d at 473.  SolarEdge touting its "record" revenues in the previous year is a factual assertion, if in fact revenues were higher than ever before, which Plaintiffs have not contradicted.  *See* Opposition at 15.  This is not a statement that necessarily conveys any guarantee of present or future performance.  Such statements are analyzed separately in this opinion.

stuffing." First MTD Opinion at 19. "While Defendants do not challenge that holding for purposes of this motion, Defendants renew their assertion, for preservation purposes, that Defendants fail to plead an actionable misstatement as to the Category (2) statements." MOL at 13. The Court therefore refers to the First MTD Opinion at 19–20 and concludes that it was materially misleading for Defendants to attribute increases in inventory to factors other than channel stuffing.

### 4.  Statements Regarding Low Inventory

In the First MTD Opinion, the Court held that Plaintiffs adequately pleaded that "the statements characterizing inventory levels as 'low' were materially misleading." First MTD Opinion at 20. "Because the Court has already ruled that Plaintiffs have adequately pleaded actionable misstatements with respect to these two statements, Defendants do not move to dismiss these two statements on actionability grounds but maintain that they did not create in the mind of the reasonable investor the unqualified impression that inventory was low in spring 2023." MOL at 15. The Court therefore refers to the First MTD Opinion at 20–21 and concludes that Plaintiffs adequately allege that the statements regarding "low" inventory were materially misleading.

### 5.  Statements Regarding Demand in Europe

Plaintiffs have plausibly pleaded that Defendants' statements regarding "strong" demand in Europe were false. CW2 and CW10, both sales managers at SolarEdge, had conversations with colleagues regarding "concerns" with SolarEdge's business in Europe. SCAC ¶ 63. The SCAC cites CW2's vague statement that he in early 2023, he heard "discussions that Europe wasn't going well." *Id.* The Court previously held that alone this allegation of "rumors" in the company was too vague an unspecific to demonstrate the falsity of Defendants' statements. First MTD Opinion at 22; *see* 15 U.S.C. § 78u-4(b)(1) ("[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state *with particularity* all facts on which that belief is formed." (emphasis added)); *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 306 (S.D.N.Y. 2019)

("Generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of the PSLRA . . . [with] no further details or explanations of these witness' allegations" (brackets omitted)).  However, in the SCAC, Plaintiffs bolster this unspecific allegation with CW10's statement that "he heard from colleagues in mid-2023 that the Company was seeing a 'slowdown' . . . in demand in Europe." SCAC ¶ 63.  According to CW10, distributors in Europe were not buying product.  *Id.*

An inference that there was weak demand in Europe in 2023 is further supported by CW15's allegation that in mid-2022, Mathews, SolarEdge's North America General Manager, explicitly told his sales team that "Europe is struggling." *Id.*  According to CW15, there was "lack of sales in Europe," which the North American team had to "make up for." *Id.*  Even though Mathews's warning came a few months before the Class Period, "courts in this Circuit frequently consider" "allegations that predate the Class Period" when making inferences about events that occurred during the Class Period.  *City of Omaha Police and Fire Ret. System v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 411 (S.D.N.Y. 2020) (citing *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001)).  In any event, CW15 noticed that "[s]ales in Europe continued to taper off until [CW15] left [the company] in May 2023," during the Class Period.  SCAC ¶ 63.  Even though CW15 was a Director of Sales for regions of the U.S. and Canada, not Europe, Plaintiffs "describe[] [the source] with sufficient particularity to support the probability that a person in the position . . . would possess the information." *In re Sierra Wireless, Inc. Securities Litig.*, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007) (where the CW had an "unspecified role").  CW15 is a sales director for large regions of the company, and one could infer that he would be privy to sales data across other regions.  Further, Plaintiffs specifically allege that Mathews gave CW15 some, if not all, of this information.  *See* SCAC ¶¶ 48, 63.  Therefore, Plaintiffs have sufficiently alleged that during the Class Period, demand in Europe was weak and that statements to the contrary were false or misleading.

