**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE SOLAREDGE TECHNOLOGIES, INC. SECURITIES LITIGATION | No. 1:23-cv-09748-GHW <br><br> **CLASS ACTION** |
| THIS DOCUMENT RELATES TO: <br><br> *ALL ACTIONS* |  |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS**
**REPRESENTATIVES AND LEAD COUNSEL**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS .............................................................................................. 3

    I.    Background of SolarEdge ................................................................... 3

    II.    Inventories Swell as Demand Declines in Europe.................................. 3

    III.    Defendants Misrepresent European Demand and Inventory Levels to Investors.......................................................................................... 5

    IV.    The Truth Emerges .......................................................................... 5

PROCEDURAL HISTORY.............................................................................................. 6

ARGUMENT.............................................................................................................. 7

    I.    THE CLASS SHOULD BE CERTIFIED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23 ................................................................ 7

        A.    The Rule 23(a) Requirements Are Satisfied .............................. 8

            1.    The Proposed Class Is So Numerous That Joinder Is Impracticable.............................................................. 8

            2.    Questions of Law or Fact Are Common to the Class ................... 9

            3.    Plaintiffs' Claims Are Typical of the Class ................................. 10

            4.    Plaintiffs Will Fairly and Adequately Protect the Interests of the Class................................................................. 11

        B.    The Requirements of Rule 23(b)(3) Are Satisfied ................................. 12

            1.    Common Questions of Law and Fact Predominate ...................... 12

                 a.    NASDAQ Listing Is Strong Evidence of Market Efficiency ......................................................... 16

                 b.    The Five *Cammer* Factors Confirm Market Efficiency.... 17

                 c.    The *Krogman* Factors Further Support A Finding Of Market Efficiency .......................................... 21

                 d.    Mechanical Damage Tabulations For Individual Class Members Will Not Defeat Predominance......................... 22

                 e.    Reliance Is Also Presumed Under *Affiliated Ute*.............. 22

            2.    A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy .................... 23

    II.    POMERANTZ SATISFIES THE RULE 23(g) PREREQUISITES FOR APPOINTMENT AS CLASS COUNSEL ........................................................ 24

CONCLUSION............................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens v. United States*,
    406 U.S. 128 (1972)................................................................................................22, 23

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)................................................................................................7, 11, 12

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)................................................................................................2, 8, 13

*Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    955 F.3d 254 (2d Cir. 2020), *vacated on other grounds*, 594 U.S. 113 (2021).......................17

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    222 F.3d 52 (2d Cir. 2000)................................................................................................11

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)................................................................................................13, 14, 16

*Blackie v. Barrack*,
    524 F.2d 891 (9th Cir. 1975) ................................................................................................10

*Califano v. Yamasaki*,
    442 U.S. 682 (1979)................................................................................................2

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) .................................................................................. *passim*

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    310 F.R.D. 69 (S.D.N.Y. 2015) .................................................................................. *passim*

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
    504 F.3d 229 (2d Cir. 2007)................................................................................................8

*Cheney v. Cyberguard Corp.*,
    213 F.R.D. 484 (S.D. Fla. 2003)................................................................................................18

*Conn. Ret. Plans & Tr. Funds v. Amgen, Inc.*,
    2009 WL 2633743 (C.D. Cal. Aug. 12, 2009)................................................................................................11

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007)................................................................................................23

*Cromer Fin. Ltd. v. Berger*,
  205 F.R.D. 113 (S.D.N.Y. 2001) ...................................................................................13

*Darquea v. Jarden Corp.*,
  2008 WL 622811 (S.D.N.Y. Mar. 6, 2008) .................................................................7

*Dietrich v. Bauer*,
  192 F.R.D. 119 (S.D.N.Y. 2000) ................................................................................9

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ....................................................................................................13

*Dura-Bilt Corp. v. Chase Manhattan Corp.*,
  89 F.R.D. 87 (S.D.N.Y. 1981) ...................................................................................12

*Epifano v. Boardroom Bus. Prods., Inc.*,
  130 F.R.D. 295 (S.D.N.Y. 1990) ................................................................................7

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ................................................................................................8, 13

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982) ....................................................................................................10

*Guadagna v. Zucker*,
  332 F.R.D. 86 (E.D.N.Y. 2019) ..................................................................................8

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ...............................................................................................15, 20

*In re Agent Orange Prod. Liab. Litig.*,
  818 F.2d 145 (2d Cir. 1987) ........................................................................................9

*In re Allergan PLC Sec. Litig.*,
  2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021) ...........................................................19

*In re Baldwin-United Corp. Litig.*,
  122 F.R.D. 424 (S.D.N.Y. 1986) ..............................................................................10

*In re Beacon Assoc. Litig.*,
  282 F.R.D. 315 (S.D.N.Y. 2012) ..............................................................................13

*In re Blech Sec. Litig.*,
  187 F.R.D. 97 (S.D.N.Y. 1999) ..................................................................................8

*In re Diamond Foods, Inc., Sec. Litig.*,
  295 F.R.D. 240 (N.D. Cal. 2013) .............................................................................22

*In re DVI, Inc. Sec. Litig.*,
  639 F.3d 623 (3d Cir. 2011)......................................................................................17

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  245 F.R.D. 147 (S.D.N.Y. 2007), *order aff'd in part, vacated in part*, 574 F.3d
  29 (2d Cir. 2009).....................................................................................................10

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009).......................................................................................10

*In re Hebron Tech. Co. Sec. Litig.*,
  2020 WL 5548856 (S.D.N.Y. Sept. 16, 2020)..........................................................25

*In re Indep. Energy Holdings PLC, Sec. Litig.*,
  210 F.R.D. 476 (S.D.N.Y. 2002) ...........................................................................2, 7

*In re JPMorgan Chase & Co. Sec. Litig.*,
  No. 12 CIV. 03852 (GBD), 2015 WL 10433433 (S.D.N.Y. Sept. 29, 2015)............22

In re *LIBOR-Based Fin. Instruments Antitrust Litig.*,
  299 F. Supp. 3d 430 (S.D.N.Y. 2018).......................................................................10

*In re Merck & Co., Inc., Sec., Deriv. & ERISA Litig.*,
  2013 WL 396117 (D.N.J. Jan. 30, 2013) ..................................................................13

*In re Oxford Health Plans, Inc.*,
  191 F.R.D. 369 (S.D.N.Y. 2000) ..............................................................................10

*In re: Petrobras Sec. Litig.*,
  312 F.R.D. 354 (S.D.N.Y. 2016), *aff'd in part, vacated in part sub nom.*, *In re
  Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017) ......................................................18, 25

