**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE SOLAREDGE TECHNOLOGIES, INC.
SECURITIES LITIGATION

No. 1:23-cv-09748 (GHW)

-------------------------------------------------------------

THIS DOCUMENT RELATES TO: ALL
ACTIONS

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

GIBSON, DUNN & CRUTCHER LLP

Christopher D. Belelieu
Nathan C. Strauss
Bethany J. Saul
200 Park Avenue
New York, New York 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035

*Attorneys for Defendants*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................ 4
    A.   Company Overview ........................................................................................... 4
    B.   European Solar Demand Surges in 2022 ......................................................... 4
    C.   European Demand Remains Steady for Most of the Class Period.................... 5
    D.   SolarEdge Discloses Warning Signs in July 2023 .......................................... 6
    E.   Lead Plaintiffs and Class Representative Invest in SolarEdge *After* the August 1, 2023 Earnings Call ........................................................................................ 7
    F.   SolarEdge Revises Q3 2023 Guidance ........................................................... 7
    G.   Lead Plaintiffs Continue to Purchase SolarEdge *After* the October 19, 2023 Press Release ................................................................................................... 8

LEGAL STANDARD............................................................................................................ 8

ARGUMENT ..................................................................................................................... 9

    I.   Lead Plaintiffs Cannot Satisfy Rule 23(A) Due To Unique Defenses............................ 9

    II.   Lead Plaintiffs Cannot SATISFY RULE 23(B)'S REQUIREMENTS ...................... 12
      A.   Lead Plaintiffs Have Failed to Show That Common Questions of Reliance Predominate. ................................................................................................ 13
        1.   Substantive Mismatch Between Statements About European Demand and Back-End Corrective Disclosures Exists Which Precludes Finding of Price Impact. ....................................................................................... 13
        2.   Generic Mismatch Between Alleged Misstatements and Back-End Corrective Disclosures Precludes Finding of Price Impact. ................. 16
        3.   Lead Plaintiffs Fail to Offer Evidence of Price Impact. ...................... 18
      B.   Rule 23(b)(3) Precludes Certification Because Lead Plaintiffs Have Failed to Present a Methodology for Calculating Damages on a Class-Wide Basis .............. 19
        1.   Lead Plaintiffs' Damages Methodology Fails to Link Alleged Damages to Plaintiffs' Theory of Liability .................................................................. 19
        2.   Lead Plaintiffs Fail to Demonstrate That Their Damages Methodology Can Properly Isolate the Impact of Confounding Factors in the August 2023 Corrective Disclosure.................................................................... 23
        3.   Lead Plaintiffs Fail to Demonstrate That Their Damages Methodology Is Capable of Measuring Damages Associated with Materialization of Risk.......... 25
      C.   Rule 23(b)(3) Precludes Certification Because the Purported Class Includes Atypical, Uninjured Members.................................................................................. 27

CONCLUSION.................................................................................................................. 28

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### Cases

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972)...................................................................................................13

*In re Aluminum Warehousing Antitrust Litig.*,
336 F.R.D. 5 (S.D.N.Y. 2020) ...............................................................................21, 24

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018).........................................................................................28

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).................................................................................3, 10, 13, 19

*Berwecky v. Bear, Stearns & Co.*,
197 F.R.D. 65 (S.D.N.Y. 2000) .................................................................................12

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013).......................................................................................... *passim*

*Dial Corp. v. News Corp.*,
314 F.R.D. 108 (S.D.N.Y. 2015), *amended*, 2016 WL 690895 (S.D.N.Y. Feb.
9, 2016) .......................................................................................................................27

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009)..........................................................................................28

*Fort Worth Empls.' Ret. Fund v. J.P. Morgan Chase & Co.*,
301 F.R.D. 116 (S.D.N.Y. 2014) ...............................................................................22

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
903 F.2d 176 (2d Cir. 1990).......................................................................................10

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
77 F.4th 74 (2d Cir. 2023) ................................................................................ *passim*

*Goldman Sachs Grp. v. Ark. Tchr. Ret. Sys.*,
594 U.S. 113 (2021)......................................................................9, 16, 17, 19

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)....................................................................................3, 9, 13

*In re Harcourt Brace Novanovich, Inc. Sec. Litig.*,
838 F. Supp. 109 (S.D.N.Y. 1993) .............................................................................10

*Hughes v. Ester C. Co.*,
320 F.R.D. 337 (E.D.N.Y. 2017)................................................................................20

*In re Initial Pub. Offerings Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006)...........................................................................................9

Table of Contents (continued)

Page

*In re Kirkland Lake Gold Ltd. Securities Litig.*,
   2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) ................................................................ *passim*

*Kronenberg v. Allstate Ins. Co.*,
   743 F. Supp. 3d 465 (E.D.N.Y. 2024) ......................................................................19, 20

*In re Moody's Corp. Sec. Litig.*,
   274 F.R.D. 480 (S.D.N.Y. 2011) ..............................................................................13, 18

*In re Niaspan Antitrust Litig.*,
   464 F. Supp. 3d 678 (E.D. Pa. 2020) ......................................................................27, 28

*Noble v. 93 Univ. Place Corp.*,
   224 F.R.D. 330 (S.D.N.Y. 2004) ....................................................................................9

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) ..................................................................................27, 28

*Pearlstein v. Blackberry Ltd.*,
   2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) .................................................................28

*In re Qualcomm Inc. Sec. Litig.*,
   2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) ..............................................................16

*Rocco v. Nam Tai Elecs., Inc.*,
   245 F.R.D. 131 (S.D.N.Y. 2007) ..................................................................................10

*In re Safeguard Scis.*,
   216 F.R.D. 577 (E.D. Pa. 2003) ..............................................................................10, 12

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
   798 F. Supp. 3d 416 (S.D.N.Y. Sept. 4, 2025) .................................................13, 15, 16

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017) ......................................................................................19, 25

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ........................................................................................................9

Defendants SolarEdge Technologies, Inc. ("SolarEdge" or the "Company"), Zvi Lando, Ronen Faier, Lior Danzinger, and J.B. Lowe (together with the Company, "Defendants") respectfully submit this memorandum of law in opposition to Lead Plaintiffs' Motion for Class Certification (the "Motion"). *See* ECF Nos. 109, 110.

## PRELIMINARY STATEMENT

Lead Plaintiffs' Motion and expert report are nothing if not perfunctory. Without analysis specific to the alleged misrepresentations at issue, Lead Plaintiffs ask this Court to certify a class based on their untested promise that they can prove damages on a class-wide basis. But blind acceptance of a hypothetical, generic damages model, coupled with a mere recitation of the requirements to certify a class, is a far cry from the "rigorous analysis" required for class certification. Lead Plaintiffs' request is no accident. They resort to boilerplate analysis because the facts specific to SolarEdge—and the solar industry more generally—foreclose any showing that this case involves actionable securities fraud, let alone class-wide proof of one.

The undisputed facts show that throughout the putative class period, SolarEdge consistently and truthfully disclosed the very market dynamics Lead Plaintiffs now attempt to repackage as fraud. As SolarEdge repeatedly informed investors, it was operating against a backdrop of macroeconomic volatility marked by rapidly shifting sales and inventory data, record demand (particularly in Europe), and supply-chain constraints that limited its ability to immediately meet soaring demand. SolarEdge's disclosures were contemporaneous, detailed, and accurate.

