# EXHIBIT 19

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


In Re SolarEdge Technologies,    )   No. 1:23-cv-09748

Inc. Securities Litigation,      )   -GHW-OTW

_____    )



VIDEO-RECORDED RULE 30(b)(6) DEPOSITION OF

HACHSHARA INSURANCE COMPANY LTD.

REPRESENTATIVE

ROI KADOSH

New York, New York

Tuesday, December 16, 2025



Reported Stenographically By:
PATRICIA A. BIDONDE
Registered Professional Reporter
Realtime Certified Reporter
JOB#:  11582

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 43

R. Kadosh

everybody go on bus or come by their private car to see the site, to see the building.

And if, for example, I don't know how to say it ...

THE INTERPRETER:  A supermarket called "Supersal." S-u-p-e-r-s-a-l.

MR. LAVIE:  It's more like a retail.

A.    Logistical center.  So they talk to the analysts to this logistical center and show how it could be -- have a huge benefit to invest in this logistical center, I think would be good influence about the company result.

Q.    And would that be for a real estate investment or that's -- could be equity --

A.    Not for real estate.  No, it could be for equity.

Q.    You mentioned buying on the dip.

A.    Mm-hmm.

Q.    Is that typically, are you trying to find assets that --

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 44

R. Kadosh

A.    No.  I'm not a day trader.  No. But obviously if something happened and it's not related to the company, it's like, you know, all the markets is down, and we see that the price of a company that we have a track on them, it's very interesting, so we want to enter into the company and maybe increase our holding in the stock.

Q.    Is your primary strategy to invest for a longer time period?

A.    Yeah, it's like a buy and hold most of the time.  Obviously, if something bad happen, so we call it the stop-loss trigger.

(Stenographer clarification.)

We cut our losses because we don't want to lose any money -- to lose any more money.  So we just cut your losses and sell the holding in the stock.

Q.    Is that something that is set in advance, like the price it would have to hit for you to sell?

A.    Basically, on a direct investment, not an ETF, we say that between 5 up to 50 percent take profit or stop loss, it's a

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 45

R. Kadosh

range that is wide enough to, you know, for a slowly movement.  But obviously, if it's go up very sharply or decrease very sharply, so the stop-loss trigger is activated and we make, like, a quick brief and decide, for example, to sell 50 percent from our holdings.

Q.   You also mentioned certain macro analysis -- right? -- the Fed decisions.  Do you analyze that yourself or are you relying on other analysts?

A.   No, both.  By myself and with other because sometimes you have to make a quick movement.  So I'm not going to wait for a external opinion.  I just grab my stuff and tell them, Okay, what do you think, should they do now until, I don't know, two weeks from now?

Q.   Does your team have more access to Israeli companies than to companies outside of the US -- I mean outside of Israel given where you're based?

A.   Yeah, I think so, yes.  It's much easier for us to deal with Israeli or Israeli-related company than with Amazon or

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 46

R. Kadosh

Google or Apple.  I don't have the opportunity to call Tim Cook or Jeff Bezos, but obviously I have the opportunity to call to the CO of Supersal or Bank Mizrahi CO.

THE INTERPRETER:  Mizrachi, M-i-z-r-a-c-h-i.

MR. STRAUSS:  Tab 9.

(Kadosh Exhibit 2, Webpage printout of Hachshara's credit and real-estate investment policy, English translation, marked for identification, as of this date.)

(Kadosh Exhibit 3, Webpage printout of Hachshara's credit and real-estate investment policy, original Hebrew version, marked for identification, as of this date.)

Q.   Mr. Kadosh, I'm showing you two documents that have been marked as Kadosh Exhibits 2 and 3.  And I'll represent to you this is taken from the Hachshara website.

Exhibit 3 is the Hebrew version, and Exhibit 2 is a translation that we have prepared.  If you look at the back, the last

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 76

R. Kadosh

Q.    Is there someone else on your team who works with the general counsel?

A.    No.

Q.    So he's doing it on his own, essentially, the Kornit case?

A.    Kornit, no.  If he needs some information from me, so he can ask me and ask for my team.  But he lead it.  It's not my job to deal with the lawsuit.  But if I have to get involved and to step in, so and then my lawyer told me that I have to do it.  So I count on it.  So I make this movement.

Q.    The Kornit lawsuit, though, also was something that was an investment that you were in charge of.  Correct?

A.    Mm-hmm.

Q.    Do you recall what the amount of the losses was --

A.    No.

Q.    -- for the Kornit investment?

A.    Not really, no.

Q.    And this, if you turn to the next page, this is, again, the list of investments by Hachshara in SolarEdge, either purchases or

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 77

R. Kadosh

sales during the relevant time period.

Do you see that?

