# EXHIBIT 36

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------

IN RE SOLAREDGE TECHNOLOGIES, INC.

SECURITIES LITIGATION


No. 1:23-cv-09748-GHW-OTW

----------------------------------------



VIDEOTAPED DEPOSITION OF

MATTHEW CAIN, Ph.D.

January 8, 2026


Reported By:

Debra Stevens, RPR/CRR

Job No.: 11595

M. CAIN, Ph.D.

If it became so volatile that there were no meaningful price responses to the earnings announcements, then the test would no longer document evidence of a cause and effect relationship.  So, it would depend on sort of how that played out.

Q.    I want to go back, switching topics a little bit, to confounding information.  We talked about that a little bit before lunch.

You say in your report it is possible to assess confounding information on a common classwide basis; correct?

MR. CALANDRA:  Objection to form, but go ahead.

A.    Yes.

Q.    Can you just define for me what you mean by confounding information?

A.    What I am referring to is let's say that there is a corrective disclosure, I do an event study and the event study shows that the stock price has dropped by $10 per share based on the corrective disclosure.

The next question is, what were

M. CAIN, Ph.D.

all the pieces of information that were causing that $10 stock price decline?  It's possible that all of that was related to the alleged fraud or it is also possible only some of that was related to the alleged fraud.  So I am going to, in a loss causation and damages report, disaggregate the portions of the stock price decline that are not related to the fraud allegations.

Q.   In your report you don't disclose how your event study would handle confounding information.  Is that fair?

A.   Well, the event study automatically deals with two types of confounding information, which are overall movements in the overall stock market and industry specific movements.  So if there is bad news about the overall economy or the overall industry that comes out on the same day, the same market impact date as a corrective disclosure, the event study automatically controls for that type of confounding information.  And I do talk about how the event study works in the

M. CAIN, Ph.D.

report.

Then also in the report, I explain that there are tools and techniques that I, that economists, including myself, employ in a loss causation and damages report to assess and disaggregate confounding information.  That could include analyst reports, internal documents, academic research.  Things like that.

Q.    You understand the distinction between a single factor model and a multifactor model, right?

A.    I understand what that means in the context of running a regression, yes.

Q.    Would that -- would you employ either a single factor model or multifactor model with respect to your event study?

A.    So the event study in this report is a multifactor model because it includes not just one factor but two factors, the market and the industry control.  So I -- that's the most common way in which I carry out single firm event studies across reports, is using this multifactor model.

M. CAIN, Ph.D.

Q.    Did you use industry or market indices?  Is that what you are saying?

A.    Yes.

Q.    You agree you have not described in your report how you would apportion any excess returns on the various alleged misrepresentation dates between inflationary or other potentially confounding information, right?

A.    I explain that event study results can be part of that process but there can also be disaggregation analysis. I would agree I have not carried out the specific calculations of artificial inflation at this point in time.

Q.    You would agree that in order for an event study to be replicated or replicatable, one would need to specify the methodological inputs for that analysis?

A.    It likely would be necessary or at least helpful for someone else to replicate the event study.

Q.    And you didn't specify here a methodology to demonstrate artificial

M. CAIN, Ph.D.

inflation; isn't that correct?

A.    So, I did specify all of my event study parameters so that that could be replicated.  But I have not yet undertaken any sort of assessment or analysis or calculation of artificial inflation at this point in time.

Q.    Without a defined method for parsing out any potentially confounding information, the results of any event study cannot be replicated.  Is that fair?

MR. CALANDRA:  Objection to form, but go ahead.

A.    I don't think I really understand your question.

Q.    Well, you put together an event study.  If you don't have a methodology that someone can look at and see to parse out what is confounding information, can I replicate that model?

A.    All I can really say is that in every report that I have done which includes an analysis, I always state all the steps in that analysis so that it is perfectly

M. CAIN, Ph.D.

replicatable.  I never produced an expert report containing any analyses that are not replicable.  It is difficult for me to envision a scenario that would fit within in your question in any of my expert work.

