**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE SOLAREDGE TECHNOLOGIES, INC. SECURITIES LITIGATION | No. 1:23-cv-09748-GHW <br><br> **CLASS ACTION** |
| THIS DOCUMENT RELATES TO: <br><br> *ALL ACTIONS* | |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS**
**REPRESENTATIVES AND LEAD COUNSEL**

REDACTED

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ........................................................................................................................... 2

    I.      PLAINTIFFS' POST-CORRECTIVE DISCLOSURE PURCHASES DO NOT MAKE THEM ATYPICAL UNDER RULE 23(a) ................................................ 2

    II.     PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23(b) ..................... 3

    A.     Defendants Fail to Carry Their Heavy Burden of Proving No Price Impact .......... 3

    B.     Damages Can Be Measured on a Class-wide Basis ............................................... 7

    C.     Defendants' Speculative Concerns Regarding Uninjured Class Members are No Bar to Class Certification ................................................................................ 11

CONCLUSION ...................................................................................................................... 12

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.,*
77 F.4th 74 (2d Cir. 2023) ...................................................................................................6

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.,*
955 F.3d 254 (2d Cir. 2020), *vacated on other grounds by Goldman Sachs
Grp., Inc. v. Arkansas Tchr. Ret. Sys.,* 594 U.S. 113 (2021) .....................................................3

*Bond v. Clover Health Invs., Corp.,*
2023 WL 1999859 (M.D. Tenn. Feb. 14, 2023) ........................................................................3

*Bos. Ret. Sys. v. Alexion Pharms., Inc.,*
2023 WL 2932485 (D. Conn. Apr. 13, 2023) .............................................................................4

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.,*
348 F.R.D. 372 (S.D. Cal. 2024) .............................................................................................4

*Feinberg v. Katz,*
2007 WL 4562930 (S.D.N.Y. Dec. 21, 2007) ..........................................................................9

*Hasthantra v. CleanSpark, Inc.,*
2025 WL 2717308 (S.D.N.Y. Sept. 24, 2025) ..........................................................................2

*In re Allergan PLC Sec. Litig.,*
2021 WL 4077942 (S.D.N.Y. Sep. 8, 2021) ...........................................................................10

*In re Credit Suisse Sec. Fraud Class Actions,*
2025 WL 1866293 (S.D.N.Y. July 7, 2025) ..........................................................................8, 9

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
574 F.3d 29 (2d Cir. 2009) ...................................................................................................11

*In re Juniper Networks, Inc. Sec. Litig.,*
264 F.R.D. 584 (N.D. Cal. 2009) ............................................................................................2

*In re Pfizer, Inc. Sec. Litig.,*
819 F.3d 642 (2d Cir. 2016) ...................................................................................................8

*In re Qualcomm Inc. Sec. Litig.,*
2023 WL 2583306 (S.D. Cal. Mar. 20, 2023). .....................................................................6, 7

*In re Safeguard Scientifics,*
216 F.R.D. 577 (E.D. Pa. 2003). ............................................................................................3

*In re Signet Jewelers Ltd. Sec. Litig.*,
　2019 WL 3001084 (S.D.N.Y. July 10, 2019) ........................................................3, 10

In *Rocco v. Nam Tai Elecs., Inc.*,
　245 F.R. D. 131 (S.D.N.Y. 2007). ........................................................................3

*Kane Assocs. v. Clifford*,
　80 F.R.D. 402 (E.D.N.Y. 1978) ............................................................................12

*Leone v. ASP Isotopes Inc.*,
　2025 WL 3484821 (S.D.N.Y. Dec. 4, 2025) ........................................................2, 3

*Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*,
　2025 WL 1744895 (N.D. Ill. June 24, 2025) ........................................................11

*Pearlstein v. BlackBerry Ltd.*,
　2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ..........................................................1, 2

*S.E.C. v. Syron*,
　934 F. Supp. 2d 609 (S.D.N.Y. 2013) ..................................................................3

