# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE SOLAREDGE TECHNOLOGIES, INC. SECURITIES LITIGATION | Case No. 1:23-cv-09748-GHW |

EXPERT REPLY REPORT OF MATTHEW D. CAIN, PH.D.

February 20, 2026

**Table of Contents**

I.      Introduction..................................................................................................................1

II.     Summary of Opinions...................................................................................................2

III.    Background on the Fraud-on-the-Market Theory and Stock Prices...........................4

IV.     The Out-of-Pocket Damages Methodology is Widely Accepted by Courts at the
        Class Certification Stage and Artificial Inflation will be Quantified at the Loss
        Causation and Damages Stage......................................................................................6

        A.    The Out-of-Pocket Methodology is Capable of Addressing Changes in
              Artificial Inflation Over the Class Period ................................................................8

        B.    The Out-of-Pocket Methodology is Capable of Addressing Alternative
              Findings of Facts Speculated by Dr. Garmaise and in Defendants' Opp.
              Brief ......................................................................................................................11

        C.    The Out-of-Pocket Methodology is Capable of Addressing
              Confounding Information .......................................................................................13

        D.    Dr. Garmaise Mischaracterizes Plaintiffs' Theory of Liability, and the
              Out-of-Pocket Methodology is Capable of Addressing Materializations
              of Risks ..................................................................................................................15

V.      Economic Evidence that the Alleged Misrepresentations Impacted SolarEdge's
        Common Stock Price ..................................................................................................19

        A.    Evidence that the Alleged Misrepresentations Had Front-End Price
              Impact ....................................................................................................................19

        B.    Fundamental Principles of Finance and Economics Demonstrate the
              Price Impact of the Alleged Misrepresentations....................................................22

        C.    The Alleged Misrepresentations are Economically Connected to the
              Relevant Truth Revealed by the Alleged Corrective Disclosures .........................23

        D.    Analyst Commentary Following the Alleged Misrepresentations
              Provides Further Evidence of Front-End Price Impact and/or Price
              Maintenance ...........................................................................................................27

        E.    Analyst Commentary Regarding the Alleged Revelations of the
              Relevant Truth Provides Further Evidence of Back-End Price Impact .................30

VI.     Conclusion .................................................................................................................34

## I.       Introduction

1.       On October 17, 2025, I submitted an expert report in this matter (my "Opening Report"), in which I concluded that the market for SolarEdge's Common Stock was efficient throughout the Class Period, February 13, 2023 to October 19, 2023, inclusive.[1] I also concluded that damages in this matter can be calculated on a Class-wide basis subject to a standard, common methodology for Plaintiffs' pending claims.[2]

2.       Following the submission of my Opening Report, Plaintiffs' Counsel provided me with the January 16, 2026 Expert Report of Professor Mark Garmaise, Ph.D. (the "Garmaise Report") and Defendants' Memorandum of Law in Opposition to Lead Plaintiffs' Motion for Class Certification ("Defendants' Opp. Brief" or "Opp. Brief"). I have been asked to review, evaluate, and respond to the Garmaise Report and certain arguments made in Defendants' Opp. Brief.

3.       My qualifications and rate of compensation for work in this matter were identified in my Opening Report, and I do not repeat them here. I have attached an updated version of my curriculum vitae as Appendix A.

4.       In formulating my opinions set forth in this Expert Reply Report, I have relied upon the analyses already described in my Opening Report, as well as my knowledge, experience, and formal training in economics, finance, and statistics, in addition to the allegations and facts set forth in this matter. All of the materials I have considered in forming my opinions are identified in Appendix B to this Reply Report, in addition to those previously identified in Appendix B to my Opening Report.

5.       I reserve the right to amend this report to reflect new information that becomes

---

[1] *See* Opening Report, ¶ 3. I continue to hold the opinions expressed in my Opening Report and reiterate them herein. Capitalized terms in this report have the same meaning as in my Opening Report.

[2] *Id.*

1

available to me in light of the discovery process or future rulings from the Court.

## II.    Summary of Opinions

6.    Nothing in the Garmaise Report or Defendants' Opp. Brief disturbs the opinions expressed in my Opening Report.

7.    The Garmaise Report and Defendants' Opp. Brief do not dispute the conclusion I reached in my Opening Report that SolarEdge Common Stock traded in an efficient market throughout the entirety of the Class Period. In my Opening Report, I tested the efficiency of the market for SolarEdge Common Stock by evaluating the standard *Cammer* and *Krogman* factors.[3] Dr. Garmaise does not dispute my analyses of or my conclusions regarding *any* of these factors. Indeed, some of Dr. Garmaise's opinions in the Garmaise Report rely implicitly on the market for SolarEdge Common Stock being efficient.

8.    Dr. Garmaise does not offer any criticism of the event study regression specified in my Opening Report, nor does he conduct his own event study regression of SolarEdge Common Stock returns to investigate efficiency. Dr. Garmaise does not dispute that I performed a valid event study regression that controls for market and industry effects and accurately measures the abnormal returns exhibited by SolarEdge Common Stock during the Class Period and on the alleged corrective disclosure dates.

9.    Dr. Garmaise does not dispute that the general damages framework and methodology (*i.e.*, the out-of-pocket methodology) that I detail in my Opening Report is standard, reasonable, and relied upon in virtually all securities class action matters alleging fraud claims under §§ 10(b) and 20(a) of the Exchange Act.[4] Nor does he articulate any alternative approach that would be more suitable in this matter.

10.    However, in their Opp. Brief, Defendants quote my deposition testimony

---

[3] Opening Report, Section V.
[4] *Id.* Section VI.

confirming that I have "not been asked to perform a loss causation analysis at this time," and they assert that this lack of a loss causation analysis is "fatal" — suggesting that a loss causation analysis is required at the Class certification stage.[5] Relatedly, the Opp. Brief and the Garmaise Report raise questions about the specific calculations of artificial inflation, potential disaggregation of confounding information, and potential findings of fact regarding an "apparent lack of information asymmetry" between certain internal Company documents and public-facing Company statements.[6]

11.     Defendants' Opp. Brief also asserts that Plaintiffs have not established that the alleged misstatements had an impact on the price of SolarEdge's Common Stock, claiming there is a "mismatch" between the alleged misstatements and the alleged truth revealed by the corrective disclosures.[7]

12.     I have analyzed the Garmaise report and Defendants' Opp. Brief, and I conclude they are flawed and unreliable. I have also reached the following opinions:

    a.  Defendants' demand for a loss causation analysis at the Class certification stage is without basis. My Opening Report opinions on market efficiency and the out-of-pocket damages methodology are reasonable, objective, and have been routinely accepted at the Class certification stage without a loss causation analysis, which commonly occurs at a later phase of litigation.[8] The out-of-pocket methodology is capable of accommodating any necessary adjustments in the calculation of a common Class-wide artificial inflation ribbon, including for confounding

---

[5] Opp. Brief at 18-19.
[6] *Id.* at 20-27; Garmaise Report ¶¶ 14, 72, 78-87.
[7] Opp. Brief at 13-18.
[8] *See Ali Diabat, et al., v. Credit Suisse Group AG, et al.* Case No. 1:23-cv-5874 (S.D. N.Y.); *see also San Antonio Fire and Police Pension Fund, et al., v. Dentsply Sirona Inc., et al.,* Case No. 1:22-cv-06339 (S.D. N.Y.); *see also El Paso Firemen & Policemen's Pension Fund, et al. v. InnovAge Holding Corp., et al.,* Case No. 21-cv-02770-WJM-SKC (D. Co.); *see also In re Upstart Holdings, Inc. Securities Litigation,* Case No. 2:22-cv-02935-ALM-EPD (S.D. Oh.); *see also Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall,* Case No. 4:21-cv-03343 (N.D. Ca.); *see also In re: QuantumScape Securities Class Action Litigation,* Case No. 3:21-cv-00058-WHO (N.D. Ca.); *see also Bond v. Clover Health Investments, Corp., et al.,* Case No. 3:21-cv-00096 (M.D. Tenn.); *see also In re: Under Armour Securities Litigation,* Case No. RDB-17-388 (D. Md.).

information, materialization of risks, and alternative findings of facts regarding liability.

b.  The Garmaise Report does not present any opinions that the alleged misstatements had no impact on the price of SolarEdge Common Stock.

c.  I document evidence that the alleged misrepresentations had front-end price impact and/or maintained the price of SolarEdge Common Stock at artificially inflated levels. For example, during the Company's Q1 2023 earnings call on May 3, 2023, analysts asked Defendants about a potential slowdown in Europe, and Defendants directly responded with alleged misstatements. Following these alleged misstatements, the price of SolarEdge Common Stock increased by a statistically significant amount. Contemporaneous analyst reports explicitly relied on and referenced the strength of demand in Europe — issues Plaintiffs allege were misrepresented.

d.  My analysis indicates no such "mismatch" between the alleged misstatements and alleged corrective disclosures. The alleged misstatements in this case were specific, detailed, and economically connected to the alleged corrective disclosures. The economic connection between the alleged misrepresentations and omissions and the corrective information is further supported by: (i) fundamental principles of finance and economic analysis, and (ii) analyst discussions, and price target changes, which explicitly referenced the same economic information pertaining to the alleged misrepresentations and the resulting alleged corrective disclosures.

e.  The alleged misstatements were value relevant and by their nature had price impact Moreover, on earnings calls, analysts asked questions related to demand in Europe, which Defendants replied to with alleged misrepresentations, and numerous analysts referenced and relied on these alleged misstatements throughout the Class Period.

f.  I document reliable economic evidence of back-end price impact of the alleged misstatements. The alleged corrective disclosures were followed by statistically significant declines in the price of SolarEdge Common Stock. Moreover, analysts referenced and relied on the alleged revelations of the relevant truth contained within the alleged corrective disclosures.

## III.   Background on the Fraud-on-the-Market Theory and Stock Prices

13.   In my Opening Report, I explained how the fraud-on-the-market theory relates directly to the price of a given security.[9] This theory posits that if a company's stock price reflects all public widely available information, then all purchasers and sellers of that company's stock

---

[9] Opening Report, Section IV.