### 6. Statements Regarding Sell-Through Rates

Plaintiffs fail to allege with particularity that the statements regarding sell-through rates were false or misleading. Plaintiffs provide two allegations related to the falsity of Defendants' forecasts of sell-through rates in Europe: CW4 stated that he was told his forecasts were "too low," SCAC ¶ 67, and CW10 stated that he was "effectively forced to revise his forecasts upward," *id.* ¶ 68. *See also id.* ¶¶ 69–70. The Court already held that CW4's allegation "is not enough to support Plaintiffs' claims that [Defendants'] five statements . . . regarding sell-through forecasts were false." First MTD Opinion at 25. That is because CW4 does not specify when he created his forecasts; because CW4 does not assert that his forecasts were ultimately adopted by Defendants; and because CW4's disagreement with his supervisors is insufficient to support an inference that his supervisors' forecasts were false. *See id.* at 25–26.

CW10's allegation is also insufficient to demonstrate that Defendants' forecasts of sell-through rates in Europe were falsely inflated. First, CW10 stated that he was told to "fudge" his sales forecasts in late 2023, "after the Class Period ended." SCAC ¶ 68. Therefore, this allegation is insufficient to disprove that Defendants' statements made during the Class Period were affected by CW10's allegedly inflated forecasts. *In re Lululemon Securities Litig.*, 14 F. Supp. 3d 553, 579 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) ("No CW sets forth facts that suggest that any of the alleged statements were false *when they were made*." (emphasis in original)).

Second, CW10 does not assert that *any* of his forecasts—let alone the "fudged" forecast that was created after the Class Period—were used by Defendants when making the challenged public statements about sell-through rates. CW10 asserts that he only "understood" that his forecasts "would make their way into" unspecified "financial guidance released publicly by the company." SCAC ¶ 70. However, Plaintiffs fail to provide any "facts on which that belief [was] formed." 15 U.S.C. § 78u-4(b)(1). Further, CW10 was a regional sales manager in the U.S., which significantly

weakens the inference that Defendants used his forecasts when they were speaking about sell-through forecasts *in Europe*. *See Steinberg v. Ericsson LM Tel. Co.*, No. 07-cv-9615 (RPP), 2008 WL 5170640, at *6 (S.D.N.Y. Dec. 10, 2008) ("As part of North American operations . . . , it is not plausible that [the CWs] would have direct knowledge about . . . rollouts in the pipeline for [emerging market countries]."). There is no allegation that CW10's forecasts related to the European market. For these reasons, the SCAC fails to adequately plead that Defendants' statements regarding sell-through rates in Europe were false.

### B. Scienter

#### 1. Legal Standard

Under the heightened pleading standards of Fed. R. Civ. P. 9(b) and the PSLRA, a plaintiff alleging securities fraud must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). The question "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322–23. "Scienter may be established by facts '(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.'" *City of Pontiac Policemen's and Firemen's Ret. System v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir.2007)).[13]

An "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. If an inference of fraudulent intent is not "at least as compelling" as a contrary inference, it is inadequate, even in a "close case." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 777 (2d Cir.

---

[13] Here, Plaintiffs concede that "the SAC does not allege motive." Opposition at 18 n.11.

2010).  An inference of scienter need not be "irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324 (quotation omitted); *see also City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) ("[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff.").  "But generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard." *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 336 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010).  "Thus, a complaint 'which fails to adduce any specific facts supporting an inference of knowledgeable participation in the alleged fraud, will not satisfy even a relaxed standard.'" *Faulkner v. Verizon Commc'ns, Inc.*, 156 F. Supp. 2d 384, 393 (S.D.N.Y. 2001) (quoting *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir.1987)).

"While 'the absence of a motive allegation is not fatal,' motive can be a relevant factor, and 'personal financial gain may weigh heavily in favor of a scienter inference.'" *Slayton*, 604 F.3d at 776 (quoting *Tellabs*, 551 U.S. at 325).  Absent a showing of motive, "the strength of [Plaintiff's] circumstantial allegations must be correspondingly greater." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)).  In sum, "[t]he inquiry on a motion to dismiss is as follows:  '[w]hen the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" *In re Scot. Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 383 (S.D.N.Y. 2007).