*In re Petrobras Sec. Litig.*,
  862 F.3d 250 (2d Cir. 2017)......................................................................................21

*In re Prudential Sec. Inc. P'ships Litig.*,
  163 F.R.D. 200 (S.D.N.Y. 1995) ................................................................................9

*In re SCOR Holding (Switzerland) AG Litig.*,
  537 F. Supp. 2d 556 (S.D.N.Y. 2008)...................................................................10, 24

*In re Sumitomo Copper Litig.*,
  182 F.R.D. 85 (S.D.N.Y. 1998) ................................................................................10

*In re Vale S.A. Sec. Litig.*,
  2022 WL 122593 (E.D.N.Y. Jan. 11, 2022) ...........................................................8, 19

iv

*In re Visa Check/MasterMoney Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001), *abrogated on other grounds by In re Initial Pub.
   Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006), *clarified sub nom. In re
   Initial Pub. Offering Sec. Litig.*, 483 F.3d 70 (2d Cir. 2007)....................................................11

*In re Vivendi Universal, S.A.*,
   242 F.R.D. 76 (S.D.N.Y. 2007) ......................................................................................8, 9

*In re Winstar Commc'ns Sec. Litig.*,
   290 F.R.D. 437 (S.D.N.Y. 2013) .......................................................................................14

*In re WorldCom, Inc. Sec. Litig.*,
   219 F.R.D. 267 (S.D.N.Y. 2003) .....................................................................................2, 23

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001): (1) ..........................................................................19, 20, 21

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*,
   967 F.2d 742 (2d Cir. 1992)................................................................................................23

*Lumen v. Anderson*,
   280 F.R.D. 451 (W.D. Mo. 2012).................................................................................16, 17

*Maywalt v. Parker & Parsley Petroleum Co.*,
   147 F.R.D. 51 (S.D.N.Y. 1993) .............................................................................................2

*Menkes v. Stolt-Nielsen S.A.*,
   270 F.R.D. 80 (D. Conn. 2010).......................................................................................8, 9

*Pearlstein v. BlackBerry Ltd.*,
   2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ......................................................................20

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
   446 F. Supp. 2d 163 (S.D.N.Y. 2006)...............................................................................13

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985)....................................................................................................2, 7

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015)................................................................................................22

*Strougo v. Barclays PLC*,
   312 F.R.D. 307 (S.D.N.Y. 2016), *aff'd sub nom.*, *Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017)..........................................................................................16, 22

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
   2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006), *aff'd*, 546 F.3d 196 (2d Cir.
   2008) ...............................................................................................................................15

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008)..................................................................................................7

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)..........................................................................................................24

*UFCW Loc. 1776 v. Eli Lilly & Co.*,
    620 F.3d 121 (2d Cir. 2010)..............................................................................................12

*Wagner v. Barrick Gold Corp.*,
    251 F.R.D. 112 (S.D.N.Y. 2008) ....................................................................................8, 10

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)............................................................................................................7

**Statutes**

15 U.S.C. §78j(b) ..............................................................................................6, 10, 13, 22

15 U.S.C. §78t(a) ......................................................................................................6, 13

Private Securities Litigation Reform Act of 1995 .........................................................2

**Rules**

Fed. R. Civ. P. 23 ................................................................................................. *passim*

Plaintiffs[1] submit this memorandum in support of their motion for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rules").[2] Plaintiffs seek certification of the following Class:

> All persons and entities other than Defendants,[3] current or former officers and directors of SolarEdge, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest, who purchased or otherwise acquired SolarEdge securities between February 13, 2023 and October 19, 2023, inclusive ("Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws.

## PRELIMINARY STATEMENT

This lawsuit is a textbook example of a case warranting class action treatment. Plaintiffs seek to prove that, like other Class members, they were injured by a common course of misconduct—the issuance of false and misleading statements and material omissions by Defendants (1) characterizing inventory levels as "low" (¶¶156-57) and (2) regarding the strength of demand in Europe (¶¶164, 167-68, 170-182, 186, 192) while Defendants were in possession of material information undermining the accuracy of their statements. The questions of law and fact relevant to the merits—issuance of false and misleading statements, reliance, materiality, scienter, loss causation and damages—are identical for every putative Class member.

---

[1] "Plaintiffs" collectively refers to Lead Plaintiffs Mivtachim the Workers Social Insurance Fund Ltd., Keren Hgimlaot Hmerkazit Histadrut Central Pension Fund Ltd., Kerren Makefet Pension and Provident Center Cooperative Society Ltd., the Hadassah Workers Pension Fund Ltd. (together, "the Amitim Funds"), and Hachshara Insurance Company Ltd. ("Hachshara"), and Named Plaintiff Javier Alcides Cascallar ("Cascallar").

[2] Unless otherwise noted, citations to "¶__" refer to the Second Amended Class Action Complaint ("SAC" or "Complaint"). Dkt. No. 72. For ease of reading, in all citations, all internal quotations and citations are omitted and emphasis is added unless otherwise indicated.

[3] "Defendants" are SolarEdge Technologies, Inc. ("SolarEdge" or the "Company") and Zvi Lando ("Lando"), Ronen Faier ("Faier"), Lior Danziger ("Danziger"), and J.B. Lowe ("Lowe").

The use of class action procedures to adjudicate claims under federal securities law has been upheld by the Supreme Court, as well as by the Second Circuit. *See, e.g.*, *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) ("most of the plaintiffs would have no realistic day in court if a class action were not available."); *In re Indep. Energy Holdings PLC, Sec. Litig.*, 210 F.R.D. 476, 479 (S.D.N.Y. 2002) (class action treatment is "particularly appropriate" for securities fraud claims, and under such circumstances courts should err in favor of certifying a class). In fact, the Supreme Court has warned against imposing restrictions on certification of federal securities claims where it is not mandated by the text of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 478 (2013). Likewise, "the Second Circuit…has explicitly noted its preference for class certification in securities cases and the importance of such certification for small securities holders located throughout the country." *Maywalt v. Parker & Parsley Petroleum Co*., 147 F.R.D. 51, 54 (S.D.N.Y. 1993); *see also In re WorldCom, Inc. Sec. Litig*., 219 F.R.D. 267, 304 (S.D.N.Y. 2003) (finding that, absent class certification, the burden and expense on individual investors of litigating independent actions against well financed defendants would leave most investors "without any recourse").

As detailed below, this action satisfies all the requirements for class certification under Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. This action also satisfies the two core requirements for certification under Rule 23(b)(3): predominance of common questions of law or fact and superiority of a class action over other available methods for adjudication. Accordingly, class certification is warranted.