When market conditions began to shift in mid-2023, SolarEdge did not conceal the warning signs. In advance of the August 1, 2023 earnings call, *i.e.*, the first "corrective disclosure," SolarEdge signaled that certain distributors were seeking to push out or cancel existing orders, even as sell-through rates continued to reach record levels. These developments reflected evolving

1

market conditions, not corrections of any prior misrepresentations. SolarEdge's disclosures during that August 2023 call also made clear that demand deterioration was most acute in the United States, *not* Europe. Moreover, as Lead Plaintiffs' expert acknowledges, SolarEdge's stock price movements following the August 1, 2023 earnings call were likely driven by the market's reassessment of disclosed risks and evolving demand conditions.

When customers increased push-outs and cancellations in September 2023, SolarEdge responded promptly and transparently. On October 19, 2023, after SolarEdge received customer data (information the Company did not receive in real time), the Company issued revised guidance, disclosing that high channel inventory and slower installation rates were driving increased customer push-outs and cancellations. By the November 2, 2023 earnings call, SolarEdge further explained that softening distributor demand, particularly in key European markets, had intensified beyond management's expectations. Far from concealing these developments, SolarEdge acknowledged that although the dynamics were consistent with prior cautions to the market, the magnitude of the slowdown had increased materially and rapidly during the third quarter.

These facts demonstrate that SolarEdge made real-time disclosures responsive to evolving market conditions, not fraudulent misrepresentations capable of class-wide proof. Lead Plaintiffs thus cannot satisfy Rule 23's "rigorous analysis" requirement, much less establish predominance in a case where no alleged fraud ever occurred. The Motion therefore fails for the following reasons:

*First*, Lead Plaintiffs are atypical class representatives who did not rely on the integrity of the market when trading SolarEdge securities. The record shows that each Lead Plaintiff purchased substantial amounts of SolarEdge stock after the alleged corrective disclosures, based on individualized trading strategies designed to opportunistically exploit perceived price

movements.  Subject to unique defenses of non-reliance that would dominate this litigation, Lead Plaintiffs cannot satisfy Rule 23(a)'s typicality requirement.

*Second*, Lead Plaintiffs cannot meet Rule 23(b)(3)'s requirement that common questions of reliance predominate.  Reliance is an essential element of a securities fraud claim, and absent a valid class-wide presumption, it must be proven individually.  *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988).  Although Lead Plaintiffs assume they are entitled to invoke *Basic*'s presumption of reliance, that presumption is rebuttable here—and class certification must be denied—where the alleged misstatements had no impact on SolarEdge's stock price.  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 279 (2014) ("*Halliburton II*").

Lead Plaintiffs fail at both steps of the price-impact analysis.  *See Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 77 F.4th 74, 99–102 (2d Cir. 2023) ("*ATRS*").  Not only is there a substantive mismatch between the alleged front-end statements asserting "strong" or "elevated" European demand and the purported corrective August and October 2023 disclosures, but even if those statements were related to the back-end statements, the earlier statements were too generic to support an inference of price impact.  Lead Plaintiffs' allegations that generic statements that "the channels are pretty . . . low on inventory" and "the level of inventory [in Europe] is relatively not high" fare no better.  Where, as here, back-end disclosures do not render the front-end statements false, there is no basis to infer front-end price inflation from a subsequent price decline.  *See id.*, 77 F.4th at 99–100.  Because Lead Plaintiffs cannot establish price impact, the *Basic* presumption is rebutted, and Lead Plaintiffs—who offer no individualized evidence of reliance— cannot satisfy Rule 23(b)(3)'s predominance requirement.

*Third*, Lead Plaintiffs fall short of Rule 23(b)(3)'s predominance requirements by failing to show that damages can be reasonably calculated on a class-wide basis.  Lead Plaintiffs' "out-

of-pocket" damages methodology is delinked from their theory of liability.  Moreover, Lead Plaintiffs fail to demonstrate how to isolate damages caused by the alleged misstatements from losses caused by something else.  In fact, Lead Plaintiffs' expert conceded that his methodology may not be able to disaggregate the price impact of the alleged fraud from other "confounding" information.  These failures likewise defeat class certification.

*Fourth*, Lead Plaintiffs' failure to account for the real risk that the proposed class includes atypical, uninjured class members—*i.e.*, individuals who purchased SolarEdge's stock *after* the allegedly concealed information was disclosed on August 1, 2023—precludes certification under Rule 23(b).  Lead Plaintiffs therefore cannot satisfy their burden to establish that the proposed class consists of members who have allegedly suffered common, typical injuries.

For those reasons, as well as those set forth below, the Motion should be denied in its entirety.

## BACKGROUND

### A.    Company Overview

SolarEdge, a leading smart energy technology provider, manufactures and sells solar products for residential, commercial, and small-scale utility markets.  ECF No. 72 ("SAC") ¶¶ 49, 52.  The Company's primary customers are distributors and wholesalers of electrical equipment that "sell-through" SolarEdge's products to end-user customers.  *Id.* ¶ 53.

### B.    European Solar Demand Surges in 2022

SolarEdge is based in Israel, but its biggest market is Europe, which accounted for 64% of the Company's revenue in 2023.  *Id.* ¶ 57.  In the years leading up to the purported class period, the industry experienced unexpected and unprecedented disruptions due to supply-chain issues tied to COVID-19 and, later, the Russia-Ukraine conflict.  *See* Ex. 1 (SEDG 2022 10-K) at 41–42.  At the same time, demand for SolarEdge products in Europe was exploding in large part due to

low global interest rates, pandemic-fueled government spending, and sanctions against Russia that drove up fossil fuel prices and made renewables more attractive. SAC ¶ 170; Ex. 2 (Garmaise Report) ¶¶ 29–34.

Both during and before the putative class period, SolarEdge issued public statements informing investors about these macroeconomic conditions. Specifically, SolarEdge highlighted that it was observing increasing volatility in sales and inventory data, while simultaneously experiencing surging demand for its products, particularly in Europe. *See* Ex. 3 (Q4 2022 Earnings Call) at 3–4, 10–11. Indeed, SolarEdge had its best financial year in history in 2022, amassing $3.1 billion in sales coupled with a large backlog of orders for 2023 and 2024. *Id.*

## C. European Demand Remains Steady for Most of the Class Period

Well into mid-summer 2023, demand for SolarEdge products continued to rise. *See* Ex. 4 (Q2 2023 Earnings Call) at 11. Defendants disclosed this to investors. *See id.* Consistent with these disclosures, elevated demand in Europe continued from 2022 into 2023, as customers rushed to place orders with SolarEdge. *See* Ex. 3 (Q4 2022 Earnings Call) at 3–4.

On the one hand, SolarEdge benefited from the increase in European demand. However, because this surge was unanticipated, SolarEdge lacked the manufacturing capacity to meet that demand. *Id.* at 11, 15. Further complicating matters, throughout 2022 and into the purported class period, SolarEdge faced production shortages for a critical component of its solar systems—the inverter—resulting in order backlogs and delayed installations. SAC ¶¶ 120, 197–98; *see also* Ex. 3 (Q4 2022 Earnings Call) at 3–4; Ex. 5 (Q1 2023 Earnings Call) at 3, 14. Numerous distributors complained about these shipping delays, contending that SolarEdge was not delivering product fast enough for distributors to meet demand from installers. *See, e.g.*, Ex. 6 (SEDG-Shen_0015708) at 2; Ex. 7 (SEDG-Shen_0017081) at 1–2; Ex. 8 (SEDG-Shen_0017707) at 7; Ex. 9 (SEDG-Shen_0005942) at 4.