A.    Mm-hmm.

Q.    To your knowledge, is this -- this is still accurate?

A.    Yeah.

Q.    Okay.  We can talk about them in more detail, but looking at this list and the dates, does that refresh your recollection about any specific discussions of whether to purchase or sell SolarEdge during this period?

A.    No, I think that if you're going to make the average price, maybe we want to do some take-profit movement, because we sold it above 300 and we buy it in 248 and 263.  So maybe the take-profit trigger was activated here, and we decided to take some money from the portfolio.

Q.    And can you explain what a take-profit trigger is?

A.    Yeah, take-profit triggers mean that if you want to buy a company and you think that in the next, maybe quarter, it will be up between 5 up to 15 percent because of

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 78

R. Kadosh

positive news or something like that.  So you want to take some money.  Not, again, not holding its buy note.  You have to react if something good happened and something bad happened.

Q.   And if you had a take-profit trigger, is that something that would execute automatically, or would you still need to authorize those sales?

A.   I need to authorize it.  I need to authorize it for sure.  And maybe I can earn more than the 15 percent.  Maybe I can earn 25 percent.

Q.   So it's not an automatic sale?

A.   No, it's not automatic in the system, we have to talk about this, I have to authorize this.

Q.   Do you recall discussions with your team to -- it looks like, you know, ten or 15 different sales of a few hundred shares over a, you know, 12-month period.

Do you recall discussions relating to those sales?

A.   Again, I'm not remember each

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 79

R. Kadosh

conversation.  But obviously, if you want to, maybe, to make more money, so I told them, Okay, now we're going to sell just 10 percent from the total holding.  Two days before, we're going to sell another ten, because if it's in a good movement in a positive movement, so we want to maximize our profit.

This is why you sell it in February 8, February 14, February 16 in the prices that are 300 and above.

Q.    Is it typical for your investments in companies to have this many different transactions over a time period like this?

A.    Yeah, it could be, yeah.  Again, it's not a majority portfolio, but obviously, if you make some money and you want to meet with the money ...

THE INTERPRETER:  "If you want to take profits, if you want to realize profits, then you sell with the hope that later on, you'd be able to get it back at a lower price."

A.    But the law -- it's not my major

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 80

R. Kadosh

activity, I'm not a hedge fund. Okay? I'm a long-term holding position for my clients. Hedge funds should be doing hundreds of transactions each day. This is not my specification. This is not what I do every day. Otherwise, I would spend all my day in day trades.

Q. Mr. Gordon would have been the head of equities during this time period?

A. Mm-hmm.

Q. Do you recall Mr. Gordon coming to you --

A. Yeah.

Q. -- 15 times, saying I want to sell some SolarEdge --

A. No. Again, if we took the decision, for example, in February 2023, let's take profit and I told them, Okay, let's take the profit during the next week. So it don't need to be -- come every day. You need to authorize every day the security activities but we move forward. Again, I'm not dealing all day with the SolarEdge equity.

Q. So there -- just to make sure I'm

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 81

R. Kadosh

understanding, there might be one discussion, but then there are three or four trades in the next week or two.  Is that correct?

A.    That's correct.

Q.    And you would need to authorize each trade?

A.    Yes, I need to authorize each trade.

Q.    But you might only have one discussion for those different trades.  Is that fair?

A.    We're not sell and buy our portfolio each day.

(Discussion off the record.)

Q.    I think you're already there, but I was going to direct you to Exhibit D next, which I think is where you are, Document 34-4 in here.  And you see this is a joint declaration filed by Hachshara and Amitim, the Amitim Funds.

Do you see that?

A.    Mm-hmm.

Q.    And if you turn to page 5 of this document, there's a signature block from

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 82

R. Kadosh

Hachshara.

Do you see that?

A.    Mm-hmm.

Q.    Is that your signature on the right?

A.    Mm-hmm.

Q.    Do you remember reviewing this document as well?

A.    I think Or maybe told me about Amitim, Mivtachim, even Makefet.

MR. LIEBERMAN:  Let him answer, don't interrupt the question.

A.    So I remember that he told me that there was some process that lead with him and Pomerantz.  And I told him, Okay, if you think we should continue with this process.  So I sign on this process.

I'm not dealing every day, you know, with technical issues.  If I have my lawyer and I count on my lawyer and he tells me, Okay, we should proceed.  So I count on his word.

Q.    Fair to say you're relying on your

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 83

R. Kadosh

lawyer Or and Pomerantz to advise you on --

A.   Yes, obviously, let's make it clear.  I'm not automatically making my signature on the document.  But I get the general information, not the bits and bites and all the technical issues.  Then look forward to the other 29 decisions that I have to make each day.