Q.   Let me ask more specifically.

Do you have any understanding of the factors that might affect demand for solar energy or SolarEdge's products?

MR. CALANDRA:  Objection to form, but go ahead.

A.   Well, I know the Complaint talks about some of those types of factors, but I have not undertaken -- that's outside the scope of my report today, to undertake any sort of assessment of the relevant factors that affected demand for the company's products.

Q.   Are you familiar at all with how the European solar market evolved in the year leading up to the class period?

A.   I have not undertaken an assessment of that market at this point in time.

M. CAIN, Ph.D.

Q.    Did you consider any impacts of changing energy subsidies in Europe?

A.    No.  I have not attempted to study European subsidies.

Q.    Did you consider the impact of the war in Ukraine on the SolarEdge market or the solar products market?

A.    I have not considered that impact for my market efficiency or damages analyses at this point in time.

Q.    You didn't consider supply chain disruptions tied to COVID, did you?

A.    Again, I considered the Complaint.  So to the extent the Complaint references these things, I do rely on the Complaint.  But those types of questions do not impact my market efficiency or damages analyses or opinions in this report.

Q.    Well, I will ask you, even though you just gave an answer, did you consider competition from China as it relates to the market for SolarEdge's products?

A.    No.  That's not an analysis that I have undertaken at this point in time.

M. CAIN, Ph.D.

Q.    Again, you didn't review the substance of any analyst reports for purposes of your report, right?

A.    That's correct.

Q.    When you conduct -- if you are retained to conduct a damages analysis in this case, would you expect to rely on analyst commentary?

A.    It is possible that I would rely on analyst commentary for some components of that analysis.

Q.    But you may not?

A.    I have done loss causation and damages reports in which I did not rely on analyst commentary.

Q.    In what scenario would you not rely on analyst commentary?

A.    I have done reports where there was no analyst commentary to the best of my recollection, so that would be one example. But like I said, I do typically review analyst -- as I testified earlier today, I do typically review all the analyst reports when I carry out a loss causation and

M. CAIN, Ph.D.

to be kept in mind when reviewing the substance of analyst reports.

But otherwise, I do agree that this is something that I talked about in this article.

Q.    So you have to look if there is a pro-management bias with respect to analyst reports?

A.    Well, I am just explaining what we were talking about here, acknowledging that there is a pro-management bias in analyst reports.

Q.    Have you -- but you didn't review any analyst reports for this report to assess the genericness of the challenged misrepresentations; correct?

A.    Well, I have not done that type of analysis.  Typically, the starting point is to look at the misrepresentations themselves without even turning to analyst reports.  I have not done any of those analyses at this point in time.

Q.    You haven't reviewed any media coverage to assess the genericness of the

M. CAIN, Ph.D.

challenged misrepresentations; correct?

A.    I have not reviewed media coverage to assess the misrepresentations or price impact questions.

Q.    And you haven't reviewed any company filings to assess the genericness of the challenged misrepresentations; correct?

A.    I reviewed some SEC filings, but I have not attempted to conduct an assessment of their genericness or specificity.

Q.    And you haven't reviewed any executive statements to assess the genericness of the challenged misrepresentations, have you?

A.    Not beyond just reviewing the alleged misstatements in the Complaint.

Q.    Have you assessed the relative genericness or specificity of the alleged misrepresentations at issue?

A.    No.  I have not been asked to conduct that type of assessment at this point in time.

Q.    Do you have an opinion as to

M. CAIN, Ph.D.

whether the alleged corrective disclosures are generic statements?

A.    Well, I have not been asked to offer that type of opinion.  Just sitting here today, what I can tell you, with my article in front of me, is that we explain that the Goldman case was pointing to challenged statements such as "our clients interests always come first" and "we have extensive procedures and controls designed to identify conflicts of interest," and that the Court ultimately stated or concluded that those were overly generic statements.