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
　349 F.R.D. 606 (S.D.N.Y. 2025) ..........................................................................10

*SEC v. Tourre*,
　950 F. Supp. 2d 666 (S.D.N.Y. 2013) ..................................................................9

*Shupe v. Rocket Companies, Inc.*,
　752 F. Supp. 3d 735 (E.D. Mich. 2024) ................................................................8, 9

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
　2026 WL 100576 (S.D.N.Y. Jan. 14, 2026) ..........................................................7

*Trauernicht v. Genworth Fin., Inc.*,
　2024 WL 3835067 (E.D. Va. Aug. 15, 2024) ........................................................12

*Waggoner v. Barclays PLC*,
　875 F.3d 79 (2d Cir. 2017) ..................................................................................1, 8

**Statutes**

15 U.S.C. §78j(b) ........................................................................................................8

**Rules**

Fed. R. Civ. P. 23 ......................................................................................................2, 3

Plaintiffs submit this memorandum in further support of their notion for class certification ("Motion," ECF No. 109).

## PRELIMINARY STATEMENT

Defendants' arguments against the Motion either have been rejected by multiple courts or are contradicted by the facts and circumstances of this case and thus do nothing to undermine Plaintiffs' showing that this case is well-suited for class certification.[1]

*First*, while Defendants assert that the Amitim Funds and Hachshara are atypical because they purchased SolarEdge common stock after alleged the corrective disclosures, courts consistently hold that such purchases do not defeat typicality. *See, e.g., Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *9 (S.D.N.Y. Jan. 26, 2021) (collecting cases).

*Second*, Defendants utterly fail to carry their burden of proving the complete lack of price impact because there is no "mismatch" between their alleged misstatements and corrective disclosures and Plaintiffs' expert's reply report provides strong evidence of price impact.

*Third*, the Second Circuit endorsed the precise out-of-pocket damages methodology in *Waggoner v. Barclays PLC*, 875 F.3d 79, 105-06 (2d Cir. 2017), as advanced by Plaintiffs here, and courts consistently reject Defendants' well-worn objections to that methodology.

*Fourth*, Defendants not only fail to identify any uninjured class members who would stand to participate in a recovery if the Motion was granted, but all such class members are easily screened out by a claims administrator.

Accordingly, the Motion should be granted in full.

---

[1] "Brief" or "Br." refer to Plaintiffs' opening memorandum of law in support of the Motion, and undefined capitalized terms have the meanings assigned in the Brief. *See* ECF No. 110. "Opposition" or "Opp." refer to Defendants' opposition to the Motion (ECF No. 117). Citations to "¶__" are to the Second Amended Class Action Complaint ("SAC" or "Complaint" ECF No. 72). Internal quotations and citations are omitted and emphasis added unless otherwise indicated.

1

## ARGUMENT

### I.    PLAINTIFFS' POST-CORRECTIVE DISCLOSURE PURCHASES DO NOT MAKE THEM ATYPICAL UNDER RULE 23(a)

Plaintiffs are *not* subject to unique defenses because they bought SolarEdge common stock after the August 1, 2023 and/or October 19, 2023 corrective disclosures ("August Correctives" and "October Correctives," respectively). *See* Opp. at 9-12. It is well-established that post-disclosure purchases do not undermine a class representative's reliance on the integrity of a security's price. *See, e.g., Leone v. ASP Isotopes Inc.*, 2025 WL 3484821, at *29–30 (S.D.N.Y. Dec. 4, 2025); *Pearlstein*, 2021 WL 253453, at *9. Nor does purchasing SolarEdge common stock after initiating this lawsuit defeat typicality. *See Hasthantra v. CleanSpark, Inc.*, 2025 WL 2717308, at *5 (S.D.N.Y. Sept. 24, 2025). Further, post-corrective purchases of shares was not atypical of Class members: 75% of the top 20 institutional holders of SolarEdge's shares increased holdings between July and September 2023, and 60% of the top 20 increased holdings between October and December 2023. *See* Reply Decl. Exs. 10-11.