4

implicitly rely on any misrepresentations or omissions because those statements or omissions have distorted the transaction price. I further explained how the fraud-on-the-market theory of reliance has been addressed by numerous courts over the years in relation to claims made under § 10(b) of the Exchange Act and was adopted by the U.S. Supreme Court in *Basic* and reaffirmed in its *Halliburton II* decision.

14.     I analyzed the *Cammer*, *Krogman*, and other relevant factors relating to SolarEdge Common Stock in my Opening Report, and I ultimately found that these factors support a conclusion of market efficiency.[10] Thus, it follows that purchasers of SolarEdge Common Stock implicitly relied on Defendants' alleged misrepresentations and/or omissions because the value of that information was impounded into the price of SolarEdge Common Stock. Dr. Garmaise does not dispute my analyses of any of the 11 relevant factors or my conclusion that SolarEdge Common Stock traded in an efficient market during the entirety of the Class Period.

15.     As part of the analysis in my Opening Report, I performed an event study to analyze the stock price movements of the SolarEdge Common Stock throughout the Class Period. To perform the event study, I used a regression analysis to measure the relationship between SolarEdge Common stock price returns and: (i) changes in market-wide factors that would be expected to impact all stocks; and (ii) changes in industry-wide factors that would be expected to impact stocks in SolarEdge's industry. By modeling how SolarEdge's stock price returns typically moves relative to an overall market index and an industry index, I can measure its "abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide movements.

16.     Dr. Garmaise offers no criticisms of my event study analysis. Nor does he dispute that it accurately measures the abnormal returns exhibited by SolarEdge Common Stock during

---

[10] *Id*. Section V.

5

the Class Period and on the alleged corrective disclosure dates. The results of my event study show that there were statistically significant price declines in SolarEdge Common Stock, after controlling for market and industry effects, following multiple alleged corrective disclosures. For both of the alleged corrective disclosures, I document abnormal declines upon the revelation of the relevant truth, which are each statistically significant at better than the 99% level.[11]

## IV. The Out-of-Pocket Damages Methodology is Widely Accepted by Courts at the Class Certification Stage and Artificial Inflation will be Quantified at the Loss Causation and Damages Stage

17.     Dr. Garmaise does not challenge my Opening Report opinion that the out-of-pocket methodology of calculating damages represents a standard and well-accepted methodology under §§10(b) and 20(a) of the Exchange Act. As I explain in my Opening Report, the out-of-pocket methodology calculates damages formulaically as the artificial inflation in the share price at the time of purchase minus the artificial inflation in the share price at the time of sale.[12]

18.     Rather than taking issue with the out-of-pocket methodology, the Garmaise Report and Defendants' Opp. Brief express concerns that I have not provided the specific approach that I will use to calculate the precise amount and timing of artificial inflation per share, which is an input to this formula. Notably, in criticizing the damages methodology described in my Opening Report, Dr. Garmaise does not offer any alternative approach. Specifically, the Garmaise Report

---

[11] Opening Report ¶¶100-101. I note that Dr. Garmaise criticizes my damages methodology because I have not yet committed to a specific methodology for calculation of artificial inflation and damages (Garmaise Report ¶¶ 70-77). While it is premature to opine on what a loss causation analysis would demonstrate, I would identify, review, evaluate, and empirically analyze the events that were alleged in the Complaint as revealing corrective information (including by conducting an event study analysis). This, along with an analysis of the alleged misstatements and omissions in this matter, would allow me to determine the amount of artificial inflation impounded into the stock on each day of the Class Period that subsequently dissipated out of the Common Stock price when the market began to learn the relevant truth. This amount of artificial inflation would apply to every member of the Class who purchased on a given day during the Class Period.
[12] Opening Report, Section VI.A.

6

and Defendants' Opp. Brief criticize the damages methodology described in my Opening Report by claiming that I have not yet conducted a full loss causation analysis[13] or explained how I would: (i) calculate the precise amount and evolution of artificial inflation,[14] (ii) address a finding of fact that "there is no daylight between the Company's knowledge and investor communications,"[15] (iii) disaggregate the effect of any potential confounding information,[16] or (iv) address materializations of risks.[17] As I explain below, such concerns relate to the specific calculation of artificial inflation which occur at the loss causation and damages stage, calculations which are readily accommodated within the out-of-pocket methodology and common across Class members.

19.     As an initial matter, it is important to draw a distinction between two concepts that are part of a damages methodology: the damages formula itself and the inputs to the damages formula. In my Opening Report, I presented the standard well-accepted damages formula. Further, I make clear in my Opening Report that quantifying artificial inflation per share for each day in the Class Period and the dissipation of artificial inflation through corrective disclosures — the inputs to the damages formula — are questions separate and apart from whether there is a common, Class-wide method for computing damages. As discussed in my Opening Report, there are a number of valuation techniques that can be employed to conduct such an evaluation of inputs.[18] All of these calculations can be applied in the same manner across Class members.

20.     Moreover, the assertions by Dr. Garmaise and Defendants' Opp. Brief relate to whether case-specific adjustments may ultimately be needed at the loss causation and damages stage — not the class certification — stage of litigation. Dr. Garmaise fails to provide any foundation for his assertion that such a methodology must be specified at an earlier stage of

---

[13] Opp. Brief at 18-19.
[14] *Id*. at 20; Garmaise Report, Section VII.
[15] Opp. Brief at 21; Garmaise Report, Section VII.
[16] Opp. Brief at 24; Garmaise Report, Section VII.
[17] Opp. Brief at 26-27; Garmaise Report, Section VII.
[18] Opening Report, Section VI.A.

litigation, and he does not suggest that my methodology could not be applied consistently to all Class members. His concerns relate to issues that are routinely addressed in the loss causation and damages stage of a case — including whether a jury or trier of fact determines that artificial inflation was caused by Defendants' misconduct, and if so, calculating the amount of artificial inflation the misconduct caused in SolarEdge Common Stock throughout the Class Period.

21. As I explained in my Opening Report, a loss causation and damages analysis is capable of assessing how artificial inflation evolved over a Class Period:

> In other instances, artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements. In any of the approaches described herein, the calculations of artificial inflation and any potential disaggregation of confounding information are based on the specific set of facts and circumstances in a given case and may involve valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents.
>
> All of these loss causation calculations can be performed on a Class-wide basis and are not dependent upon individual Class member identities or circumstances. This is because, as noted above, the level of artificial inflation remains the same across all Class members at any given point in time, regardless of how it is calculated.[19]

22. In the following subsections, I further explain why each of the specific hypothetical scenarios speculated by Dr. Garmaise or in Defendants' Opp. Brief can reliably be addressed if needed within a detailed loss causation and damages analysis, and that such analyses would be carried out on a common, Class-wide basis.

**A. The Out-of-Pocket Methodology is Capable of Addressing Changes in Artificial Inflation Over the Class Period**

23. The Garmaise Report claims that macroeconomic conditions and the European Solar industry's growth rates changed during the Class Period.[20] He then speculates that the observed stock price drops following the alleged corrective disclosures may not "serve as reliable

---

[19] Opening Report ¶¶ 106-107.
[20] Garmaise Report, Section V.B.

indicators of inflation created by the alleged misrepresentations" because these market conditions may have changed during the Class Period.[21] Dr. Garmaise has not conducted any analysis of the evolution of artificial inflation in SolarEdge's Common Stock over time; he simply speculates that it may have varied over the Class Period.

24.    Dr. Garmaise's speculation concerns whether case-specific adjustments may ultimately be needed at the *merits* stage and not at the Class certification stage of litigation. Dr. Garmaise fails to provide any foundation for his assertion that such a methodology must be specified at an earlier stage of litigation and he does not suggest that the methodology could not be applied consistently to all Class members. His speculative concerns relate to loss causation and damages issues that are addressed in the merits stage of a case — including whether a jury or finder of fact determines that artificial inflation was caused by Defendants' misconduct, and if so, calculating the amount of artificial inflation the misconduct caused in SolarEdge's Common Stock throughout the Class Period.

25.    As I explain in my Opening Report, the out-of-pocket methodology is "flexible and able to incorporate alternative findings of fact regarding the measurement and quantification, timing, and back-casting of artificial inflation, including how it evolved over the Class Period…including, but not limited to: (1) the presence and degree of confounding information versus corrective information; (2) how to back-cast inflation over the Class Period; and (3) when the first actionable fraudulent conduct or misstatement occurred."[22] As a result, Dr. Garmaise's speculative concerns regarding whether case-specific adjustments may ultimately be needed are unfounded at this early, pre-merits stage.

26.    Separately, Dr. Garmaise suggests that the statistically significant declines in SolarEdge's Common Stock price following the alleged corrective disclosures may have been

---

[21] Garmaise Report ¶¶ 87-102.
[22] Opening Report ¶ 108.

caused, at least in part, by the release of industry-wide information rather than disclosures of the relevant truth.[23] This assertion is speculative and unfounded. While Dr. Garmaise observes general factors purportedly affecting the solar industry sector, he offers no empirical evidence connecting those industry-wide trends to the specific timing and magnitude of SolarEdge's stock price movements.

27.     Furthermore, Dr. Garmaise fails to explain why the event study methodology — a tool designed to control for market and industry changes — would not account for these purported industry changes. As explained in my Opening Report, by modeling how SolarEdge's stock price returns typically moves relative to an overall market index and an industry index, my event study measures the "abnormal" stock return, which represents the component of the return that is not attributable to market-wide or industry-wide movements. Therefore, the identification of a large, statistically significant negative abnormal return for SolarEdge is consistent with price impact driven by idiosyncratic information rather than the general industry trends speculated by Dr. Garmaise.

28.     Moreover, several industry peers disclosed their performance in the weeks before the alleged corrective disclosures.[24] In an efficient market (which Dr. Garmaise does not dispute), these types of industry trends would already be reflected in SolarEdge's Common Stock prices prior to the alleged corrective disclosures. Also, as explained above, my event study explicitly controls for industry changes. Finally, Dr. Garmaise ignores the very nature of the alleged

---

[23] Garmaise Report ¶¶ 15, 88, 102.