## 2.  Scienter with Respect to Channel Stuffing

Plaintiffs still fail to adequately allege that Defendants had actual knowledge of or recklessly disregarded information about SolarEdge's practice of channel stuffing.  The SCAC merely alleges that Lando, Faier, and the SolarEdge executives urged sales teams to "sell the stock as aggressively as possible" and to "sell stock desperately."  SCAC ¶¶ 85, 96.  These requests do not support an

inference that Lando or Faier knew or intended that the stock would be sold by stuffing the channels. "Pushing representatives to sell does not, on its own and without more, suggest that [management] was encouraging or was aware of widespread fraud." *Gross v. AT&T Inc.*, No. 19-cv-2892 (VEC), 2021 WL 9803956, at *9 (S.D.N.Y. Sept. 27, 2021), *aff'd sub nom. Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*, No. 21-2698-cv, 2022 WL 17587853 (2d Cir. Dec. 13, 2022); *see also In re Bristol-Myers Squibb Securities Litig.*, 312 F. Supp. 2d 549, 566 (S.D.N.Y. 2004) ("[W]ithout additional allegations not present here, the allegation that the sales at issue were made pursuant to incentives to meet goals set by management is an insufficient basis on which to infer conscious misbehavior or recklessness."); *San Antonio Fire and Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 321 (S.D.N.Y. 2024) ("[A]ggressive sales targets do not necessarily suggest wrongdoing.").[14] Lando and Faier are the CEO and CFO of SolarEdge, respectively, "so it is not at all surprising that [they] would set aggressive sales goals." *Gross*, 2021 WL 9803956, at *9. While CW14 may think that an aggressive sales strategy was "the worst thing imaginable," SCAC ¶ 86, the Court cannot infer wrongdoing where mismanagement is at least equally plausible. *Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, 227 (S.D.N.Y. 2020) (holding that where a CW disagreed with decisions, "[a]t worst, such statements allege inactionable mismanagement"); *Gavish v. Revlon, Inc.*, No. 00-cv-7291 (SHS), 2004 WL 2210269, at *19 (S.D.N.Y. Sept. 30, 2004) ("[T]he aggressive sales practices attributed to Revlon do not by themselves raise a strong inference of scienter as to the existence of the alleged channel stuffing trend. Simply put, 'there may [have been] any number of legitimate reasons for attempting to achieve sales earlier,' none of which would have necessarily entailed

---

[14] The Court notes that in Plaintiffs' Opposition, they cite *San Antonio Fire*, 732 F. Supp. 3d at 321, with the following parenthetical: "'aggressive sales targets' support scienter inference." Opposition at 21. However, the actual quote from that case is, "Defendants rightly argue that even aggressive sales targets *do not* necessarily suggest wrongdoing." *San Antonio Fire*, 732 F. Supp. 3d at 321 (emphasis added). That case states that recklessness was shown by the confluence of "*outlandish* sales targets, silenc[ing] critics, mudd[ying] internal controls, and bull[ying]" sales teams. *Id.* (emphasis added). No such conduct is alleged here. Counsel are reminded of their duty of candor to the Court.

knowledge of the trend." (quoting *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 203 (1st Cir. 1999))).

Further, the Court cannot infer scienter from the fact that "the Individual Defendants knew about the use of discounts and payment terms to push product on customers." SCAC ¶ 87. "Offering incentives to meet sales or earnings goals is a common practice, and, without additional allegations not present here, the allegation . . . is an insufficient basis on which to infer conscious misbehavior or recklessness." *In re Bristol-Myers Squibb Securities Litig.*, 312 F. Supp. 2d 549, 566 (S.D.N.Y. 2004).[15]