**STATEMENT OF FACTS**

## I.    Background of SolarEdge

SolarEdge is an Israel-based company that designs, develops, manufactures, and sells inverter solutions for solar energy systems. ¶¶49-51. The Company's "customers" are primarily distributors, wholesalers, and installers who "sell through" SolarEdge products to end users. ¶53. The Company SEC filings disclose SolarEdge's own inventory levels of "raw materials," "work in progress," and "finished goods," *i.e.*, completed. products available for sale. ¶55. It does not disclose "channel inventory," or inventory held by customers that has not been sold through. *Id.* Europe is by far the Company's most important region, producing 64% of the Company's revenues in 2023, *i.e.*, the year of the Class Period. *See* ¶¶57-58. Analysts characterized SolarEdge's European business as a prime reason to invest in the Company. *See* ¶¶60, 62.

## II.    Inventories Swell as Demand Declines in Europe

By the start of the Class Period, demand in Europe for SolarEdge products had been in decline for months and channel inventories were rising. ¶¶62-63, 100. For example, CW15,[4] a SolarEdge director of sales in northeast and Midwest U.S. and Canada (¶48), stated that he learned of declining demand in Europe directly from Peter Mathews ("Mathews"), the Company's North America General Manager, at a July 2022 national sales meeting in San Jose. ¶63. CW15 further stated that Defendants knew about declining demand in Europe from monthly sales and inventory reports from distributors, which showed an imminent drop-off in sales. ¶93. Indeed, in August 2022 CW15 became extremely worried by swelling channel inventories, which he estimated would take four to six quarters to correct, and asked the Company's Israel-based strategy team how it planned to handle the "impending [sales] collapse." ¶80. CW15 said

---

[4] "CWs" are confidential witnesses who spoke with Plaintiffs' investigators. They are referred to in the masculine to preserve their anonymity.

that SolarEdge's Senior Sales Director of the Distribution Channel in North America shared his concerns, which were communicated to SolarEdge's leadership. ¶81. CW15 further stated that European demand continued to decline until he left SolarEdge in May 2023. ¶63. ¶74.

CW15's description of a slowdown in Europe was corroborated by CW2, who described hearing in early 2023 "concerns and discussions that Europe wasn't going well." ¶63. These discussions included his sales colleagues, Mathews, and SolarEdge's upper management in North America. *Id.* Likewise, CW10, a SolarEdge sales manager in the northeast U.S., stated that he heard from colleagues in mid-2023 that the Company was seeing a "slowdown" in its European business and an "overstock in distribution channels." *Id.* According to CW10, excess inventory "wasn't moving at the distribution level," because distributors "weren't buying it because of the slowdown." *Id.*

Slowing demand in Europe also was reflected in SolarEdge's inventories and channel inventories, which were skyrocketing during the Class Period. ¶¶56, 62-82. For example, while the Company had held $729 million in inventory ($202 million of finished goods) as of December 31, 2022, that inventory had increased 20%, to $874 million (with finished goods inventory increasing 64.4% to $303) at the end of Q1 2023 and rising an additional 12.6%, to $984 million (with finished goods inventory increasing another 46.4% to $487 million), at the end of Q2. *Id.* SolarEdge's inventory rose a total of 35% (and its finished goods inventory rose 141%) during the first half of 2023. ¶82. Similarly, CW4 described how "SolarEdge's commercial inventories were rising sharply during the first half of 2023" because customers did not need more products given their saturated inventories (¶100); CW5 recalled distributors "trying to cancel orders [from] at least as early as February 2023" up through the end of the Class Period "because their inventories were saturated" (¶72); and CW7 heard distributors

4

"saying that they have too much equipment in the first half of 2023" (¶67). Further, in Q1 and Q2 2023, SolarEdge was forcing product on customers that was not needed at least in substantial part because channel inventories were saturated. *See* ¶¶62-82.

### III. Defendants Misrepresent European Demand and Inventory Levels to Investors

Rather than disclose the truth to investors, however, Defendants continued concealing declining demand in Europe and the reasons underlying soaring inventory levels—even in response to skeptical analysts. *E.g.*, ¶¶156-57, 164, 167-68, 170-182, 186, 192. For example, on the 2022 Earnings Call, Lando boasted that "*we continue to see very strong demand from Europe for all products and relatively low inventory levels in the channel*" and "*in many cases, we see that the demand is far exceeding our ability to manufacture and deliver*" (¶167). Lando also responded to a query on the Q1 2023 Call by touting, "we don't see right now a change in the pattern of demand in the market in Europe," (¶172), and consistently communicated that demand in Europe was growing, when it was not (¶¶168-170, 173-74, 181). Similarly, on March 28, 2023, when asked about backlog for SolarEdge products, Faier assured investors that "*when we are looking at the inventory on hand, when it comes to our distributors, the channels are pretty, I would say, low on inventory in most cases*." ¶156. Similarly, when an analyst inquired about channel inventories in Europe on an earnings call in May 2023, Lando responded, "in Europe, *we actually see low [channel] inventory days on hand*," and "*the level of [channel] inventory is relatively not high*." ¶157.

### IV. The Truth Emerges

The truth—that demand in Europe had been declining and inventories were saturated—began to emerge on August 1, 2023, when Defendants acknowledged that SolarEdge's European distributors were "experiencing higher-than-optimal" channel inventories and that "growth in demand has tapered off." ¶¶197-98. Although Lando emphasized—including in response to

direct questions from analysts—that these developments were mere hiccups, he provided revenue "guidance" disclosing that revenues were likely to decline from $947.4 million in Q2 2023 to between $850 million and $890 million in Q3. ¶¶204-08. On this news, the Company's share price fell $43.96 per share, or 18.3%, to close at $195.51. ¶¶209-10.

The truth fully emerged on October 19, 2023, when SolarEdge issued a press release disclosing that "[d]uring the second part of the third quarter of 2023, we experienced substantial unexpected cancellations and pushouts of existing backlog from our European distributors" and, as a result, third quarter revenue guidance was further lowered by another approximately 17%, to $720 million to $730 million. ¶¶210-11. The Company's share price plummeted again. ¶215.