**D.**     **SolarEdge Discloses Warning Signs in July 2023**

Before the August 1, 2023 earnings call, SolarEdge became aware of some requests from distributors to push out (postpone) or cancel existing orders, even though sell-through rates continued to grow to record highs.  *Id.* ¶¶ 120, 122.  But push-out and cancellation requests were not atypical for SolarEdge in Europe in June and July:  there is an annual, industry-wide reduction in summer sales as many Europeans take vacation.  Ex. 10 (Q3 2023 Earnings Call) at 20.

Moreover, June and July sales information was not immediately accessible to SolarEdge, as end-of-month inventory and installation data is typically unavailable until the second half of the following month.  *See e.g.*, Ex. 11 (SEDG-Shen_0012062) (Q2 and June report delivered July 20, 2023); Ex. 12 (SEDG-Shen_0012066) (July report delivered August 16, 2023).   As such, SolarEdge lacked insight into June 2023 inventory and installation levels until the second half of July, and July data until well after the August 1, 2023 earnings call.

Even without the full picture, SolarEdge's executives proceeded with caution.  On the August 1 earnings call, Lando and Faier candidly shared the market developments SolarEdge observed in July 2023.  Lando explained:  "In Europe, installation rates continue to be high in both residential and commercial.  However, the strength in the market is somewhat more moderate than what was anticipated heading into 2023, largely due to a milder winter, reduced concerns over energy resilience, and lower electricity prices."  Ex. 4 (Q2 2023 Earnings Call Transcript) at 3.  Lando added that, although "sell-through by our distributors in the second quarter was up 49% year-over-year in residential and up 115% year-over-year in commercial," SolarEdge had recently observed that "the distribution channels in Europe are experiencing higher than optimal inventory levels, especially as it relates to solar modules" because "distributors placed large orders for modules and inverters in order to ensure stability of supply to support the growing demand."  *Id.*  Lando clarified that "[a]s growth in demand has tapered off, distributors are taking a more cautious

approach in order to better manage their cash flow" by "reduc[ing] inventory levels" and "the number of suppliers in their portfolio." *Id.*

SolarEdge juxtaposed these warnings about the European solar market with news of decreasing demand in the United States and the impact of the shifting regulatory landscape on its business in the region. *Id.* at 3–4, 6, 8–9. Following the call, analysts focused on SolarEdge's disclosures about U.S. demand.[1] Ex. 2 (Garmaise Report) ¶ 127.

### E. Lead Plaintiffs and Class Representative Invest in SolarEdge *After* the August 1, 2023 Earnings Call

Notwithstanding Lead Plaintiffs' allegations that SolarEdge "corrected" prior alleged misstatements during the August 1, 2023 earnings call, Lead Plaintiffs purchased shares of SolarEdge stock *after* the alleged corrective disclosure. Lead Plaintiff Hachshara increased its holdings by nearly 20,000 shares in August, ECF No. 34-3 (Declaration of Jeremy A. Lieberman Ex. C) at 10, and the Amitim funds, another Lead Plaintiff, purchased 45,000 shares between August and early September *for the very first time*. *Id.* at 4–7. Mr. Cascallar similarly invested $200,000 in SolarEdge stock after the August 1, 2023 call. Ex. 15 (Plaintiffs_0000065).

### F. SolarEdge Revises Q3 2023 Guidance

When September's sales figures became available to the Company in October 2023, *see* Ex. 16 (SEDG-Shen_0012072), it was clear that the headwinds SolarEdge first observed in late July had not abated. In fact, they had increased substantially as distributors increasingly requested push-outs and order cancellations, Ex. 17 (October 19, 2023 Press Release). This led SolarEdge to issue revised mid-quarter earnings guidance. *Id.* Still trying to understand the macroeconomic

---

[1] *See, e.g.*, Ex. 13 (8/2/23 HSBC Report) ("US - may take more time to recover."); Ex. 14 (8/3/23 Roth Report) ("In the US, the resi solar problem appears to be deeper and likely more enduring.").

situation, SolarEdge disclosed that it had experienced unusually high channel inventories and slower-than-normal installation rates, resulting in a wave of order cancellations and push-outs. *Id.*

On the November 2, 2023 Earnings Call, SolarEdge provided a clearer picture of what was transpiring. As Lando explained, "market demand began to slow in the third quarter, and distributors began to experience financial challenges" resulting in "a large amount of requests to cancel or pushout orders." Ex. 10 (Q3 2023 Earnings Call) at 3. Lando emphasized that "[a]lthough the dynamics are consistent with what we cautioned during out second quarter earnings call, the magnitude grew much greater than we anticipated," noting the sharp quarter over quarter decline for SolarEdge's largest markets, which materialized suddenly in Q3 2023. *Id.*

**G.    Lead Plaintiffs Continue to Purchase SolarEdge *After* the October 19, 2023 Press Release**

Lead Plaintiffs continued purchasing SolarEdge stock even after the allegedly corrective October 19 press release. Lead Plaintiff Hachshara admitted to purchasing over 50,000 shares of SolarEdge shortly after it had agreed to join the lawsuit against SolarEdge. Ex. 18 (Plaintiffs_0000044); Ex. 19 (Kadosh Tr.) 106:5–107:12. Similarly, by the end of Q1 2024, Lead Plaintiff Amitim had more than doubled its SolarEdge holdings from 45,000 to over *100,000 shares*. *See* Ex. 20 (S&P Capital IQ Report) at 9. In fact, in Q2 2025, one of the Lead Plaintiff Amitim funds boosted its SolarEdge stake by 39.3%, adding 120,000 shares for a total of 424,982 shares, making SolarEdge its 21st-largest holding. Ex. 21 (Market Beat Article) at 1.

## LEGAL STANDARD

Because it is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only, . . . [a] party seeking class certification must affirmatively demonstrate his compliance with [Rule 23]." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348, 350 (2011) (quotations and citation omitted). To certify their proposed class, Lead Plaintiffs bear

the burden of demonstrating, by a preponderance of the evidence, that: (1) "the class is so numerous that joinder of all members is impracticable"; (2) "there are questions of law or fact common to the class"; (3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class"; and (4) "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

Lead Plaintiffs must also satisfy Rule 23(b), which "is far more demanding than . . . Rule 23(a)." *Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 339 (S.D.N.Y. 2004). Specifically, Lead Plaintiffs must demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Moreover, Lead Plaintiffs must "actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton II*, 573 U.S. at 275. Indeed, a "rigorous analysis" of Rule 23 is necessary to determine whether each requirement is established by a preponderance of the evidence. *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 29–30 (2d Cir. 2006) (quotation omitted). Courts must study "all probative evidence . . . regardless of whether that evidence is also relevant to a merits question." *Goldman Sachs Grp. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 122 (2021) ("*Goldman II*").