Q.   If you look at paragraph 6 on the page 2 at the bottom, turn back a couple of pages.

A.   Paragraph 6.

Q.   That paragraph mentions that:

"Representatives of the Amitim Funds and Hachshara participated in a conference call."

Do you see that?

A.   Mm-hmm.

MR. LIEBERMAN:  I object to the line questioning that this witness isn't designated to talk about the oversight of litigation or --

MR. STRAUSS:  I understand.

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 84

R. Kadosh

He signed the document.

MR. LIEBERMAN:  So he can speak in his personal capacity as a signatory of the document.  He's not designated on this topic.

Go ahead.

BY MR. STRAUSS:

Q.    Did you participate in a conference call with Amitim?

A.    No.

Q.    Okay.

MR. STRAUSS:  I think we have been going for about an hour.  Why don't we take a quick break.

THE VIDEOGRAPHER:  The time now is 2:09 p.m.  This concludes Media 2.  Off the record.

(Recess taken from 2:09 p.m. to 2:27 p.m.)

THE VIDEOGRAPHER:  The time now is 2:27 p.m.  This begins Media 3.  On the record.

BY MR. STRAUSS:

Q.    Mr. Kadosh --

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 85

R. Kadosh

A.    Which exhibit?

Q.    Could you please stay on Exhibit 4.  I'm back on where it says "Document 34-3" at the top.  Before that.

MR. STRAUSS:  Page 10 of 10.  Right?

Q.    Page 10 of 10, correct.  The transaction list from your declaration.  So again, this is the list of purchases and sales that was attached to your declaration that shows transactions at least from April 26, 2022, through September 18, 2023, Hachshara's purchases and sales in SolarEdge.

Do you see that?

A.    Mm-hmm.

Q.    And I wanted to ask you about a couple in particular.  If you notice, all of the purchases are on top and then the sales below.

A.    Yeah.

Q.    So I'd like to -- directing your attention specifically to the purchase on May 3, 2023, of 11,628 shares.

Do you see that?

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 86

R. Kadosh

A.    Mm-hmm.

Q.    Do you recall anything or any discussion prior to that purchase regarding that larger purchase of shares?

A.    I can assume maybe because the price was very high -- very low -- sorry -- so we decided to increase our holdings.  You see the price, if you compare it to the price that we bought before in 294, 258.  So maybe --

Q.    And you're referring to the fact that the price there is $263 and change.  Correct?

A.    Mm-hmm.

Q.    And then, if we look below in the sales the next day on May 4, 2023, there's --

A.    May 4.

Q.    In the sales section near the bottom, the third row from the bottom, there's a sale the next day of 11,964 shares.

Do you see that?

A.    Mm-hmm.

Q.    And as you said, at a higher price of $290.

Do you recall -- does this refresh

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 87

R. Kadosh

your recollection and do you recall anything about buying and then selling the next day?

A.   Maybe the company published the result, and if so, the result was very good. And we thought it was a jump in the stock share and we decided to, you know, trigger of the take-profit trigger.

Q.   I will represent to you, I can show you a document if you want, but I can represent to you that there was an earnings call after trading on May 3.

A.   Mm-hmm.

Q.   So does that -- do you typically take a position in advance of an earnings call?

A.   We can do it but it is not our major job.

Q.   Do you recall specifically for this one either you or someone on your team believing that the report would be favorable and that's why you should buy more before the earnings call?

A.   No, it doesn't regarding also to the call.  It's also regarding to the share

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 88

R. Kadosh

price.  And obviously, if we think or we have some expectation about the result, so we say, Okay, we're going to buy it.  So we have the stop-loss price and we have the debt-profit price, and if it hits one of these barriers, so we should sell or buy the stock.  We mainly it doesn't do it.  We do it just in a very ...

THE INTERPRETER:  "On rare occasion."

A.    Rare occasion.

Q.    So if it is on rare occasions, do you remember anything about doing it on this occasion?

A.    No, not remember at all, no.

Q.    Do you think you would have had a meeting to discuss this given the larger share price?

A.    I think it was a meeting.  But again, I have to authorize this.  So even though there is no meeting between me and my equity team.  And the equity team decided between them, and just pick up the phone and tell me, Okay, well, we think that we should enlarge our holding in SolarEdge because of

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 105

R. Kadosh

A.    Mm-hmm.

Q.    And it looks like the document is showing transactions by Hachshara in SolarEdge securities, this one running from February of 2020 through February of 2024.

Do you see that?

A.    Mm-hmm.

Q.    And I just want to ask, in the second column, at least as it's translated, the transactions are either labeled as "purchase" or "custodian purchase," or "sale" or "custodian sale."

Do you have any understanding of what the difference is?