And the Court said that you can look at -- you can have some sense of genericness or specificity just using common sense.  So, obviously, an earnings announcement, for any company, is very specific and contains specific details that are quite different from boilerplate risk-factor disclosures that the Goldman case was pointing to.

But beyond that, like I said, I have not been asked to form any opinions as

M. CAIN, Ph.D.

of today regarding whether the misreps or the correctives were generic or specific in this case.

Q.   Well, what were the risk disclosures in Goldman being compared against?

A.   I am not sure that I understand your question.

Q.   In other words, if there is an alleged corrective disclosure, there had to be an alleged misrepresentation, right?

A.   Typically, yes.

Q.   So I am asking you, you pointed to one side of the Goldman analysis.  What's the other side?

A.   My recollection is that it is a one-sided analysis in terms of looking at the alleged misrepresentations and asking whether those are overly generic or highly -- or specific in detail, and that that's the starting point in the Goldman case after a lack of front-end price impact.

Q.   So do you think that, in this case, that there doesn't have to be a link

                    M. CAIN, Ph.D.

between the alleged corrective disclosures

and the misstatements at issue?

          MR. CALANDRA:  Objection to form,

     outside the scope, legal conclusion.  Go

     ahead.

     A.    I think you are trying to combine

an academic article that I wrote in a law

review with the opinions I am providing in

the efficiency report.  But there is really

no overlap between those two things.  So, I

wrote an academic article talking about the

impact of the Goldman decision.  But in this

case and in this efficiency report, I am not

offering any sort of legal opinions or

assessment.  The only opinions I am

providing are on market efficiency and that

the out-of-pocket damages methodology is

appropriate.

     Q.    To be clear, you are not offering

any opinion that the August 1, 2023 alleged

corrective disclosure constitutes a

corrective disclosure as a legal matter.  Is

that fair?

     A.    That's correct.

M. CAIN, Ph.D.

Q.    And the same for the October 19, 2023 earnings release; correct?

A.    That's correct.  I'm just relying on the allegations in the Complaint.

Q.    Is it hypothetically possible that there is a substantive or genericness mismatch between the alleged corrective disclosures in this case and the alleged misrepresentations?

MR. CALANDRA:  Objection to form, but go ahead.

A.    I don't know.  Like I said before, I have not been asked to conduct that type of assessment at this point in time.

Q.    So is it fair to say you assumed, based on Plaintiffs' theory of liability, for purposes of your report, that the corrective disclosures are linked in some way to the alleged misstatements?

MR. CALANDRA:  Objection to form, but go ahead.

A.    Yes.  Like I described earlier, I start with that assumption, but I also

M. CAIN, Ph.D.

conducted my own independent review of the allegations contained within the Complaint. And I concluded that there was a sufficient economic coherence between the alleged misrepresentations and alleged corrective disclosures that gave rise to allegations of an inflated stock price, which renders the out-of-pocket damages methodology to be reasonable and appropriate in this case.

Q.   And economic coherence is just your understanding of the link between the disclosures and the alleged misstatements?

A.   It's -- it's based on my review of the Complaint and those allegations and corrective disclosures; yes.

Q.   Is economic coherence a term of art in the economic academic world?

A.   It's a phrase that I have used before and I have seen before; yes.

Q.   Is it only used in the context of litigation?

A.   I don't think so, no.

Q.   You have read it in academic articles?  Is that fair?

M. CAIN, Ph.D.

A.     I believe so, yes.

Q.     And it has a defined definition in the academic world; is that fair?

A.     I have not undertaken any sort of exhaustive review to look for definitions, but I have an academic understanding of that phrase; yes.

Q.     Well, what is it -- does it go beyond some linkage between misstatements and alleged corrective disclosures in a 10b-5 case?

A.     It could.  But the way that I am using it today is in the context of a 10b-5 case and assessing that there is that type of link or at least alleged link between the misstatements and the corrective disclosures.