Defendants' evidence underscores Plaintiffs' reliance on the integrity of public disclosures when making post-corrective purchases. For example, while Defendants assert that the Amitim Funds are atypical because SolarEdge was a "high-risk" investment, the funds' emails show that they were relying on Defendants' false assurances of *temporary* slowdowns in demand and higher channel inventories. See ECF No. 119-22 at 2. Not only is this consistent with the SAC's allegations that Defendants' August Correctives were misleading (¶¶198-202), but viewing an investment as "high-risk" does not create atypicality. *See In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584, 589 (N.D. Cal. 2009) (report describing "high risk" company does not defeat typicality). Similarly, Hachshara's potential use of "take profit" or "stop loss" trading does not render it atypical because trading to limit damages or maximize profits rely on the integrity of

2

disclosures and react to market information. *See, e.g., Leone*, 2025 WL 3484821, at *29–30. In any event, Hachshara's stop-loss and take profit mechanisms did not automatically sell SolarEdge shares, they were triggers for further stock-specific analysis. See 119-19 at 44:20-45:07, 77:13-19, 87:19-88:08.

Defendants' cases do not hold otherwise. In *Rocco v. Nam Tai Elecs., Inc.*, the court held that a plaintiff was atypical because it purchased shares after possessing non-public information regarding the fraud itself. 245 F.R. D. 131, 136 (S.D.N.Y. 2007). Here, there is no suggestion that Hachshara had any inside information. The plaintiff in *In re Safeguard Scientifics*, unlike any Plaintiff here, was a self-professed day trader, 216 F.R.D. 577, 582 (E.D. Pa. 2003).

## II.    PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23(b)

### A.    Defendants Fail to Carry Their Heavy Burden of Proving No Price Impact

Defendants do not address the well-established *Cammer* and *Krogman* market efficiency factors, let alone rebut the Plaintiffs' showing that those factors are present, and thus concede market efficiency. *Compare* Br. at 17-21 *with* Opp. at 13-27; *see S.E.C. v. Syron*, 934 F. Supp. 2d 609, 631 (S.D.N.Y. 2013) (unaddressed argument in opposition is conceded).

Plaintiffs are thus entitled to the fraud-on-the-market presumption of reliance, and Defendants bear the heavy burden of rebutting that presumption. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *11 (S.D.N.Y. July 10, 2019). To rebut the presumption, Defendants must "demonstrate…using event studies or other means, that the other events explain the ***entire*** price drop." *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 270 n.18 (2d Cir. 2020), *vacated on other grounds by Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 126-27 (2021).

Defendants' expert, Dr. Mark Garmaise ("Dr. Garmaise"), did not provide an event study or otherwise opine on price impact, an omission that substantially weakens Defendants' rebuttal

3

efforts. *See* Reply Decl.[2] Ex. 2 at 36:22-37:2; *Bond v. Clover Health Invs., Corp.*, 2023 WL 1999859, at \*12 (M.D. Tenn. Feb. 14, 2023) ("defendants…do not rely on any expert economic analysis…which already places their [price impact] argument on shaky ground). Instead, Defendants point to their statements and analyst reports and baldly assert that their misrepresentations had *no* price impact. *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 2023 WL 2932485, at \*12 (D. Conn. Apr. 13, 2023) ("the inquiry is whether Defendants have proven a complete lack of price impact during the Class Period"). Defendants are wrong.

*First*, Defendants put forth *no* evidence to demonstrate a lack of front-end price impact. Conversely, early in the Class Period Defendants mischaracterized European demand as strong and channel inventory levels as low in response to questions from analysts, who relied on and repeated those misrepresentations to investors, and SolarEdge's share price surged 9.1% (after controlling for market and industry effects)—powerful evidence of front-end price impact for those misstatements.[3] Reply Decl. Ex. 1 ("Cain Reply") ¶¶47-51; *see City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 348 F.R.D. 372, 386 (S.D. Cal. 2024) (misstatements followed by price increase show front-end impact).