[24] Q2 2023 results were announced by Enphase (July 27) and Atlantica (August 1 at 7:13 AM) before SolarEdge (August 1 at 4:11 PM). Q3 2023 results were announced by Maxeon (October 10) before SolarEdge (October 19). *See*, Enphase, Form 10-K, July 27, 2023, https://www.sec.gov/Archives/edgar/data/1463101/000146310123000140/0001463101-23-000140-index.htm; Atlantica, Form 6-K, August 1, 2023, https://www.sec.gov/Archives/edgar/data/1601072/000114036123037179/0001140361-23-037179-index.htm; Maxeon Solar Technologies, Form 6-K, October 10, 2023, https://www.sec.gov/Archives/edgar/data/1796898/000179689823000066/0001796898-23-000066-index.htm.

misrepresentations in this matter. As detailed in **Section V.C** below, many of the alleged misrepresentations were made by Defendants — who provided repeated assurances of strong European demand throughout the Class Period — when analysts inquired about potential negative industry trends. Thus, as further detailed in **Section V.A** below, my event study — which documents statistically significant declines in SolarEdge's Common Stock prices following the alleged corrective disclosures — provides reliable economic evidence of price impact.

**B.  The Out-of-Pocket Methodology is Capable of Addressing Alternative Findings of Facts Speculated by Dr. Garmaise and in Defendants' Opp. Brief**

29.    Defendants' Opp. Brief criticizes my lack of a loss causation analysis, and raises speculative questions about how I would address a hypothetical finding of fact in which "there is no daylight between the Company's knowledge and investor communications."[25] Similarly, the Garmaise Report suggests a novel requirement that I must propose a damages "methodology for linking the specific alleged misrepresentations to the alleged corrective disclosures" and that I also must address the "challenges in calculating artificial inflation via back-casting if the fact-finder dismisses some of the alleged misrepresentations."[26]

30.    Specifically, Dr. Garmaise suggests there was an "apparent lack of information asymmetry" between the Company and investors. He asserts that certain internal documents available to the Company's Board regarding channel inventory levels and demand in Europe was "consistent" with Defendants' public statements.[27] For example, relying on specific slides depicting historical Days on Hand ("DOH"), Dr. Garmaise suggests that because internal charts showed metrics that the Company itself later characterized as "normal," the Company's statements were consistent with information available to Defendants at the time.[28]

---

[25] Opp. Brief at 21; Garmaise Report, Section VII.
[26] Garmaise Report ¶ 130.
[27] *Id.* Section VII.A.
[28] *Id.* ¶ 82.

31.    As an initial matter, Dr. Garmaise and Defendants' Opp. Brief appear to attempt to resolve a merits question — whether the Company's statements were false or misleading — which I understand is a question reserved for the fact-finder.[29] Moreover, Dr. Garmaise and Defendants' Opp. Brief imply a novel requirement that I must articulate precisely what the Company should have disclosed to investors — a standard that I understand does not exist.[30]

32.    I also note that Dr. Garmaise's selective interpretation of internal case documents is directly contradicted by the specific text elsewhere within those same documents. For example:

- ███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████[31]███████████████████████████████████████████████████████

- ███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████[32]

---

[29] *See SEC v. Ripple Labs, Inc.*, 2023 WL 5670711, at *7 (S.D.N.Y. Mar. 6, 2023) ("opinions as to the materiality of important disclosures is a legal conclusion that would usurp "the role of the jury in applying th[e] law to the facts before it"); *SEC v. Tourre*, 950 F. Supp. 2d 666, 682 (S.D.N.Y. 2013) (directing expert to "avoid all characterizations of the marketing materials as 'misleading'…That is a legal conclusion and not proper expert testimony"); *SEC v. Leslie*, 2010 WL 2991038, at *9 (N.D. Cal. July 29, 2010), *clarified on denial of reconsideration*, 2010 WL 3259375 (N.D. Cal. Aug. 18, 2010) (barring expert opinion on "whether certain statements were misleading" because "it is for the jury to determine whether Defendants' statements in fact were misleading").

[30] *See, e.g., Feinberg v. Katz*, 2007 WL 4562930, at *9 (S.D.N.Y. Dec. 21, 2007)(rejecting expert attempting to testify that specific "omissions from the financial statements are material and it is my opinion that *had this information been available*, many if not all of the creditors using these financial statements would not have issued credit to the Company" because the proposed opinion "manages in a single sentence to both usurp the trial judge's function of instructing the jury on the law and tell the jury what result to reach on the facts: a breathtaking tour de force of inadmissibility."

[31] SEDG220_0000147 at -151.

[32] SEDG220_0000225 at -227.

-

33.     Additionally, the historical data regarding DOH and Point of Sale ("POS") also appear to be inconsistent with Dr. Garmaise's selective interpretation. For example, Dr. Garmaise asserts that ███████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████[34] A closer inspection

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████[35] Furthermore, Dr.

Garmaise's analysis also appears to ignore ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████[36]

34.     Dr. Garmaise thus selectively and inconsistently interprets internal case documents, rendering his opinions flawed and unreliable.

### C. The Out-of-Pocket Methodology is Capable of Addressing Confounding Information

35.     Dr. Garmaise speculates about sources of potential confounding information that may have affected the price of SolarEdge's Common Stock following the alleged corrective

---

[33] SEDG220_0000173 at -175, 192.
[34] Garmaise Report ¶ 84.
[35] SEDG220_0000173 at -190.
[36] *Id*.

disclosure on August 1, 2023, such as information about the U.S. market and firm-level gross margin guidance for the following quarter.[37]

36.      However, the presence of confounding information, if any, does not render the out-of-pocket methodology unreliable; rather, addressing such information is a standard component of a loss causation and damages analysis. As explained in my Opening Report, there are many potential ways to disaggregate confounding information, to the extent such confounding information exists. These include a variety of well-accepted techniques including, but not limited to, valuation analysis, the review of analyst reports, and methods derived from principles of finance and peer-reviewed academic research.[38] This is an issue of fact that would need to be considered as part of any loss causation and damages analysis.[39] Dr. Garmaise suggests, without support, that such an analysis needs to be designed and explained in my Opening Report, without regard to what evidence may become available in further discovery. This demand is misguided. If such a disaggregation analysis becomes necessary, the standard damages methodology readily incorporate such adjustments, which would be applied on a Class-wide basis.

37.      Furthermore, Dr. Garmaise has not conducted any analysis to quantify the price impact of confounding information on SolarEdge's Common Stock following the August 1, 2023 alleged corrective disclosure. He simply states that confounding information "may" have impacted SolarEdge's stock returns on that day. Moreover, to the extent firm-specific confounding information exists, disaggregating its impact is a standard economic analysis appropriately conducted during the loss causation and damages stage of a case and will be carried out in a manner that is common across all Class members. Therefore, Dr. Garmaise's speculative concerns are

---

[37] Garmaise Report ¶¶ 125, 126, 129.
[38] Opening Report ¶ 102.
[39] *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2183 (2011) (holding that securities fraud plaintiffs need not prove loss causation in order to obtain class certification).

14

unfounded.

**D. Dr. Garmaise Mischaracterizes Plaintiffs' Theory of Liability, and the Out-of-Pocket Methodology is Capable of Addressing Materializations of Risks**

38.      The Complaint alleges that as of the start of the Class Period and throughout it, Defendants misled investors, and made materially false and misleading statements and omissions relating to the inventory held by SolarEdge's customers ("channel inventory") and demand in Europe. Specifically, Defendants made statements that characterized inventory as low when inventory levels were allegedly high due to declining demand.[40] Additionally, Defendants asserted that demand in Europe was strong when demand was allegedly slowing and sales were lacking.[41] The Complaint further alleges that the undisclosed risk of customer order cancellations materialized and led to a decline in revenue.

39.      I understand that this is not a case premised upon undisclosed (or under-disclosed) prospective risks that were unknown to Defendants at the time of the alleged misrepresentations. Rather, I understand Plaintiffs' theory of liability involves allegations that Defendants misrepresented the actual state of SolarEdge's business — specifically regarding inventory levels and European demand — that existed at the time when the alleged misstatements were made. For example, the Complaint alleges: "[b]ecause of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and/or misleading."[42] The Complaint further details that Defendants had access to "Sell-Through" reports which contradicted their public

---

[40] Complaint ¶¶ 6-8, 63, 83, 89-91, 102, 105-107, 110, 118, 155-158, 160; *see also*, MTD Opinion at 16, 23, 25-26.
[41] Complaint ¶¶ 4, 7-8, 63, 83, 93, 100, 102-110, 112, 114-115, 117-118, 167-168, 170-183, 186, 192-193; *see also*, MTD Opinion at 16-17, 23-27.
[42] Complaint ¶ 33.

15

statements that inventory was "healthy" and demand was "strong."[43]

40.    Dr. Garmaise and Defendants' Opp. Brief raise concerns regarding a different theory of liability: one in which the alleged corrective disclosures pertain to previously undisclosed (or under-disclosed) prospective risks that were not known to Defendants at the time of the alleged misrepresentation. [44] Dr. Garmaise explains this in a hypothetical example: A company's management conceal from the market a 25% risk that its operating license will be revoked, which would cause the company's equity value to fall by $100 million.[45] Because this risk is concealed, the market assigns only a 5% probability to license revocation, failing to incorporate an additional $20 million expected loss into the company's equity value.[46] Subsequently, the license is actually revoked and the company's equity value declines by $100 million upon public disclosure. Defendants' Opp. Brief and Dr. Garmaise appear to argue that an event study would incorrectly calculate the entirety of this $100 million decline as dissipation of artificial inflation, when in fact, only $20 million of the $100 million decline would represent the estimate of artificial inflation.[47]

41.    However, even in such a hypothetical scenario the out-of-pocket methodology remains applicable and reliable. A loss causation and damages analysis would reasonably conclude that 80% of the price decline was due to confounding factors (assuming this portion of the decline was truly non-fraud-related), and therefore would need to be disaggregated. Thus, $80 million of the abnormal price decline (80% of $100 million) could be attributed to the alleged corrective information on that date and one would reasonably conclude that $20 million of artificial inflation

_____

[43] Complaint ¶¶ 12, 17, 102-103, 114, 122, 182,
[44] Garmaise Report ¶¶ 74, 108, 114.
[45] Id. ¶¶ 109-110.
[46] In the hypothetical example, if the true 25% risk were disclosed, the market would incorporate a $25 million expected loss into the stock price (25% × $100 million). However, because the company concealed the risk, the market assigned only a 5% probability, incorporating only a $5 million expected loss (5% × $100 million). The difference of $20 million represents the artificial inflation.
[47] Garmaise Report ¶¶ 106-113.