Plaintiffs fall back on conclusory allegations that "the whole company knew" about the channel stuffing. SCAC ¶ 96; *see also id.* ¶ 85 ("You want to know who knew the situation with regard to stock? The whole board knew."). But, as the Court made clear in the First MTD Opinion, "Plaintiffs cannot rely on assertions that the information presented by confidential witnesses was known or common knowledge within the company." *In re Citigroup Inc. Securities Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010). The CWs that Plaintiffs cite are "merely parrot[ing] the conclusory allegations contained in the complaint." *In re Sierra Wireless, Inc. Securities Litig.*, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007). Additionally, allegations that "[t]he whole board knew" about "this situation with regard to stock" does not necessarily demonstrate that the whole board knew that the overstocked inventories were a result of deliberate channel stuffing. SCAC ¶ 85.[16] For these

---

[15] The cases cited by Plaintiffs do not counsel a different conclusion. There is no allegation that the discounts offered by SolarEdge sales teams "essentially nullified any revenue gain" such that "the plain import" was to "boost revenue artificially." *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Intern. N.V.*, 89 F. Supp. 3d 602, 616 (S.D.N.Y. 2015) (holding that "offering discounts to stimulate sales is not automatically manipulation and may well stimulate demand"). Nor is there an allegation that the discount decisions were "against corporate self-interest." *In re Mylan N.V. Securities Litig.*, No. 16-cv-7926 (JPO), 2018 WL 1595985, at *17 (S.D.N.Y. Mar. 28, 2018).

[16] Likewise, any allegedly "misleading responses to questions about inventory declines," Opposition at 22, do not support an inference that Lando and Faier were aware that inventories were oversaturated due to channel stuffing. Plaintiffs' citation to *Pirnik v. Fiat Chrysler Automobiles, N.V.* is inapposite because those defendants "frequently discussed" the very compliance issues of which the plaintiffs alleged they had knowledge. No. 15-cv-7199 (JMF), 2016 WL 5818590, at *7 (S.D.N.Y. Oct. 5, 2016). Similarly, *In re Gen. Elec. Co. Sec. Litig.* is inapposite because it is "highly improbable" that someone making "detailed reports regarding the financial health of GE Capital's loan portfolio" would ignore "the backdrop of the global financial crisis." 857 F. Supp. 2d 367, 395–96 (S.D.N.Y. 2012). Here, "there may [have been] any number of legitimate reasons" why inventories remained high, "none of which would have necessarily entailed knowledge of [channel stuffing]." *Gavish*, 2004 WL 2210269, at *19.

reasons, Plaintiffs have failed to allege Defendants' scienter with respect to the alleged channel stuffing.

### 3. Scienter with Respect to Inventory Levels

In the First MTD Opinion, the Court held that "Plaintiffs have adequately pleaded that Lando and Faier had knowledge of or recklessly disregarded information that inventory levels in the channels were becoming saturated when they stated that inventory levels were low." First MTD Opinion at 30. "While Defendants do not challenge that holding for purposes of this motion, Defendants renew their assertion, for preservation purposes, that Plaintiffs fail to plead scienter with respect to the Category (3) statements." MOL at 23. Therefore, the Court refers to the First MTD Opinion at 30–32 and concludes that Plaintiffs adequately pleaded scienter with respect to the statements about inventory levels.

### 4. Scienter with Respect to Demand in Europe

#### a. Forward-Looking Statements

The PSLRA defines forward-looking statements as, among others, statements of "the plans and objectives of management for future operations" and statements of "future economic performance." 15 U.S.C. § 78u-5(i)(1)(B)–(C). To plead scienter for a forward-looking statement, a plaintiff must allege that the statement was made "with actual knowledge" of its falsity. 15 U.S.C. § 78u-5(c)(1)(B); *see also Slayton v. Am. Exp. Co.*, 604 F.3d 758, 776 (2d Cir. 2010) ("[T]he scienter requirement for forward-looking statements is stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity."). If the alleged violator is a business entity, a plaintiff must prove that the forward-looking statement was "made by or with the approval of an officer of that entity . . . with actual knowledge by that officer that the statement was false or misleading." *Id.* § 78u-5(c)(1)(B)(ii).