## PROCEDURAL HISTORY

This action commenced with the filing of a class action complaint on November 3, 2023, alleging violations under Sections 10(b) and 20(a) of the Exchange Act. ECF No. 1. The Amitim Funds and Hachshara moved to be appointed as Lead Plaintiffs on January 2, 2024 (ECF No. 30). On February 7, 2024, the Amitim Funds and Hachshara were appointed Lead Plaintiffs and Pomerantz LLP was appointed Lead Counsel. ECF No. 47. On April 22, 2024, Plaintiffs filed a consolidated amended class action complaint. ECF No. 55. Defendants moved to dismiss that complaint, and the motion was fully briefed on September 16, 2024 (ECF Nos. 65-69). On December 4, 2024 the Court granted and denied the motion in part and granted Plaintiffs leave to amend. ECF No. 70. Plaintiffs filed the SAC on January 3, 2025 (ECF No. 72), Defendants moved to dismiss the SAC on February 10, 2025, and the motion was fully briefed on March 3, 2025 (ECF No. 80). On April 6, 2025, the Court granted and denied in part Defendants' motion and granted Plaintiffs leave to amend. ECF No. 81. On May 6, 2025, Plaintiffs apprised the Court that they would stand on their SAC. ECF No. 82. Defendants filed their answer and affirmative defenses to the SAC on November 11, 2024. ECF No. 86.

6

**ARGUMENT**

**I.     THE CLASS SHOULD BE CERTIFIED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23**

To certify a putative class, the Court must determine whether four threshold requirements of Fed. R. Civ. P. 23(a) are met: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). In addition, the Court must determine whether the action is maintainable under Fed. R. Civ. P. 23 (b)(1), (2) or (3). *Id.* at 614. "[T]he preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

Class actions promote judicial economy by aggregating small claims into one lawsuit. "Class actions…permit the plaintiffs to pool claims which would be uneconomical to litigate individually.… [M]ost of the plaintiffs would have no realistic day in court if a class action were not available." *Shutts*, 472 U.S. at 809. It is well settled that "[t]here is a strong public policy in favor of private enforcement of the nation's securities laws." *Epifano v. Boardroom Bus. Prods., Inc.*, 130 F.R.D. 295, 298 (S.D.N.Y. 1990). Thus, Courts in the Second Circuit have repeatedly acknowledged that "[b]ecause of the usefulness of class actions in addressing allegations of securities fraud, the class certification requirements of Rule 23 are to be construed liberally." *Darquea v. Jarden Corp.*, 2008 WL 622811, at *4 (S.D.N.Y. Mar. 6, 2008). In a securities fraud action, if a court is in doubt as to whether to certify a class action, it should err in favor of certification. *Indep. Energy Holdings*, 210 F.R.D. at 479.

While courts must conduct a "rigorous analysis" to determine whether the elements of Rule 23 have been satisfied, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011), Rule 23 is not a "license to engage in free-ranging merits inquiries at the [class] certification stage."

*Amgen*, 568 U.S. at 466. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* Accordingly, while it is appropriate to consider whether a securities market was efficient to support a presumption of reliance, it is not appropriate to delve into merits issues such as scienter, materiality, or loss causation. *See, e.g.*, *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 811 (2011) ("*Halliburton I*"); *Amgen*, 568 U.S. at 464–65; *Guadagna v. Zucker*, 332 F.R.D. 86, 92 (E.D.N.Y. 2019) (discussing how overlap with the merits "is not an invitation for courts to decide the case through a class certification motion").

### A.    The Rule 23(a) Requirements Are Satisfied

#### 1.    The Proposed Class Is So Numerous That Joinder Is Impracticable

Rule 23(a)(1) requires that the class be so numerous that joinder of all members would be "impracticable." *See In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *3 (E.D.N.Y. Jan. 11, 2022), *report and recommendation adopted*, 2022 WL 969724 (E.D.N.Y. Mar. 31, 2022). Impracticable does not mean impossible, but only that the difficulty of joining all class members makes a class action appropriate. *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244–45 (2d Cir. 2007). Further, plaintiffs need not allege the exact number or identity of class members. *See In re Blech Sec. Litig.*, 187 F.R.D. 97, 103 (S.D.N.Y. 1999). "Joinder is generally presumed to be impracticable when a putative class exceeds 40 members." *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 90 (D. Conn. 2010) (citing *Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997)). "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007) (collecting cases); *accord Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 116 (S.D.N.Y. 2008).

8

During the Class Period, SolarEdge's shares were listed on the NASDAQ under the symbol "SEDG." *See* Declaration of Brian Calandra ("Calandra Decl.") Exhibit 1, Expert Report of Matthew D. Cain, Ph.D. ("Cain Report") ¶15. During that time, on average, there were between 56.1 million and 56.6 million shares of SolarEdge common stock issued and outstanding. *Id*. ¶91. Although Plaintiffs have not at this time ascertained the precise number of potential Class members, they believe that there are many thousands of geographically dispersed members of the proposed Class who can be readily identified from the securities brokerage and nominee firms' books and records. Accordingly, the proposed Class clearly consists of a sufficient number of persons (*i.e*., more than 40) that joinder is impracticable. *See Menkes*, 270 F.R.D. at 90.

### 2.      Questions of Law or Fact Are Common to the Class

Rule 23(a)(2)'s requirement of "questions of law or fact common to the class" is a "low hurdle" that is "easily surmounted." *See In re Prudential Sec. Inc. P'ships Litig*., 163 F.R.D. 200, 206 n.8 (S.D.N.Y. 1995); *see also Dietrich v. Bauer*, 192 F.R.D. 119, 124 (S.D.N.Y. 2000) (commonality requirement "has been applied permissively by courts in the context of securities fraud litigation"). Commonality is established so long as the plaintiffs can "identify some unifying thread among the [class] members' claims." *Vivendi*, 242 F.R.D. at 84 (citation and internal quotation marks omitted). Even a single common legal or factual question will suffice. *See In re Agent Orange Prod. Liab. Litig*., 818 F.2d 145, 166–67 (2d Cir. 1987).

Here, common questions of law and fact include: (i) whether Defendants' statements were materially false and misleading; (ii) whether the underlying misrepresentations and omissions were made with scienter; (iii) whether the price of the Company's stock was artificially inflated during the Class Period; and (iv) whether Defendants' misrepresentations and omissions caused Class members to suffer economic losses. The misstatements were made to the

9

Class as a whole, and injured market participants in the same way. In comparable situations, courts consistently find the commonality requirement to have been satisfied. *See, e.g.*, *In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 571 (S.D.N.Y. 2008); *Wagner*, 251 F.R.D. at 116; *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 157–58 (S.D.N.Y. 2007), *order aff'd in part, vacated in part*, 574 F.3d 29 (2d Cir. 2009). Indeed, here, like all Section 10(b) cases, the commonality of the shareholders' claims is self-evident. *See Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975).