## **ARGUMENT**

## I. **LEAD PLAINTIFFS CANNOT SATISFY RULE 23(A) DUE TO UNIQUE DEFENSES**

The Motion should be denied because each Lead Plaintiffs are atypical of the proposed class, as they did not rely on the integrity of the market in their transactions of SolarEdge securities. To satisfy Rule 23(a), Lead Plaintiffs must demonstrate, *inter alia*, that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P.

23(a)(3).  That requirement is not met where a proposed class representative is subject to a unique defense that threatens to become the focus of the litigation.  *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990), *abrogated on other grounds by Microsoft Corp. v. Baker*, 582 U.S. 23 (2017).

Such unique defenses arise where a plaintiff is subject to "an arguable defense of non-reliance" on the integrity of the market.  *In re Harcourt Brace Novanovich, Inc. Sec. Litig.*, 838 F. Supp. 109, 113 (S.D.N.Y. 1993).  That is because "[a]ny showing that severs the link between the alleged misrepresentation and . . . [a plaintiff's] decision to trade at a fair market price" rebuts the presumption of reliance.  *Basic*, 485 U.S. at 248.  Irregular trading activity, individualized investment analysis, or reliance on factors other than market integrity have been held to be relevant to a court's analysis of reliance.  *See Harcourt*, 838 F. Supp. at 113–14 (collecting cases).

Courts have also repeatedly held that "a person that increases his holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative."  *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (quotation omitted).  Because Lead Plaintiffs' transactions in SolarEdge were based on "technical price movements" rather than its perceived intrinsic value, Lead Plaintiffs are not entitled to the fraud-on-the-market presumption and are not proper class representatives.  *See In re Safeguard Scis.*, 216 F.R.D. 577, 582 (E.D. Pa. 2003) (finding plaintiff who traded on stock price movements rather than actual price inadequate class representative).

By their own admissions, Lead Plaintiffs did not rely on the integrity of the market when they purchased SolarEdge stock.  As highlighted above, Hachshara, Amitim, and Cascallar purchased large quantities of SolarEdge stock after the August 1, 2023 disclosure.  *See supra* Section E.  Assuming, as Lead Plaintiffs argue, that the August 1, 2023 call constituted a fraudulent

and unexpected shift in the Company's representation of market conditions, each Lead Plaintiff could not have been relying on the integrity of the market when they purchased SolarEdge stock that same month. Lead Plaintiffs' opportunistic transactions in SolarEdge did not end there, as Hachshara and Amitim purchased even more SolarEdge stock after the allegedly corrective October 19, 2023 disclosure. *See supra* Section G.

Contemporaneous evidence from Lead Plaintiffs further supports these non-integrity based trades. On August 31, 2023, the same day Amitim purchased 45,000 shares of SolarEdge, Mr. Adi Heller, the Head of Equities for Amitim, received an analyst report titled "SolarEdge – Temporary weakness represents an opportunity." Ex. 22 (Plaintiffs_0000003) at 2. That report explicitly stated that SolarEdge's stock price had fallen due to a "slowdown in the market combined with inventory buildup." *Id.* at 3. An analyst on Mr. Heller's team noted that "[i]nvestors are concerned about . . . the slowdown in the growth rate in the European market." *Id.* at 1. The analyst requested approval for a $15 million investment, characterizing the stock's price as "very attractive and a convenient entry point." *Id.* at 2. Mr. Heller approved the transaction the same day. *Id.* at 1. Mr. Heller characterized this sort of purchase as "appealing" and "high risk/high return." Ex. 23 (Heller Tr.) at 103:18–104:10; 110:21–24. This philosophy seems to have stuck with the company, as it continued accumulating SolarEdge stock after the alleged corrective disclosures and even after accusing SolarEdge of fraud. *See* Ex. 20 (S&P Capital IQ Report) at 9; Ex. 24 (Hirsch Tr.) at 62:24–63:7 (confirming Amitim held SolarEdge stock as late as December 2025).

Similarly, Hachshara's Chief Investment Officer, Mr. Roi Kadosh, testified that he attempted to profit from short-term movements in SolarEdge's stock price. Mr. Kadosh explained that Hachshara actively employed "take-profit" and "stop-loss" strategies, pursuant to which it would buy and sell SolarEdge shares to capture perceived price volatility. *See* Ex. 19 (Kadosh

11

Tr.) at 77:13–19; 79:3–10; 44:10–45:7.  He further admitted that Hachshara sometimes purchased SolarEdge shares immediately before earnings announcements and sold them immediately afterward if the price increased.  *Id.* at 85:23–86:24; 87:4–8.  He further testified that he personally authorized Hachshara to routinely sell shares in tranches over short periods to "maximize [its] profit."  *Id.* at 79:3–11; 80:25–81:9.  Most tellingly, Mr. Kadosh summarized Hachshara's approach as seeking to "buy in a . . . low price and sell it in a high price," expressly disavowing any notion that these trades were premised on confidence in the market's assessment of SolarEdge's disclosures.  *Id.* at 110:12–13.

Courts have repeatedly held that opportunism and post-disclosure trading rebut the *Basic* presumption of reliance.  *See Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 69 (S.D.N.Y. 2000); *In re Safeguard Scientifics*, 216 F.R.D. at 582–83 (plaintiff who "would have made—and in fact did—purchase stock regardless of the fraud[]" was inadequate).  By their own admissions, Lead Plaintiffs did not rely on the integrity of the market when they purchased SolarEdge stock, thereby rendering them atypical class representatives under Rule 23(a) because these individualized issues would dominate the case.  Accordingly, the Court should deny class certification.

## II.   LEAD PLAINTIFFS CANNOT SATISFY RULE 23(B)'S REQUIREMENTS

The Motion should also be denied because Lead Plaintiffs have failed to show that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  Lead Plaintiffs therefore fail to satisfy the "even more demanding," requirements of Rule 23(b).  *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).

**A. Lead Plaintiffs Have Failed to Show That Common Questions of Reliance Predominate.**[2]

Lead Plaintiffs have failed to show entitlement to class certification because common questions of reliance predominate under Rule 23(b)(3). While Lead Plaintiffs contend they are entitled to the fraud-on-the-market presumption established in *Basic*, that presumption may be rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price,"—i.e., price impact. *Basic*, 485 U.S. at 248; *see also Halliburton II*, 573 U.S. at 279. Accordingly, courts review the alleged misstatements and corrective disclosures closely to ensure that there is no mismatch between the substance and specificity of the statements.

> 1. <u>Substantive Mismatch Between Statements About European Demand and Back-End Corrective Disclosures Exists Which Precludes Finding of Price Impact.</u>

Lead Plaintiffs' bid for class certification – premised on an inflation maintenance theory – fails because there is a "substantive mismatch between the alleged misstatement and the corrective disclosure," thereby "sever[ing] the link between back-end price drop and front-end misrepresentation," which is fatal to class certification. *In re Kirkland Lake Gold Ltd. Securities Litig.*, 2024 WL 1342800, at *12 (S.D.N.Y. Mar. 29, 2024) (citing *ATRS*, 77 F.4th at 104). The logic is simple: A corrective disclosure on a subject cannot dissipate fraud-induced inflation caused by an unrelated misstatement. *See Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 798 F. Supp. 3d 416, 468–69 (S.D.N.Y. Sept. 4, 2025) (disclosure of meeting potentially related to fraud scheme could not correct related "statements about fees and commissions"); *see also Kirkland*,

---

[2]   While Lead Plaintiffs suggest that reliance is "presumed" under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), they are not entitled to this presumption because their theory of liability is rooted in affirmative misstatements. *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 494 (S.D.N.Y. 2011).