A.    Custodian sale, it's -- I think it's made by the bank.  And the other purchase and sale is by external brokers.

Q.    Sorry.  When you would you trade through the bank?

A.    It depends.  It's not my decision. The equity team decided who they want to give the trade.  It's not my decision.

Q.    So for purposes of this, purchases and custodian purchases are the same, they're

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 106

R. Kadosh

both fore -- on behalf of customers?  Customer money?

A.    On behalf of -- mm-hmm.

Q.    And we've already talked about, I know, many of the transactions.  I want to direct your attention today last page.  And in particular, on January 3 there are a number of purchase transactions.  They're labeled as "custodian purchase" here.

Do you see that?

A.    Mm-hmm.

Q.    I think total -- I won't do math on the fly, but it looks like more than 50,000 shares purchased --

A.    Mm-hmm.

Q.     -- on January 3, 2024.  Is that correct?

A.    Mm-hmm.

Q.    You recall you signed declarations to join this lawsuit in December of 2023 -- correct? -- we looked at that declaration you signed?

A.    Okay.

Q.    And in connection with signing

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 107

R. Kadosh

those declarations, remember you said that you had reviewed the complaint in this case and the allegations against SolarEdge.  Correct?

A.   Mm-hmm.

Q.   So why would you purchase over 50,000 shares of the company when you had just agreed to join a lawsuit against the company?

A.   Nobody told me that there is -- I'm not allowed to purchase the company shares.  And if my team think it was a good price to buy, so we buy it.

Q.   I'm not questioning whether you were allowed to or not.  Would you typically invest in companies if you believed they had committed fraud?

A.   If we think that it's going to be, again, if we think that it going to be a recovery.  So I'm not now the judge.  I just ask myself if I think the COO will fired and the CIO will fired, if the company can make, not that debt can bounce, can it be sharply higher because the core business are good, so we will invest in this company.

And obviously, I don't know if

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 108

R. Kadosh

Amazon or Google make any fraud, but, you know, it's not in my calculation. If I think that I can make some good money from this position, I just enter into the position.

Q. So even if you think the company is not telling the truth in its statements to the market, you would still buy in the company?

A. If I think that the share price reflect all the things that I know for sure, and I think it's an honest price, and I think that is a good entry point, so I would enter to this company.

Q. But would you think the company's price is honest if you also think that the company is engaging in telling --

A. I think --

Q. -- hold on -- making misrepresentations to the market?

MR. LIEBERMAN: Objection to form, speculation.

Go ahead.

A. The share price would reflect everything that we know, not hiding. And if I

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 109

R. Kadosh

think that -- I thought this, I really don't remember what was the price over here because the column is not regarding to the price.

But if my team thinks that it's a good price to enter, so we just enter.  I'm not -- I'm ...

THE INTERPRETER:  "I'm not coming to educate the market."

A.   If I think it's a good price to enter to a company with a good business, I will enter.

Q.   Do you have an obligation to your customers whose money you invest to invest in companies you think are honest?

THE INTERPRETER:  "My obligation is to do what's the very best thing that there is to do."

A.   For example, if I think Petro buys make a pollution, but if I think that it is a good price to buy the stocks, so I would buy it.

Q.   So you thought that either you will make some money back in the lawsuit or you'll buy low and gain money when the stock

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 110

R. Kadosh

goes back up?  Is that fair?

A.    No.

MR. LIEBERMAN:  Objection to form.

A.    When I enter to the company, to the stock, I'm not taking calculation if it's going to be a lawsuit and I'm going to earn it.  This is not the thing that I come to do in Hachshara, to think about the lawsuit and how money I can earn from the lawsuit.

I just want to buy in a dip price or in a low price and sell it in a high price.

Q.    So you thought at this point in early January 2024, the price had dipped and you thought you would buy in the dip.

Is that what you're saying?

A.    I don't really see the price.  But if you say so.  So obviously, again, there is a stop-loss trigger.  If you buy and something happen, it could be any reason, it could be tariff, it could be oil price, it could about with the rate, it could be declarations from the company, so you sell it.

Q.    Do you recall discussions about

RESTRICTED - CONFIDENTIAL SOURCE CODE
PURSUANT TO PROTECTIVE ORDER

Page 111

R. Kadosh

making this large total purchase in January 2024?

A.     Not specific conversation.  Again, we have our path.  We can move right or follow left, but we have our path that we invested the way that we act.  We just regarding to the company result to the company market, to the industry, and to understand if the price reflect the core business, not the CEO honesty or the CIO honesty.

So you see, we made a lot of buy and sell if we think that we can earn if we expect that there will be a rapid movement between the price.

Q.     If you look at the -- several lines after that, there are a number of sales then on January 18, 2024.

Do you see that?

A.     January 18.

Q.     Several lines of sales of, again, without adding it up, more than -- selling over 50,000 shares total on January 18.

Do you see that?

A.     Mm-hmm.