Q.     And why do you say -- how is that link economic?

A.     Well, because it pertains to impacts on the stock price, for example. So, there is an allegation that the stock price was inflated by virtue of the alleged misrepresentations and that those alleged

M. CAIN, Ph.D.

misrepresentations were corrected through two dates on which the relevant truth came out, which allegedly removed artificial inflation from the stock price.

Q.   What I guess I am trying to figure out is like, how is that economic coherence -- anybody could allege that any misstatements are tied to, you know, some corrective disclosure.  How do you make the conclusion that it's economically coherent?

MR. CALANDRA:  Objection.

Outside the scope.  Go ahead.

A.   It's based on my professional and expert experience, my qualifications and background.  But ultimately, like we have discussed today, it is also based on an assumption that Plaintiffs will ultimately prove their case.  So, I am certainly not opining that in fact there are any damages as of today.  I have not undertaken any sort of loss causation or damages analysis.

If I were asked to do that at some future point, then I would undertake a much more exhaustive analysis.  And it is

M. CAIN, Ph.D.

possible that I could reach conclusions that may differ from the allegations in the Complaint.

Q.   I am not trying to keep pushing this.  I am just trying to really understand it.

Is the economic coherence related to the stock drop, or is it just simply related to you finding a linkage between the alleged misstatement and the alleged corrective disclosure?

A.   Well, it's -- I mean, it's the entire Complaint is the starting point for this.  So like I said before, there is an allegation that the stock price was inflated because of misstatements or misrepresentations and that the inflation came out of the stock price later in the class period by virtue of corrective disclosures.

And looking at the alleged corrective disclosures, the Complaint alleges that there was relevant truth that was disclosed on those two dates that is

M. CAIN, Ph.D.

economically connected to the alleged misrepresentations even though we obviously don't have a mirror image in terms of misrepresentations and earnings announcements; that there is underlying relevant truth pertaining to inventory and customer demand that was revealed through these two events.

Q.   I promise I am almost done with this.  But is the economic connection the stock drop or is it the inflation or is it just, again, your reading of the Complaint in totality and saying, "This is the alleged misrepresentation; it lines up with the alleged corrective disclosure"?

A.   So it includes the artificial inflation in the stock price and it includes the information that was allegedly misrepresented and then corrected.  So just to give you a counterfactual example, if that helps to illustrate it, if there was a Complaint that alleged that a stock price was inflated by misrepresentations but then there is no corrective disclosure to remove

M. CAIN, Ph.D.

that artificial inflation, then that's where -- that would be an example of a case in which -- that could cause an issue for the out-of-pocket damages methodology.

In fact, I have seen in the past instances of allegations in which there is an allegation that investors are misled and yet there is no allegation that the truth ever came out, right?  The truth still hasn't been disclosed and so there is no way for the stock price artificial inflation to be dissipated.  That would be a counterfactual example.

Q.   But again, you are not opining here as a legal matter that there is an alleged corrective disclosure, right?

A.   I am just pointing to the allegations in the Complaint.

Q.   Let me move on from that.

The Lead Plaintiffs we talked about earlier, do you have any understanding of when they purchased securities in this case, SolarEdge securities?

A.   No, I don't.

Page 294

M. CAIN, Ph.D.

Q.   Do you know if any of them purchased after the August 2023 alleged corrective disclosure?

A.   I don't know.

MR. BELELIEU:  I have no further questions.  Thank you.

THE WITNESS:  Thanks.

MR. CALANDRA:  That was the fastest I've ever seen someone conclude.

I have no questions for the witness, either.  I think we are done.

THE VIDEOGRAPHER:  This concludes the deposition.  We are going off the record at 3:48 p.m.

(Transcript orders taken)

[TIME NOTED:  3:48 p.m.]

_____
MATTHEW  CAIN, PH.D.


_____
Subscribed and sworn to

Before me this _____

Day of _____, 20__.


_____
Notary Public

CERTIFICATION

I, DEBRA STEVENS, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 11th day of January 2026.

_____

DEBRA STEVENS, RPR-CRR

*      *      *