*Second*, Defendants are simply incorrect that their misstatements regarding European demand are unrelated to the August and October Correctives. Opp. at 13-15. For starters, Defendants do not address, and thus concede, that their channel inventory misstatements and corrective disclosures concerned the same subject. *See id.* In addition, Defendants' assertion that their misstatements referred only to general European demand, while their August Correctives

---

[2] Citations to "Reply Decl." are to the Reply Declaration of Brian Calandra filed herewith.

[3] For the avoidance of doubt, Plaintiffs are proceeding under a theory of front-end price impact for the misstatements in paragraphs 157 and 171-73, and inflation-maintenance theory for the misstatements in paragraph 156, 164, 167, 168, 170, 174-82, 186 and 192.

4

addressed distributor behavior, channel inventory levels, and installation delays and their October Correctives referred to customer pushouts, cancellations, and installation delays, asks the Court to blind itself to the obvious. *See* Opp. at 14.

For example, the August Corrective's disclosure that "growth in demand has tapered off" ***expressly disclosed declining demand in Europe.*** *See* ECF No. 119-4 at 4. Moreover, when Defendants touted European demand, they connected those statements to low channel inventory levels (¶167) or the Company's inability to manufacture sufficient products to meet demand (¶¶167-68, 170, 173), thus the August Correctives' references to unsold inventories in the channels contradicted these statements by disclosing declining demand, not an inability to manufacture products (*see* ¶197-98). Further, even the analysts cited by Defendants recognized that the August Correctives disclosed to declining demand. *See, e.g.*, ECF No. 119-13 at 2 ("the company is toning down the previous optimism a bit….[D]ue to slightly higher than normal channel inventory *as demand is tapering off*….The latest guidance implies *an even weaker residential…segment in Europe*), 119-14 at 3 ("[m]anagement noted higher inventory in the EU…*primarily driven by…slower EU growth*"); Cain Reply ¶69.

As for Defendants' assertions regarding the October Correctives, even Dr. Garmaise acknowledged during his deposition that installation rates are a proxy for demand. Reply Decl. Ex. 2 at 141:13-146:14. In addition, analysts consistently inferred demand declines from the October Correctives. Cain Reply ¶¶70-71; Reply Decl. Ex. 7 at 2 ("*sluggish residential demand (both in the US and Europe)*"); *id.* Ex. 8 at 2 ("European distributors are canceling orders in the face of *excess inventory and lower demand*"). In fact, a BMO Capital Markets analyst expressly stated that the October Corrective's "comment on installation rates" directly contradicted touts of strong

5

European demand that Defendants made at conferences during the class period—*the very touts that the SAC alleges are misleading*. *Compare* ¶¶178, 181-82 with Reply Decl. Ex. 9 at 2.

*Third*, Defendants incorrectly assert that they have shown a complete lack of price impact because their alleged misrepresentations concerning European demand and channel inventories are too "generic," and there is a purported "mismatch" between the specificity of the alleged misstatements and the August and October Correctives. Opp. at 16-18 (citing *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.* ("*ATRS*"), 77 F.4th 74, 102 (2d Cir. 2023)).

As alleged in the SAC, Defendants specifically assured investors about strong European demand (¶¶164, 167-68, 170-82, 186) and low channel inventory levels (¶¶156-57)—often in response to pointed analyst questions (¶¶167-68, 170, 172-75, 177, 179, 181-82). On their face, these statements bear no resemblance to the boilerplate risk disclosures in *ATRS* and thus cannot fairly be described as "generic." *See* 77 F.4th 74, 102

In addition, the bulk of Defendants' evidence of a purported mismatch is that their alleged misstatements referred to European demand and channel inventory levels in ways that Defendants self-servingly claim are less specific than the August and October Correctives. *See* Opp. at 16-18. But Defendants seek a "precise match" between misstatements and the correctives, which the Second Circuit expressly was not required. *See ATRS*, 77 F.4th at 98 ("[i]t may frequently be the case that what is *corrective* about a 'corrective disclosure' is situated among details which, in the aggregate, make for a somewhat more specific back-end disclosure") (emphasis in original).