16

dissipated from the company's value on that date. Whether a disaggregation analysis at the loss causation and damages stage determines that 0%, 80%, or some other percentage of a price decline is due to confounding factors, the resulting artificial inflation can easily be updated and incorporated into the out-of-pocket methodology.

42.    Moreover, Dr. Garmaise's hypothetical example ultimately entertains a theory of liability that is fundamentally different from Plaintiffs' theory of liability. Dr. Garmaise's hypothetical example involves a risk-based false statement, in which a defendant is unsure about the future outcome and value of the truth. In contrast, the alleged misrepresentations in this matter are not only probabilistic statements concerning a future risk, but also alleged misrepresentations involving facts that Defendants allegedly knew had already occurred.[48]

43.    Taken together, Dr. Garmaise's view ultimately relates to questions about the need to separate fraud-related revelations from non-fraud-related information (i.e., confounding information), an exercise that is conducted at the loss causation and damages stage on a complete record. This dynamic raises questions about isolating corrective information from confounding information, if any, on alleged corrective disclosure dates and how to measure artificial inflation. In my experience, answering these questions requires an exhaustive loss causation analysis, which both Dr. Garmaise and I understand is not required at the class certification stage of litigation.[49] These more nuanced issues regarding loss causation (i.e., disaggregating the impact of confounding information) are present in virtually every certified securities class action matter, are routinely the subject of expert discovery during the loss causation and damages phase of the litigation, and in any event, such analyses are determined based upon proof that is common to all Class members. In other words, the out-of-pocket methodology — which can rely on an event

---

[48] Complaint ¶¶ 164, 167, 170-73, 175-82.
[49] Garmaise Report ¶ 69 ("I understand that at this stage, Dr. Cain does not need to implement his methodology to calculate inflation or damages. *Neither does he need to provide a loss causation analysis*.")

study (such as the one presented in my Opening Report, and which Dr. Garmaise does not dispute is reliable) or other valuation techniques — can accommodate artificial inflation that controls for any confounding information (including any materializations of risks). I have not and need not conduct a robust analysis of loss causation or damages at this stage because such an analysis is not necessary to conclude that there is a common methodology for calculating damages on a Class-wide basis.[50]

44.    In summary, the fact that Plaintiffs' theory of liability includes alleged misstatements that were disclosed to the market through a series of corrective disclosure events that may legally be characterized as potential materializations of risk does not prevent me from quantifying artificial inflation throughout the Class Period and measuring damages on a Class-wide basis at the loss causation and damages stage. Whether the alleged relevant truth-revealing disclosures are characterized as corrective disclosures or materializations of the risk does not impact the out-of-pocket damages methodology, its reasonableness, its applicability Class-wide, or its reliability. The out-of-pocket methodology has been regularly relied upon at the Class certification stage (and beyond) as a method for calculating Class-wide damages in cases that allege misrepresentations that are probabilistic statements about future risks, such as company risk factor disclosures, and assert that the relevant truth is revealed through subsequent materializations of risk.[51]

---

[50] *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 349 F.R.D. 606, 614 (S.D.N.Y. 2025) (certifying a class in reliance on a damages methodology propounded by Dr. Cain that is substantively similar to the methodology also proposed by Dr. Cain here over the objection that the methodology was not supported by sufficient proof of loss causation or damages).

[51] Memorandum Opinion, Civil Action No. 1:17-cv-00388-RDB filed September 29, 2022, *In Re Under Armour Securities Litigation* at 34 (certifying a class in reliance on the out-of-pocket

## V.    Economic Evidence that the Alleged Misrepresentations Impacted SolarEdge's Common Stock Price

45.    I understand that Defendants bear the burden of establishing that the alleged misrepresentations had no impact on the price of SolarEdge's Common Stock. Defendants attempt to rebut the "fraud-on-the-market" presumption by claiming that the alleged misstatements and revelations did not impact the stock price of SolarEdge's Common Stock.[52] The Garmaise Report does not offer any price impact opinions. Dr. Garmaise confirmed in testimony that he has not formed any opinions regarding a lack of price impact of the alleged misstatements.[53]

46.    In the following sections, I document reliable economic evidence that that alleged misstatements were not generic, but rather contained specific and detailed information that matches the alleged relevant truth contained in the corrective disclosures. Furthermore, fundamental principles of finance and economics, as well as commentary from research analysts indicate the presence of front-end price impact and/or maintenance and back-end price impact of the alleged misstatements on the price of SolarEdge's Common Stock.

### A.  Evidence that the Alleged Misrepresentations Had Front-End Price Impact

47.    On May 3, 2023, after markets had closed, SolarEdge announced its Q1 2023 earnings and held an earnings call with investors and analysts.[54] On this call, Defendants Faier and

---

damages methodology where plaintiffs' theory of liability involved materialization of risk); Consolidated Third Amended Complaint for Violations of the Federal Securities Laws, Civil Action No. 1:17-cv-00388-RDB filed October 14, 2020, *In Re Under Armour Securities Litigation*, ¶ 377 "The truth was not revealed to the market all at once, but, rather, the truth began to emerge, and the **risk caused by Defendants' fraud materialized, through partial revelations of truthful information**," and ¶ 404: "These warnings were not meaningfully different from year-to-year, but, instead, were merely boilerplate language that failed to develop with time as the very **risks they sought to warn of began to materialize**" (emphasis added). *See also* Memorandum Opinion and Order filed March 29, 2018, in *Washtenaw County Employees' Retirement System v. Walgreen Co., et al.*, No. 15-cv-3187 (N.D. Ill.).

[52] Opp. Brief at 13-19.
[53] Garmaise Tr. 66:04-67:19.
[54] Complaint ¶¶ 10, 110.

Lando made comments characterizing European demand as strong and channel inventory levels as low.

48.     On the call, Defendant Faier stated that the "vast majority" of SolarEdge's batteries were being shipped to Europe due to "strong adoption and demand" for their three-phase solution.[55] When Goldman Sachs analyst Brian Lee raised concerns about a potential European slowdown, Defendant Lando responded that Defendants saw no change in demand patterns in Europe and that "the market continues to be strong."[56] Later, when Deutsche Bank analyst Corinne Blanchard asked about European growth expectations for Q2 and Q3, Defendant Lando responded that European growth was "more dependent on our ramp of manufacturing" than demand, stating the company's intent was to "continue and increase capacity of three-phase residential inverters" with an outlook for "likely growth."[57]

49.     During the call, Philip Shen of ROTH Capital Partners asked Defendants whether the company expected destocking given the heavy U.S. channel inventory compared to tight European inventory.[58] Defendant Lando's response was consistent with Shen's characterization of European channel inventory as "tight," describing inventory levels as "low" and "not relatively high," while claiming the channel was experiencing "record sellout of products."[59]

50.     Following the earnings call, the price of SolarEdge's Common Stock increased by 9.1% after controlling for market and industry effects, a return that was statistically significant at the 99% confidence level. The market's reaction indicates that the alleged misrepresentations made by Defendants were value relevant.

51.     Following the Q1 2023 earnings call, analysts relied on and repeated Defendants'

---

[55] *Id.* ¶ 171.
[56] *Id.* ¶ 172.
[57] *Id.* ¶ 173.
[58] *Id.* ¶ 157.
[59] *Id.* ¶¶ 157-158.

alleged misstatements characterizing demand in Europe as strong, growth as constrained by manufacturing ramp-up rather than demand, and inventory levels as low.

Goldman Sachs (May 3, 2023, price target increased from $420 to $445): "SEDG reported strong growth Europe and rest of world, which has offset declining residential volumes in the US. Looking ahead, to 2Q23, the company expects that Europe and rest of world will continue to buffer weakness in the US residential market."[60]

"Growth in 2Q23 will be driven by Europe and rest of world where SEDG continues to see strong demand, especially in C&I end markets, while the company expects US will be flat or decline qoq driven primarily by residential."[61]

KeyBanc Capital Markets (May 3, 2023): "Europe, however, remains strong for residential and C&I with inventory levels in line with backlog growth. ... Europe residential market sales were strong (+22% sequentially), led by inverter sales and demand for batteries. The trend is expected to remain strong, as evidenced by backlog growth."[62]

"SEDG expects growth, especially in Europe, to be driven not by demand but by how quickly it can ramp manufacturing to cater to the backlog."[63]

Daiwa Capital Markets (May 4, 2023): "We raise our ests given our positive impression on the robust Europe performance and n-t margin expansion but see headwinds for l-t GM expansion due to product mix and competition … SEDG says demand is stellar for both Europe and for worldwide commercial market and they will be focused in 2023 on fulfilling a healthy backlog level."[64]

HSBC (May 4, 2023): "**Strong momentum in Europe, its home market:** During our recent marketing, investors expressed rising concerns over on pricing and inventory in Europe, from the Chinese peers' 1Q results. But SolarEdge is showing something different in the region: 1) shipments up 20% q-o-q and nearly double y-o-y in 1Q23; 2) aiming to hold up pricing due to its differentiated values; and 3) light channel inventory. … We believe that

---

[60] "Clean 1Q23 beat and more margin upside, as strength in non-US highlights diversification of model; Buy (on CL)", *Goldman Sachs,* May 3, 2023, at 1.

[61] *Id*. at 3.

[62] "SEDG: International Operations Carry the Day; U.S. Sales Soft; Remain Sector Weight on Valuation", *KeyBanc Capital Markets,* May 3, 2023, at 1.

[63] *Id*. at 2.