One of the statements regarding demand in Europe is a forward-looking statement. *See* SCAC ¶ 169 ("[I]t's definitely the case that [Europe] will probably be the fastest-growing geographies for us . . . . We're definitely looking ahead toward a very healthy and robust year in Europe again."). Danziger's statement that SolarEdge is "looking ahead" to a "very healthy and robust year" in Europe is a forward-looking prediction about future economic performance. Because Plaintiffs fail to adequately allege that Danziger had actual knowledge that demand in Europe would not be healthy going forward—as discussed further in Section IV.B.4.c below— Plaintiffs fail to state a section 10(b) claim with respect to this statement.

The remaining statements in this category are not forward looking, to the extent that what Plaintiffs allege to be false are Defendants' characterizations of demand in Europe at the time the statements were made. *See* SCAC ¶ 183 ("The above statements identified in paragraphs 166-182 communicated to or gave investors the impression that demand for SolarEdge products in Europe was high. These statements were materially false and/or misleading, however, because Defendants knowingly or recklessly failed to disclose that demand in Europe was falling."). Contrary to Defendants' argument, the statements at SCAC ¶¶ 168 (same as 186), 173, 174 are not forward-looking with respect to the characterization of demand in Europe. These statements "contain some elements that look forward and others that do not," and therefore the Court may "sever" the "forward-looking elements" from the "non-forward-looking elements." *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 385 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021) (quoting *In re Vivendi S.A. Securities Litig.*, 838 F.3d 223, 246 (2d Cir. 2016)). While the parts of these statements that project what the "outlook" is for growth are forward looking, the characterization of demand in Europe as presently strong is a statement about present conditions. *Compare* SCAC ¶ 173 ("So the outlook is for likely growth."), *with id.* ("In Europe, the situation is more dependent on our supply."); *compare id.* ¶ 168 ("[O]ur 2023 in Europe will be similar to the condition we were in in

2022."), *with id.* ("[A]s far as we can see, the market is – the demand is good, and the market is strong, and we are ramping production to meet demand.").  *See In re Turquoise Hill Resources Ltd. Securities Litig.*, 625 F. Supp. 3d 164, 211 (S.D.N.Y. 2022) (contrasting "specific information about the current situation" with statements asserting "that, whatever the present situation is, it makes the future projection attainable").

### b. Plaintiffs Adequately Allege That Lando and Faier Had the Requisite Scienter

Plaintiffs have adequately pleaded a strong inference that Lando and Faier had actual knowledge of or recklessly disregarded information that demand in Europe was weak at the time they made the challenged statements.  Karlstetter "had weekly meetings about SolarEdge's European business with [] Lando and Faier."  SCAC ¶ 97.  Karlstetter also provided "inventory as well as forecasting updates to [] Lando and Faier during [QBRs]."  *Id.*  During these QBRs, "the Company's leaders—i.e., Lando, Faier, Mathews, and Cohen—would share all the financial details, where [SolarEdge] is going each quarter, what are the targets, how much are they met, what is expected, what they can provide to achieve their expectations."  *Id.* ¶ 99 (internal quotation marks omitted).  Specific data presented at the QBRs include "earnings, projections, and volumes of inverters and batteries sold."  *Id.*  It is therefore a reasonable inference that at either the weekly meetings with Karlstetter or the Europe QBRs, Lando and Faier were informed that Europe was "struggling" in 2022 and into 2023.  *Id.* ¶ 63.[17]  Meanwhile Lando and Faier were publicly telling investors that demand in Europe "continued" to be strong from 2022 into 2023.  *See, e.g., id.* ¶¶ 168, 170, 172.