### 3. Plaintiffs' Claims Are Typical of the Class

Rule 23(a)(3) mandates that the claims of the representative plaintiffs be typical of the claims of the class. The Supreme Court has acknowledged that the "commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). "Typicality does not require that the situations of the named representatives and the class members be identical." *In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 375 (S.D.N.Y. 2000); *see also In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 94 (S.D.N.Y. 1998). A plaintiff's claim is typical if it arises from "the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). In other words:

> Because this inquiry focuses on the nature of the claims asserted, factual differences involving the date, type and manner of the purchase, the investor[s'] perception of the transaction, or even the information furnished to him at the time will not destroy typicality if each class member was the victim of the same material omissions and the same consistent course of conduct.

*In re Baldwin-United Corp. Litig.*, 122 F.R.D. 424, 428 (S.D.N.Y. 1986), abrogated on other grounds by *Dukes*, 564 U.S. at 351, as recognized in In re *LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 572 (S.D.N.Y. 2018).

10

Plaintiffs satisfy the typicality requirement. They each purchased the Company's shares during the same period of time as the putative class members purchased or held their shares. ECF No. 34-3; Certification of Javier Alcides Cascallar, *Cascallar v. SolarEdge Technologies, Inc.*, No. 1:23-cv-10847-GHW (S.D.N.Y.), ECF No. 1-1. Their claims, like those of all other Class members, derive from the same legal theories and the same misrepresentations and omissions. Accordingly, Plaintiffs' claims are typical of those of the Class. *Conn. Ret. Plans & Tr. Funds v. Amgen, Inc.*, 2009 WL 2633743, at \*5-6 (C.D. Cal. Aug. 12, 2009).

### 4.    Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

The Rule 23(a)(4)'s requirement that "the representative parties will fairly and adequately protect the interests of the class" is unquestionably met. The focus of a court's inquiry is "whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. It is important to emphasize that "[t]he conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental, and speculative conflict should be disregarded at the class certification stage." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001), *abrogated on other grounds by In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006), *clarified sub nom. In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70 (2d Cir. 2007).

Here, Plaintiffs "possess the same interest and suffer[ed] the same injury as the class members," *Amchem*, 521 U.S. at 594–95, and no actual or potential conflicts exist. Plaintiffs and all Class members have suffered losses from purchasing the Company's securities at artificially inflated prices. They have been injured by the identical wrongful underlying misrepresentations

11

and omissions of Defendants. Each of the Plaintiffs has been involved in this litigation, has communicated with counsel throughout the course of this action, and each is willing to serve as a representative party on behalf of the Class and understands his/her duties as Class representatives. *See* Calandra Decl. Exhibits 2-4.

Plaintiffs have engaged qualified, experienced and capable attorneys. Proposed Class Counsel are highly experienced in complex class litigation, especially securities fraud actions, and have the ability and willingness to prosecute this action vigorously. Calandra Decl. Exhibit 5 (firm resume). Lead Counsel's abilities and vigorous pursuit of the Class's interests are well documented by their advancement of the Class's claims in this Action, including, *inter alia*, its investigation into Defendants' alleged wrongdoing, filing of multiple amended complaints, and partial defeat of the Defendants' motions to dismiss.

### B. The Requirements of Rule 23(b)(3) Are Satisfied

Rule 23(b)(3) requires that common questions of law or fact predominate over individual questions and that a class action is superior to other available methods of adjudication.

#### 1. Common Questions of Law and Fact Predominate

"Predominance is a test readily met in certain cases alleging consumer or securities fraud." *Amchem*, 521 U.S. at 625. "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *See UFCW Loc. 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010); *see also Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y. 1981) ("to allow various secondary issues of plaintiffs' claim to preclude certification of a class would render the rule an impotent tool for private enforcement of the securities laws.").

Plaintiffs will prove, on a common basis, the elements of their Sections 10(b) and 20(a) claims: a material omission or misrepresentation; scienter; connection to purchase or sale of a security; reliance; economic loss; and loss causation.[5] *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005) "Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Halliburton I*, 563 U.S. at 810.[6] Here, reliance (or transaction causation) will be established on a common basis under the "fraud-on-the-market" theory. Per *Basic Inc. v. Levinson*, 485 U.S. 224, 241–42 (1988) (alteration in original) :

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.

> As the Court further explained:

> An investor who buys or sells stock at the price set by the market does so in

---

[5] In addition to an underlying Section 10(b) violation by a controlled entity, Section 20(a) liability requires control of the primary violator by the defendant. *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 190 (S.D.N.Y. 2006). Control can be proved class-wide. *See, e.g.*, *In re Beacon Assoc. Litig.*, 282 F.R.D. 315, 333 (S.D.N.Y. 2012).

[6] Aside from reliance and damages (as to which individual issues do not defeat predominance), courts routinely find that the other elements can be proved with common evidence. *See In re Merck & Co., Inc., Sec., Deriv. & ERISA Litig.*, 2013 WL 396117, at \*12 (D.N.J. Jan. 30, 2013) ("Defendants' liability will depend on the same evidence relating to the materiality of the misstatements and omissions at issue and Defendants' state of mind in making such statements or failing to disclose certain information .… In addition…loss causation for the putative class is also capable of proof through common evidence. Each class member's claim for relief is based on the same corrective disclosures"); *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 127 (S.D.N.Y. 2001) ("With one exception [reliance], there is no dispute that each element necessary to establish liability…is common to the class…. The proof for the claims of misrepresentation or omission, materiality, and [Defendant's] scienter are all based on a common nucleus of facts and a common course of conduct."). Because merits determinations are to be eschewed, the Supreme Court has recently confirmed that neither materiality nor loss causation has to be proved at the class certification stage to trigger *Basic*'s presumption of reliance. *See Amgen*, 568 U.S. at 467 (materiality); *Halliburton I*, 563 U.S. at 811–12 (loss causation).

reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations…may be presumed for purposes of a Rule 10b-5 action.

*Id*. at 247. To invoke the fraud-on-the-market-presumption, "plaintiffs must demonstrate that (1) the alleged material misstatements were [publicly] known, (2) that the security traded on an efficient market, and (3) that the plaintiff purchased his shares between the time the misleading statement was made and the time the truth was revealed." *In re Winstar Commc'ns Sec. Litig*., 290 F.R.D. 437, 445 (S.D.N.Y. 2013). Plaintiffs demonstrate all three.