2024 WL 1342800, at *12 (noting that "commentary touching upon only the same subject matter . . . cannot be enough").

Here, there is a mismatch between the alleged front-end misstatements related to European demand and the alleged corrective disclosures.  Lead Plaintiffs generically refer to "European demand" in the alleged misstatements, despite the complexity of SolarEdge's supply chain.  Lead Plaintiffs refer to sweeping front-end statements about demand in Europe as "very strong," and "very healthy."  SAC ¶¶ 170, 174.  While the front-end statements addressed demand in basic, general terms, the back-end disclosures on August 1, 2023 addressed different subjects entirely— specifically, distributor behavior, channel inventory levels, and installation delays, each of which may be driven by factors unrelated to demand.  Moreover, the October 19, 2023 press release did not even refer to "demand in Europe," and instead disclosed customer pushouts, cancellations, and installation delays.  *See* Ex. 17 (October 19, 2023 Press Release).  While those factors *may or may not* suggest declining demand, "a closer fit . . . between the front- and back-end statements" is required post-*Goldman* to determine "whether there is a basis to infer that the back-end price equals front-end inflation."  *ATRS*, 77 F.4th at 99 n.11.  No such fit exists here.

Indeed, contemporaneous analyst coverage confirms this mismatch, as analysts could not pinpoint the factors influencing the cancellations, pushouts, and installation delays cited in the disclosure.  *See id.* at 104 ("[M]arket commentary can provide insight into the kind of information investors would rely upon in making investment decisions.").  Specifically, in its October 23, 2023 report, Citibank speculated that "the largest drivers for margin decline are 1) pricing, 2) lower optimizer/inverter ratio, 3) product mix shift, and 4) air freight," not once raising the possibility that the revised guidance could be tied to declining European *demand*.  Ex. 25 (10.23.2023 Citibank Report).  Other analysts attributed the revised guidance to factors *other* than product

14

demand.[3]  And even the analysts that speculated that underlying product demand could be a potential causal factor still juxtaposed that hypothesis against alternative explanations.[4]

This market commentary underscores that SolarEdge's disclosure regarding heightened channel inventory and slower installations "does not necessarily render false the statements" concerning European demand.  *See Sjunde*, 798 F. Supp. 3d at 469 (disclosure that defendant's CEO met with alleged fraudster did not render false statements that defendant did not know where funds went following closing of defendant's deal with the fraudster).  Because SolarEdge's alleged corrective disclosures referred to inventory amounts and installation rates only, it fails to demonstrate the Company had a "clear picture" regarding European demand.  *Id.* (finding a substantive mismatch where defendant's awareness of a fraudster's involvement and compliance concerns did not show defendant had a "clear picture" regarding diversion of funds).

Accordingly, Lead Plaintiffs have failed to show a close fit between the subject of the alleged misrepresentations related to demand in Europe and the subsequent disclosures to support any inference that the market *actually relied* on the statements, which is fatal to predominance and class certification.  *Kirkland*, 2024 WL 1342800, at *12.

---

[3]  Ex. 26 (Morgan Stanley Report 10.19.2023) (attributing revised guidance to channel overstocking); Ex. 27 (Wells Fargo Report 10.19.2023) (revised guidance tied solely to distributor overstocking); Ex. 28 (BOA Report 10.20.2023) (declining revenues as a result of price cuts to SolarEdge products); Ex. 29 (Roth Report 10.20.2023) (attributing revised guidance to excess channel inventory, disruption tied to the Israeli conflict, and issues with foreign exchange rates).

[4]  Ex. 30 (Barclays Report 10.19.2023) (questioning whether guidance could be indicative of distributor insolvency issues or declining end-user demand); Ex. 31 (Goldman Sachs Report 10.20.2023) (observing issues could be tied to channel overstocking, weakened demand, and/or lower profit margins); Ex. 32 (Oppenheimer Report 10.20.2023) (attributing revised guidance to "longer cycle [i.e., installation] times" for large customers, unusually high channel inventory levels, demand headwinds due to "regional policy shifts," and higher interest rates).

2.  <u>Generic Mismatch Between Alleged Misstatements and Back-End Corrective Disclosures Precludes Finding of Price Impact.</u>

Even if Lead Plaintiffs could prove a substantive match (which they cannot), their bid for class certification still fails because there is a mismatch stemming from the alleged corrective disclosures being "far more specific and severe in nature." *Sjunde*, 798 F. Supp. 3d at 437 (citing *ATRS*, 77 F.4th at 99–100). "[A] plaintiff cannot (a) identify a specific back-end, price-dropping event, (b) find a front-end disclosure bearing on the same subject, and then (c) assert securities fraud, unless the front-end disclosure is sufficiently detailed in the first place." *ATRS*, 77 F.4th at 102; *Kirkland*, 2024 WL 1342800, at *7 (noting that "the value of the back-end proxy . . . will be diminished" where there is a gap in specificity between a misstatement and back-end disclosure (quoting *ATRS*, 77 F.4th at 103)). "Under those circumstances, it is less likely that the specific disclosure actually corrected the generic misrepresentation, which means that there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Goldman II*, 594 U.S. at 123; *see also Kirkland*, 2024 WL 1342800, at *7.

The alleged misstatements about European demand "are fairly broad and generic statements" resulting in a generic mismatch between the alleged misstatements and alleged corrective disclosures. *Kirkland*, 2024 WL 1342800, at *8. Throughout the purported class period, the Company broadly remarked that European demand was "strong," "good," "healthy," or "fastest-growing." *E.g.*, SAC ¶¶ 168–170, 174; *see also In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *12 (S.D. Cal. Mar. 20, 2023) (vague statements touting company's "broad," "fair," "reasonable," and "non-discriminatory" licensing practices did not match with antitrust lawsuits alleging that company did not license its computer chips). Even when read in context, many of the alleged misstatements concerning Europe only discuss demand for SolarEdge's products *as compared to prior quarters—see,* Ex. 3 (Q4 2022 Earnings Call) at 14 (characterizing

Europe as "similar to the condition[s] we were in 2022"); Ex 4 (Q2 2023 Earnings Call) at 11 ("record levels over the last two quarters"); Ex. 33 (08.08.2023 Oppenheimer Conf.) at 1 (citing Europe growing "30% to 40% year of year")—*or in relation to other regions*, such as the United States, *see,* Ex. 34 (06.21.2023 JPM Conf.) (calling Europe "the fastest-growing geograph[y] for us"); Ex. 35 (09.06.2023 Barclays Conf.) ("[W]e directed a lot of our shipments to Europe [instead of the U.S.] . . . given the fact that we see Europe growing relatively quickly."). Critically, none of the statements "go much beyond broad generalities" about SolarEdge's performance in Europe, nor do they provide specific numbers or metrics, or "rule[] out" declining demand in the future. *Kirkland*, 2024 WL 1342800, at *8 (statements discussing company's desire to prioritize "organic growth over M&A activity" were more generic than corrective disclosure announcing merger with another company).