For example, Defendants' assurances of "strong" demand in Europe, which were corrected by disclosures of slowing demand growth and pushouts and cancellations in August and October 2023, respectively, are not any less aligned than the statements at issue in *In re Qualcomm Inc. Sec. Litig.*, where the court held that there was no mismatch between the statement "we tend to

keep the licensing and the chip business very separate…we don't bundle those together" and the corrective disclosure that the company withheld "its baseband processors unless a customer accept[ed] a license ... on terms preferred by Qualcomm." *See* 2023 WL 2583306, at *14 (S.D. Cal. Mar. 20, 2023). Likewise, assurances of low channel inventory levels (¶¶156-57), which were later in part corrected by descriptions of "higher than optimal inventory levels" (¶198), are as aligned as the statements in *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, where the court found no mismatch between statements like "[i]t's not necessarily a demand issue we're seeing" and the subsequent disclosure, "lower volumes for our...test drove a year-over-year decline in revenue," 2026 WL 100576, at *7 (S.D.N.Y. Jan. 14, 2026).

Even if the Court were to find a mismatch between Defendants' misstatements and the August and October Correctives—and there is *none*—that is not the end of the matter. Under *ATRS*, the Court must then ask "what would have happened if [the company] had spoken *truthfully*." *See* 77 F.4th at 99, 102 (emphasis in original). In *ATRS*, the panel held that the defendants had provided sufficient evidence that the stock price would have been affected had the defendants spoken truthfully. *See id.* at 103-04. Here, Defendants simply assert that a mismatch exists without addressing what would have happened had SolarEdge spoken truthfully, and thus Defendants' "mismatch" arguments fail. *See id.* at 102-04.

*Fourth*, contrary to the Opposition, the Cain Reply presents copious evidence of price impact, including event-study documented and statistically significant price declines in SolarEdge common stock following corrective disclosures and analyst commentary recognizing those disclosures. *See* Cain Reply ¶¶16 & n.11, 26-28, 67-72).

**B.    Damages Can Be Measured on a Class-wide Basis**

Relying on Dr. Garmaise's expert report, Defendants assert that Dr. Cain's damages model is inadequate because it (i) fails to link alleged damages to Plaintiffs' theory of liability (Opp. at

7

19-23); (ii) cannot isolate the impact of confounding factors (Opp. at 23-25); and (iii) cannot measure damages associated with a materialization of a concealed risk (Opp. at 25-27). Courts, however, routinely reject these arguments and accept Dr. Cain's model. *See,* Cain Reply ¶12 n.[8] (citing cases). Indeed, less than a year ago Judge McMahon accepted Dr. Cain's model over substantively similar objections ***by Dr. Garmaise himself,*** *see In re Credit Suisse Sec. Fraud Class Actions,* 2025 WL 1866293, at *8-10 (S.D.N.Y. July 7, 2025), and another court recently rejected substantively similar arguments from Dr. Garmaise in approving a model substantively similar to Dr. Cain's, *see Shupe v. Rocket Companies, Inc.,* 752 F. Supp. 3d 735, 783-84 (E.D. Mich. 2024). Defendants' objections to Dr. Cain's model fair no better here.