[64] "Europe Supercharges Results, Which Should Continue", *Daiwa Capital Markets,* May 4, 2023, at 1 (emphasis removed).

> SolarEdge is well positioned to benefit from the accelerating MLPE adoption in Europe and, at the same time, less affected by the slowdown in the US residential solar market, in contrast to Enphase[.]"[65]

## B. Fundamental Principles of Finance and Economics Demonstrate the Price Impact of the Alleged Misrepresentations

52.    A core principle of finance and economics is that the value of a company's common stock reflects the market's expectations of the firm's future cash flows, discounted to present value. When new information alters investors' assessment of a company's ability to generate future revenues or profits, the firm's stock price must therefore adjust accordingly.[66] For instance, when investors learn that previously accepted information was false or misleading, the stock price will fall to reflect the corrected expectations of future cash flows.

53.    There is a direct economic connection between the information Defendants allegedly misrepresented regarding European demand and inventory, and the Company's future cash flows. Demand directly translates into revenues, with both actual and expected demand informing investors' projections of future revenues. During the Class Period, Europe was SolarEdge's largest market, comprising 54% of its revenues in 2022 and 64% in 2023.[67] European demand was therefore central to investors' expectations of the Company's future revenue and cash flows.

54.    Channel inventory levels provide the market with information to estimate future revenues. Changes in channel inventory signal the strength of underlying demand among installers and end-users, which directly affects future orders from SolarEdge's direct customers. SolarEdge's

---

[65] "Buy: Another beat and raise", *HSBC,* May 4, 2023, at 1.

[66] *See, e.g.*, David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook*, The Role of the Financial Expert (3rd ed. 2001) ("the price of an efficiently traded stock is equal to the present value of the discounted future stream of free cash flow"); *See also* Aswath Damodaran, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset* (John Wiley & Sons, 1996), at 11 ("This [DCF] approach has its foundation in the present value rule, where the value of any asset is the present value of expected future cashflows on it.").

[67] Complaint ¶ 3.

channel inventory levels therefore provided important information for the investors' revenue and cash flow expectations for the Company.

55.    Fundamental principles of finance and economics therefore establish that Defendants' statements about SolarEdge's European demand and channel inventory levels were value relevant and had price impact. It follows that the Company's stock price would be expected to fall in response to the alleged revelation of relevant truth, reflecting the effect on expected future revenues and cashflows.

## C. The Alleged Misrepresentations are Economically Connected to the Relevant Truth Revealed by the Alleged Corrective Disclosures

56.    Defendants' Opp. Brief asserts there is a "mismatch" between the alleged misrepresentations and corrective disclosures in this case.[68] However, the Garmaise Report offers no evidence, opinions, or support for this claim. As I explain in this section, the mismatch claim made by Defendants lacks foundation and is unpersuasive.

57.    As an initial matter, I understand the *Goldman* case Defendants point to involved a mismatch between generic misstatements and highly specific corrective disclosures. Examples of the generic challenged statements in the *Goldman* case include:

- "Our clients' interests always come first. Our experience shows that if we serve our clients well, our own success will follow."

- "Integrity and honesty are at the heart of our business."

- "Conflicts of interest are increasing and a failure to appropriately identify and deal with conflicts of interest could adversely affect our businesses."

- "Our reputation is one of our most important assets."

58.    The Complaint in this matter alleges that Defendants made materially false and misleading statements and omissions relating to channel inventory level and demand for SolarEdge

---

[68] Opp. Brief at 3, 13-18.

products in Europe. ***Many of these statements were made in direct response to analyst questions regarding the potential for declining European demand***. Some of the specific statements made in the alleged misrepresentations include:

- On February 13, 2022, during the Q4 2022 earnings call, Defendant Lando stated "[f]rom a demand and inventory point of view, we continue to see very strong demand from Europe for all products and relatively low inventory levels in the channel."

  Later during the call, Alex Vrabel of Bank of America Merrill Lynch asked "[w]hat do you expect for European growth here in 2023,"[69] to which Defendant Lando responded, "in many cases, we see that the demand is far exceeding our ability to manufacture and deliver."[70]

  On the same call, Philip Shen of ROTH Capital Partners asked "are you seeing any signs of a slowdown [in Europe]?"[71] Defendant Lando responded that 2023 "will be similar to the condition we were in in 2022, which is more dependent on our ability to produce the volumes than the demand" and noted "our current backlog for 2023 is well above what we delivered in 2022."[72]

- On March 28, 2023, during the Wells Fargo Clean Energy Symposium, an analyst asked Defendant Faier about European lead times and where the six-month backlog currently stood. Defendant Faier responded "the demand…continues to be very strong" and "today, most dynamics are related to…the ability to supply rather than the demand."[73]

  During the same call, in response to an analyst question on backlog and lead times for SolarEdge products, Defendant Faier responded that the Company's channel was "low on inventory in most cases."[74]

- On May 3, 2023, during the Q1 2023 earnings call, Philip Shen of ROTH Capital Partners asked whether the company expected "massive destocking" given heavy U.S. channel inventory versus tight European inventory. Defendant Lando responded that "in Europe, we actually see low [channel] inventory days on hand" and "we see record sellout of products coming from the distribution channels."[75]

  During the same call, Brian Lee of Goldman Sachs sought clarity around a "potential shutdown in that region [Europe]," to which Defendant Lando reiterated that the

---

[69] Complaint ¶ 167.
[70] *Id.*
[71] *Id.* ¶ 168.
[72] *Id.*
[73] *Id.* ¶ 170.
[74] *Id.* ¶ 156.
[75] *Id.* ¶ 157.

Company "[didn't] see right now a change in the pattern of demand in the market in Europe," and that "the market continue[d] to be strong."[76]

Similarly, when responding to Deutsche Bank analyst Corinne Blanchard's questions about growth "expectations in 2Q and 3Q versus the first quarter," Defendant Lando emphasized that the "outlook [was] for likely growth."[77]

- On August 1, 2023, during the Q2 2023 earnings call, Brian Lee of Goldman Sachs asked about the "timing of inventory balance." Defendant Faier responded that "[i]n Europe today, what we see is that the inventory levels, on one hand, are relatively high. But when you look at the days outstanding, which is a result of the sell-through from the channel, they are not high at all. They're actually at the normal level."[78]

  During the same Q2 2023 earnings call, Vikram Bagri of Citi asked about the magnitude and timing of European inventory rebalancing between Q3 and Q4. Defendant Faier stated "the inventory corrections, at least in Europe, are going to be a little bit quicker" and "the correction within the distributors should be relatively quick, given the fact that the inventories levels...are not so high when it reflects inventory days." [79]

  Also during the Q2 2023 call, Defendant Faier characterized the situation as "more of a correction rather than a crisis" when responding to a question from Philip Shen of ROTH MKM.[80]

- On June 21, 2023, at the JPMorgan Energy, Power, and Renewables Conference, Mark Strouse of JPMorgan asked Defendant Danziger for "the latest and greatest in what you're seeing in Europe" given "third-party forecasts...for some flattening in the market." Defendant Danziger responded "we're still looking at very healthy demand across the board in the markets and in the segments" and Europe "would probably still be the fastest-growing geographies for [the Company] in 2023."[81]

  Strouse followed up by asking whether growth reflected "the overall market growing still" or "more share gains." Defendant Danziger responded that the Company's growth was "a combination of all" and noted "it's still a very attractive economic investment to do to install a solar system in Europe" with "ESG-driven demand" on the commercial side.[82]

- On September 6, 2023, during the Oppenheimer conference, the hosting analyst noted market surprise at Defendant Faier's comments on inventory in Europe and asked him

---

[76] *Id.* ¶ 172.
[77] *Id.* ¶ 173.
[78] *Id.* ¶ 159.
[79] *Id.* ¶ 161.
[80] *Id.* ¶ 177.
[81] *Id.* ¶ 174.
[82] *Id.* ¶ 175.

for an update. Defendant Faier responded "nothing changed from our call" and "the underlying demand in Europe continues to be strong and continues to be very great...we see a very nice uplift in all of Europe."[83]

- On September 21, 2023, at the KeyBanc symposium, Sophie Karp of KeyBanc asked Defendant Lowe for "incremental color" on the "current inventory cycle." Defendant Lowe responded that while European distributors had "too much inventory...especially on solar panels," the "underlying demand for solar is very, very strong" and "data we see from our distributors is continuing to show significant growth in terms of sell-through into Europe."[84]

59.    As can be seen from the examples above, the alleged misstatements in this matter were not simply boilerplate, generic claims about the importance of integrity or putting clients' interests first, but rather pertained to demand for the Company's products for a specific geographic market in relation to specific financial periods. The alleged misstatements also made connections between European demand and channel inventory and other factors, including distributor behavior and supply constraints. Moreover, as noted above, *many of the alleged misstatements were made in direct response to analyst questions about these topics*.

60.    Furthermore, the alleged misstatements in this matter are clearly linked to the alleged truth revealed by the corrective disclosures. The alleged corrective disclosures address the specific subject matter of the alleged misrepresentations — channel inventory and demand in Europe:

- **August 1, 2023**: Defendant Lando stated that "[t]he solar market is going through a transition, emerging from the recent period of component shortages, high energy prices, and rapid growth to one now impacted by higher interest rates and excess inventory." Defendant Lando further said "[as] growth in demand has tapered off, distributors are taking a more cautious approach in order to better manage their cash flow."[85]

- **October 19, 2023**: SolarEdge issued a press release with its preliminary Q3 2023 results which disclosed that "[d]uring the second part of the third quarter of 2023, we experienced substantial unexpected cancellations and pushouts of existing backlog from our European distributors," "third quarter revenue, gross margin and operating

---

[83] *Id.* ¶ 181.
[84] *Id.* ¶ 182.
[85] *Id.* ¶¶ 120, 197

income will be below the low end of the prior guidance range," and the Company "anticipates significantly lower revenues in the fourth quarter of 2023 as the inventory destocking process continues."[86]

61.    The evidence thus demonstrates that, contrary to Defendants' assertions, there is no mismatch between the specificity of the alleged misstatements and corrective disclosures. Moreover, there is a direct economic connection between the alleged misstatements and corrective disclosures.