Further, the frequent reports of inventory and sell-through data were specifically shared with Lando and Faier.  SCAC ¶¶ 89–92.  Plaintiffs allege that Lando and Faier demonstrated their

---

[17] Or at least there is a reasonable inference that Lando and Faier recklessly disregarded the information available to them regarding the strength of demand in Europe.

awareness of the content of these reports by questioning subordinates with specific knowledge of distributors' inventories and needs. *Id.* ¶ 92. And Lando and Faier touted these inventory reports to investors, *id.* ¶¶ 102–03, which further supports an inference that Lando and Faier had knowledge of the contents of the reports. *See In re Salix Pharm., Ltd.*, No. 14-cv-8925 (KMW), 2016 WL 1629341, at *14 (S.D.N.Y. Apr. 22, 2016) (holding that a defendant's statement to analysts about "how he knew inventory levels with specificity . . . weighs in favor of scienter"). While Defendants argue that inventory or sell-through data would not necessarily alert Defendants to "issues about demand," Reply at 5, it is a more-than-reasonable inference that if a corporate executive looks at reports of inventory and looks at reports of the rate at which that inventory is sold, they could get a picture of the distributors' demand. *Compare Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Intern. N.V.*, 89 F. Supp. 3d 602, 617 (S.D.N.Y. 2015) (holding that "[r]ead most favorably to the plaintiff," reports containing "data showing that there was a trend of many months of fast-increasing receivables" is sufficient to "raise an inference that [the defendant] either knew or had access to information about . . . loosened terms"), *with Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) ("[Plaintiff's] broad reference to raw data lacks even an allegation that these data had been collected into reports that demonstrated that loan origination practices were undermining the collateral's performance.").

### c. Plaintiffs Adequately Allege That Danziger and Lowe Recklessly Disregarded Information That Rendered Their Statements False and Misleading

Plaintiffs sufficiently allege that Danziger and Lowe recklessly disregarded information that contradicted their statements that demand in Europe was strong. "Securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). Plaintiffs allege that Danziger and Lowe, as members of the C-

level management team, had access to the monthly reports of sales and inventory provided by distributors. SCAC ¶ 93. Lowe even referenced this distributor data specifically when speaking publicly about the "very, very strong" "underlying demand" in Europe. *Id.* ¶ 182; *see In re Salix*, 2016 WL 1629341, at *14. This shows that Lowe was aware of the reports—to which he had access— that allegedly revealed that demand in Europe was not in fact strong. Therefore, Plaintiffs have adequately pleaded that Danziger and Lowe recklessly disregarded information that contradicted their statements to investors.

Because Plaintiffs have not alleged Danziger's actual knowledge of any of the reports or data that showed weak demand, Plaintiffs' claim regarding Danziger's forward-looking statement at SCAC ¶ 169 fails.

### C. Section 20(a) Liability

Plaintiffs' Section 20(a) claims fail where the SCAC does not adequately plead that Defendants are liable for a primary violation of Section 10(b). *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) ("ATSI fails to allege any primary violation; thus, it cannot establish control person liability."); *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 207 (2d Cir. 2009). Defendants provide no other argument for dismissing the Section 20(a) claims. *See* MOL at 25. Therefore, the Court does not dismiss Plaintiffs' Section 20(a) claims regarding Defendants' statements that inventory was low and that demand in Europe was strong.

### V.    LEAVE TO AMEND

Defendants' motion to dismiss is granted in part with leave to amend as described below. "The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014)

(quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).

Plaintiffs have failed to adequately plead that Defendants' sell-through forecasts were improperly inflated, and Plaintiffs have failed to adequately plead that the Individual Defendants were aware of the alleged channel stuffing. The Court cannot conclude that further amendment would not cure these deficiencies in the SCAC. The Court therefore grants Plaintiffs leave to file a third amended complaint solely to cure the deficiencies identified with respect to these claims no later than 30 days from the date of this order. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 191 (2d Cir. 2015).

## VI.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART. Plaintiffs have adequately stated claims for Section 10(b) and Section 20(a) liability with respect to the statements by the Individual Defendants that inventory levels in 2023 were low and that demand in Europe in 2023 was strong. Claims arising from the remaining statements are dismissed with leave to amend as described above. The Clerk of Court is directed to terminate the motion pending at Dkt. No. 76.

SO ORDERED.

Dated:  April 6, 2025
New York, New York

_____
GREGORY H. WOODS
United States District Judge

28