Here, there can be no dispute that the alleged misrepresentations were public, as they were made in SEC filings, press releases, and earnings calls. Also, the members of the proposed Class, by definition, purchased SolarEdge's securities during the Class Period after alleged misrepresentations were made and before the truth was revealed. The final requirement, that SolarEdge's securities traded in an efficient market, is established in the Cain Report, as discussed herein. Plaintiffs thus are entitled to the fraud-on-the-market presumption of reliance.

In *Cammer v. Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989), the court set forth certain factors as an aid to determine whether the market for any stock is open and efficient:  (1) whether there "existed an average weekly trading volume during the class period in excess of a certain number of shares," to wit, 1% for a "substantial presumption" of efficiency, 2% turnover for a "strong presumption, *id*. at 1293; (2) whether "a significant number of securities analysts followed and reported on [the] company's stock during the class period"; (3) whether the company's stock "had numerous market makers"; (4) whether "the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met"; and (5) whether "empirical

14

facts show[ ] a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price," *id*. at 1284–87.

"The vast majority of courts have used the *Cammer* factors as an analytical tool rather than as a checklist." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 83 (S.D.N.Y. 2015) (collecting cases). "If, for example, a security is listed on the NYSE, AMEX, NASDAQ, or a similar national market, the market for that security is presumed to be efficient." *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 2006 WL 2161887, at *8 (S.D.N.Y. Aug. 1, 2006), *aff'd*, 546 F.3d 196 (2d Cir. 2008).

In *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 271 (2014) ("*Halliburton II*") the Supreme Court clarified the standard for fraud-on-the-market. Notably, the Court stated that the three prerequisites to invoking the fraud-on-the-market presumption were really proxies for the fact that the misrepresentation or omission affected the market price of the security (*i.e.*, "price impact"). *Id.* at 280. *Halliburton II* further clarified that a plaintiff can show fraud on the market *either* by providing evidence that the company's stock generally traded on an efficient market, *or* by direct evidence that the misleading statement had a price impact. *Id*. Defendants, by the same token, may also show a lack of price impact by direct evidence to rebut the presumption. *Id.* The Court *also* confirmed that market efficiency for purposes of the fraud-on-the-market presumption is not tied to any academic strain of market efficiency. *Id.* at 272. Instead, it is based on the "fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'" *Id.* Accordingly, "[d]ebates about the precise *degree* to which stock prices accurately reflect public information are thus largely beside the point." *Id*. In short, *Halliburton II* holds plaintiffs are not *required* to show price impact to obtain a fraud-on-the-market presumption of

15

reliance. Rather, plaintiffs may show that they are entitled to a presumption of reliance through either showing market efficiency *or* direct evidence that the misrepresentation or omission had an impact on the stock's price.

### a.    NASDAQ Listing Is Strong Evidence of Market Efficiency

Throughout the Class Period, the Company's shares were listed and traded on the NASDAQ, a major national exchange. Cain Report ¶¶15, 27. Congress, the Supreme Court, and *Cammer* all recognize that such well-developed markets are generally efficient in reflecting publicly available information in the prices of securities traded on those markets. In *Basic*, the Supreme Court noted that in "drafting [the 1934] Act, Congress expressly relied on the premise that securities markets are affected by information, and enacted legislation to facilitate an investor's reliance on the integrity of those markets…Recent empirical studies have tended to confirm Congress' premise that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." 485 U.S. at 245–46; *see also Lumen v. Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012) (holding that the NASDAQ is an efficient market because "*Basic* recognized the NYSE as an efficient market…and there is no material difference between NYSE and NASDAQ"). Similarly, *Cammer* quoted with approval treatise commentary that "there should be a presumption—probably conditional for class determination—that certain markets are developed and efficient for virtually all the securities traded there: the [NASDAQ]." 711 F. Supp. at 1292.

Indeed, Courts consistently find that the fact that a company's stock trades on the NASDAQ is sufficient to establish a presumption of efficiency. *See, e.g.*, *Strougo v. Barclays PLC*, 312 F.R.D. 307, 318 (S.D.N.Y. 2016), *aff'd sub nom.*, *Waggoner v. Barclays PLC*, 875 F.3d 79, 105-07 (2d Cir. 2017). ("most courts in this Circuit agree that" a listing on the NYSE or NASDAQ "is a good indicator of efficiency"). In fact, the Second Circuit has described the

16

NASDAQ as a "theoretically efficient market[]." *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 261 (2d Cir. 2020), *vacated on other grounds*, 594 U.S. 113 (2021); *see also In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011) ("[T]he listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency."), *abrogated on other grounds by Amgen*, 568 U.S. at 455; *Barclays*, 310 F.R.D. at 81 ("most courts agree that such listing is a good indicator of efficiency."); *Lumen*, 280 F.R.D. at 459–60 (cases "too numerous to cite[] establish the NYSE and NASDAQ are at least entitled to a *presumption* of efficiency — making it incumbent upon Defendants to rebut the presumption.").

### b.    The Five *Cammer* Factors Confirm Market Efficiency

Dr. Cain's holistic analysis of the *Cammer* factors and other indicia of market efficiency demonstrate that SolarEdge's common stock traded in an efficient market in the Class Period.

**Factor One—Weekly Trading Volume:** "[A] large weekly volume of stock trades…implies significant investor interest in the company [which] implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F. Supp. at 1286. During the Class Period, the average weekly trading volume of SolarEdge's stock listed on the NASDAQ as a percentage of shares outstanding was 12.5%. Cain Report ¶38. Thus, the average weekly reported trading volume of the Company's stock during the Class Period exceeds the 2% "strong presumption" of market efficiency in *Cammer*.

**Factor Two—Analyst Coverage:** Analyst coverage on a stock implies that information about the company is rapidly reflected in the stock price. *Cammer*, 711 F. Supp. at 1286. During the Class Period, at least 33 well-known investment firms followed and published reports on SolarEdge. Cain Report ¶42. More than 199 analysts' reports on the Company were issued during the Class Period. *Id.* In addition, during the Class Period, financial information was

17

further disseminated to investors via media coverage (including 323 unique articles), investor conferences, trade magazines, the Company's presentations and SEC filings. *Id.* ¶¶44-46. Furthermore, the Company's filings with the SEC were publicly available online during the Class Period at no cost. *Id.* ¶45. This volume of news coverage supports an inference that the stock traded on an efficient market. *See Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 499 (S.D. Fla. 2003) (524 news items over two years showed efficient market).