As these European-demand statements make plain, there is a "considerable gap in genericness between the earlier statements and the corrective disclosure[s]" in August 2023 that discussed specific details of customer pushouts, cancellations, and installation delays, and in the October 2023 adjusted guidance announcement that resulted from unexpected cancellations and pushouts from distributors. *Id*. at *8 (concluding that "broad statements" about the defendant's "focus on internal growth are far more generic than the announcement of a specific all-stock acquisition of a specific mine, with unique characteristics, nine months later, at a particular valuation"); s*ee also Goldman*, 594 U.S. at 123 (finding no price impact where "it is less likely that the specific disclosure actually corrected the generic misrepresentation").

Lead Plaintiffs' theory similarly fails where the front-end statements regarding low inventory levels are markedly generic and do not align with more specific back-end statements. A brief, sweeping statement related to undefined low inventory levels cannot possibly match the

17

detailed statements made in the August 1, 2023 Earnings Call, in which the Company explained that "the distribution channels in Europe are experiencing higher than optimal inventory levels, especially as it relates to solar modules." Ex. 4 (Q2 2023 Earnings Call) at 3. When the alleged corrective disclosure imparts substantially more information than the earlier statements, price movements following the alleged disclosure cannot be attributed to the inflation introduced by the alleged misstatement. *ATRS*, 77 F.4th at 99–100 ("[A] misrepresentation must actually maintain inflation; it must, in other words, hold its weight in propping up the price."). Similarly, the October 19, 2023 press release provides "details and severity," *ATRS*, 77 F.4th at 100, of the low inventory levels leading to the revised revenue guidance that cannot be substituted for the generic front-end statements. Ex. 17 (October 19, 2023 Press Release) at 1. In short, Lead Plaintiffs cannot establish causality between the supposed artificial inflation of the general alleged misstatements about inventories and the price impact of the alleged corrective disclosure.

Because of this "mismatch" in specificity and substance, Lead Plaintiffs have failed to demonstrate price impact, thereby failing to satisfy the presumption of reliance from *Basic* and the Rule 23(b)(3) predominance requirement. *In re Moody's*, 274 F.R.D. 480, 490 (S.D.N.Y. 2011) ("A successful rebuttal *defeats* class certification by defeating the Rule 23(b)(3) predominance requirement.").

### 3.   Lead Plaintiffs Fail to Offer Evidence of Price Impact.

Lead Plaintiffs are unable to rebut these generic and substantive mismatch arguments because their Motion and expert report fail to advance any evidence of price impact. Lead Plaintiffs' expert, Dr. Matthew D. Cain ("Cain"), admitted that he "has not been asked to perform a loss causation analysis at this time," confirming that he did not yet analyze whether the alleged misstatements had any price impact consistent with Lead Plaintiffs' inflation-maintenance theory. *See* ECF No. 111-1; Ex. 36 (Cain Tr.) at 283:6–285:3. This is fatal under

*Goldman*, which held that courts "cannot conclude that Rule 23's requirements are satisfied without considering *all evidence relevant to price impact*." *Goldman*, 594 U.S. at 122 (emphasis added). Critically, this expands the scope of the district court's purview at class certification and "obligat[es]" the court in "assessing price impact" to "inquir[e] into" "merits question[s] like materiality" and/or loss causation. *Id*. Lead Plaintiffs' expert does not test, or even address, whether the alleged misstatements had any price impact consistent with Plaintiffs' theory of liability. As *Goldman* makes clear, "*Basic*'s fundamental premise completely collapses" without a showing of price impact. 594 U.S. at 119 (citation modified). And since Defendants have effectively "sever[ed] the link between the alleged misrepresentation," Defendants have "rebut[ted] the presumption of reliance" on which Lead Plaintiffs' premise this action. *Basic*, 485 U.S. at 248,

### B. Rule 23(b)(3) Precludes Certification Because Lead Plaintiffs Have Failed to Present a Methodology for Calculating Damages on a Class-Wide Basis

When a damages model does not "actually measure damages that result from the class's asserted theory of injury," Lead Plaintiffs cannot establish class certification under Rule 23(b). *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017) (citing Roach v. T.L. Cannon Corp., 778 F.3d 401, 407–08 (2d Cir. 2015)). Class certification should thus be denied where, as here, plaintiffs present a generic damages approach untethered from their liability theory. Kronenberg v. Allstate Ins. Co., 743 F. Supp. 3d 465, 501–02 (E.D.N.Y. 2024) (denying class certification because plaintiffs' "model hardly models anything" and is "silent" on theory of liability).

### 1. Lead Plaintiffs' Damages Methodology Fails to Link Alleged Damages to Plaintiffs' Theory of Liability

To satisfy Rule 23(b), Lead Plaintiffs must propose a "model purporting to serve as evidence of damages," which "measure[s] only those damages attributable" to their theory of liability. *Comcast*, 569 U.S. at 35. Courts deny class certification when plaintiffs merely offer a

generic discussion of damages untethered to the specific allegations in the case. *Kronenberg v. Allstate Ins. Co.*, 743 F. Supp. 3d 465, 501–02 (E.D.N.Y. 2024) (denying class certification because plaintiffs' "model hardly models anything" and is "silent" on theory of liability); *Hughes v. Ester C. Co.*, 320 F.R.D. 337, 342 (E.D.N.Y. 2017) (holding that plaintiff's model failed to "measure damages that result from the class's asserted theory of injury"). Lead Plaintiffs fall into this trap.

For their proposed damages theory, Lead Plaintiffs rely on Cain's expert testimony. Cain presents the theoretical concept of "out-of-pocket" damages, *see* ECF No. 111-1 ¶ 3.d., which would measure damages as the difference in "artificial inflation in the stock price at the time of purchase minus the artificial inflation in the stock price at the time of sale," *id.* at ¶ 97. "The mere reference to this approach, however, is not a guarantee that Dr. Cain can put forth a methodology to reliably measure damages in this matter." Ex. 2 (Garmaise Report) ¶ 71. Indeed, Cain offers no indication as to *how* exactly he plans on calculating artificial inflation in a manner consistent with Lead Plaintiffs' specific liability theory.

Lead Plaintiffs need not apply their expert's methodology to calculate "exact" individualized damages amounts, *see Comcast* at 35–36, however, they are required at this stage to do more than pontificate about damages theories. *See id.* (explaining that plaintiffs must "decide whether the methodology [was] a just and reasonable inference or speculative," in order to "determine[e] [if] Rule 23 is satisfied, even when that requires inquiry into the merits of the claim"). Lead Plaintiffs' expert must therefore prove that his out-of-pocket damages formula can reasonably be applied to the facts of the case. Cain has failed to do so.

Critically, Lead Plaintiffs' unsupported assertion of "out-of-pocket" damages fails to account for the possibility that there was no artificial inflation attributable to the alleged

misstatements.  For instance, Lead Plaintiffs allege that SolarEdge falsely told investors European channel inventory was "low" in March and May 2023.  SAC ¶¶ 155–58.  Yet, Lead Plaintiffs have failed to dispute the veracity of these statements in March and May 2023.  In fact, ████████

██████████████████████████████████████████████████████

██████████████████████████████████████████.  *See* Ex. 37 (SEDG-Shen_000333) at 350.  Compared to the "normal" inventory-on-hand range of 60–90 days, *see* Ex. 10 (Q3 2023 Earnings Call) at 22, the Company's residential inventory was at the low end of normal, and commercial-and-industrial inventory was well below normal in March 2023. Moreover, █████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████.  *See* Ex. 37 (SEDG-Shen_000333) at 350. Again, these figures were still within or below the Company's stated normal range.