*First,* Defendants' assertion that Dr. Cain's methodology is "generic" (Opp. at 20) overlooks that Dr. Cain's Opening Report detailed the how damages can be calculated on a class-wide basis in a manner consistent with Plaintiffs' theory of liability using the "out-of-pocket" method. *See* ECF No. 111-1 at ¶¶96-113. It also ignores that his type of damages model ***has been expressly endorsed by the Second Circuit,*** *see Waggoner,* 875 F.3d at 105-06, and is the standard measure of damages in Section 10(b) securities fraud cases, *see In re Pfizer, Inc. Sec. Litig.,* 819 F.3d 642, 649 (2d Cir. 2016). Indeed, Dr. Cain's report and the *Waggoner* report describe the damages model in similarly general ways. *Compare* 111-1 ¶¶95-113 *with* Expert Report of Zachary Nye, Ph.D., *Strougo v. Barclays PLC, et al.,* No. 14-cv-05797-SAS (S.D.N.Y. Jul. 7, 2015), ECF No. 57-1 ¶¶76-80.

Defendants try to overcome this rock-solid precedent by asserting that Dr. Cain fails to account for the "complex reality surrounding European demand during the purported class period." *See* Opp. at 21-22. But not only is Dr. Cain's model capable of accounting for demand declines on a class-wide basis (*see* Cain Reply at 25-28), it is well-established that extraordinary "black swan"

events do not disqualify the out-of-pocket damages methodology. *See, e.g., Credit Suisse*, 2025 WL 1866293, at *10 ("historic" merger of UBS and Credit Suisse); *Shupe*, 752 F. Supp. 3d at 784 (COVID-19 pandemic).

Further, Defendants' assertion that Dr. Cain does not address whether Defendants actually committed securities fraud (*see* Opp. at 20-22) fails because, as a class certification expert, Dr. Cain is not permitted to usurp the role of the jury and conclude that Defendants' misstatements were in fact misleading. *See SEC v. Tourre*, 950 F. Supp. 2d 666, 682 (S.D.N.Y. 2013) (directing expert to "avoid all characterizations of the marketing materials as 'misleading'"); *Feinberg v. Katz*, 2007 WL 4562930, at *9 (S.D.N.Y. Dec. 21, 2007) (rejecting expert testimony as to what defendants needed to disclose to make their statements not misleading). Indeed, Defendants cite *no* authority for their assertion that, at class certification, a damages model must confirm that Defendants are liable for securities fraud.

Regardless, Defendants' own documents provide powerful evidence that Defendants had information contradicting their statements regarding channel inventories and European demand. *See* Cain Reply ¶¶29-34. For example, a presentation from SolarEdge's outside auditor stated that

██████████████████████████████████████████████████

████████████████. *See* Reply Decl. Ex. 3 at SEDG-Shen_000311. Similarly, an April 16, 2023 email to Lando, Danzinger, and others stated ████████████████████████

███████████████████████████. *See id.* Ex. 4 at SEDG-Shen 0005947. In addition, a May 31, 2023 Board presentation stated that ██████████████████

████████████████████████ (*see id.* Ex. 5 at SEDG-Shen_000387) and a September 19, 2023 Board Presentation showed ████████████████████

██████████████████████████████████ (*see id.* Ex. 6

9

at SEDG-Shen_000350; Cain Reply ¶33. Indeed, Dr. Garmaise himself testified that ███████

███████████████████████████████████████████████████

███████████████████████████████████. Reply Decl. Ex. 2 at 56:07-60:20. Defendants' documents thus *corroborate* Plaintiffs' allegations that Defendants misrepresented European channel inventories and demand during the Class Period.

*Second*, it is widely recognized that an event study like the one used in Dr. Cain's model can disaggregate the effects of confounding information. *See* Cain Reply ¶¶35-37; *In re Allergan PLC Sec. Litig.*, 2021 WL 4077942, at *15 (S.D.N.Y. Sep. 8, 2021). Indeed, "[w]ere it otherwise, nearly every securities fraud class action would fail." *Signet*, 2019 WL 3001084 at *20. Regardless, "while Plaintiff ultimately will need to disaggregate confounding factors to prove economic loss, it need not do so at this juncture to establish that common issues relating to damages predominate." *Id.*

*Third*, Dr. Cain's model is also capable of accounting for materialization of concealed and known risks. *See* Opp. at 25-27. As an initial matter, Defendants' contention "is simply a loss causation argument in disguise" and Plaintiffs are not required to establish loss causation at class certification. *See Signet*, 2019 WL 3001084, at *20. Further, Dr. Cain's out-of-pocket methodology can reliably disaggregate losses from the materialization of known or concealed risks. *See* Cain Reply ¶¶38-44; *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 349 F.R.D. 606, 614 (S.D.N.Y. 2025) (certifying class relying on Dr. Cain's methodology over the objection that the methodology was not supported by sufficient proof of loss causation or damages).