## D.    Analyst Commentary Following the Alleged Misrepresentations Provides Further Evidence of Front-End Price Impact and/or Price Maintenance

62.    As noted above, many of the alleged misrepresentations were specific statements made by Defendants at investor conferences and in reply to questions from analysts on earnings calls.  The fact that Defendants made these statements in response to analyst inquiries in itself demonstrates that analysts viewed the alleged misrepresentations as value relevant, and provides clear front-end evidence of price impact and/or price maintenance.

63.    Moreover, analysts referenced and relied upon the economic information at issue within the alleged misrepresentations. This reliance provides additional economic evidence of the front-end price impact and/or price maintenance caused by the alleged misrepresentations.

64.    Multiple analysts relied upon Defendants' statements about channel inventory and European demand in their assessment of the Company throughout the Class Period. Furthermore, analysts cited these factors as drivers for expected growth in SolarEdge's business dealings, as well as increased revenues, profits, and price targets for the Company's stock price. This consistent focus indicates that analysts and investors viewed the alleged misrepresentations as economically important to SolarEdge's value. For example:

> Wolfe Research (February 13, 2023): "SEDG's commentary on Europe remained quite bullish … The demand outlook remains strong in Europe where

---

[86] *Id.* ¶¶ 125, 211.

27

channel inventories are low. SEDG said its biggest concern here is having the manufacturing/delivery capacity to meet demand .... the robust outlook in Europe (57% of 2022 revenue) should ultimately drive strong performance in 2023." [87]

Wells Fargo (February 13, 2023): "SEDG was cautious on the pace of recovery in the US residential solar market. Preliminary expectations are for US shipments to be flattish (year/year) in Q1. Conversely, **demand in Europe and ROW is so robust that SEDG will struggle to meet with demand with its current supply capacity [sic].**" [88]

Susquehanna (February 13, 2023): "European demand robust, US seeing slowdown. The European market remains red-hot, with solar revenues +145% y/y. Elevated electricity prices and energy security concerns have boosted demand, which should continue into '23. Demand far exceeds supply in Europe, and SEDG's backlog for '23 in Europe is well above total MW shipped in '22." [89]

Barclays (February 14, 2023): "Europe and ROW to offset US residential softness while commercial demand is more than double what it was a year ago, with supply as the constraint." [90]

Wells Fargo (March 28, 2023): "SEDG expects flattish to moderate growth in the US residential solar market this year. However, European demand remains robust." [91]

Crispidea (March 29, 2023): "We maintain a "Buy" rating for SolarEdge Technologies ... Following are the reasons for the above assumptions: 1) Strong demand from European market; 2) Expanding capacity for battery 3) Raw material costs likely to amplify amidst geo- political conditions and 4) Drastic fall in stock." [92]

J.P. Morgan (June 21, 2023): "We hosted SEDG at our J.P. Morgan Energy, Power & Renewables Conference. Demand from Europe and global C&I remains strong... SEDG continues to see strong demand from Europe, which we

---

[87] "SEDG: A tale of two continents part 2", *Wolfe Research,* February 13, 2023, at 1.
[88] "SEDG: Q4 Beat & Raise — Robust Europe Demand to Offset Soft US Resi-Market — Positive", *Wells Fargo,* February 13, 2023, at 1 (emphasis added).
[89] SolarEdge Technologies: 4Q Review: Robust Europe Demand, Improving Margins, and Manufacturing Expansion", *Susquehanna,* February 13, 2023, at 2.
[90] "Robust demand, not enough supply", *Barclays,* February 14, 2023, at 1.
[91] "SEDG: 2023 Clean Energy Symposium Takeaways", *Wells Fargo,* March 28, 2023, at 1.
[92] "Growing solar demand provides an edge for SEDG", *Crispidea,* March 29, 2023, at 1.

believe is a positive given investor concerns over recent third-party market forecasts." [93]

J.P. Morgan (June 22, 2023): "Europe market update… The company noted very healthy demand in Europe, which we believe is a positive given investor concerns over recent third-party market forecasts." [94]

Bank of America (June 30, 2023): "For the first time in recent memory, it seems investors have become concerned about the cadence of resi growth in Europe in the immediate term ….Despite recent concerns, SEDG maintains that it is seeing robust growth across Europe in its resi and C&I segments, and mgmt. believes that it is out-growing the broader market." [95]

65.    On August 1, 2023 SolarEdge reported its Q2 2023 financial results and held an earnings call in which part of the relevant truth was allegedly disclosed alongside further alleged misstatements. Following this, analysts repeated Defendant Lando's comments downplaying the impact of these revelations, characterizing the issues as temporary and unlikely to significantly affect the Company's performance:

J.P. Morgan (August 2, 2023, price target reduced from $359 to $335): "The company remains encouraged by end-market demand in Europe (POS data is reportedly at record highs) as well as its competitive positioning as evidenced by no changes in pricing strategy through at least the end of the year. SEDG continues to expect 3-phase inverter supply to normalize by year-end, and therefore expects overall deliveries in Europe to improve heading into FY24. In sum, we believe the company's commentary regarding US weakness largely aligned with low expectations while the European channel headwinds could prove to be relatively short-lived" [96]

Barclays (September 7, 2023): "SEDG's view/update on the European market: Not much has changed since the 2Q earnings call: underlying demand is still strong, though not as strong as previously expected at the beginning of the year,

---

[93] "J.P. Morgan Energy Conference Takeaways", *J.P. Morgan,* June 21, 2023, at 1.
[94] "Alternative Energy and Services Residential Solar Update", *J.P. Morgan,* June 22, 2023, at 2 (emphasis removed).
[95] "2Q23 Preview: Diversification benefits propping up the outlook; Reiterate Buy", *Bank of America*, June 30, 2023, at 4, 5.
[96] "Mixed 2Q Results, 3Q Guide Disappoints Owing to Direct and Indirect Channel Inventory Impacts", *J.P. Morgan,* August 2, 2023, at 10.

and both distributors and installers overstocked inventory due to supply chain uncertainty that has since gone away."[97]

Zacks Equity Research (September 11, 2023): "Looking ahead, SolarEdge expects the momentum to continue to grow in Europe."[98]

Barclays (September 21, 2023): "SEDG noted that underlying demand is still strong in Europe, although it is not as robust as they expected at the beginning of this year, and still expect this year to trend 30-40% y/y growth on installations, but this does not equates to 30-40% y/y growth in shipments due to the high inventories in the channel. At this time, they expect channel inventories to be normalized in 1Q."[99]

66.     As documented above, analysts referenced and relied upon the alleged misrepresentations when developing their assessments of the Company. Such reference provides reliable economic evidence that the alleged misrepresentations had front-end price impact and/or maintained the price of SolarEdge Common Stock at artificially inflated levels. Moreover, as I document in **Section V.E** below, analysts referenced and relied upon the relevant truth related to the alleged misrepresentations when updating their assessments of SolarEdge following the alleged corrective disclosure events and correspondingly lowered their price targets for SolarEdge Common Stock. Such reference further demonstrates the price impact of the alleged misrepresentations, and supports the economic connection between the alleged misrepresentations and the relevant truth.

E. **Analyst Commentary Regarding the Alleged Revelations of the Relevant Truth Provides Further Evidence of Back-End Price Impact**

67.     Following the alleged corrective disclosures, analysts referenced the economic information at issue within the alleged misrepresentations. Such reference provides evidence of the back-end price impact of the alleged misrepresentations.

---

[97] "Conference Takeaways", *Barclays,* September 7, 2023, at 1 (emphasis removed).
[98] "SolarEdge Technologies (SEDG)", *Zacks Equity Research,* September 11, 2023, at 2.
[99] "Comparing and contrasting SEDG and ENPH commentary at our conference", *Barclays,* September 21, 2023, at 2.

68.    Plaintiffs allege that the relevant truth came to light through two corrective disclosures, as described further below. Analyst commentary following the alleged corrective disclosures supports the economic connection between the alleged misrepresentations and alleged corrective disclosures, and provides further support of the price impact resulting from the alleged misrepresentations.

69.    Plaintiffs allege that the relevant truth was first revealed on August 1, 2023, when SolarEdge hosted its Q2 2023 earnings call. During the call, Defendants disclosed that demand in the European solar market had weakened and inventory levels were higher-than-optimal. Following this, analysts expressed surprise over SolarEdge's results and inventory levels in Europe, with some opting to lower their price targets in response to the news:

> HSBC (August 2, 2023, price target reduced from $386 to $371): "[T]he company is toning down the previous optimism a bit. According to the company, this is due to slightly higher than normal channel inventory as demand is tapering off amid lower power prices and less energy security concern."[100]

> Deutsche Bank (August 6, 2023, price target reduced from $375 to $300): "We were surprised to see SolarEdge's share price fell ~18% the day after results - we believe investors had higher expectations for growth in Europe vs the message management delivered, which we could characterize as 'cautious.'"[101]

> Barclays (October 2, 2023, price target reduced from $274 to $152): "Late to the game, but downgrading SEDG as we think there is probably more bad news before we get good news: On the 2Q call, we weren't expecting SEDG's comments about how high US inventory levels had grown and were also surprised at the level of inventories in Europe, so we admittedly missed the call to downgrade the stock prior to the print."[102]

70.    The relevant truth was allegedly further revealed on October 19, 2023, when

---

[100] "Buy: Managing down expectations", *HSBC,* August 2, 2023, at 1.
[101] "2Q23 Earnings Recap - SEDG, RUN, SPWR", *Deutsche Bank,* August 6, 2023, at 1 (emphasis removed). Deutsche Bank reduced their price target in an earlier report, *see* "Looking ahead - challenges on the horizon; but diversification will be key", *Deutsche Bank*, August 2, 2023, at 1.
[102] "Outlook: Not sunny yet; Downgrade SEDG to Equal Weight", *Barclays,* October 2, 2023, at 1 (emphasis removed).