**Factor Three—Market Makers and the Potential for Arbitrage:** Market makers are significant to the market efficiency analysis because they "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level," thereby enabling public companies to immediately deliver information to the market, which is immediately incorporated into the price of a security. *Cammer*, 711 F. Supp. at 1286-87. "Courts in this Circuit have found that anywhere between six and twenty market makers is sufficient to support a finding of market efficiency." *Carpenters*, 310 F.R.D. at 92. SolarEdge easily exceeded this amount, as there were at least 114 market makers for its common stock during the Class Period. Cain Report ¶¶47-53.

Additionally, during the Class Period, there were over 1,259 institutional investors with ownership of an average of 53.6 million shares, or 95% of the Company's outstanding shares. *Id.* ¶52. The presence of institutional investors in SolarEdge, who were able to evaluate and trade SolarEdge shares based on new, material information, strongly supports a finding of market efficiency. *See id.*; *see also Carpenters*, 310 F.R.D. at 92 (*Cammer* 3 satisfied where between 55% and 97% of outstanding ADSs were held by institutional investors); *In re: Petrobras Sec. Litig.*, 312 F.R.D. 354, 366 (S.D.N.Y. 2016), *aff'd in part, vacated in part sub nom.*, *In re*

18

*Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017) (crediting expert opinion that wide institutional ownership indicates market efficiency).

**Factor Four—S-3 Eligibility:** The *Cammer* Court found that a company's eligibility to file a short-form registration statement, *i.e.*, Form S-3, supports a finding of an efficient market. *Cammer*, 711 F. Supp. at 1285. A company is entitled to S-3 registration if it meets certain requirements. Cain Report ¶55. As discussed by the *Cammer* court, S-3 eligible companies— those that disclose financial information to the SEC and issue press releases to the public—will have ready and ample access to publicly available information about the issuer, and, therefore, that the market operates efficiently for them. *See id.* ¶44. SolarEdge made all required filings with the SEC in a timely manner and satisfied the other Form S-3 requirements throughout the Class Period. *Id.* ¶57. Accordingly, this *Cammer* factor is consistent with the efficiency of the market for SolarEdge Common Stock throughout the Class Period.

**Factor Five—Cause and Effect Relationship of Unexpected Material News and Stock price:** The fifth *Cammer* factor tests if there is a causal connection between the disclosure of material information and stock price movement. *See Cammer*, 711 F. Supp. at 1287. "'[A]n event study that correlates . . . disclosures of [unanticipated,] material information [about a security] with corresponding fluctuations in price has been considered *prima facie* evidence of a causal relationship under the fifth *Cammer* factor.'" *Vale*, 2022 WL 122593, at *10.

Here, because Plaintiffs have already established the first four *Cammer* factors as well as all *Krogman* factors (*see infra* Section IV.B.1.c), further analysis of the fifth *Cammer* factor is unnecessary. In fact, Courts in this District have cautioned that direct proof of causality "would place an unnecessarily unrealistic evidentiary burden on the Rule 10b-5 plaintiff who has traded on an impersonal market." *In re Allergan PLC Sec. Litig.*, 2021 WL 4077942, at *9 (S.D.N.Y.

Sept. 8, 2021); *see also Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *16 (S.D.N.Y. Jan. 26, 2021), at *16 ("As the Second Circuit noted in *Waggoner*, where the remaining four *Cammer* factors and the three *Krogman* factors all point toward market efficiency, a court can dispense with the fifth *Cammer* factor completely.").

Regardless, Dr. Cain has proved that SolarEdge stock responded to new, Company-specific information by performing an event study analyzing SolarEdge stock price movements. Cain Rpt. ¶¶60-79. "Cammer 5 is often proven with an event study." *Barclays*, 310 F.R.D. at 80; *see also Halliburton II*, 573 U.S. at 280 (event studies are "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events"). To isolate the impact of Company-specific news on SolarEdge's stock price during the Class Period, Dr. Cain performed regression analyses to isolate Company-specific price movements from: (1) changes in market-wide factors that would be expected to impact all stocks, and (2) changes in industry-wide factors that would be expected to impact stocks in SolarEdge industry. *Id.* at ¶¶62-64; *see also Barclays*, 310 F.R.D. at 92-93 (finding expert's event study analysis provided evidence of market efficiency).

Dr. Cain's event study showed that SolarEdge's common stock reacted to Company-specific news in a manner expected in an efficient market. Cain Report ¶¶70-79, Exs. 4-7. The event study also determined that on days when SolarEdge announced Company-specific news, the stock price reacted more frequently with statistically significant movements and exhibited increased volume than on days when no Company-specific news was delivered. *Id.* at ¶¶76-79, Exs. 6, 7. As a result, Dr. Cain concluded that there was a clear cause-and-effect relationship between new Company-specific information and SolarEdge common stock price movements,

supporting the conclusion that SolarEdge's common stock traded in an efficient market throughout the Class Period. *Id*.

### c. The *Krogman* Factors Further Support A Finding Of Market Efficiency

To determine market efficiency, a number of courts have also considered three additional factors outlined in *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001): (1) market capitalization; (2) the bid-ask spread for stock sales; and (3) the public float. *See, e.g.*, *In re Petrobras Sec. Litig.,* 862 F.3d 250, 276 (2d Cir. 2017). Each of these factors support a finding of market efficiency here.

*First*, SolarEdge's market capitalization (the total value of a company's equity) averaged $13.7 billion over the Class Period. Cain Report ¶¶80-83, Ex. 8. This places SolarEdge above the 90th percentile of all companies listed on the NASDAQ and the NYSE from 2016-18 and supports. *Id*. ¶82.

*Second*, the average and median bid/ask spreads on SolarEdge's common stock during the Class Period were not only comparable to, but significantly lower than, those of comparable firms. As noted in *Krogman,* the smaller the spread, the more efficient the market. 202 F.R.D. at 478; Cain Report ¶¶84-88, Ex. 9. During the Class Period, SolarEdge's spread averaged 0.05%, which is far lower than the median bid-ask spread of 1.69% for a set of comparable firms. *Id*. ¶¶84-88, Ex. 9. This narrow spread further supports a finding of market efficiency.

Finally, the size of the "public float," that is, the number of SolarEdge shares held by the public, as opposed to insiders, further supports a finding of market efficiency. Insiders held less than 0.8% of the outstanding SolarEdge shares during the Class Period, meaning that over 99% of SolarEdge's common stock was held by non-insiders, which equates to an average public float of $12.0 billion. *Id*. at ¶¶89-92, Ex. 10.