These facts confirm that the information available to SolarEdge about European channel inventory was consistent with the Company's statements on the topic on March 28, 2023 and May 3, 2023.  Cain never explains how price impact, if any, could be reasonably measured by the out-of-pocket method in a situation in which there is no daylight between the Company's knowledge and investor communications.  This dearth of methodological rigor shows that Cain's out-of-pocket model cannot apply here in practice.  *See e.g.*, *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 46 (S.D.N.Y. 2020) ("A court may certify a class . . . only where the Court finds the model methodologically sound.").

Relatedly, Lead Plaintiffs' proposed damages methodology is not "suitably rigorous," *id*. at 49, because it fails to address how to reasonably account for the complex reality surrounding European demand during the purported class period.  On the one hand, Lead Plaintiffs suggest that

SolarEdge misstated European demand as "strong" when it allegedly knew "demand in Europe was weak." Order on MTD SAC at 16–17. But SolarEdge experienced record revenues in Europe in Q1 and Q2 of 2023, *see* Ex. 4 (Q2 2023 Earnings Call) at 1, ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████, *see* Ex. 37 (SEDG-Shen_000333) at 350. It is thus unclear what disclosures, if any, SolarEdge could have made about "weak" demand earlier in 2023. Lead Plaintiffs' proposed damages model makes no effort to engage with these facts.

Lead Plaintiffs' armchair theorizing about a potential damages methodology is insufficient in light of the unique facts and circumstances of the solar industry. During his deposition, Cain testified that after his "independent review of . . . the Complaint," he "concluded that there was a *sufficient economic coherence* between the alleged misrepresentations and alleged corrective disclosures that give rise to allegations of an inflated stock price, which renders the out-of-pocket methodology to be reasonable an appropriate." Ex. 36 (Cain Tr.) at 288:4–10 (emphasis added). But when repeatedly pressed, Cain could not clearly explain what it was about this particular case that allowed him to conclude there was "economic coherence" justifying the out-of-pocket method. *See id*. at 290:14–22. That leaves this Court with nothing more than Cain's unsupported assertions that he can reliably calculate artificial inflation. However, Cain's "say-so" is far from enough. *Fort Worth Empls.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 141–42 (S.D.N.Y. 2014) (rejecting plaintiff's damages model where plaintiff's expert testified "he was 'confident' in his ability to apply a model 'that's applicable, systematically, for all members of the class . . . [but] ha[d] not created such a model to date'"). Ultimately, Cain's musings do not supply Lead Plaintiffs with any evidence, much less a preponderance, that damages can be measured on a class-

wide basis consistent with their theory of liability, which is fatal to class certification. *Comcast*, 569 U.S. at 35.

    2.    <u>Lead Plaintiffs Fail to Demonstrate That Their Damages Methodology Can Properly Isolate the Impact of Confounding Factors in the August 2023 Corrective Disclosure.</u>

Lead Plaintiffs also fail to present any viable methodology of disentangling the price impact of the alleged fraud from a myriad of other potentially confounding variables raised during the August 1, 2023 earnings call. In any securities fraud case, it is fundamental that plaintiffs' proposed damages model distinguish between losses attributable to defendants' alleged conduct and losses attributable to other factors. *Comcast*, 569 U.S. at 35. Here, Lead Plaintiffs' "model does not even attempt to do that," and as such, "it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.*

Critically, Lead Plaintiffs fail to isolate the impact of mixed news during the August 1, 2023 earnings call. In addition to some discussion of the European market, SolarEdge highlighted that the Company was facing share price headwinds due to poor ***U.S.*** demand, increases in ***U.S.*** client inventories, and erosion in gross margins due to a product mix shift and higher freight costs. Ex. 4 (Q2 2023 Earnings Call) at 3, 7, 12. In fact, analysts discussed factors wholly unrelated to European demand that likely depressed SolarEdge's stock price after the August 1, 2023 earnings call: "[D]isappointment over the magnitude of US weakness, and [SolarEdge]'s margin outlook, may put some pressure on valuation for the near term. Our expectations were clearly too high, and we have taken our 2024 numbers down." Ex. 38 (8/2/23 Guggenheim Report); *see ATRS*, 77 F.4th at 104 ("[M]arket commentary can provide insight into the kind of the information investors would

rely upon in making investment decisions."). Several other analysts raised similar concerns regarding SolarEdge's U.S. business.[5]

Lead Plaintiffs have failed to address these confounding factors, let alone account for them in their proposed damages methodology. Indeed, Lead Plaintiffs' expert report does not endeavor to bifurcate the price impact of the U.S.-related news from that which might be tied to the alleged fraud. Cain testified that he has not given thought to, let along analyzed, precisely *how* he would go about "disaggregat[ing] the portions of the stock price decline that are not related to the fraud allegations." Ex. 36 (Cain Tr.) at 254:8–10. All Cain does is offer generic references to "tools and techniques" he might be able to employ—not tools he will actually use or those that will actually work—in "assess[ing] and disaggregate[ing] confounding information." *Id*. at 255:3–10. By failing to address these confounding factors, Lead Plaintiffs' damages model lacks methodological rigor and is woefully incomplete. *See e.g.*, *Aluminum Warehousing*, 336 F.R.D. at 46, 48.

Lead Plaintiffs' damages methodology similarly fails to account for industry and macroeconomic effects, which had significant confounding impacts on SolarEdge's stock. Cain testified during his deposition to having "not undertaken an assessment of [the solar] market at [the at issue] time." Ex. 36 (Cain Tr.) at 258:23–25. Similarly, Cain's expert report lacks any discussion as to how confounding factors such as "changing energy subsidies in Europe," or "the war in Ukraine," or "supply chain disruptions tied to COVID" might have impacted SolarEdge's stock. *Id*. at 259:1–23.

---

[5] *See Supra* nn. 3–4.

While Lead Plaintiffs acknowledge that these factors might have been present, *see* ECF No. 111-1 ¶ 63, they fail to explain *how* their damages theory might account for them. Where, as here, the solar industry experienced an industry-wide "shock" in mid-2023, Lead Plaintiffs cannot choose to focus only on SolarEdge's allegedly corrective disclosures to explain the declines in stock price. *See* Ex. 2 (Garmaise Report) ¶¶ 88–93. Further, among its peer companies, SolarEdge was one of the first companies to announce Q2 and Q3 2023 earnings or preliminary earnings. *Id.* ¶¶ 94–100, Exhibit 12. Several European solar companies similarly faced stock price declines following their earnings announcements from July 2023 to November 2023, *id.* ¶ 95, consistent with the theory of "intra-industry lead-lag effect," where SolarEdge, as a leader in the industry, disseminated industry-wide information to inform—and ultimately affect the stock prices of— other companies, *id.* ¶¶ 91–92. Lead Plaintiffs' damages methodology does not account for this negative "shock" news and fails to consider the component of the price drop tied to industry-wide phenomenon.

Lead Plaintiffs have thus failed to set forth a damages model that successfully disentangles the price impact of SolarEdge's specific alleged conduct from that of industry-wide factors. This generic damages model is thus unsound and does not "actually measure damages that result from the class's asserted theory of injury." *Waggoner*, 875 F.3d at 106. Lead Plaintiffs cannot therefore establish class certification.