**C.      Defendants' Speculative Concerns Regarding Uninjured Class Members are No Bar to Class Certification**

The Opposition concludes by asserting that while "the proposed class includes a significant number of uninjured class members," Plaintiffs fail to provide "any method…for distinguishing uninjured and injured class members" and thus individualized inquiries may predominate. *See* Opp. at 27-28. Defendants are wrong.

*First*, the need to exclude uninjured class members easily can be addressed by a plan of allocation designed to exclude any SolarEdge investor without losses. *See Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*, 2025 WL 1744895, at *17 (N.D. Ill. June 24, 2025) ("If the class succeeds in proving" their claims, uninjured class "members may not recover anything because they cannot identify losses. That is part and parcel of administering class recovery; it is not an obstacle to class certification"). Indeed, the PSLRA has a specific formula for capping damages at the stock's purchase price and the issuer's average stock price during the 90-day period after information correcting the alleged fraud is disseminated to the market, which will weed out any purportedly undamaged purchasers. *See* 15 U.S. Code § 78u-4(e).

*Second*, Defendants' assertion should be rejected because they cannot identify *any* purported class members who are uninjured. *See id.* at 28. Instead, Defendants generally suggest that "certain class members, including Lead Plaintiffs, are differently situated given the timing of their purchase relative to the alleged corrective disclosures." *See id.* If the existence and quantity of uninjured class members were so pervasive Defendants should be able to identify and describe them. Indeed, in the securities fraud class action Defendants cite, uninjured class members were clearly identifiable. *See, e.g., In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 41 (2d Cir. 2009) (sellers of shares before a specific corrective disclosure). Defendants can only speculate that some unidentified number of class members may be uninjured because they are "differently

11

situated," which does not defeat class certification. *See Kane Assocs. v. Clifford*, 80 F.R.D. 402, 407 (E.D.N.Y. 1978) ("speculation" insufficient to defeat predominance in securities class action).

*Third*, the speculative potential existence of uninjured Class members is not a ground for denying the Motion because the Court can modify the Class as appropriate at a later date. *See Trauernicht v. Genworth Fin., Inc.*, 2024 WL 3835067, at *10 (E.D. Va. Aug. 15, 2024) ("certifying a class that may encapsulate some uninjured class members does not necessarily violate Article III or the Rules Enabling Act because those class members can later be identified and excluded from any recovery").

## CONCLUSION

For these above reasons, the Motion should be granted in its entirety.

Dated: February 20, 2026

POMERANTZ LLP

/s/ Brian Calandra
Brian Calandra
Jeremy A. Lieberman
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
bcalandra@pomlaw.com
jalieberman@pomlaw.com

*Lead Counsel for Plaintiffs and the Proposed Class*

12

## **WORD COUNT CERTIFICATION**

I, Brian Calandra, certify that the foregoing memorandum of law complies with the word-count limitations set forth in Local Civil Rule 7.1(c). According to the word count of the word-processing program used to prepare the memorandum, and exclusive of the portions of it that are excluded by the rule, there are 3,500 words in the document.

February 20, 2026                              _/s/ Brian Calandra_____
                                              Brian Calandra

13

## CERTIFICATION OF SERVICE

I, Brian Calandra, hereby certify that I filed true and correct copy of the foregoing Plaintiffs' Reply Memorandum of Law In Support of their Motion for Class Certification and Appointment of Class Representatives and Lead Counsel with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Executed on February 20, 2026

/s/ Brian Calandra
Brian Calandra

14