31

SolarEdge released its preliminary Q3 2023 results. In this press release, the Company disclosed that: (i) European distributors were cancelling or delaying existing orders due to excess inventory and slower installation activity; (ii) as a result, revenue, gross margin, and operating income for Q3 2023 would fall below the low end of prior guidance; and (iii) Q4 2023 revenue would drop significantly as inventory destocking continued. [103] Following the announcement, analysts expressed surprise at SolarEdge's Q3 2023 results and Q4 2023 outlook, citing European channel inventory issues and weakened demand as drivers, and lowered their price targets for the Company accordingly:

> Piper Sandler (October 19, 2023, price target reduced from $210 to $110): "While the market expected a challenging update from SEDG (valuation already implied large y/y 2024 EBITDA declines), SEDG's pre-announcement was nevertheless significantly weaker than contemplated. 3Q'23 revenues missed expectations by 20% given elevated European channel inventory and slower September installation rates than anticipated. ... We look to the earnings call to understand the magnitude of the decline in European resi shipments in 4Q'23 (modeling down 80-90% y/y but confidence impossible given limited disclosures), how many weeks of inventory exists within the channel, and how long it might take to clear the channel assuming the recent installation/shipment cadence."[104]

> Guggenheim (October 20, 2023, price target reduced from $290 to $135): "We had expected the outlook for Q4 to be weak but **are surprised that Europe slowed quickly enough to take SEDG's business below the previous target range, and hence force a preannouncement**. Although SEDG did not offer any specific commentary on the US we believe the same challenges are impacting SEDG as Enphase (ENPH, $$115.90, Neutral). **Our US numbers don't change much for SEDG**, and we note that the US was only 15% of inverter shipments in MW terms in Q2. The **major changes to our model flow from Europe**, which was 75% inverter MW volume in Q2"[105]

---

[103] Complaint ¶¶ 125, 211.

[104] "Pre-Announces 3Q Results Well Beneath Expectations; Destocking Continues in 4Q", *Piper Sandler,* October 19, 2023, at 1.

[105] "SEDG: Europe Inventory Problems Hit Home", *Guggenheim,* October 20, 2023, at 1 (emphasis added).

TD Cowen (October 20, 2023, price target reduced from $176 to $140): "CHANNEL INVENTORY WORSE THAN FEARED …. SEDG provided disappointing 3Q preliminary results on unexpected cancellations and delays of existing backlog from European distributors during the second part of 3Q…. we incorrectly viewed SolarEdge as a more defensive play."[106]

71.    Further, BMO Capital Markets directly contrasted Defendants' earlier alleged misstatement from September 6, 2023 with the alleged corrective disclosure, expressly noting the "sudden change in tone" on demand:

BMO Capital Markets (October 23, 2023, price target reduced from $216 to $111): "Admittedly there is still much we don't know (temporary destocking vs. structural change in margins) … Investors we spoke to echoed the same, with many expressing some view they were surprised shares didn't come off even more given how sudden the change in tone regarding demand was. … What portion of all of this is from residential vs. C&I? We think mostly EU residential but show impact of changes in volumes of each. How much of this is a structural shift to lower margins vs. a temporary destocking? Difficult to say right now, but we think volumes and margins will come back in 2H 2024, but at lower levels than we thought."[107]

"the 27% move lower in SEDG shares in some ways felt about how we thought the stock would react. However, what is surprising is the seeming shift in tone of the SEDG messaging on demand trends. On 9/6 at a conference, SEDG described demand as follows: "So starting from the underlying demand, the underlying demand in Europe continues to be strong and continues to be very great. We are seeing every quarter the sell-through data coming from our distributors. You do see every week, by the way, the number of systems that are being connected to our monitoring portal. I can tell you that in both cases, we see a very nice uplift in all of Europe and also in specific countries in the [ph] countries, in Germany, Austria, Switzerland are leading this kind of growth but we feel almost everywhere…." [Source: FactSet]. Contrast this with its 10/19 press release where it noted "During the second part of the third quarter of 2023, we experienced substantial unexpected cancellations and pushouts of existing backlog from our European distributors. We attribute these cancellations and pushouts to higher than expected inventory in the channels and slower than expected installation rates. In particular, installation rates for the third quarter

---

[106] "Channel Inventory Worse Than Feared; Big Preannounced Miss on Europe Softness", *TD Cowen,* October 20, 2023, at 1.
[107] "SEDG: Updating Numbers and Sensitivity Analysis in the Eye of the Storm", *BMO Capital Markets,* October 23, 2023, at 1.

were much slower at the end of the summer and in September where traditionally there is a rise in installation rates."[108]

"[T]he apparent suddenness in the shift and commentary on a less than normal seasonal upturn in September installations suggest this is a European residential issue in large measure."[109]

72.    In summary, following the alleged corrective disclosure events, analysts referenced and relied upon the relevant truth related to the alleged misrepresentations as they related to demand in Europe for SolarEdge's products and the Company's channel inventory. This further demonstrates the price impact of the alleged misrepresentations, and supports the economic connection between the alleged misrepresentations and the alleged subsequent revelations of the relevant truth.

## VI.    Conclusion

73.    In summary, Dr. Garmaise's opinions, and the claims made in Defendants' Opp. Brief in relation to damages methodology and price impact are flawed.

74.    I have provided a reasonable and concrete damages methodology, and I have also explained how the out-of-pocket damages methodology is widely employed in cases like this one precisely because it is capable of reliably calculating damages on a Class-wide basis in a manner consistent with Plaintiffs' theory of liability. The out-of-pocket damages methodology is flexible enough to consider and incorporate the concerns raised by Dr. Garmaise and in Defendants' Opp. Brief.

75.    In this report, I have also documented reliable economic evidence consistent with price impact of the misrepresentations alleged by Plaintiffs.

---

[108] *Id.*at 3 (emphasis removed).
[109] *Id.*at 4.

I declare under the penalty of perjury that the foregoing is true and correct.

Matthew D. Cain

**Appendix A**

## Matthew D. Cain, Ph.D. <span style="float:right">February 2026</span>

E-mail: mdcain@outlook.com
Mobile: 574-485-8065

### Education

Ph.D., Finance, August 2007      Purdue University, West Lafayette, IN
B.S., Finance, May 2001      Grove City College, Grove City, PA

### Professional and Academic Experience

*Senior Fellow*, New York University School of Law, 2024-Present

*Senior Fellow*, Berkeley Center for Law and Business, 2019-2024

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

### Publications

What is Price Impact? How the *Goldman* Decisions are Reshaping Shareholder Class Actions (with Per Axelson), *Berkeley Business Law Journal* 22:2, 441-465 (2025).

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics* 66, 535-555 (2023).

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

**Presentations**

- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway

- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden
- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group
- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania; Napa
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Peregrine Economics
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**:  *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance*, *European Financial Management*, *Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*

A-3

**Teaching Experience**

UC Berkeley School of Law

LAW 246.31:  Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2026

LAW 251.52:  Economics of Corporate and Securities Litigation, Fall: 2020-2023


University of Notre Dame, Mendoza College of Business

FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013

FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013


Purdue University, Krannert School of Management

MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008

MGMT 610: Financial Management I (MBA Core), Fall: 2007


**Expert Witness Experience**

- *Michael Farzad and Gregory Perri, et al. v. Trasimene Capital FT, LP II, Trasimene Capital Management, LLC, William P. Foley, II, Richard N. Massey, Erika Meinhardt, Mark D. Linehan, C. Malcolm*, C.A. No. 2023-0193-JTL (Del. Chancery). Report February 2026.

- *City of Fort Lauderdale General Employees' Retirement System, et al. v. Holley Inc., et al.*, Case No. 1:23-cv-00148-GNS (W.D. Ky.). Report January 2026.

- *Securities and Exchange Commission v. Anthem Hayek Blanchard and Anthem Holdings Company*, Case No. 2:24-cv-02437-KHV-GEB (D. Kan.). Report January 2026.

- *In re SVB Financial Group Securities Litigation*, Case No. 3:23-cv-01097-NW (N.D. Ca.). Report January 2026.

- *In re Seagate Technology Holdings plc Securities Litigation*, Case No. 3:23-cv-03431-RFL (N.D. Ca.). Report December 2025. Deposition January 2026.

- *United States of America v. Andrew Left*, CR No. 2:24-cr-00456-TJH (C.D. Ca.). Declaration December 2025. Declaration February 2026.

- *Glazing Employers and Glaziers' Union Local #27 Pension and Retirement Fund, et al. v. iRhythm Technologies, Inc., et al.*, Case No. 3:24-cv-706 (N.D. Ca.). Report November 2025. Deposition December 2025.

- *In re Virtu Financial, Inc. Securities Litigation*, Case No. 1:23-cv-03770 (E.D. N.Y.). Report October 2025. Deposition December 2025.

- *In re SolarEdge Technologies, Inc. Securities Litigation*, Case No. 1:23-cv-09748 (S.D. N.Y.). Report October 2025. Deposition January 2026.

- *Joe Fasano, et al. v. Dangdang Holding Company, Ltd., et al.*, Case No. 01-22-0003-8285 (AAA). Report September 2025. Rebuttal Report October 2025.

A-4

- *KAYNE MICHAEL MIDDLETON v. TELUS INTERNATIONAL (CDA) INC., et al.*, Case No. S-248620 (Supreme Court of British Columbia, Vancouver Registry). Report August 2025.

- *In re Doximity, Inc., Securities Litigation*, Case No. 5:24-cv-02281 (N.D. Ca.). Report August 2025. Rebuttal Report October 2025. Deposition November 2025.

- *In re The Estee Lauder Co., Inc. Securities Litigation*, Case No. 1:23-cv-10669 (S.D. N.Y.). Report July 2025. Deposition December 2025.

- *Genesee County Employees' Retirement System, et al., v. DocGo Inc., et al.*, Case No. 1:23-cv-09476 (S.D. N.Y.). Report July 2025.

- *YVONNE DOLBEC c. BANK OF MONTREAL, et al.*, Case No. 500-06-001335-245 (Province of Quebec, District of Montreal). Report May 2025.

- *In re National Instruments Corporation Securities Litigation*, Case No. 1:23-cv-10488 (S.D. N.Y.). Report May 2025. Deposition June 2025. Report July 2025. Rebuttal Report November 2025. Deposition November 2025.