21

> **d.**     **Mechanical Damage Tabulations For Individual Class Members Will Not Defeat Predominance**

Where liability can be proved class-wide, it is "well-established" Second Circuit precedent that "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification under Rule 23(b)(3)." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). This is especially true for securities fraud cases, where the process of computing damages after liability is established is "virtually a mechanical task." *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 252 (N.D. Cal. 2013) (quoting *Blackie*, 524 F.2d at 905). *See Barclays*, 310 F.R.D. at 74 ("Issues and facts surrounding damages have rarely been an obstacle to establishing predominance in section 10(b) cases."). For this reason, courts do not require a formal damages model to demonstrate that damages can be determined on a classwide basis. Instead, to the extent any evidence is required, an event study like that provided by Dr. Cain (Cain Report ¶¶49-53) will suffice. *See, e.g.*, *JPMorgan Chase.*, 2015 WL 10433433, at *7; *Diamond Foods*, 295 F.R.D at 251–52.

As Dr. Cain explains, his damages model can determine the inflation present in SolarEdge securities during each day of the Class Period via an event study, mechanically tabulate each Class Member's damages using his or her transactions, and apply a generally accepted out-of-pocket methodology incorporating the PSLRA's 90-day lookback period. Cain Report ¶¶95-113. This out-of-pocket methodology is sufficient to calculate damages for claims brought under Section 10(b) of the Exchange Act and has been endorsed by the Second Circuit. *See Waggoner*, 875 F.3d at 105-07.

> **e.**     **Reliance Is Also Presumed Under *Affiliated Ute***

In *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), the Supreme Court held that reliance is presumed where "a plaintiff's claim is based on a defendant's failure to disclose

22

material information." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 748 (2d Cir. 1992). In such circumstances, individual reliance need not be proven. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [its] decision." *Affiliated Ute*, 406 U.S. at 131. Reliance thus may be presumed here based on Defendants' omissions of material information.

### 2. A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy

Rule 23(b)(3) requires that a class action be superior to other methods of handling litigation. Together with predominance, the superiority requirement "ensures that the class will be certified only when it would 'achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007). As discussed, courts have universally recognized the superiority of class actions in cases alleging securities fraud, especially where the fraud-on-the-market presumption applies.

> This Court analyzes four factors in determining the superiority of the class action:
>
> A) the class members' interests in individually controlling the prosecution…of separate actions; B) the extent and nature of any litigation concerning the controversy already begun by…class members; C) the desirability…of concentrating the litigation of the claims in the particular forum; and D) the likely difficulties [to be encountered] in managing a class action.

Fed. R. Civ. P. 23(b)(3). These factors weigh in favor of class certification in this case.

*First*, the members of the proposed Class have little incentive to pursue individual actions. The costs and expenses of such actions, when weighed against the individual recoveries obtainable, would be prohibitive. *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. at 304 (finding superiority requirement met when "[f]ew individuals could even contemplate proceeding with

23

this litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail," particularly when many of the putative plaintiffs have suffered economic loss of *de minimus* value). A class action is not only an essential mechanism for investors to redress the injuries they suffered because of defendants' misconduct, it will also facilitate the vindication of the statutory objective of a fair, orderly, trustworthy, and reliable securities market. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 320 n.4 (2007) ("Nothing in the PSLRA, we have previously noted, casts doubt on the conclusion 'that private securities litigation is an indispensable tool with which defrauded investors can recover their losses' — a matter crucial to the integrity of domestic capital markets." ). Moreover, there are thousands of class members. "Litigating each case separately would be wasteful, and result in delay and an inefficient expenditure of judicial resources." *SCOR*, 537 F. Supp. 2d at 579. It would also "risk disparate results among those seeking redress." *Id*. Finally, there is no reason to expect any difficulties in managing this case as a class action. Indeed, class actions of this size and complexity are common.

## II.      POMERANTZ SATISFIES THE RULE 23(g) PREREQUISITES FOR APPOINTMENT AS CLASS COUNSEL

In confirming its appointment of Lead Counsel as Class Counsel, this Court must consider the factors enumerated in Rule 23(g)(1)(A):

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Under these criteria, the Pomerantz firm is eminently qualified, and this Court should confirm their appointment as Class Counsel in this case. *See* Calandra Decl. Exhibit 5 (firm resume). For over eighty-five years, Pomerantz has been a leader in litigating securities fraud

24

cases on behalf of investors in both class and individual actions, setting important precedents. *See, e.g.*, *In re Hebron Tech. Co. Sec. Litig.*, 2020 WL 5548856, at *6 (S.D.N.Y. Sept. 16, 2020) (Pomerantz has "extensive experience as lead counsel in securities class actions"); *Petrobras*, 312 F.R.D. at 362 ("There is no real dispute that Pomerantz is an established firm with considerable class action experience, and the [c]ourt has now had multiple opportunities to observe Pomerantz's performance. The [c]ourt finds that the Pomerantz firm has both the skill and resources to represent the Classes adequately.").

Pomerantz has committed substantial time and resources to representing the Class, has worked vigorously to prosecute this action, and has and will continue to zealously and competently represent the interests of the members of the Class. Pomerantz has effectively used its experience to vigorously pursue the interests of all Class members including filing factually detailed complaints, mounting a successful defense of the allegations in response to the Defendants' motions to dismiss, and engaging Defendants in the discovery process. Thus, Plaintiffs have satisfied Rule 23(g).

## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court issue an Order: (1) certifying this action pursuant to Rule 23 as a class action and certifying the Class defined herein; (2) appointing Plaintiffs as Class Representatives; (3) appointing Pomerantz LLP as Class Counsel; and (4) granting such other relief as the Court may deem just and proper.

Dated: October 17, 2025

**POMERANTZ LLP**

*/s/ Brian Calandra*

Brian Calandra
Jeremy A. Lieberman
600 Third Avenue
New York, New York 10016

25

Telephone: (212) 661-1100
Facsimile: (212) 661-8665
bcalandra@pomlaw.com
jalieberman@pomlaw.com

*Lead Counsel for Plaintiffs and the Proposed Class*

26

## WORD COUNT CERTIFICATION

I, Brian Calandra, certify that the foregoing memorandum of law complies with the word-count limitations set forth in Local Civil Rule 7.1(c). According to the word count of the word-processing program used to prepare the memorandum, and exclusive of the portions of it that are excluded by the rule, there are 8,071 words in the document.

*/s/ Brian Calandra*
Brian Calandra

## CERTIFICATION OF SERVICE

I, Brian Calandra, hereby certify that I filed true and correct copy of the foregoing Plaintiffs' Memorandum of Law In Support of their Motion for Class Certification and Appointment of Class Representatives and Lead Counsel with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Executed on October 17, 2025

*/s/ Brian Calandra*
Brian Calandra

28