3. <u>Lead Plaintiffs Fail to Demonstrate That Their Damages Methodology Is Capable of Measuring Damages Associated with Materialization of Risk</u>

Lead Plaintiffs' damages methodology is also flawed because it fails to account for the materialization of a known risk. In an efficient market, which Cain identifies here, *see* ECF No. 111-1 ¶ 31, if investors are aware of certain risks that may or may not occur, a stock price reaction upon the materialization of that risk will reflect the value of that risk materializing into certainty,

and thus will overstate the inflation corrected by revelation of the allegedly concealed portion (if any) of the risk.

As discussed, *supra* Section § B, SolarEdge had booming sales from mid-2020 into 2023, until shifting industry conditions softened demand. Demand risks were previewed by SolarEdge's disclosures prior to and during the purported class period. Specifically, SolarEdge's 2022 Form 10-K highlighted throughout that declining demand "could reduce [] future revenues," *see* Ex. 1 (SEDG 2022 10-K) at 24, "harm or halt the growth of the solar electricity industry and our business," *id.* at 31, and even "have a material adverse effect on our business, financial condition, results of operations and future growth," *id.* at 32. Moreover, market analysts flagged potential risks related to declining demand across the industry. *See* Ex. 39 (6.30.2023 Bank of America Report) at 4 ("The European solar [] growth opportunity remains the critical question for SEDG fundamentals[]. . . . For the first time in recent memory, it seems investors have become concerned about the cadence of resi growth in Europe in the immediate term. . . . [S]ome investors are weary that solar installations may slow while distributors sit on out of the money solar panels.").

Lead Plaintiffs fail, however, to account for these known risks in their damages methodology. A methodology like Dr. Cain's that uses the stock price declines following the alleged corrective disclosures to measure inflation inappropriately attributes the *full* post-disclosure decline in SolarEdge's stock price to the alleged fraud, while some portion of that price decline is due to the realization of a risk that the market was already aware of and had baked into the expected performance of SolarEdge's stock.[6] Ex. 2 (Garmaise Report) ¶¶ 107–113. Thus, by

---

[6] While Cain notes that event studies can, in general, take into account "stock price reactions to disclosures and materializations of [] risks," ECF No. 111-1 ¶¶ 6, 99, he does not endeavor disentangle the price contributions of the materialization of known demand-related risk and that of the alleged fraud. *Comcast*, 569 U.S. at 35 ("[A] model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory.").

failing to properly account for the materialization of the risk associated with declining solar demand, Lead Plaintiffs do not have a model that can measure inflation, and therefore damages, in the nuanced way required at the class certification stage. *See Comcast* at 35 (Plaintiffs' damages model must "measure only those damages attributable" to Plaintiffs' theory of liability); Ex. 2 (Garmaise Report) ¶¶ 107–13.

### C. Rule 23(b)(3) Precludes Certification Because the Purported Class Includes Atypical, Uninjured Members.

Lead Plaintiffs further fail because the proposed class includes a significant number of uninjured class members that Lead Plaintiffs cannot identify without an individualized inquiry. "To the extent that a proposed class contains uninjured class members, plaintiffs must provide a reasonable and workable method for differentiating between uninjured class members and injured class members so that uninjured class members do not recover damages." *In re Niaspan Antitrust Litig.*, 464 F. Supp. 3d 678, 715 (E.D. Pa. 2020) (denying class certification where plaintiffs fail to show a non-individualized means of identifying uninjured class members) (citation omitted).

While class certification is "not automatically defeat[ed]" if "some putative class members may be uninjured," *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 120 (S.D.N.Y. 2015), *amended*, 2016 WL 690895 (S.D.N.Y. Feb. 9, 2016), courts have held "that Rule 23(b)(3)'s predominance requirement is not satisfied when the need to identify uninjured class members 'will predominate and render an adjudication unmanageable.'" *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 n.13 (9th Cir. 2022) (en banc) (citation omitted). Accordingly, district courts must perform a "rigorous analysis" to determine "whether the possible presence of uninjured class members means that the class definition is fatally overbroad." *Id.* at n.14.

Here, Lead Plaintiffs do not provide *any* method, let alone a "reasonable and workable" one, for distinguishing uninjured and injured class members. *Niaspan*, 464 F. Supp. 3d at 715.

This is a particularly important issue given the undisputed evidence that certain class members, including Lead Plaintiffs, are differently situated given the timing of their purchases relative to the alleged corrective disclosures. *See supra*, Sections E, G. Lead Plaintiffs and their expert completely ignore this basic issue. In fact, Cain, when asked directly at his deposition if he had "any understanding of when [Lead Plaintiffs] purchased securities in this case," he testified "No, I don't." Ex. 36 (Cain Tr.) at 293:20–25. Cain further testified that he did not know if any Lead Plaintiffs "purchased after the August 2023 alleged corrective disclosure." *Id.* at 294:2–5.

Although there is no "per se rule," post-disclosure purchases can be grounds for deeming plaintiffs atypical. *See Pearlstein v. Blackberry Ltd.*, 2021 WL 253453, at *9 (S.D.N.Y. Jan. 26, 2021); *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29, 39–41 (2d Cir. 2009) (holding that investors who sold stock before alleged corrective disclosure cannot be included in a class with investors who sold stock after alleged corrective disclosure).

Lead Plaintiffs' failure to consider treatment of potentially uninjured class members thus fails Rule 23(b)(3)'s predominance requirement. *See In re Asacol Antitrust Litig.*, 907 F.3d 42, 53–54 (1st Cir. 2018) ("The need to identify those [uninjured] individuals will predominate and render an adjudication unmanageable absent evidence . . . [of] some . . . mechanism that can manageably remove uninjured persons.").

## **CONCLUSION**

Defendants respectfully request that the Court deny Lead Plaintiffs' (i) motion for class certification, (ii) request to be appointed as Class Representatives, and (iii) attorney, Pomerantz LLP's request to be appointed as Class Counsel.

Dated:  January 16, 2026                 Respectfully Submitted,
        New York, New York


                                         */s/ Christopher D. Belelieu*
                                         Christopher D. Belelieu


                                         **GIBSON, DUNN & CRUTCHER LLP**
                                         Christopher D. Belelieu
                                         Nathan C. Strauss
                                         Bethany J. Saul
                                         200 Park Avenue
                                         New York, NY 10166-0193
                                         Telephone: (212) 351-4000
                                         Facsimile: (212) 351-4035
                                         CBelelieu@gibsondunn.com
                                         NStrauss@gibsondunn.com
                                         BSaul@gibsondunn.com

## WORD COUNT CERTIFICATION

I, Christopher Belelieu, certify that the foregoing memorandum of law complies with the word-count limitations set forth in Local Civil Rule 7.1(c).  According to the word count of the word-processing program used to prepare the memorandum, and exclusive of the portions of it that are excluded by that rule, there are 8,748 words in the document.

*/s/ Christopher D. Belelieu*
Christopher D. Belelieu

**CERTIFICATION OF SERVICE**

I, Christopher Belelieu, hereby certify that the foregoing was filed electronically via the Court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties whose counsel has appeared in this action, by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

/s/ Christopher D. Belelieu
Christopher D. Belelieu