- *MOUVEMENT D'ÉDUCATION ET DE DÉFENSE DES ACTIONNAIRES c. CAE INC., MARC PARENT, and SONYA BRANCO*, Case No. 500-06-001312-244, (Province of Quebec, District of Montreal). Report April 2025.

- *In re StoneCo Ltd. Securities Litigation*, Case No. 1:21-cv-09620 (S.D. N.Y.). Report April 2025. Declaration November 2025.

- *In re UiPath, Inc. Securities Litigation*, Case No. 1:23-cv-07908 (S.D. N.Y.). Report February 2025.

- *Ali Diabat, et al., v. Credit Suisse Group AG, et al.*, Case No. 1:23-cv-5874 (S.D. N.Y.). Report December 2024. Rebuttal Report January 2025.

- *San Antonio Fire and Police Pension Fund, et al., v. Dentsply Sirona Inc., et al.*, Case No. 1:22-cv-06339 (S.D. N.Y.). Report November 2024. Rebuttal Report February 2025. Report September 2025. Deposition October 2025.

- *Steven Leventhal, et al. v. Chegg, Inc., et al.*, Case No. 5:21-cv-09953 (N.D. Ca.). Declaration November 2024.

- *Miami Firefighters' Relief & Pension Fund v. Carl C. Icahn et al.*, Index No. 657447/2019 (N.Y. Sup. Ct.). Declaration September 2024. Rebuttal Report October 2024.

- *Securities and Exchange Commission v. American Renal Associates Holdings, Inc., et al.*, Case No. 22-cv-10651-NMG (D. Mass.). Report June 2024. Deposition September 2024.

- *Securities and Exchange Commission v. Kevin A. Van de Grift and Gil Friedman*, Case No. 1:23-cv-01491 (S.D. N.Y.). Report June 2024. Declaration November 2024.

- *El Paso Firemen & Policemen's Pension Fund, et al. v. InnovAge Holding Corp., et al.*, Case No. 21-cv-02770-WJM-SKC (D. Co.). Report May 2024. Rebuttal Report October 2024.

A-5

- *In re Bed Bath & Beyond Corporate Securities Litigation*, Case No. 1:22-cv-02541-TNM (D.D.C.). Report February 2024. Deposition April 2024. Rebuttal Report June 2024. Report July 2024. Hearing August 2024. Rebuttal Report October 2024.

- *In the Matter of Joshua Abrahams*, File No. 3-21214, (SEC Admin. Proc.). Rebuttal Report February 2024.

- *In re Emergent Biosolutions Inc. Securities Litigation*, Case No. 8:21-cv-00955-PWG (D. Md.). Report February 2024.

- *In re Upstart Holdings, Inc. Securities Litigation*, Case No. 2:22-cv-02935-ALM-EPD (S.D. Oh.). Report January 2024. Deposition April 2024. Rebuttal Report December 2024.

- *Jed Lemen, et al. v. Redwire Corporation, et al.*, Case No. 3:21-cv-01254-TJC-PDB (M.D. Fl.). Report January 2024. Deposition March 2024. Rebuttal Report July 2024. Declaration September 2024.

- *In re Exxon Mobil Corp. Securities Litigation*, Case No. 3:21-cv-00194-N (N.D. Tx.). Report January 2024. Report February 2025. Rebuttal Report August 2025. Deposition August 2025.

- *In re Grand Canyon Education, Inc. Securities Litigation*, Case No. 1:20-cv-00639-MN-CJB (D. Del.). Report January 2024.

- *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Ca.). Report November 2023. Deposition January 2024. Rebuttal Report March 2024. Report July 2024. Deposition August 2024. Rebuttal Report September 2024. Declaration January 2026.

- *William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.). Report November 2023. Deposition January 2024. Rebuttal Report February 2024.

- *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.). Report November 2023.

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.). Report October 2023. Report December 2024. Deposition March 2025.

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.). Report August 2023. Deposition October 2023. Rebuttal Report January 2024. Report September 2024. Rebuttal Report November 2024. Deposition January 2025.

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. N.Y.). Rebuttal Report April 2023. Deposition September 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.). Report March 2023. Deposition April 2023.

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.). Report February 2023. Rebuttal Report May 2023.

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

A-6

- *Thomas S. Swanson, et al. v. Interface, Inc., et al.*, Case No. 1:20-cv-05518-BMC (E.D. N.Y.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023. Rebuttal Report May 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022. Report March 2024.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021. Report April 2023. Rebuttal Report June 2023. Deposition July 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. N.Y.). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. N.Y.). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. N.Y.). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021. Rebuttal Report March 2024. Report September 2024. Deposition November 2024. Rebuttal Report January 2025.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

**Appendix B**

**Documents Considered**

**Case Documents:**

- Second Consolidated Amended Complaint for Violations of the Federal Securities Laws dated January 3, 2025, Case No. 1:23-cv-09748-GWH.

- Memorandum Opinion & Order dated April 6, 2025, Case No. 1:23-cv-09748-GWH.

- Expert Report of Matthew D. Cain, Ph.D. dated October 17, 2025.

- Expert Report of Professor Mark Garmaise, Ph.D. dated January 16, 2026.

- Defendants' Memorandum of Law in Opposition to Lead Plaintiffs' Motion for Class Certification dated January 16, 2026, Case No. 1:23-cv-09748-GWH.

**Deposition Testimony:**

- Deposition of Mark Garmaise Ph.D. February 10, 2026.

**Academic Articles:**

- Damodaran, Aswath, Investment Valuation: Tools and Techniques for Determining the Value of Any Asset (John Wiley & Sons, 1996).

- Tabak, David I., and Frederick C. Dunbar, 2001, Materiality and Magnitude: Event Studies in the Courtroom, Litigation Services Handbook, The Role of the Financial Expert 3rd ed., Ch. 19.

**Analyst Reports:**

- "SolarEdge Technologies: 4Q Review: Robust Europe Demand, Improving Margins, and Manufacturing Expansion", *Susquehanna*, February 13, 2023.

- "SEDG: Q4 Beat & Raise — Robust Europe Demand to Offset Soft US Resi-Market — Positive", *Wells Fargo*, February 13, 2023.

- "SEDG: A tale of two continents part 2", *Wolfe Research*, February 13, 2023.

- "Robust demand, not enough supply", *Barclays*, February 14, 2023.

- "SEDG: 2023 Clean Energy Symposium Takeaways", *Wells Fargo*, March 28, 2023.

- "Growing solar demand provides an edge for SEDG", *Crispidea*, March 29, 2023.

- "Clean 1Q23 beat and more margin upside, as strength in non-US highlights diversification of model; Buy (on CL)", *Goldman Sachs*, May 3, 2023.

- "SEDG: International Operations Carry the Day; U.S. Sales Soft; Remain Sector Weight on Valuation", *KeyBanc Capital Markets*, May 3, 2023.

- "Europe Supercharges Results, Which Should Continue", *Daiwa Capital Markets*, May 4, 2023.

- "Buy: Another beat and raise", HSBC, May 4, 2023.

- "J.P. Morgan Energy Conference Takeaways", J.P. Morgan, June 21, 2023.

- "Alternative Energy and Services Residential Solar Update", *J.P. Morgan*, June 22, 2023.

- "2Q23 Preview: Diversification benefits propping up the outlook; Reiterate Buy", *Bank of America*, June 30, 2023.

- "Looking ahead - challenges on the horizon; but diversification will be key", *Deutsche Bank*, August 2, 2023.

- "Buy: Managing down expectations", *HSBC*, August 2, 2023.

- "Mixed 2Q Results, 3Q Guide Disappoints Owing to Direct and Indirect Channel Inventory Impacts", *J.P. Morgan*, August 2, 2023.

- "2Q23 Earnings Recap - SEDG, RUN, SPWR", *Deutsche Bank*, August 6, 2023.

- "Conference Takeaways", *Barclays*, September 7, 2023.

- "SolarEdge Technologies (SEDG)", *Zacks Equity Research*, September 11, 2023.

- "Comparing and contrasting SEDG and ENPH commentary at our conference", *Barclays*, September 21, 2023.

- "Outlook: Not sunny yet; Downgrade SEDG to Equal Weight", *Barclays*, October 2, 2023.

- "Pre-Announces 3Q Results Well Beneath Expectations; Destocking Continues in 4Q", *Piper Sandler*, October 19, 2023.

- "SEDG: Europe Inventory Problems Hit Home", *Guggenheim*, October 20, 2023.

- "Channel Inventory Worse Than Feared; Big Preannounced Miss on Europe Softness", *TD Cowen*, October 20, 2023.

- "SEDG: Updating Numbers and Sensitivity Analysis in the Eye of the Storm", *BMO Capital Markets*, October 23, 2023.

**Legal Documents:**

- *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. (2011)

- *Feinberg v. Katz*, 2007 WL 4562930 (S.D.N.Y. Dec. 21, 2007)

- Memorandum Opinion, Civil Action No. RDB-17-0388 filed September 29, 2022, *In Re Under Armour Securities Litigation*.

- Consolidated Third Amended Complaint for Violations of the Federal Securities Laws, Civil Action No. RDB-17-0388 filed October 14, 2020, *In Re Under Armour Securities Litigation*.

- *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 349 F.R.D. (S.D.N.Y. 2025)

- *SEC v. Leslie*, 2010 WL 2991038 (N.D. Cal. July 29, 2010)

- *SEC v. Leslie*, 2010 WL 3259375 (N.D. Cal. Aug. 18, 2010)

- *SEC v. Ripple Labs, Inc.*, 2023 WL 5670711 (S.D.N.Y. Mar. 6, 2023)

- *SEC v. Tourre*, 950 F. Supp. 2d (S.D.N.Y. 2013)

- Memorandum Opinion and Order filed March 29, 2018, in *Washtenaw County Employees' Retirement System v. Walgreen Co., et al.*, No. 15-cv-3187 (N.D. Ill.).

**Other:**

- SEC EDGAR

All other data and documents cited or referred to within this report and Opening Report.